*TO BE FILED UNDER SEAL*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| T-NETIX, INC. | ) | |
| | ) | |
| *Plaintiff/Counter-Defendant* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VALUE-ADDED COMMUNICATIONS, | ) | |
| INC. | ) | **Case No. 3-05-654-D** |
| | ) | |
| *Defendant/Counter-Plaintiff* | ) | |
| v. | ) | |
| | ) | |
| SECURUS TECHNOLOGIES, INC. | ) | |
| | ) | |
| *Counter-Defendant* | ) | |
| _____ | ) | |

### VALUE-ADDED COMMUNICATIONS, INC.'S APPENDIX IN SUPPORT
### OF ITS OBJECTIONS TO THE UNITED STATES MAGISTRATE'S
### MARCH 28, 2013 FINDINGS, CONCLUSIONS AND RECOMMENDATIONS

Steven N. Williams, Bar No. 21577625
Kenneth P. Kula, Bar No. 24004749
MCDOLE & WILLIAMS, PC
1700 Pacific Avenue
Suite 1280
Dallas, Texas 75201
Telephone: (214) 979-1122
Facsimile: (214) 979-1123
Email: swilliams@mcdolewilliams.com

Dale A. Cooter   (Admitted pro hac vice)
Donna S. Mangold (Admitted pro hac vice)
COOTER, MANGOLD, DECKELBAUM
 & KARAS, LLP
5301 Wisconsin Avenue, NW
Suite 500
Washington, DC 20015
Telephone:  (202) 537-0700
Facsimile:  (202) 364-3664
Email: efiling@cootermangold.com

*Attorneys for Defendant/Counter-plaintiff*
*Value Added Communications, Inc.*

## APPENDIX INDEX

Defendant/Counter-Plaintiff Value-Added Communications, Inc. ("VAC"), by and through undersigned counsel, hereby submit true and correct copies of the following evidence in support of *Value-added Communications, Inc.'s Objections to the United States Magistrate's March 28, 2013 Findings, Conclusions and Recommendations.*

| *SHOW CAUSE HEARING EXH* | *DATE* | *DESCRIPTION* | *APPENDIX NO.* |
|---|---|---|---|
| | 3/28/13 | Findings, Conclusions, and Recommendations | VAC App. 001 - 031 |
| | 2/25/13 | Transcript of Show Cause Hearing | VAC App. 032 - 407 |
| VAC Exh. 1 | 3/3/06 | Agreed Protective Order | VAC App. 408 - 423 |
| VAC Exh. 2 | 4/16/08 | Transcript, Motions Hearing before the Honorable William Sanderson | VAC App. 424 - 498 |
| VAC Exh. 3 | 4/21/08 | Report and Recommendation of the United States Magistrate Judge | VAC App. 499 - 510 |
| VAC Exh. 4 | 12/14/12 | Stephanie Clouston Declaration | VAC App. 511 - 517 |
| VAC Exh. 5 | 4/16/08 | Letter from Eric Tautfest to Jeff Lowenstein | VAC App. 518 - 519 |
| VAC Exh. 6 | 4/17/08 | Letter from Jeffrey Lowenstein to Stephanie Clouston | VAC App. 520 |
| VAC Exh. 7 | 4/18/08 | Letter from Stephanie Clouston to Jeffrey Lowenstein | VAC App. 521 |
| VAC Exh. 8 | 4/18/08 | Letter from Neil Suite to Stephanie Clouston attaching 4/16/08 letter from Tautfest to Lowenstein | VAC App. 522 - 524 |

| *SHOW CAUSE HEARING EXH* | *DATE* | *DESCRIPTION* | *APPENDIX NO.* |
|---|---|---|---|
| VAC Exh. 9 | 8/25/10 | Email from Anthony Magee to Christina Ryan | VAC App. 525 - 526 |
| VAC Exh. 10 | 8/25/10 | Email from Anthony Magee to Stephanie Clouston | VAC App. 527 - 528 |
| VAC Exh. 11 | 8/27/10 | Letter from Anthony Magee to Joel Beres | VAC App. 529 - 535 |
| VAC Exh. 12 | 10/3/12 | Letter from Jeffrey Lowenstein to Stephanie Clouston | VAC App. 536 - 537 |
| VAC Exh. 13 | 10/19/12 | Letter from Stephanie Clouston to Jeffrey Lowenstein and Anthony Magee | VAC App. 538 - 539 |
| VAC Exh. 14 | 11/9/12 | Letter from Anthony Magee to Dale Cooter | VAC App. 540 - 543 |
| VAC Exh. 15 | 11/16/12 | Email from Kenneth Kula to Anthony Magee | VAC App. 544 - 545 |
| VAC Exh. 16 | 9/28/12 | Declaration of Anthony J. Magee | VAC App. 546 - 552 |
| GH Exh. 25 | | Demonstrative exhibit (prepared by David Cowen) describing copying of drive | VAC App. 553 |
| | 4/11/13 | Declaration of Donna S. Mangold | VAC App. 554 - 556 |

Respectfully submitted,

/s/ Steven N. Williams
Steven N. Williams, Bar No. 21577625
Kenneth P. Kula, Bar No. 24004749
MCDOLE & WILLIAMS, PC
1700 Pacific Avenue, Suite 1280
Dallas, Texas 75201
Telephone: (214) 979-1122
Facsimile: (214) 979-1123
Email: swilliams@mcdolewilliams.com

/s/ Dale A. Cooter
Dale A. Cooter   (Admitted pro hac vice)
Donna S. Mangold (Admitted pro hac vice)
COOTER, MANGOLD, DECKELBAUM
& KARAS, LLP
5301 Wisconsin Avenue, NW
Suite 500
Washington, DC 20015
Telephone:  (202) 537-0700
Facsimile:  (202) 364-3664
Email: efiling@cootermangold.com

April 11, 2013                          *Attorneys for Defendant/Counter-plaintiff*
                                        *Value Added Communications, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

On this 11th day of April 2013, I electronically submitted the foregoing document with the Clerk of the Court for the Northern District of Texas, Dallas Division, using the case filing system of the Court.

I hereby certify that I have served all counsel of record electronically or by another manner authorized by F.R.Civ.P. 5(b)(2).


/s/ Dale A. Cooter
Dale A. Cooter

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| T-NETIX, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:05-CV-0654-D (BK) |
| | § | |
| VALUE ADDED COMMUNICATIONS, | § | |
| INC., | § | |
| Defendant. | § | ***SEALED*** |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to the District Court's *Order of Reference* (Doc. 228), filed October 31, 2012, the Court has considered *Defendant's Motion for Order to Show Cause Why T-Netix, Inc., Securus Technologies, Inc., Richard A. Smith, Dennis J. Reinhold, and Gruber Hurst Johansen Hail Shank, LLP Should Not Be Held in Contempt of Court for Violation of the Court's March 3, 2006 Protective Order* (Doc. 202), filed August 24, 2012. The Court also has considered Gruber Hurst Johansen Hail Shank LLP's ("Gruber Hurst's") *Motion Seeking Leave to Purge McAlexander Rebuttal Report* (Doc. 263) ("*Motion to Purge*"). On February 25, 2013, the Court conducted a hearing to determine whether to certify facts to the District Judge of the alleged contempt of (1) T-Netix, Inc., Securus Technologies, Inc., Richard A. Smith, Dennis J. Reinhold ("the T-Netix parties"), and (2) Gruber Hurst (collectively, "the Respondents"). Various witnesses and Respondents appeared in person before the undersigned through counsel and gave testimony. Based on the parties' pleadings, the evidence presented at the hearing, and the parties' post-hearing briefs, the undersigned recommends that the District Court **DENY**

1

*Defendant's Motion for Order to Show Cause* and **GRANT** Gruber Hurst's *Motion to Purge*.

## I.   BACKGROUND

This case was commenced in April 2005 when T-Netix filed a patent infringement

complaint against VAC. (Doc. 1). Subsequently, VAC filed a counterclaim against T-Netix and

its parent company, Securus. (Doc. 26). Non-party Respondent Richard Smith is the Chief

Executive Officer and President of Securus. Non-party Respondent Dennis Reinhold is the Vice-

President, General Counsel, and Secretary of Securus.

On March 3, 2006, the District Court entered the Agreed Protective Order that is the

subject of the current dispute. (Doc. 44). The Agreed Protective Order contained the following

provisions:

> Documents designated COUNSEL EYES ONLY CONFIDENTIAL
> INFORMATION and contents thereof shall be available only to counsel for the
> parties, the technical advisers who are assisting them, data processing vendors and
> graphics and trial consultants. . .
>
> CONFIDENTIAL INFORMATION and COUNSEL EYES ONLY
> CONFIDENTIAL INFORMATION shall be held in confidence by each person to
> whom it is disclosed, shall be used only for purposes of this litigation, shall not be
> used for any business or other purpose, and shall not be disclosed to any person
> who is not entitled to receive such information as expressly provided herein. All
> produced CONFIDENTIAL INFORMATION and COUNSEL EYES ONLY
> CONFIDENTIAL INFORMATION shall be carefully maintained so as to
> preclude access by persons who are not entitled to receive such information. . .
>
> CONFIDENTIAL INFORMATION or COUNSEL EYES ONLY
> CONFIDENTIAL INFORMATION shall not be copied or otherwise reproduced
> by a receiving party, except for transmission to qualified recipients, without the
> written permission of the producing party, or, in the alternative, by further order of
> the Court.

(Gruber Hurst Binder Ex. 1 at ¶¶ 16, 19, 23). The Agreed Protective Order also required that,

within 60 days of the entry of judgment or settlement, each party would either return confidential

**VAC App. 002**

information to the producing party or destroy same. *Id.* at ¶ 26. "Counsel" was defined as "outside attorneys retained by the parties to work on this litigation." *Id.* at ¶9. "Counsel" would thus include the Pittman and Bell Nunnally law firms, who are counsel of record for T-Netix and Securus in this case.

In the instant *Motion for Order to Show Cause*, VAC claims that it learned in late 2007 that T-Netix/Securus first violated the Agreed Protective Order when they disseminated in a state court proceeding and provided to Non-party Respondent Gruber Hurst a rebuttal expert report prepared by Joseph C. McAlexander ("the McAlexander Report").[1]  (Doc. 204 at 5-6).  VAC contends that the McAlexander Report discussed the validity of certain patents in this action and contained confidential information and lengthy block quotations from "Counsel Eyes Only" VAC documents. *Id.*  In December 2007, VAC filed a *Motion to Enforce the Agreed Protective Order, for Civil Contempt, Sanctions and Injunctive Relief* ("*Motion to Enforce*").[2]  (Doc. 155).

Pursuant to an *Order of Reference*, Magistrate Judge Sanderson held a hearing on April 16, 2008.  At the hearing, Mike Bowers with the Bell Nunnally firm appeared as counsel for T-Netix/Securus.  He acknowledged that the McAlexander Report had been produced to Gruber Hurst and then inadvertently produced by Gruber Hurst in a case pending in the Eastern District of Texas.  (Doc. 204, Ex. A at 46-47).  Bowers argued, however, that Gruber Hurst was permitted to possess the McAlexander Report because that firm was also representing T-

---

[1] Gruber Hurst has appeared as counsel for T-Netix/Securus in patent litigation filed in Texas and elsewhere although that firm was not counsel of record in this particular case.

[2] When this case subsequently settled, the *Motion to Enforce* was one of several documents in this action that was "withdrawn and permanently sealed" by agreement of the parties. *See* Doc. 200.

3

Netix/Securus and was therefore subject to the Agreed Protective Order. *Id.* at 50-52. VAC's

counsel, Stephanie Clouston, asserted that Gruber Hurst was not counsel of record in this case.

*Id.* at 57-58.

Eric Tautfest, then a Gruber Hurst partner, stated during the hearing that Gruber Hurst

had expert reports and discovery responses relating to the instant case because the firm was

working with the Pittman and Bell Nunnally firms for the benefit of their mutual clients, T-

Netix/Securus. *Id.* at 69. As to the reports and discovery documents, Judge Sanderson instructed

that Gruber Hurst needed to return them right away until the firm formally entered an appearance

in the case. *Id.* at 69-70. Bowers stated that the documents would be returned that day. *Id.*

Later that month, Judge Sanderson issued a recommendation to the District Court on

VAC's *Motion to Enforce.*[3]  (Doc. 184 at 9). Judge Sanderson noted that Tautfest "agreed -

pursuant to the undersigned magistrate judge's oral directive at the hearing - that copies of any

documents which had been produced by VAC in this case under the agreed protective order and

which the Gruber law firm had received from T-Netix's counsel of record in this case would be

destroyed or returned by the Gruber law firm unless or until the Gruber law firm entered its

formal appearance as counsel of record for T-Netix in this action." *Id.* at 6. Judge Sanderson

noted that Gruber Hurst's argument that the firm represented T-Netix/Securus in the instant case

was "incredible and wholly unworthy of belief." *Id.* at 7.

Judge Sanderson then recommended that the District Court find that T-Netix and its

counsel of record, the Pittman and Bell Nunnally law firms, "knowingly and deliberately"

---

[3] Judge Sanderson's recommendation was subsequently removed from the record and
sealed pursuant to the parties' joint dismissal motion.  (Doc. 200).

VAC App. 004

violated the Agreed Protective Order. *Id.* at 8. Nevertheless, Judge Sanderson declined to recommend injunctive relief or disqualify counsel from representing T-Netix as VAC requested because, *inter alia*, the McAlexander Report had been clawed back by Gruber Hurst and either returned to VAC or destroyed. *Id.* at 9-10. Instead, Judge Sanderson recommended an award of costs and attorneys' fees in VAC's favor or, alternatively, a finding of civil contempt against the respondents. *Id.* at 11. In August 2008, prior to the District Court's consideration of Judge Sanderson's recommendation, the parties settled the action. (Doc. 199).

Four years later, VAC moved to reopen this case and filed the instant motion against the Respondents. (Doc. 201). VAC alleged that subsequent to the settlement and dismissal of this case, Gruber Hurst filed patent infringement actions against other defendants on behalf of T-Netix and Securus, namely (1) *T-Netix, Inc. v. Combined Public Communications, Inc.*, 3:09-cv-00743-CRS-DW, in the United States District Court for the Western District of Kentucky ("the Combined Action"); and (2) *T-Netix, Inc. v. Pinnacle Public Services LLC*, 2:09-cv-00333-JRG, in the United States District Court for the Eastern District of Texas (the "Pinnacle Action"). (Doc. 204 at 9). VAC contended that it subsequently learned that Gruber Hurst had improperly produced the McAlexander Report in discovery in at least one of those matters. *Id.* at 9-10. VAC asserted that Gruber Hurst violated Paragraphs 16, 19, 23, and 26 of the Agreed Protective Order by (1) failing to destroy or return the McAlexander Report within 60 days of the dismissal of this case; (2) disseminating the McAlexander Report in the Combined Action; and (3) possibly disseminating the McAlexander Report in the Pinnacle Action. *Id.* at 9-12.

As to individual Respondents Smith and Reinhold, VAC argued that a corporation can only act through the individuals who operate it and, to the extent the Court found that Smith and

5

Reinhold had directed, participated in, or condoned the violations of the Agreed Protective Order, they should be held in contempt as well. *Id.* at 14. VAC maintained that sanctions against Gruber Hurst were appropriate because, as a non-party to the case, it never should have had the McAlexander Report in the first place and, even after it obtained a copy, it wrongly kept it. *Id.* at 16.

Respondents opposed VAC's *Motion to Reopen*, arguing that they were voluntarily complying with the Agreed Protective Order, and Gruber Hurst had immediately clawed back the McAlexander Report, which Gruber Hurst partner Tony Magee had unknowingly produced in the Combined and Pinnacle Actions. (Doc. 218 at 3-5; Doc. 219 at 8-14). Over Respondents' opposition, the District Court reopened the case. (Doc. 228).

## II.   EVIDENTIARY HEARING

On February 25, 2013, the parties appeared before the undersigned for a hearing. At the outset of the hearing, counsel for Gruber Hurst noted that VAC had argued in the prior contempt proceeding, and Judge Sanderson had found, that Gruber Hurst was not entitled to have the McAlexander Report because the firm was not a party to the Agreed Protective Order. (Doc. 274 at 6-7). Gruber Hurst asserted that VAC, thus, was estopped from arguing in the instant proceeding that Gruber Hurst should be held in contempt for violating the Agreed Protective Order. *Id.*

The Court subsequently heard testimony from Clouston, who discussed the events that underlay the initial contempt proceedings before Judge Sanderson, as well as the circumstances that led to the instant proceedings relating to the McAlexander Report. Clouston stated that immediately following the contempt hearing held by Judge Sanderson in 2008, Gruber Hurst

VAC App. 006

returned all confidential documents, including the McAlexander Report, to the Bell Nunnally firm, which then returned the documents to Clouston as counsel for VAC. *Id.* at 26-30.

Clouston averred that on August 24, 2010, she received a phone call from Magee inquiring whether she would ask VAC whether it would agree to allow Magee to produce "certain documents" from the instant case in the Combined and Pinnacle Actions. *Id.* at 32-33, 69-70. Clouston testified that she told Magee she did not believe VAC would agree to that because some of the documents he appeared to be asking for had been central in a "prior contempt proceeding" or "prior proceeding," and VAC subsequently did decline to allow the production. *Id.* at 35-36, 72-73. Clouston averred that she did not go into any detail with Magee about what she meant by "prior proceeding," but Magee appeared to understand what she meant. *Id.* at 73-74.

The next day, Magee e-mailed Clouston that he was following up on a letter his associate had sent to VAC, asking whether VAC would allow T-Netix/Securus to produce, in the Combined Action, the settlement agreement and patent license agreement entered in this case as well as any materials that related to invalidity contentions. *Id.* at 62-69; Gruber Hurst Binder Exs. 9, 13. Clouston testified that Magee did not indicate to her at that time that he had the McAlexander Report, that he had any knowledge of the Report, or that the Report had been produced to opposing counsel in any other case. (Doc. 274 at 35, 70-71).

Clouston subsequently began representing Combined in the Combined Action. *Id.* at 37. In going through the discovery in the case, she noticed a reference to the McAlexander Report in an August 27, 2010 letter from Magee to Clouston's predecessor counsel. *Id.* at 39-41; VAC Binder Ex. 11. In the letter, Magee noted that he had inadvertently produced the McAlexander

**VAC App. 007**

Report, which was protected from disclosure by a protective order in this case but, "as indicated in previous discussions," he was talking with VAC to see if it would consent to permit production of the Report. (VAC Binder Ex. 11). After Clouston spoke with her law partners, it was decided that VAC should be notified that the McAlexander Report had been produced in other litigation in violation of the Agreed Protective Order. (Doc. 274 at 43). Upon examination by counsel for the T-Netix parties, Clouston testified that she had no knowledge that Securus, T-Netix, Reinhold, or Smith had provided a copy of the McAlexander Report to Gruber Hurst or asked Gruber Hurst to provide that document to any party in any lawsuit. *Id.* at 100-01.

VAC's only other witness was Respondent Reinhold, and he categorically testified that Securus "did not have the document," and, "[w]e still don't have the document. We've never had the document." *Id.* at 115. Reinhold also averred that he had an electronic search run which did not find the document in Securus's possession. In his words, "I wanted to make sure we did not have the document. I knew we did not have the document, because I had never seen it, nor had anyone in my office ever seen it, and so we did a search this past week." *Id.* at 114.

Gruber Hurst attorney Tony Magee testified as follows: He joined Gruber Hurst on September 2, 2008, after the instant case had settled. *Id.* at 239. In September 2009, he filed the Pinnacle and Combined actions on behalf of T-Netix/Securus. *Id.* at 240. The McAlexander Report was found in Gruber Hurst's archives after he had the firm's document vendor search for all documents the firm had produced in a previous patent case so that Magee could use the same production in the Combined and Pinnacle Actions, which involved similar patents. *Id.* at 241-48. The vendor's search led to the location of several hundred thousand images, including the McAlexander Report, which Magee then produced in the Combined and Pinnacle Actions. *Id.* at

VAC App. 008

248-50, 298.  At the time, Magee was unaware of the existence of the McAlexander Report and the prior contempt proceeding in this case.  *Id.* at 241-42, 250.

He subsequently learned from opposing counsel in the Combined Action that he had included some potentially privileged documents in his discovery response.  *Id.* at 253-55.  In an effort to assemble a privilege log to claw back the privileged documents, on August 24, 2010, Magee obtained the privilege log used in the prior case that he had pulled the discovery responses from.  *Id.* at 260-61; Gruber Hurst Binder Ex. 11.  The privilege log was 41 pages long and listed 288 documents, including the McAlexander Report at item number 166 on page 23.  (Doc. 274 at 262-64; Gruber Hurst Binder Ex. 26).  Magee averred that when he spoke to Clouston on the phone that same day, he still was unaware of the McAlexander Report.  (Doc. 274 at 263).  Over the course of the next two days, Magee determined which of the documents on the privilege log had been produced in the Combined Action and he reviewed them individually to determine whether it was worth clawing them back.  *Id.* at 270-71.

During the review process, Magee came across the McAlexander Report and was confused about why an expert report was marked "privileged."  *Id.* at 272.  He asked an associate at the firm, who told him that the McAlexander Report was not privileged, but it was subject to a protective order, Gruber Hurst was not supposed to have it, and it had to be clawed back from Combined.  *Id.* at 272-73.  Magee believed that he learned this on August 26, 2010.  *Id.* at 301.  Magee thus amended the privilege log he was drafting for the Combined Action to note that the McAlexander Report was being clawed back because it was subject to a protective order, not privileged.  *Id.* at 273.  On August 27, 2010, Magee sent the privilege log to counsel in the Combined Action, noting that the basis for withholding the McAlexander Report was that it was

9

subject to a protective order and explaining that he was willing to produce the Report with the

consent of VAC with whom he was in discussion. *Id.* at 274-75.

Magee denied that he had spoken with Clouston about the McAlexander Report or that

Clouston had ever told him about the contempt proceeding. *Id.* at 282. Magee said that while he

spoke with Clouston in this timeframe, he did not know about the McAlexander Report when

they talked, and he called her because he wanted VAC's permission to disclose to Combined two

other documents from this case. *Id.* at 263, 264-65. Regarding the follow-up e-mail Magee had

sent to Clouston the day after they spoke, Magee acknowledged that the e-mail said he had "not

seen the contentions because they were covered by a protective order." *Id.* at 267; (Gruber Hurst,

Binder Ex. 13). He testified, however, that he was not referring to the McAlexander Report and,

in fact, had no idea that the McAlexander Report had anything to do with invalidity contentions

because that was not information referenced on the privilege log. *Id.* at 263-64; Gruber Hurst,

Binder Exs. 13, 26; (Ex. 26 privilege log, listing Bates Number "ST200646-200760 - Rebuttal

Report of Joseph Alexander (VAC case) - Attorney Client and Work Product").

Magee also testified at length regarding the measures Gruber Hurst undertook to alleviate

VAC's concerns about dissemination of the McAlexander Report. He stated that the firm

verbally offered to have a forensic expert determine where the McAlexander Report was in

Gruber Hurst's system and purge it at Gruber Hurst's expense, but VAC's counsel rejected the

offer. (Doc. 274 at 288-90). Gruber Hurst then repeated that offer in writing, suggested a

potential forensic expert, and forwarded the proposed expert's resume to VAC's counsel. *Id.* at

290-92; Gruber Hurst Binder Ex. 20. VAC's counsel advised that such a measure did not

mitigate Gruber Hurst's past actions and did not affect the pending contempt matters. (Gruber

10

**VAC App. 010**

Hurst Binder Ex. 21).

On examination by T-Netix/Securus's counsel, Magee stated that he had never received a copy of the McAlexander Report from any of the T-Netix parties or affiliates, nor had any of those parties ever directed him to produce a copy of the Report in the Combined or Pinnacle Actions. (Doc. 274 at 292-93).

At the close of the evidence, the Court directed the parties to submit post-hearing briefs on the issues of (1) whether Gruber Hurst was subject to the Agreed Protective Order; (2) whether VAC was estopped from arguing that Gruber Hurst was subject to the Agreed Protective Order in light of the position it took in the 2008 contempt proceedings before Judge Sanderson; and (3) whether Gruber Hurst violated Judge Sanderson's directive about the destruction or return of the McAlexander Report and, if so, whether sanctions were appropriate. *Id.* at 320-24.

## III.   APPLICABLE LAW

To satisfy the clear and convincing standard necessary to justify a finding of civil contempt, the movant's evidence must be "so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 582 (5th Cir. 2005) (quotation omitted). The movant must prove that (1) a court order was in effect; (2) the order required certain conduct by the respondent; and (3) the respondent failed to comply with the court order. *Id.* at 581-82.

## IV.   ARGUMENTS AND ANALYSIS

### A. *Whether Gruber Hurst Can Be Subject to Contempt Under the Agreed Protective Order*

Gruber Hurst contends that VAC is judicially estopped from arguing that Gruber Hurst is

VAC App. 011

a party to the Agreed Protective Order because VAC espoused the opposite position in the 2008

briefing and hearing before Judge Sanderson on its *Motion to Enforce*. (Doc. 271 at 4-7).

Further, Gruber Hurst argues that because Judge Sanderson determined that the firm was not a

party to the Agreed Protective Order, VAC is also collaterally estopped from relitigating that

issue. *Id.* at 7-8. Moreover, Gruber Hurst asserts, it is not liable for having "acted with" an

enjoined party to violate the Agreed Protective Order because the evidence demonstrates that it

did not conspire with any of the other Respondents to use or possess the McAlexander Report.

*Id.* at 9-10. Even if it there were any evidence to support VAC's aiding and abetting theory,

Gruber Hurst maintains that it acted in good faith by immediately clawing back the McAlexander

Report from opposing counsel in the Combined and Pinnacle actions. *Id.* at 10-11. Finally,

Gruber Hurst asserts that VAC is estopped from arguing that Tautfest's execution of the

Confidentiality Agreement attached to the Agreed Protective Order brought Gruber Hurst within

its scope. (Doc. 285 at 3-4).

      VAC urges that it has not taken inconsistent positions that would warrant application of

the doctrine of judicial estoppel. (Doc. 269 at 2). In particular, VAC contends that it takes the

same position now as it did in the hearing before Judge Sanderson, which is that Gruber Hurst

never should have had the McAlexander Report because it was not counsel of record in this

action. *Id.* at 2, 7-8. VAC submits that Gruber Hurst's judicial estoppel argument is based on

the false premise that VAC argued (and Judge Sanderson found) that Gruber Hurst was not

"subject to" the Agreed Protective Order. VAC maintains that its complaint about Gruber

Hurst's conduct in 2008 – and the basis of Judge Sanderson's ruling – was that the firm should

not have had the McAlexander Report because it was not counsel of record. *Id.* at 3-8.

12

**VAC App. 012**

In short, VAC asserts that the fact that Gruber Hurst was not a signatory to the Agreed Protective Order and that it has never been counsel in this action does not mean that Gruber Hurst cannot be held in contempt for its admitted violation of the Agreed Protective Order because (1) Gruber Hurst was at all times the agent of Securus/T-Netix; and (2) prior to its dissemination of the McAlexander Report in the Combined and Pinnacle Actions in 2010, Gruber Hurst had actual knowledge of the Agreed Protective Order. *Id.* at 4. Thus, VAC maintains, Gruber Hurst's retention and dissemination of the McAlexander Report in the Pinnacle and Combined Actions was for the benefit of Securus/T-Netix and as part of Gruber Hurst's coordination of efforts with the Bell Nunnally firm, which supports a finding of contempt against Gruber Hurst. *Id.* at 9-11. VAC further notes that Tautfest executed a Confidentiality Agreement stating that he would keep all information provided to him in this case confidential and acknowledging that he was subject to the authority of the Court if the Agreed Protective Order was violated.[4] *Id.* at 10-11 (citing Gruber Hurst Binder Ex.2).

Courts in the Fifth Circuit generally consider three criteria when evaluating a defense of judicial estoppel, including whether: "(1) the party against whom judicial estoppel is sought has asserted a legal position that is 'plainly inconsistent' with a position asserted in a prior case; (2) the court in the prior case accepted that party's original position, thus creating the perception that one or both courts were misled; and (3) the party to be estopped has not acted inadvertently." *In re Oparaji*, 698 F.3d 231, 235-36 (5th Cir. 2012) (citing *Love v. Tyson Foods, Inc.*, 677 F.3d 258, 261 (5th Cir. 2012)). The purpose of the judicial estoppel doctrine is to protect the integrity

---

[4] VAC and Gruber Hurst also have filed responses to each other's post-hearing briefs that largely reiterate their original arguments and thus will not be extensively summarized here. (Docs. 281, 285).

VAC App. 013

of the judicial process by preventing parties "from playing fast and loose with the courts" to suit

their self interests. *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999).

In the 2008 contempt proceeding, VAC (1) objected to the Bell Nunnally firm's assertion

that Gruber Hurst was counsel in this case, and (2) argued that Gruber Hurst was not entitled to

see VAC's confidential documents and expert reports because it was not counsel of record.

(Doc. 204, Ex. A at 12-13, 22-24, 26-29, 56-57, 67-68).   Judge Sanderson agreed and determined

that Gruber Hurst should not have copies of the McAlexander Report or other confidential

documents until the firm entered a formal notice of appearance in the case. *Id.* at 68-69, 71.

Under these circumstances, VAC is judicially estopped from arguing that Gruber Hurst is

subject to the terms of the Agreed Protective Order and can thus be held in contempt for violating

it. *See* Doc. 204 at 10-12 (stating at p. 10 that the McAlexander Report should never have been

in the hands of Gruber Hurst because they were not outside counsel of record in this action;

stating at pp. 12, 15-16 that Gruber Hurst's possession of the McAlexander Report violated the

Agreed Protective Order, and Gruber Hurst should be held in contempt due to its knowledge of

the Order).   The applicability of the Agreed Protective Order to Gruber Hurst in this proceeding

is dependent on Gruber Hurst being T-Netix/Securus's counsel of record in this case, and VAC

taking that position would be "plainly inconsistent" with its position in the 2008 contempt

hearing; (2) Judge Sanderson accepted VAC's original position; and (3) VAC did not act

inadvertently in taking that position. *Oparaji*, 698 F.3d at 235-36.  Even though Gruber Hurst is

not bound by the terms of the Agreed Protective Order as a signatory, the Court still must

consider whether Gruber Hurst can be held in contempt for conspiring with one of the other

Respondents to violate the Agreed Protective Order.

14

The general rule in a civil contempt proceeding is that a party need not intend to violate

an injunction to be found in contempt. *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187,

191 (1949). However, the rule is different when it comes to non-parties like Gruber Hurst. A

non-party can be subject to contempt sanctions if it "acts with" an enjoined party to bring about a

result prohibited by court order, but only if the non-party is aware of the order and knows that its

acts are in violation. *Additive Controls & Measurement Systems, Inc. v. Flowdata, Inc.*, 154 F.3d

1345, 1353 (5th Cir. 1998), quoting *Waffenschmidt v. MacKay*, 763 F.2d 711, 723-26, 726 (5th

Cir. 1985) ( "Although good faith is irrelevant as a defense to a civil contempt order, good faith

is relevant to whether [a non-party] aided or abetted [an enjoined party] in dissipating the funds

with knowledge that it was violating the court's orders.") (alterations in original); *Merial Ltd. v.

Cipla Ltd.*, 681 F.3d 1283, 1304-05 (Fed. Cir. 2012) (stating that a non-party to an injunction

may not be held in contempt for its wholly independent conduct and noting that *Additive

Controls* held that a finding of contempt requires that the non-party "act[ed] with an enjoined

party to bring about a result forbidden by the injunction . . . if they are aware of the injunction

and know that their acts violate the injunction."). Thus, a court order binds not only the parties

subject thereto, but also non-parties who act with the enjoined party, although a showing of

wilfulness must be shown before a non-party can be found held liable. *See NLRB v. Laborers'

Int'l Union of N. Am., AFL-CIO*, 882 F.2d 949, 954 (5th Cir. 1989) ("[A]ny party who knowingly

aids, abets, or conspires with another to evade an injunction or order of a court is also in

contempt of that court.").

   In *Whitcraft v. Brown*, 570 F.3d 268, 272 (5th Cir. 2009), the district court held that an

attorney violated the court's freeze order, which prohibited his client (and the client's officers,

VAC App. 015

agents, employees, attorneys, etc.) from spending funds or disbursing assets in the client's possession. The appeals court upheld the district court's ruling, noting that the freeze order clearly bound the attorney, and the attorney had actual notice of the order. 570 F.3d at 272. Further, the district court determined that counsel had acted in "active concert or participation" with his client by (1) participating in discussions about how to get funds to his client, (2) approving the sale of a painting, and (3) permitting his office to be used as the place to consummate the sale. *Id.* The appellate court found that the attorney's actions in facilitating the sale of the painting "aided or abetted [the client] . . . with knowledge that [the client] was violating the court's orders." *Id.*

In *Waffenschmidt*, the court noted that good faith was relevant in considering whether a non-party bank had knowingly aided or abetted the defendant in dissipating funds in violation of a temporary restraining order. 763 F.2d at 726. The bank had relied on the defendant's assurances and required him to pledge a note as collateral when it loaned him money. The appellate court found that when the bank, on the defendant's instructions, applied the proceeds of the security to the defendant's debts, it did not knowingly violate a court order, because the restraining order had expired and the bank had not received a copy of the preliminary injunction. *Id.* The appellate court noted that while the bank might have been negligent, it did "not affect the conclusion that the [b]ank did not actively aid or abet [defendant] with knowledge that it was violating the court's orders." *Id.*

In this case, VAC did not present any evidence that Gruber Hurst "acted with" or "actively aided or abetted" T-Netix/Securus, Reinhold, Smith, or anyone at the Pittman or Bell Nunnally law firms to violate the Agreed Protective Order by disseminating the McAlexander

Report to opposing counsel in the Combined and Pinnacle Actions. *Additive Controls*, 154 F.3d

at 1353; *Waffenschmidt*, 773 F.2d at 726. Clouston testified that she was aware of no such

evidence. (Doc. 274 at 100-01). Reinhold testified that T-Netix/Securus never had possession of

the document, and no one there had ever even seen it. *Id.* at 114-15. There is no evidence in the

record to suggest that the Pittman or Bell Nunnally law firms had any further involvement with

the McAlexander Report after they returned it to VAC and settled this case in 2008. Although

VAC argues at length that Gruber Hurst generally engaged in "coordinated activity" with Bell

Nunnally and T-Netix/Securus in litigating various causes of action, VAC has not shown that

those parties engaged in any coordinated activity *to violate the Agreed Protective Order* in

connection with the 2010 disclosure of the McAlexander Report, which is the required showing

in this Circuit. *Additive Controls*, 154 F.3d at 1353; *NLRB*, 882 F.2d at 954; *Waffenschmidt*, 773

F.2d at 726.

　　　　Gruber Hurst partner Magee testified that the production of the McAlexander Report in

the Combined and Pinnacle Actions was solely the error of Gruber Hurst. Magee recalled in

detail the manner in which the McAlexander Report was found, and the Court finds his testimony

to be credible in all material respects. In particular, Magee averred that the McAlexander Report

was located in Gruber Hurst's archives by the firm's document vendor when Magee was

searching for documents the firm had produced in a previous patent case so that he could

replicate that production in the Combined and Pinnacle Actions. *Id.* at 241-48. The

McAlexander Report was included in Magee's document production together with approximately

600,000 other images, and the Court thus deems it credible that Magee was not aware of its

existence until after he had already produced the Report in the Combined and Pinnacle Actions.

VAC App. 017

*Id.* at 241-42, 248-50. Further, the Court finds credible Magee's testimony that he was unaware

of the prior contempt proceedings in this action given that he did not start to work at Gruber

Hurst until after the instant action was dismissed. *Id.* at 239. For these reasons, VAC has not

shown that Gruber Hurst "acted with" or "actively aided or abetted" T-Netix/Securus, Reinhold,

Smith, or anyone at the Pittman or Bell Nunnally law firms to violate Paragraphs 16, 19, or 23 of

the Agreed Protective Order by disseminating the McAlexander Report to opposing counsel in

the Combined or Pinnacle Actions. *Additive Controls*, 154 F.3d at 1353; *Waffenschmidt*, 773

F.2d at 726. Accordingly, the Court cannot find that Gruber Hurst violated the Agreed Protective

Order. Thus, *Defendant's Motion for Order to Show Cause Why T-Netix, Inc., Securus*

*Technologies, Inc., Richard A. Smith, Dennis J. Reinhold, and Gruber Hurst Johansen Hail*

*Shank, LLP Should Not Be Held in Contempt of Court for Violation of the Court's March 3,*

*2006 Protective Order* (Doc. 202) should be **DENIED** as to Gruber Hurst.

### B. Violation of Judge Sanderson's Directive

VAC further asserts that the current proceeding encompasses Gruber Hurst's conduct

after the 2008 hearing before Judge Sanderson and Gruber Hurst's failure to comply with Judge

Sanderson's directive to either (1) return or destroy the confidential materials it possessed or (2)

enter an appearance in this action. (Doc. 269 at 2). VAC contends that the key factor in Judge

Sanderson's decision not to recommend injunctive relief was his understanding that Tautfest had

agreed at the contempt hearing to destroy or return the confidential documents. *Id.* at 11. VAC

maintains that Gruber Hurst's efforts to purge their files of the McAlexander Report were

ineffectual and half-hearted, and Magee exacerbated the problem by failing to substantively

review the archived documents he located before producing them in the Combined and Pinnacle

18

Actions. *Id.* at 12.

VAC points out that Gruber Hurst's former paralegal testified that she did not search desktop computers, personal laptops, or any cell phones that might have contained the McAlexander Report, and she could not recall whether she checked any firm laptops; thus, the Report still might exist within Gruber Hurst. (Doc. 281 at 9) (citing Doc. 274 at 235-37). VAC maintains that if Gruber Hurst had taken its purge responsibilities seriously, it would have confirmed the purge with its information technology vendor – the same vendor that apparently transferred the firm over to a new database two weeks later and included the McAlexander Report in the documents transferred. *Id.* at 10. VAC urges that a contempt sanction against Gruber Hurst is warranted, and the Court can recommend such a sanction based on its inherent authority and Gruber Hurst's repeated instances of bad faith conduct. *Id.* at 13-15.

As an initial matter, Gruber Hurst argues that the undersigned cannot consider whether the firm's conduct violated Judge Sanderson's directive because that is outside the scope of VAC's application for an order to show cause and the District Court's *Order of Reference.* (Doc. 271 at 16-17). Gruber Hurst further argues that Judge Sanderson did not order the firm to take a particular course of action, and Tautfest made no representation to the Court as to what he would do when presented with the options of either entering a notice of appearance or returning the documents in question. *Id.* at 11-13, 17. Last, Gruber Hurst maintains that it substantially complied with Judge Sanderson's directive by undertaking extensive efforts to destroy and return all copies of the McAlexander Report as testified to by Tautfest and the firm's former paralegal, Lisa Miller, but mistakenly failed to destroy one version. *Id.* at 13-17.

19

*1. Whether the Undersigned Has Authority to Consider Whether Gruber Hurst Violated Judge Sanderson's Directive*

The Court has the inherent power to impose sanctions against attorneys who engage in bad faith conduct in litigation. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991). Such authority exists when a party shows bad faith by "hampering enforcement of a court order." *Hutto v. Finney*, 437 U.S. 678, 689 n.14 (1978) (citation omitted). The undersigned thus finds that while Judge Fitzwater's *Order of Reference* was limited to the acts surrounding the Agreed Protective Order, the Court can call upon its inherent authority to recognize, and recommend punishment for, any bad faith conduct that occurred if a party violated a different Court order. Nevertheless, while this inherent power exists, the threshold for its use to impose sanctions is high. *Reed v. Iowa Marine and Repair Corp.*, 16 F.3d 82, 84 (5th Cir. 1994).

*2. Whether Judge Sanderson Issued a Directive With Which Gruber Hurst was Required to Comply*

Tautfest, then a Gruber Hurst partner, stated during the April 2008 hearing before Judge Sanderson that Gruber Hurst had expert reports and discovery responses relating to the instant case because the firm was working with the Pittman and Bell Nunnally firms on behalf of their mutual clients, T-Netix/Securus. (Doc. 204, Ex. A at 69). As to those documents, Judge Sanderson instructed: "*that needs to go back right now. If you and your firm want to formally enter an appearance as the third counsel representing T-Netix in this case, then so be it. But I think there are all kinds of confusions here when you are representing T-Netix or Securus in an Eastern District case. So let's get that back right now.*" *Id.* (emphasis added).

Mike Bowers of the Bell Nunnally firm started to ask a question of the Court regarding the McAlexander Report, and Judge Sanderson stated that he did not need any further

20

information about that, but he did "want those documents returned to counsel whose appearance has already been entered in this case." *Id.* at 70.  Judge Sanderson then remarked that "if you wish to enter an appearance formally . . . in this case . . . then I think *once you have been enrolled and your firm has been enrolled as co-counsel of record in the Northern District of Texas, you are then thereafter entitled to access* under the terms of the confidentiality order." *Id.* (emphasis added).  Bowers stated that the documents at issue would be returned that day. *Id.*  When Clouston then started to ask a question regarding the McAlexander Report, Judge Sanderson stated that he was not going to further address it because he had received assurances that everything had been clawed back and that any documents that remained in Gruber Hurst's possession were going to be returned to VAC in the next day or so. *Id.* at 71.

Considering the totality of the evidence, it is clear to the undersigned that Judge Sanderson directed Gruber Hurst to return the documents unless and until such time as Gruber Hurst filed a notice of appearance on behalf of the T-Netix parties.  Only after the notice of appearance was filed would Gruber Hurst then be permitted to access the confidential documents, including the McAlexander Report.  Gruber Hurst never entered an appearance in this case and, therefore,  was required to return the McAlexander Report to counsel of record and/or VAC.  Accordingly, the next issue the Court must address is whether Gruber Hurst complied with Judge Sanderson's directive.

### 3. Whether Gruber Hurst Complied with Judge Sanderson's Directive

Tautfest testified that he met with the Gruber Hurst team after the 2008 hearing before Judge Sanderson and advised Lisa Miller, the team paralegal, that they needed claw back the documents that Judge Sanderson had ordered Gruber Hurst to return. (Doc. 274 at 198-99;

VAC App. 021

Gruber Hurst Binder Ex. 3). Tautfest instructed Miller "to send back the originals to Bell

Nunnally and . . . get into Summation, get the documents off of there, get them off the system,

and round up any copies anybody has and get them and delete them." (Doc. 274 at 199).

Miller testified that she complied with Tautfest's instructions by (1) getting all copies of

the documents out of any working notebooks and from the recycling bin and shredding them; (2)

deleting all of the electronic copies off the firm's computer system; and (3) giving the original

documents to Tautfest so he could return them to Bell Nunnally. *Id.* at 225-26. Miller said that

she deleted the electronic documents from the firm's computer system by opening the database,

marking the documents for deletion, and purging them. *Id.* at 227-28. Then she went into the

system through the hard drive where there were actual physical documents in labeled folders and

manually deleted the documents and moved them out of the folders. *Id.* at 228. Tautfest testified

that after Miller told him that she had deleted the documents from the firm's computer system, he

searched for several of the documents on the system, but could not find any. *Id.* at 199-200.

It is clear that Gruber Hurst did not fully comply with Judge Sanderson's directive,

however, because it retained a copy of the McAlexander Report in its firm database, even if

inadvertently. Nevertheless, Gruber Hurst contends that its actions constituted substantial

compliance, an assertion with which VAC disagrees. An accused contemnor may avoid a

contempt finding if it can show that it has either substantially complied with the order at issue or

has made every reasonable effort to do so. *U.S. Steel Corp.*, 598 F.2d at 368; *Rizzo*, 539 F.2d at

465.

In *Rizzo*, the appellate court reversed a finding of contempt, which the district court had

imposed when it found that the defendant had not adequately complied with an IRS summons to

22

VAC App. 022

produce certain records. *Id.* The higher court observed that there was no evidence that the defendant had attempted to destroy or withhold any of the missing records, he had ordered his office staff to produce all of the records, he testified that some records might not have been made and others might have been transferred to other doctors, and his record-keeping system was confusing. *Id.* at 466. Moreover, the defendant had produced a great deal of records initially, several more trickled in over time, and he and his assistant testified that they had searched the office files several times for responsive documents and discovered more records, but not all of the ones sought by the IRS. *Id.* The appeals court held that, on these facts, the government had not proved contempt by clear and convincing evidence. *Id.* at 466-67.

In *Mendoza v. Regis Corp.*, 2005 WL 1950118 (W.D. Tex. 2005), cited by VAC, the district court considered whether the defendant had substantially complied with an injunction that enjoined it from using the "Hairmasters" name. On two occasions, one before and one after the consent injunction was entered, the defendant instructed its media agency to replace its telephone listings for "Regis Hairmasters" with a different name, but did nothing further to ensure that the listings were changed. 2005 WL 1950118 at *2. Unbeknownst to the defendant, the directory listing was not changed. The court rejected the defendant's argument that its efforts to comply relieved it of liability, holding that only by making "every reasonable effort to comply" could a contemnor satisfy the substantial compliance test. *Id.* at *4 (finding that the defendant made only a "casual effort to comply," resulting in the incorrect listings appearing in the phone book for more than three years after issuance of the injunction).

The undersigned does not find *Mendoza* to be directly analogous to the circumstances presented here. In this case, it appears that Gruber Hurst made "in good faith all reasonable

23

efforts to comply" with Judge Sanderson's directive to return the outstanding confidential documents to VAC and/or Bell Nunnally. *Rizzo*, 539 F.2d at 465. While Gruber Hurst's compliance was not perfect – Miller, for example, could have searched individual laptops, phones, and desk top computers – the team working on this matter was small, as testified to by Tautfest, and Miller removed physical copies of the documents from individual's offices, went through the recycling bin to retrieve copies, got the original documents back to Tautfest, and deleted the documents from the firm's database to the best of her ability. Tautfest verified Miller's efforts to delete the documents by attempting to search for them on the database and, finding none, believed they had been deleted satisfactorily. The Court believes these efforts to be reasonable, considering that the individuals involved are in the legal field, not the information technology field. *U.S. Steel*, 598 F.2d at 368. Moreover, these efforts are far greater than those expended by the defendant in *Mendoza*. The facts here are more analogous to those in *Rizzo* where the accused contemnor produced significant documentation, but testified that after repeated efforts he had been unable to locate anything further. The undersigned thus finds that Gruber Hurst was in substantial compliance with Judge Sanderson's directive and should not be subjected to sanctions in that regard.

## C. *Actions of the T-Netix Parties*

VAC next argues that a contempt finding against the T-Netix parties is appropriate because they did not adequately ensure that their counsel, Gruber Hurst, complied with the Agreed Protective Order and Judge Sanderson's directive. (Doc. 269 at 13-16).

The T-Netix parties respond that VAC has not provided any evidence that the T-Netix parties were ever in possession of the McAlexander Report or that they were aware that Gruber

24

VAC App. 024

Hurst retained and inadvertently produced the Report in other litigation. (Doc. 278 at 6-7). The

T-Netix parties assert to the contrary that the evidence shows that they never had the

McAlexander Report and did not know about, and are not liable for, its production by Gruber

Hurst in 2010. *Id.* at 7-9, 12-19. The T-Netix parties conclude that VAC has generated

thousands of dollars in unnecessary attorneys' fees to purportedly coerce compliance from

Respondents who are not refusing to comply with the Agreed Protective Order, but VAC has

refused all of Respondents' offers to destroy the McAlexander Report and have a forensic expert

confirm destruction. *Id.* at 21-22.

Upon consideration of the parties' arguments, the Court finds that VAC has not provided

clear and convincing evidence that the T-Netix parties violated either the Agreed Protective

Order or Judge Sanderson's directive. Indeed VAC has not provided any evidence that any of the

T-Netix parties ever even saw the McAlexander Report, much less that they were somehow

involved with Gruber Hurst's production of the Report in the Combined and Pinnacle Actions.

Under these circumstances, VAC cannot point to the "clear, direct and weighty" evidence

required to allow the undersigned "to come to a clear conviction, without hesitancy, of the truth

of the precise facts of the case." *Test Masters*, 428 F.3d at 582.

Additionally, the T-Netix parties should not be deemed bound by the acts of the Gruber

Hurst firm in disseminating the McAlexander Report merely because of their attorney-client

relationship. A client generally is deemed bound by the acts of his lawyer, *United States v.*

*Villanueva-Diaz*, 634 F.3d 844, 851 n.4 (5th Cir. 2011). However, that is not the case if the

lawyer's acts exceeded his authority. *Heine v. Schendel*, 797 S.W.2d 278, 280 (Tex. App. –

Corpus Christi, 1990). Here, Gruber Hurst's dissemination of a document that it should not have

25

had and which Reinhold testified the T-Netix parties had never seen should not be binding on the

T-Netix parties. Moreover, the Court has already found that Gruber Hurst's actions were

inadvertent and not themselves subject to contempt or any other type of sanctions. It would

hardly seem appropriate to punish Gruber Hurst's client under the circumstances.

For the above reasons, *Defendant's Motion for Order to Show Cause Why T-Netix, Inc.,*

*Securus Technologies, Inc., Richard A. Smith, Dennis J. Reinhold, and Gruber Hurst Johansen*

*Hail Shank, LLP Should Not Be Held in Contempt of Court for Violation of the Court's March 3,*

*2006 Protective Order* (Doc. 202) should be **DENIED** as to the T-Netix parties as well.

### D.  *Gruber Hurst's Motion to Purge*

Gruber Hurst has filed a *Motion to Purge*, requesting the Court's leave to engage a

computer expert to delete all copies of the McAlexander Report from its computer system and

other storage media and describe and certify the expert's forensic analysis, procedure, metadata

inspection, and results relating to such deletion. (Doc. 263 at 2, 7-8). Gruber Hurst avers that it

has repeatedly offered to delete the McAlexander Report from its database with the assistance of

a forensic consulting firm, but VAC has refused. *Id.* at 7.

VAC responds that an immediate purge of the McAlexander Report will deprive VAC of

its ability to trace the acquisition and dissemination of the document. (Doc. 265 at 2). VAC

argues that this Court needs to assist in selecting and instructing the forensic consultant as to the

scope of services to be provided. Further, VAC maintains that all history related to the

McAlexander Report must be preserved prior to the purge, and the purge cannot occur until VAC

reviews and accepts or objects to the history and tracking report, and this Court determines

whether the investigation and tracking report is sufficient. *Id.* at 3. VAC asserts that any

consultant must determine how, when, and to whom Gruber Hurst disseminated the McAlexander Report. *Id.* at 4-5. Finally, VAC contends that the Court also should order Respondents to pay for an investigation and purge of the T-Netix parties' and their local counsel's computers as well. *Id.* at 5.

Gruber Hurst replies that David Cowen, who testified as its computer forensics investigator at the Court's evidentiary hearing, averred that he found every copy of the McAlexander Report that was located on Gruber Hurst's server and explained who had accessed it and when and, thus, VAC's objections have been rendered moot. (Doc. 282-1 at 3). Gruber Hurst notes that VAC has not demonstrated any shortcomings in Cowen's qualifications or expertise. *Id.* at 3-4.

At the evidentiary hearing held before the undersigned, Cowen detailed the McAlexander Report's original location on Gruber Hurst's computer system and how it was transferred to a different drive when Gruber Hurst added additional storage space to its server on April 28, 2008 (12 days after the hearing on the *Motion to Enforce* held by Judge Sanderson). (Doc. 274 at 155-57, 172). Cowen stated that his review indicated that the McAlexander Report was not accessed by anyone other than an information technology administrator after 2010, and he described the Report's two current locations on Gruber Hurst's server. *Id.* at 160, 163-64. Cowen also testified that he was aware that Gruber Hurst had produced in the Combined and Pinnacle Actions an external hard drive that contained the McAlexander Report, but the drive had been sent back to Gruber Hurst. *Id.* at 163-64.

Based on the testimony at the hearing, as a whole, it is clear to the undersigned that the McAlexander Report was acquired by Gruber Hurst before the April 2008 hearing before Judge

Sanderson, and there is no evidence to suggest that Gruber Hurst improperly reacquired the McAlexander Report thereafter as VAC has suggested.  VAC had no objection to Cowen testifying as a computer forensic expert and has not suggested that he is unqualified to give his opinion in regard to the remaining matters.  *Id.* at 150.  The undersigned finds Cowen's testimony to be reliable and persuasive.  As to the scope of the additional forensic investigation VAC asserts is required, Cowen testified that the scope of his task in this matter was to "[f]ind out everything I can about the existence of the . . . McAlexander [Report], where it existed on the [Gruber Hurst] server, what happened to [the McAlexander Report], any possible copies of it, track it down, find out what happened to it.").  *Id.* at 168.  Such investigation should be sufficient under the circumstances of the case.

Moreover, there is no support for VAC's assertion that the Court should order Respondents to pay for an investigation and purge of the computers of the T-Netix parties or their local counsel, the Bell Nunnally and Pittman firms.  There is simply no evidence to suggest that the T-Netix parties ever had the McAlexander Report; indeed T-Netix's counsel strongly denied it, and VAC presented no such evidence, but merely speculated to the contrary.  Further, VAC presented no evidence at the evidentiary hearing suggesting that the Bell Nunnally and Pittman firms violated the Agreed Protective Order by retaining the McAlexander Report after the settlement of this case.

VAC App. 028

## V.    CONCLUSION

For the reasons discussed above, the undersigned recommends that the District Court

**DENY** *Defendant's Motion for Order to Show Cause Why T-Netix, Inc., Securus Technologies,*

*Inc., Richard A. Smith, Dennis J. Reinhold, and Gruber Hurst Johansen Hail Shank, LLP Should*

*Not Be Held in Contempt of Court for Violation of the Court's March 3, 2006 Protective Order*

(Doc. 202) and **GRANT** Gruber Hurst's *Motion Seeking Leave to Purge McAlexander Rebuttal*

*Report* (Doc. 263).

**SO RECOMMENDED** on March 28, 2013.

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

29

**VAC App. 029**

**Natasha Shannon**

| | |
|---|---|
| **From:** | ecf_txnd@txnd.uscourts.gov |
| **Sent:** | Thursday, March 28, 2013 4:44 PM |
| **To:** | Courtmail@txnd.uscourts.gov |
| **Subject:** | Activity in Case 3:05-cv-00654-D T-Netix Inc v. Value Added Communications Inc Sealed and/or Ex Parte Order |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

If you need to know whether you must send the presiding judge a paper copy of a document that you have docketed in this case, click here: Judges' Copy Requirements. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas should seek admission promptly. Forms and Instructions found at www.txnd.uscourts.gov.

**U.S. District Court**

**Northern District of Texas**

**Notice of Electronic Filing**

The following transaction was entered on 3/28/2013 at 3:44 PM CDT and filed on 3/28/2013
**Case Name:**      T-Netix Inc v. Value Added Communications Inc
**Case Number:**      3:05-cv-00654-D
**Filer:**
**Document Number:** 309

**Docket Text:**
**(Document Restricted) Sealed FINDINGS, CONCLUSIONS, AND RECOMMENDATION: It is recommended that the District Court DENY Defendant's [202] Motion for Order to Show Cause and GRANT Gruber Hurst's [263] Sealed Motion Seeking Leave (See order for specifics). (Ordered by Magistrate Judge Renee Harris Toliver on 3/28/2013) (mcrd)**

**3:05-cv-00654-D Notice has been electronically mailed to:**

G Michael Gruber  mgruber@ghjhlaw.com, jellis@ghjhlaw.com, vwhitney@ghjhlaw.com, wrussell@ghjhlaw.com

Robert W Turner  rturner@mcdolewilliams.com, aburzlaff@mcdolewilliams.com

Sally C Helppie  shelppie@tiptonjoneslaw.com

VAC App. 030

Dale A Cooter efiling@cootermangold.com, mterry@cootermangold.com, nshannon@cootermangold.com

William B Mateja mateja@fr.com, heddins@fr.com, starkus@fr.com

Aubrey Nick Pittman pittman@thepittmanlawfirm.com

Steven N Williams swilliams@mcdolewilliams.com, MWNEF@mcdolewilliams.com, aburzlaff@mcdolewilliams.com, dpage@mcdolewilliams.com, ggates@mcdolewilliams.com

Anthony J Magee amagee@ghjhlaw.com, brichmond@ghjhlaw.com, jellis@ghjhlaw.com, rweitzel@ghjhlaw.com, sschafer@ghjhlaw.com

Tammy Sue Wood tammyw@bellnunnally.com, susans@bellnunnally.com

Kenneth P Kula kkula@mcdolewilliams.com

Jeffrey S Lowenstein jeffl@bellnunnally.com, ruthb@bellnunnally.com

Stephanie D Clouston stephanie.clouston@alston.com, jacquelyn.rogers@alston.com, kim.wokal@alston.com

A Shonn Brown sbrown@ghjhlaw.com, bcongdon@ghjhlaw.com, swiebel@ghjhlaw.com, tashworth@ghjhlaw.com

Christopher Groves cgroves@milleregan.com

Neal J Suit nsuit@ccsb.com, jdaugherty@ccsb.com

Gwen I Walraven gwenw@bellnunnally.com, benl@bellnunnally.com, chereej@bellnunnally.com, deborahc@bellnunnally.com, ladonnaa@bellnunnally.com

Sean M Whyte sean.whyte@alston.com, jacquelyn.rogers@alston.com, lori.holland@alston.com

Donna S Mangold efiling@cootermangold.com, mterry@cootermangold.com, nshannon@cootermangold.com

**3:05-cv-00654-D The CM/ECF system has NOT delivered notice electronically to the names listed below. The clerk's office will serve notice of court Orders and Judgments by mail as required by the federal rules. An attorney/pro se litigant is cautioned to carefully follow the federal rules (see FedRCivP 5) with regard to service of any document the attorney/pro se litigant has filed with the court. The clerk's office will not serve paper documents on behalf of an attorney/pro se litigant.**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1004035775 [Date=3/28/2013] [FileNumber=6875349-0
] [8cda48b448d5bf122e26a41fdc6d6c5ee66d26a5144b0107a9277bc723405f576de
126b2fd5c52039da162bd8769e59237b347506c83e54b54444198c5dc17fa]]

**VAC App. 031**

<u>IN THE UNITED STATES DISTRICT COURT</u>

<u>FOR THE NORTHERN DISTRICT OF TEXAS</u>

<u>DALLAS DIVISION</u>

```
T-NETIX, INC.,                 (    3:05-CV-0654-D
  Plaintiff/Counter-Defendant,(
                               (
                               (
VERSUS                         (    DALLAS, TEXAS
                               (
VALUE-ADDED                    (
COMMUNICATIONS, INC.,          (
  Defendant/Counter-Plaintiff,(
                               (
VERSUS                         (
                               (
SECURUS TECHNOLOGIES.,INC.,    (
  Counter-Defendant            (    FEBRUARY 25, 2013
```

TRANSCRIPT OF SHOW CAUSE HEARING BEFORE THE HONORABLE

MAGISTRATE JUDGE RENEE HARRIS TOLIVER

UNITED STATES DISTRICT JUDGE


<u>A P P E A R A N C E S</u>:


FOR MOVANT:            DALE A. COOTER
                       Cooter Mangold Deckelbaum & Karas LLP
                       5301 Wisconsin Avenue NW
                       Suite 500
                       Washington, DC 20015
                       202/537-0700
                       efiling@cootermangold.com

                       DONNA S. MANGOLD
                       Cooter Mangold Deckelbaum & Karas LLP
                       5301 Wisconsin Avenue NW
                       Suite 500
                       Washington, DC 20015
                       202/537-0700
                       efiling@cootermangold.com

VAC App. 032

```
FOR MOVANT:
                        STEVEN N. WILLIAMS
                        McDole & Williams PC
                        1700 Pacific Ave
                        Suite 1280
                        Dallas, TX 75201
                        214/979-1122
                        swilliams@mcdolewilliams.com


                        KENNETH P. KULA
                        McDole & Williams PC
                        1700 Pacific Avenue
                        Suite 1280
                        Dallas, TX 75201
                        214/978-4000
                        kkula@mcdolewilliams.com




FOR RESPONDENTS:        WILLIAM B. MATEJA
                        Fish & Richardson
                        1717 Main St
                        Suite 5000
                        Dallas, TX 75201
                        214/747-5070
                        mateja@fr.com


                        A. SHONN BROWN
                        Gruber Hurst Johansen Hail Shank LLP
                        1445 Ross Avenue
                        Suite 2500
                        Dallas, TX 75202
                        214/855-6815
                        sbrown@ghjhlaw.com
                        JEFFREY S. LOWENSTEIN
                        Bell Nunnally & Martin LLP
                        3232 McKinney Ave
                        Suite 1400
                        Dallas, TX 75204-2429
                        214/740-1410
                        jeffl@bellnunnally.com
```

**VAC App. 033**

```
FOR RESPONDENTS:      GWEN I. WALRAVEN
                      Bell Nunnally & Martin
                      3232 McKinney Ave
                      Suite 1400
                      Dallas, TX 75204-2429
                      214/740-1484
                      gwenw@bellnunnally.com




Also present:         JASON COOK
```

```
COURT REPORTER:          PAMELA J. WILSON, RMR, CRR
                         1100 Commerce Street, Room 1535
                         Dallas, Texas 75242
                         214.662.1557
                         pam_wilson@txnd.uscourts.gov


      Proceedings reported by mechanical stenography,

transcript produced by computer.
```

VAC App. 034

```
 1              SHOW CAUSE HEARING - FEBRUARY 25, 2013
 2                    P R O C E E D I N G S
 3          THE SECURITY OFFICER:  All rise.
 4          THE COURT:  Good morning.
 5      Please be seated.
 6      The court calls for hearing case number 3:05-CV-654-D,
 7  hearing on the motion for an order to show cause.
 8      And who do we have for movant?
 9          MR. COOTER:  Your Honor, I'm Dale Cotter.  With me
10  is my partner, Donna Goodman.
11          MS. MANGOLD:  Good morning, Your Honor.
12          THE COURT:  Morning.
13          MR. WILLIAMS:  And also Steven Williams and Ken
14  Kula.  Good morning.
15          THE COURT:  Good morning.
16      And for respondent?
17          MR. MATEJA:  Two respondents, Your Honor.  Bill
18  Mateja on behalf of Gruber Hurst, Shonn Brown on behalf of
19  Gruber Hurst as well.
20          MS. BROWN:  Good morning, Your Honor.
21          THE COURT:  Good morning.
22          MR. LOWENSTEIN:  Your Honor, Jeff Lowenstein and
23  Gwen Walraven for T-Netix Inc., Securus Technologies Inc.,
24  Dennis Reinhold and Richard Smith.
25          THE COURT:  Okay.  Thank you.
```

1       As you know, Judge Fitzwater referred to me the motion

2   to -- for an order to -- to show cause.  Because I am a

3   magistrate judge the procedure under the statute is that I

4   should hold this hearing, determine whether or not the

5   elements, so to speak, for contempt exist, and if so to

6   certify to Judge Fitzwater facts that may constitute

7   contempt.

8       The closest analogy I can draw is that -- and this is

9   from what Judge Boyle said to me before when I have done one

10  of these, is that if I do determine that there are facts that

11  may constitute contempt and certify those facts, then that

12  certification becomes sort of like an indictment would be

13  in -- in a criminal case for the district judge to follow in

14  determining the ultimate issues.

15      And so at this time I'm going to turn it over to movant

16  to present its case.

17          MR. MATEJA:  Your Honor, can I bring up a

18  procedural matter at the very outset?

19          THE COURT:  Yes, sir.

20          MR. COOTER:  If you didn't I was going to.

21          THE COURT:  Okay.

22          MR. MATEJA:  Well, let me throw something out.  I'm

23  relatively new to this party.  I just got hired a little less

24  than a month ago.  And something has been eating at me in

25  this case that I hadn't put my finger on until last night,

1    and the light bulb finally clicked, which is in 2008 in this
2    case the movants argued that we should not have this report,
3    that we shouldn't have any of the documents in the case
4    because we weren't entitled to be a party to the protective
5    order.  And Judge Sanderson ultimately found that they were
6    right, that we were not entitled to have the documents, and
7    he asked that we return them.  We said that we would return
8    them.  Obviously, we did not do a good job at that and we're
9    sorry for that.
10         But the point is, is that in that proceeding there was
11   already an argument and a ruling made that we weren't
12   entitled to them because we weren't subject to the protective
13   order.  Okay?
14         This is a contempt proceeding to show cause as to why we
15   should not be held in contempt as to why we violated the
16   protective order.  And I believe that they are now estopped
17   from arguing that we're subject to the protective order, that
18   Judge Sanderson basically ruled that we weren't subject to
19   the protective order.
20         And -- and I bring this up now because we could be here
21   for a very long time today.  I've got at least four to seven
22   witnesses that I plan on putting on.  But I don't see that --
23   how we can have a proceeding asking us to show cause why we
24   didn't violate the protective order, if we weren't subject to
25   the protective order.

1           THE COURT:  Well, since the first thing I have to

2     determine is whether or not there is indeed -- has indeed --

3     or I believe that there has indeed been one, then I expect

4     that I will hear evidence that could convince me that you are

5     or Gruber Hurst is in fact bound by -- or a party to or bound

6     by the protective order in some other way.

7           MR. MATEJA:  Well, the irony is, is that, quite

8     frankly, Your Honor, we argued then and we -- and we contend

9     now that we were subject to the protective order.  Okay?

10        Now, that's not what they argued and that's not what

11    Judge Sanderson said.

12        The point is that we believe that we are but as a matter

13    of law, Your Honor, I mean, we could spend a whole lot of

14    time, but I think this is --

15          THE COURT:  Well, if that's a matter of law I'm

16    going to give you an opportunity at the end of our factual

17    findings here to submit any research, any memo or brief you

18    want to give me on what law should apply before I make that

19    ruling.

20        So I'll hear you here --

21          MR. MATEJA:  Okay.

22          THE COURT:  -- and if you want to go into more

23    detail in writing, I'll consider that as well.

24          MR. MATEJA:  Very well, Your Honor.

25          THE COURT:  Okay.

```
 1          MR. COOTER:  I don't want to -- I could respond to
 2   that but I don't think it's necessary at the moment.
 3      Procedurally you've issued a show cause.  Under Fifth
 4   Circuit law, we've looked at all the Fifth Circuit cases, the
 5   question is once you issue a show cause who -- who goes
 6   first.  Essentially the case law seems to indicate that they
 7   go first.
 8          THE COURT:  Okay.  My show cause isn't the show
 9   cause you requested, and so that's how I started out
10   explaining.
11          MR. COOTER:  Okay.
12          THE COURT:  My show cause is for you to show cause
13   why a show cause issue -- order should be issued.  And I know
14   it's convoluted, which is why I started with the explanation.
15   Because ultimately it will be Judge Fitzwater who determines
16   whether or not to issue a show cause based on my report and
17   also if I certify facts to him that I believe constitute
18   contempt.
19          MR. COOTER:  All right.  That's fine.  I just
20   wanted to clarify.
21      But --
22          THE COURT:  I'm clear, as long as everybody else is
23   clear.
24          MR. COOTER:  We have a one-witness case and I'm
25   told -- is she here?
```

```
 1              MR. COOK:  Your Honor, my name is Jason Cook.  I'm
 2    representing the witness they're about to call.  She's stuck
 3    in traffic.  She should be here shortly, Ms. Clouston.
 4              MR. COOTER:  Maybe we can make some progress in her
 5    absence.
 6              THE COURT:  Okay.
 7              MR. COOTER:  We have a -- a book, a binder of
 8    essentially Plaintiff's Exhibits.
 9         We have one for you.  We have one for our opponents.  We
10    have one for a testifying witness, if I had a testifying
11    witness who was here.  We met with her yesterday.  I know
12    she's coming.
13         Can we hand this up?
14              THE COURT:  Yes.  And I do have up here already a
15    nice book of exhibits from Gruber Hurst.  Do you have those
16    as well?
17              MR. COOTER:  I believe that we do.  Yes.
18              MS. MANGOLD:  Yes, Your Honor.
19              MR. COOTER:  It seems most of these exhibits are
20    noncontroversial.  Maybe we could just go ahead and admit
21    them and then when Ms. Clouston comes here we'll take her
22    testimony as she goes through them.  And if there are
23    objections then I guess we have to wait for Ms. Clouston to
24    come.
25         The first is the original agreed-upon protective order
```

```
 1    in this case, Exhibit Number 1.  I would move its admission.

 2

 3              THE COURT:  Any objection?

 4              MR. MATEJA:  Your Honor, let me just flip through

 5    these very quickly.

 6              THE COURT:  All right.

 7              MR. MATEJA:  We might be able to take care of this

 8    en masse.

 9              THE COURT:  Thank you.

10              MR. MATEJA:  Your Honor, subject to under tab one

11    there looks to be like a check statement from Bank of America

12    that I don't believe is related to this case.

13              MR. COOTER:  Court's indulgence.

14              MS. MANGOLD:  Your Honor, I pulled that from your

15    binder.  I pulled it.

16              MR. MATEJA:  Subject to that we have no objections

17    to the introduction and admission of Respondent's 1 through

18    15.

19              THE COURT:  And they are admitted.

20              MR. COOTER:  Oh, good.  He's efficient, isn't he?

21         I have to deal with Ms. Clouston.  It's a one-witness

22    case from our standpoint.

23              THE COURT:  How long do you think that will take?

24              MR. COOTER:  Her testimony?

25              THE COURT:  I mean for her to arrive.
```

```
 1          MR. COOK:  Your Honor, I'm informed five minutes.
 2          THE COURT:  Well, I know y'all don't want to look
 3   at me for five minutes, so why don't we take a brief
 4   adjournment.
 5          MR. COOTER:  Thank you, Your Honor.
 6          COURTROOM DEPUTY:  All rise.
 7                    (Brief recess taken.)
 8          THE COURT:  Please be seated.
 9       Are we ready now?
10          MS. MANGOLD:  Yes, Your Honor.
11          THE COURT:  Call your witness.
12          MS. MANGOLD:  Your Honor, movants call Stephanie
13   Clouston.
14          MR. COOK:  Your Honor, I'd like to make an
15   appearance on behalf of Stephanie Clouston.
16       My name is Jeffrey Cook.
17       I'm a partner of hers with the law firm of Alston &
18   Bird.
19          THE COURT:  Yes, sir.  Ma'am, I know you're used to
20   stopping there.
21                    (Laughter.)
22          THE WITNESS:  That's right.
23       I've been on this side before.
24          THE COURT:  Will you raise your right hand, please.
25                    (Witness sworn.)
```

```
 1              THE COURT:  Please have a seat.
 2              MS. MANGOLD:  Thank you, Your Honor.
 3         Your Honor, may I pass up to the witness the book of
 4    admitted exhibits?
 5              THE COURT:  Of course.
 6              MS. MANGOLD:  Thank you, Your Honor.
 7              THE COURT:  You may proceed.
 8              MS. MANGOLD:  Thank you, Your Honor.
 9
10                        DIRECT EXAMINATION
11    BY MS. MANGOLD:
12    Q.   Good morning, Ms. Clouston.
13    A.   Good morning.
14    Q.   Do you have some water up there?
15    A.   I think I do.
16    Q.   State your name for the record, please.
17    A.   Stephanie Clouston.
18    Q.   And, Ms. Clouston, how are you employed?
19    A.   I'm a partner with the law firm of Alston & Bird.
20    Q.   Where were you employed before Alston & Bird?
21    A.   I was a partner with the law firm Jones Day.
22    Q.   When did you move over to Alston & Bird?
23    A.   Somewhere I think in the end of August of 2011.
24    Q.   And were you counsel of record in this action
25    previously?
```

```
 1   A.    Yes.
 2   Q.    Okay.  Tell us about that.
 3   A.    I represented, along with one of my other partners,
 4   Value-Added Communications in this proceeding, the underlying
 5   proceeding that involved patent litigation and allegations
 6   related to patents.
 7   Q.    Tell us a little bit about the subject matter of the
 8   underlying lawsuit.
 9         What kind of patent litigation?
10   A.    The parties involved in the underlying proceeding are
11   prison telecommunications companies, meaning that both sides
12   develop and install and service various telephone equipment,
13   system services that allow prisoners either who are
14   incarcerated in state, county or federal prisons to make
15   phone calls to their loved ones.
16         The underlying litigation in this proceeding, the
17   Northern District of Texas case, involved allegations of I
18   believe infringement of three or four patents by the
19   plaintiffs in this case that included T-Netix, Inc., and I
20   believe some of their sister companies.
21   Q.    And were their sister companies including Securus?
22   A.    That is, as I understand it from this litigation as well
23   as other litigation that I've been involved in with T-Netix
24   and Securus that Securus is the ultimate parent or holding
25   company for all of the T-Netix Abercrom related entities.
```

```
 1   Q.   In the course of this litigation take a look at -- or
 2   strike that.
 3        Take a look at what's been admitted as Exhibit 1.  It's
 4   in your binder, in the white binder, pink cover.
 5        White binder, pink cover.
 6   A.   Okay.
 7   Q.   Do you recognize that document?
 8   A.   Yes.  It is an agreed protective order that was entered
 9   in the underlying case, 3:05-CV-0654 pending before Judge
10   Fitzwater.
11   Q.   In the course of your experience have you been involved
12   in other kind -- other cases involving patent litigation?
13   A.   Yes.
14   Q.   And was this protective order typical of the types of
15   protective orders you would enter into on behalf of your
16   clients?
17   A.   Yes, as I recall.
18   Q.   Okay.  Take a look at page 16 of the protective orders
19   on page 6.  Tell us what that is.
20   A.   This appears to be a provision that allows the counsel,
21   the outside counsel involved in the -- this underlying
22   litigation to designate documents produced to the other
23   side's counsel as counsel eyes only confidential information,
24   by either labeling the documents information or other
25   discovery as counsel only or highly confidential, meaning
```

1    that it is reserved only -- can only be seen by the outside

2    counsel that appears in this litigation as well as the

3    outside technical advisors.

4    Q.   In the course of the underlying litigation what kind of

5    document production was there?

6         Give us a sense of the scope and the kinds of documents

7    that were involved.

8    A.   Well, it's been quite some time, but this was a -- a

9    patent litigation between two competitors involved in this

10   industry, and because of the type of litigation it involved a

11   lot of technical information produced by Jones Day's client,

12   by Value-Added Communications that was accused of infringing

13   various patents as well as diagrams, how the systems work,

14   financial information, information about what facilities,

15   what prison and county and state facilities Value-Added

16   Communications served.

17   Q.   And how were those documents treated for purposes of the

18   protective order?

19        What -- what happened?

20        Were all the documents marked confidential, were some of

21   them marked confidential?  How did that work?

22        Were some of them marked AE, attorneys eyes only?

23        Tell me how that worked.

24   A.   Only the documents that were -- I believe fell into the

25   category of AEO did we designate as highly confidential, and

1    that includes in paragraph 16 the types of documents that

2    were to be treated as restricted confidential.

3         Again, I haven't looked -- gone back and looked at any

4    document production in this case in quite some time.  I don't

5    have access to those documents.

6         But my recollection is there was a -- this litigation

7    had been ongoing for several years.  There were a number of

8    documents that have been produced by both sides and

9    designated under the various levels of the protective order.

10   Q.   The focus of this proceeding now is the Joseph

11   McAlexander rebuttal report.  Are you familiar with that

12   rebuttal report?

13   A.   I am familiar with the report and that it was the

14   subject of an unfortunate prior proceeding involving alleged

15   sanctions and contempt.

16   Q.   Whose expert was Joseph McAlexander?

17   A.   He was T-Netix's expert.

18   Q.   And why was -- strike that.

19        Was part of his report designated attorneys eyes only?

20   A.   Yes.

21   Q.   And why was that?

22        First of all, who designated it attorneys eyes only?

23   A.   I know I -- I recall at one point that VAC's counsel,

24   Jones Day, designated the report attorneys eyes only.

25        There may also have been some designation that was done

VAC App. 047

1  by T-Netix's counsel in this case.

2  Q.   And why was it that Jones Day designated it attorneys

3  eyes only?

4  A.   My recollection is that we designated in some

5  correspondence with the opposing counsel the document and

6  report as attorneys eyes only because it contained

7  incorporated in the body of a -- of the report, it was quite

8  long, testimony from VAC principals, engineers, as well as

9  technical documents that had been produced as a -- by

10  Value-Added Communications.

11  Q.   At the time that the case was pending in this court, the

12  underlying litigation, were you involved in other litigation

13  involving T-Netix?

14  A.   Yes.

15  Q.   And where was that?

16  A.   I was involved in another lawsuit in Dallas District

17  Court, I believe originally in the 44th court.  It was Judge

18  Kettleton and Judge Cortez and then later transferred to the

19  68th court, Judge Hoffman.

20  Q.   And that was in state court here in Dallas?

21  A.   Yes, ma'am.

22  Q.   Okay.  And at the same time are you aware -- were you

23  aware that there was other litigation involving T-Netix that

24  was going on in the federal court in the Eastern District?

25  A.   Yes.

```
1    Q.    And what -- what was that?  Do you remember?
2    A.    We were not counsel in that case, but as I recall there
3    was also other ongoing patent infringement litigation that
4    T-Netix Abercrom and/or maybe Securus, their related holding
5    company, was involved in against other competitors in the
6    industry involving patent -- alleged patent infringement.
7    Q.    And VAC was not a party to that case; is that right?
8    A.    No.  That is correct.
9    Q.    Do you remember who the lawyers were representing the --
10   at least who was representing T-Netix in that case?
11   A.    Gruber Hurst.
12   Q.    In the east -- in the Eastern District case, I'm sorry.
13   A.    The Gruber Hurst was one of the firms representing
14   T-Netix, as I recall.
15   Q.    Okay.  And how about in the state court litigation?  Who
16   was representing -- you represented VAC; is that right?
17   A.    Yes.
18   Q.    And you were still at Jones Day at that time?
19   A.    Yes.
20   Q.    Okay.  And who was representing T-Netix in that case?
21   A.    The Bell Nunnally Martin firm and the Pittman law
22   firm.
23   Q.    Okay.  And who was representing T-Netix in this -- in
24   this underlying litigation at that same -- at that time?
25   A.    The same counsel, Bell Nunnally Martin and the Pittman
```

1    law firm.

2    Q.   Okay.  Take a look at in your book to -- at Exhibit 2.

3    And that exhibit has also been admitted into evidence.

4         Tell me what that is.

5    A.   It appears to be the transcript -- the court's

6    transcript from a hearing that was held on April 16, 2008,

7    before Judge Sanderson involving motions to modify the agreed

8    protective order in this case and VAC's motion for

9    enforcement of the protective order.

10   Q.   Were you counsel during that hearing?

11   A.   Yes.  I was counsel for VAC.

12   Q.   Okay.  And did -- tell us what led to VAC having filed

13   the motion to enforce the protective order.

14   A.   Well, there were I guess a course of unfortunate

15   circumstances that led up to this hearing taking place.

16   There had been -- had been a couple of violations of the

17   agreed protective order in this case.

18        The first instance where we thought that there had been

19   a violation of the protective order involved the Dallas state

20   court proceeding.  And in that proceeding that involved

21   alleged breaches on both sides of the case of a patent

22   license agreement or patent license agreements between --

23   that had been entered into between VAC and some of the

24   Securus parties.

25        There were documents that had been produced only in this

1    case, the Northern District of Texas case, that were attached

2    and entered into evidence and argued to some degree before

3    then Judge Cortez that the parties in the state court

4    proceeding had not been permitted to have, because they were

5    deemed irrelevant.

6    Q.   Who deemed them to be irrelevant?

7    A.   Judge Cortez when he -- he denied the T-Netix's parties

8    motion to compel production of some of the line count

9    reports, royalty type documents, line count reports related

10   to certain sites in the state court proceeding.

11   Q.   What position did that take in response to the fact that

12   these confidential documents had been produced, if any?

13   A.   Mr. Turner, my partner and I, took various steps to

14   attempt to get Bell Nunnally and the Pittman law firm to work

15   with us to withdraw the documents out of the state court file

16   and to not raise the documents produced only in this case

17   that they had been denied access to in the state court case,

18   to not argue those in front of our then District Court Judge

19   Cortez.

20   Q.   What kind of efforts were those?

21        Were those informal efforts, were those efforts in

22   pleadings, via the telephone, do you remember?

23   A.   It was over the course of time, but the immediate

24   attempts were correspondence with the other side, as I

25   recall, and phone calls that we were making because we had

 1    a -- an upcoming another round of hearings before Judge

 2    Cortez in getting ready for trial at the time.

 3    Q.   Were those efforts successful?

 4    A.   Eventually they were, but not until after the documents

 5    had already been entered into the Texas state court record

 6    and Judge Cortez stated that he voluntarily recused himself.

 7              MR. MATEJA:  Your Honor, I'm going to object at

 8    this point in time the relevance of this line of testimony.

 9    We're really rehashing a lot of stuff that was heard back in

10    2008 that has nothing to do with the facts that my client

11    inadvertently produced records in 20 -- in 2010.

12         This has been heard, done with, over.  It's just not

13    relevant to this proceeding.

14              MS. MANGOLD:  Your Honor, the inadvertence is --

15    has to be looked at in the context of this has happened

16    before.  They made promises in response to having it happen

17    before, it was pursuant to a hearing, there were

18    representations made by his client to Judge Sanderson in that

19    hearing, judge Sanderson took steps based on those

20    representations, and the whole concept of inadvertence must

21    be seen during -- in the context of this evidence.

22              THE COURT:  The objection is overruled.

23              MR. MATEJA:  Can I have a running objection, Your

24    Honor?

25              THE COURT:  No.

```
 1              MR. MATEJA:  No?
 2    BY MS. BROWN:
 3    Q.    And I apologize.  I sort of lost track.
 4         What -- what was the impact in terms of the state court
 5    proceeding?
 6    A.    Well, there were --
 7              MR. MATEJA:  Your Honor, I'm going to renew my
 8    objection.  I will also note, Your Honor, we weren't a party
 9    to this state court case.
10         This has nothing to do with Gruber Hurst.
11              THE COURT:  Okay.  I'm going to overrule your
12    objection and I'm going to permit her to answer before you
13    lodge another objection.
14              MR. MATEJA:  Okay.
15              THE COURT:  Thank you.
16              THE WITNESS:  I believe the question was --
17    BY MS. MANGOLD:
18    Q.    What was the impact?
19         What happened in the state court proceeding as a result
20    of the fact that these documents had been attached and used
21    in that proceeding?
22    A.    There were various hearings, rehearings, motions filed,
23    a lot of time, fees, and costs involved.  And, ultimately,
24    while I cannot state why Judge Cortez recused himself, he
25    stated in a hearing that I believe the transcript is in the
```

1  record, or at least was in the underlying contempt proceeding

2  that Judge Sanderson cited to, that he -- he believed he --

3  he had seen -- it appeared he had seen materials that he was

4  not permitted to see because they were produced under a

5  federal protective order and he then later that same day or

6  the next morning recused himself.

7      We at Value-Added Communications tried to determine if

8  there was anything we could do to get Judge Cortez back as

9  our judge, and we -- there was no path that we could take to

10  do that.

11  Q.   Let's switch over to the Eastern -- the case that was

12  pending at the same time in the Eastern District.  You said

13  that there were documents from that case also.  Can you

14  explain that?

15  A.   Around the same time that this was occurring in the

16  state court proceeding, where it led to Judge Cortez recusing

17  himself, in this other proceeding, I don't remember the style

18  of -- of the case, but it was in the Eastern District of

19  Texas, it involved the Securus entities along with other

20  competitors in the prison inmate telephone industry.

21  Q.   And was -- was VAC a party to that case?

22  A.   No, ma'am.

23  Q.   Okay.  And how about the other people who were involved

24  in the case, other than T-Netix, were they competitors of

25  VAC?

```
 1   A.    They were.

 2   Q.    Okay.  Go ahead.

 3   A.    And in that -- in that case it appeared that some of the

 4   defendants who were accused of infringing some of Securus's

 5   patents had sought discovery of some of the expert reports

 6   and other materials from this case involving VAC and Securus

 7   entities.  Our case here was further along I believe in the

 8   discovery process than the Eastern District of Texas case was

 9   at the time.

10         One of the counsel representing one of the defendants in

11   that case was seeking some of the expert reports from this

12   case that had been designated AEO.  VAC did not approve of

13   that.  They reached out and asked if we would voluntarily

14   give some of the documents we had designated as AEO.

15   Q.    Who?

16         Who reached out?

17   A.    I believe it was ICS, one of the other defendant's

18   counsel, outside counsel in that case.

19         Our client would not voluntarily produce any documents

20   in that case and I communicated that to the counsel that

21   represented one of the defendants, ICS, I believe.

22         As we were going through the same process in the state

23   court case involving the loss of our judge, the counsel from

24   ICS notified me that, "Don't worry about our request to --

25   that we may subpoena these documents from Value-Added
```

1    Communications, we have obtained these documents from

2    Securus's counsel in our case."

3        That came as quite a surprise to us because we were

4    unaware that they had been produced.

5    Q.   So what'd you do next?

6    A.   Next we took steps -- Gruber Hurst was the law firm

7    representing Securus in -- in that case.  My -- my partners

8    and -- robert Turner and Tom Jackson from Jones Day, we

9    reached out to the lawyers that we knew at Gruber Hurst to

10   try to figure out what had happened, what they had, what they

11   had produced, and asked for assistance from the counsel both

12   involved in this case for Securus and in the Eastern District

13   of Texas case to try to help us in determining the scope of

14   the problem as well as how to get the documents back.

15   Q.   Were you successful in those efforts?

16   A.   We were -- we were successful in obtaining assistance

17   from the Gruber Hurst firm to obtain -- to snap -- help snap

18   back the documents that they had produced in the Eastern

19   District of Texas case; however, we were unable at that time

20   to be able to gain the assistance of the Bell

21   Nunnally/Pittman firm and the Gruber Hurst firm in

22   identifying what had been given to Gruber Hurst in production

23   AEO designated in this case and getting those documents back

24   from the Gruber Hurst firm.

25       We were unsuccessful at that time until there was a

```
 1    court proceeding involving what Gruber Hurst had and still
 2    maintained at that time.
 3    Q.   We have the transcript in evidence as Exhibit 2 of that
 4    hearing, and you were present at that hearing; is that
 5    correct?
 6    A.   Yes, ma'am.
 7    Q.   Okay.  And during -- what position was taken by Gruber
 8    Hurst in the context of that hearing about the attorneys eyes
 9    only documents?
10         And I take it that during that hearing that the
11    McAlexander rebuttal report was one of the documents that was
12    at issue in that hearing; is that right?
13    A.   Yes.  It was one of the central documents that there was
14    a dispute about having been produced in the Eastern District
15    of Texas case and -- and maintained by the Gruber Hurst firm.
16    Q.   Was Gruber Hurst present at the hearing?
17    A.   Yes.
18    Q.   Okay.  And who -- what lawyers from Gruber Hurst were
19    present at the hearing to the best of your recollection?
20    A.   My recollection is Mr. Eric Tautfest, who is a partner
21    at Gruber Hurst and -- and who we as VAC's counsel were
22    communicating with was there.  I believe he was the one that
23    primarily addressed the questions that came from Judge
24    Sanderson.
25         I believe also a Mr. Michael Lang, was also a partner at
```

1    Gruber Hurst, was present during the hearing.

2    Q.   Prior to the hearing had Gruber Hurst filed any

3    pleadings in -- T-Netix the hearing?

4    A.   None that I can recall unless you can refresh my memory.

5    Q.   Were there motions -- had VAC sent out subpoenas to

6    Gruber Hurst for request for documents?

7    A.   We had.

8    Q.   And did Gruber Hurst move to quash those, do you

9    remember?

10   A.   You've refreshed my memory somewhat that it was either

11   Securus or the lawyers involved in this case and/or perhaps

12   Gruber Hurst who had moved to quash the documents.  What --

13   or the subpoenas.

14        What we were attempting to seek was the -- the scope of

15   what Gruber Hurst had in its files and when and how they had

16   obtained those documents.

17   Q.   At the hearing you said that Mr. Tautfest responded to

18   questions by Magistrate Judge Sanderson; is that correct?

19   A.   This is my recollection.

20   Q.   To the best of your recollection what was the position

21   taken by Mr. Tautfest about why they had the documents and

22   what they were going to do about it?

23   A.   My recollection was that Gruber Hurst at least initially

24   took the position that they were, in fact, co-counsel with

25   the Bell Nunnally and Pittman law firms for T-Netix in this

1   case and that therefore they were permitted to have copies of

2   AEO confidential designated documents under the protective

3   order entered in this case.

4   Q.   And what was judge -- Magistrate Judge Sanderson's

5   position on that, do you remember?

6   A.   My recollection is that at one point during the hearing

7   he said that, you know, Gruber Hurst could either enter, you

8   know, a formal appearance and enter as, you know, counsel in

9   this case, or had until a certain amount of time to -- and it

10  was either the same day or by the next morning, a quick

11  turnaround to represent to the court and to Jones Day, VAC's

12  counsel, that they had returned all of the documents that

13  they had obtained that were produced in this case.

14  Q.   And what did they -- what did they do?

15       What did Gruber Hurst do?

16       Did they enter an appearance or did they do something

17  else?

18  A.   They did something else.

19  Q.   And what was that?

20  A.   They returned voluntarily the documents to Jones Day and

21  made representations to the parties involved in this case and

22  Judge Sanderson that they retained no additional documents

23  that were produced in this case.

24  Q.   Take a look in your exhibit binder at Exhibit 6 and tell

25  us what that is.

1    A.   This appears to be a letter from Mr. Jeff Lowenstein

2    from the Bell Nunnally Martin firm to me dated April 17,

3    2008, regarding the return of all documents that had been

4    previously provided to the Gruber Hurst law firm that was

5    subject to the protective order entered in this case.

6    Q.   Take a look at Exhibit 7.  Tell us what that is.

7    A.   This is a copy of a letter that I sent to Mr. Lowenstein

8    the following day, it appears, April 18th, 2008,

9    acknowledging receipt of Bell Nunnally Martin firm's letter

10   notifying us that Gruber Hurst had returned all copies of

11   documents that contained any information designated by VAC as

12   confidential under the protective order in this case and

13   asking that all of those documents be sent to my office.

14   Q.   And then take a look at Exhibit 8, tell us what that --

15   Exhibit 8.  Tell us what that is.

16   A.   This is a copy of a letter dated April 18, 2008, from

17   Mr. Neal Suit of the Bell Nunnally Martin firm to me, it

18   appears hand-delivering documents that Mr. Tautfest and the

19   Gruber Hurst firm had sent back in compliance with Judge

20   Sanderson's directive during the hearing.

21   Q.   And item number 2 on that list, on the attached --

22   what's attached -- what's the document that's attached to

23   that?

24   A.   It appears that the -- the other letter that's attached

25   is referenced in Mr. Suit's letter to me that was a letter

1    from the Gruber Hurst firm to the Bell Nunnally firm listing

2    the items that had been returned to the Bell Nunnally firm

3    following the hearing before Judge Sanderson and then

4    subsequently delivered to Jones Day.

5    Q.   And what's item 2 on that list?

6    A.   It is the rebuttal expert report of Joseph C.

7    McAlexander regarding validity of claims.

8    Q.   Take a look at what's behind your tab 3 and tell us what

9    that is.

10   A.   This appears to be the 12 page report and

11   recommendation that Judge Sanderson issued regarding the

12   April 2008 hearing.

13        There is also I believe another report that he also

14   issued that denied T-Netix's request to declassify certain

15   documents under the protective order.

16   Q.   Was -- did the district court ever enter an order based

17   on this report and recommendation?

18   A.   No, I don't believe Judge Fitzwater did.

19   Q.   And what -- what happened after this report and

20   recommendation was issued?

21        What went on in the case?

22   A.   I don't remember exactly the -- the timing, but there

23   was a -- a series of -- of things that had occurred that led

24   up to settlement discussions between the VAC parties and the

25   Securus parties that ultimately led to a settlement prior to

```
 1    Judge Fitzwater issuing an order based upon the report and
 2    recommendation by Judge Sanderson.
 3    Q.   And the case -- do you remember when the case was
 4    ultimately settled and dismissed?
 5    A.   I'm sure you could refresh my recollection.
 6         Sometime in the late summer is my recollection.
 7    Q.   August of that year?
 8    A.   That sounds right.
 9    Q.   2008.
10         What happened -- when was the next time you heard about
11    this issue again, in terms of this -- this underlying case
12    or -- strike that.
13         What -- what happened next?
14         Did you continue to represent VAC at that point in any
15    of this litigation?
16    A.   We did not -- Jones Day did not.
17         And my recollection is that VAC wasn't -- at least we
18    were not aware of additional litigation involving VAC and
19    Securus during this subsequent time frame.
20    Q.   Did there come a time when the issue of the rebuttal
21    expert report raised its head again?
22    A.   Well, the -- a potential disclosure of the report did
23    raise its head again subsequently in another case.
24    Q.   And how did that happen?
25    A.   I -- I guess the next chain of events pertinent to this
```

```
 1    situation was a time when we -- we --
 2            MR. MATEJA:  Your Honor, I'm going to object.  Kind
 3    of a narrative answer.  We would ask that the witness be
 4    asked to answer a specific question.
 5            MS. MANGOLD:  I'll -- let me -- I'm sorry, Your
 6    Honor.
 7            THE COURT:  Overruled.
 8    BY MS. MANGOLD:
 9    Q.   I'll -- go ahead.
10            THE COURT:  You may answer.
11            THE WITNESS:  The next event that I recall that's
12    pertinent to why we are here today, is -- it's a circumstance
13    when we were -- I was a partner at Jones Day.  We were not
14    representing Value-Added Communications in -- in any active
15    lawsuit.  Mr. Tony Magee, who I knew from other lawsuits,
16    patent infringement cases involving other competitors,
17    reached out to me.
18    BY MS. MANGOLD:
19    Q.   What firm was he with at the time?
20    A.   He was with Gruber Hurst.  During the entire course of
21    my dealing with Tony Magee he always has been a partner with
22    Gruber Hurst.  He reached -- or at least as far as I know.
23         He reached out to me and said that he was involved in
24    some other lawsuits against other competitors, of which I was
25    not involved in, Jones Day was not involved in, and asked --
```

1    that he was trying to obtain copies of certain documents that

2    he understood had been exchanged in this case, the Northern

3    District of Texas case, for potential production in two other

4    patent infringement cases that he was involved in

5    representing Securus against other competitors.

6    Q.    Did he tell you what those cases were?

7    A.    He -- he told me -- I believe he told me the style of

8    the cases, that one of them was the Pinnacle Telmate case

9    pending in the Eastern District of Texas and then another one

10   was a Combined Public Communications case pending in

11   Kentucky.

12   Q.    And was Securus T-Netix a party in each of those cases?

13   A.    I believe so.  I believe that's what he said.

14   Q.    And do you remember when this telephone call or --

15   strike that -- when this communication was?

16   A.    I believe it's in my affidavit --

17   Q.    Why don't you take a look at --

18   A.    -- the exact timing.

19   Q.    Okay.

20   A.    I believe also in the summer.  Let me make sure I have

21   the --

22   Q.    Why don't you take a look at Exhibit 10 in the book.

23   A.    Is it Exhibit 4 perhaps?

24   Q.    Well, look at Exhibit 10.  And tell us what that is.

25   A.    This is an email that was sent to me, it looks like

1   it's been redacted, but a portion of an email that Mr. Magee
2   sent to me confirming -- he had reached out to me it looks
3   like August 2010 regarding a request to obtain copies of
4   certain documents that the opposing sides in patent
5   infringement cases were requesting.
6   Q.   The email is dated August 25th, 2010, and the email
7   states "Stephanie, thank you for taking the time to talk to
8   me last night."
9        Is it consistent with your recollection that you had a
10  conversation with Mr. Magee probably on August 24th, 2010?
11  A.   Yes, ma'am.  I believe I had one other telephone
12  conversation right around the same time with Mr. Magee
13  regarding the same request.
14  Q.   In Mr. Magee's email he says to you, it's in the last
15  sentence, "I have not seen these contentions because of the
16  prohibitions contained in the protective order, but I
17  understand that they were designated as confidential under
18  the protective order in place in that litigation."
19       Did you have any conversations with Mr. Magee as to
20  whether or not he had -- he says that in his email, but did
21  you have any conversations with him about whether he had seen
22  the documents at that point?
23  A.   I believe that Mr. Magee's request was a request to
24  obtain copies of the documents.  And I'm not sure he
25  affirmatively said, absent what he said here in writing, that

1    we had a conversation about whether he had copies of the

2    documents.

3        I assumed, you know, given that this was a part of the

4    prior proceeding that he did not.

5    Q.   Did Mr. Magee during this conversation in August of 2010

6    give you any indication that Gruber Hurst actually possessed

7    the document, the McAlexander rebuttal report?

8    A.   No, ma'am.  Absolutely not.

9    Q.   And I take it then that he did not tell you that --

10   whether those -- that document had already been produced to

11   the other side in any litigation?

12   A.   No, ma'am.

13   Q.   Okay.  When's the -- what happens after that?

14       Did you -- did you have any further dealings as to his

15   request?

16       What -- what did you do?

17   A.   I forwarded his request to the proper principals at

18   Value-Added Communications and I followed up with them saying

19   that this is what I understood Gruber Hurst was asking

20   permission to obtain copies of and could someone please, you

21   know, communicate back with Gruber Hurst about the request

22   and that I had -- I believe I disclosed to our former clients

23   at Value-Added Communications that I had expressed to

24   Mr. Magee that I did not anticipate that VAC would

25   voluntarily provide copies of those documents but that I was

1   passing along the information.

2   Q.   And what was your basis for telling Mr. Magee that you

3   did not believe it would be successful in getting permission

4   to produce those documents?

5   A.   Just that some of the documents that it appeared he was

6   asking for had been central in a prior contempt proceeding

7   and I did not anticipate that the clients would voluntarily

8   provide copies of those documents to Gruber Hurst to produce

9   in other cases.

10   Q.   And as far as you know did the client -- did VAC ever

11   give permission?

12   A.   I understand they did not.

13   Q.   When -- let's come forward then, and tell us the next

14   time that you are involved in a situation involving the issue

15   in this case.

16   A.   I guess sometime -- sometime subsequent to this August

17   2010 communication with Mr. Magee I didn't have any further

18   communication with Gruber Hurst or any other counsel for

19   T-Netix regarding this request.

20      But subsequent to that, the -- in the Combined Public

21   Communications cases --

22   Q.   Is that one of the cases Mr. Magee had talked to you

23   about that night when you had your conversation?

24   A.   Yes, ma'am.  In the Combined Public Communication cases

25   they -- the parties had conducted a -- what sounded like a

 1   failed mediation attempt with a magistrate judge in

 2   Louisville, and Mr. Magee was one of the counsel present

 3   during that as well as I believe Mr. Reinhold and the

 4   principals of Combined Public Communications.

 5        Following that first failed attempt to mediate, the

 6   principals of Combined Public Communications came into

 7   contact with us to potentially represent them in those cases.

 8   Q.   And then ultimately did Jones Day accept the engagement

 9   to represent of Combined in that litigation?

10   A.   Yes, ma'am.

11   Q.   And what -- who is the counsel that was prior counsel

12   for Combined?

13        Who is that, do you remember?

14   A.   I believe there was the Stites & Harbison firm out of

15   Louisville as well as Joe Bell, Campbell, out of Bowling

16   Green, Kentucky was also involved as a local counsel.  And I

17   don't recall if he was in both the patent litigation as well

18   as tortious interference cases, but he was certainly in the

19   tortious interference case.

20   Q.   And at the state's law firms, who was the lawyers that

21   were primarily responsible for the representation of

22   Combined?

23   A.   I believe it was Joel Beres and Christina Ryan.

24   Q.   Okay.  And did they stay in on the litigation once Jones

25   Day entered its appearance?

```
1    A.    Maybe for a short amount of time.
2    Q.    And what -- what then happened in terms of the materials
3    that they had?  Meaning the -- the prior law firm.
4    A.    Pursuant -- there was a -- there was a transfer of
5    files, correspondence, documents, to Jones Day as new counsel
6    for Combined Public Communications in those cases.
7    Q.    When -- when you entered your appearance in the case
8    what was the status of the case?
9          Was there discovery ongoing, were there motions?
10         What was going on?
11   A.    There had been a -- a second round of court-ordered
12   mediation before the magistrate judge in Louisville that was
13   going to occur in a very quick manner as soon as we were
14   coming in the case.  The first round had apparently been
15   unsuccessful but the judge deemed that there should be a
16   second round of mediation take place before the magistrate.
17   Q.    Ultimately were you involved in discovery in that case?
18   In the -- in the Combined case?
19   A.    Yes, at some point in time.
20   Q.    And do you remember when that -- when discovery began in
21   earnest?
22   A.    It was many months after we came into the case, the
23   reason being that we were involved in several rounds of
24   additional mediation and an attempt to settle.  I mean, there
25   were multiple cases going between these parties, as well as
```

1   motions to dismiss, motions to add additional parties

2   involved in the case.  And so while those motions were being

3   briefed and pleadings were being filed by the different sides

4   in the litigation we were not -- we did not have ongoing

5   discovery effort.

6   Q.   Okay.  Bring us up to the next time the McAlexander

7   rebuttal report becomes an issue.

8   A.   Let me see if I can refer back to my affidavit.  Was

9   that --

10  Q.   Exhibit 4.

11  A.   Exhibit 4.

12       It appears it was sometime in July 2011 when we were

13  beginning efforts and -- to restart discovery, the mediation,

14  and motions to dismiss.  Mediation had not been successful at

15  that point and the motion practice had been fully briefed and

16  some of that I recall had been ruled on.

17       We began going through the discovery correspondence.

18  And it was in the course of those efforts of going through

19  the correspondence to figure out what had and had not been

20  produced in the Combined Public Communications/Securus

21  lawsuits in Kentucky that this document was -- or a piece of

22  correspondence referring to Mr. McAlexander's report was

23  brought to my attention.

24  Q.   Take a look at what are Exhibit 9 and 11 in the book and

25  tell me if that's one of the pieces of correspondence that

```
 1   you are referring to.  Either one or both of those.
 2   A.   My intent to raise the question was Exhibit 11 and the
 3   privileged log attached to Exhibit 11.
 4   Q.   And how about Exhibit 9, do you remember seeing that at
 5   about the same time or in the course of -- of this review?
 6   A.   It looks like this copy has been redacted, I assume for
 7   production or use in this case, but I recall seeing in
 8   correspondence between Mr. Magee and CPC's then counsel at
 9   some point in time in the late summer of 2011.
10   Q.   What's -- as to Exhibits 9 and 11, what impact did they
11   have on you, if any?
12          MR. COOK:  Objection, Your Honor.  This gets into
13   Ms. Clouston's state of mind.
14       You know, this is irrelevant.  And because Ms. Clouston
15   at the time was representing another client, you know, this
16   could get into privilege -- privileged communications.  I
17   would ask that counsel restate the question.
18          MS. MANGOLD:  I will -- I will narrow the question,
19   Your Honor.
20   BY MS. MANGOLD:
21   Q.   Do both of these documents -- or do both of these bits
22   of correspondence deal with the confidential documents from
23   the earlier case?
24       Did you read them to -- to relate to those?
25          MR. MATEJA:  Objection.  Vague, Your Honor.  I'm
```

```
 1    not sure I understand.  "Confidential documents" in the other
 2    case?
 3              MS. MANGOLD:  Let me take a look.
 4    BY MS. MANGOLD:
 5    Q.   Take a look at the email -- I'm sorry, the letter which
 6    is 11.  As to the letter to Mr. Beres from Mr. Magee, as to
 7    the last -- the first paragraph, it says, "As indicated in
 8    previous discussions."
 9    A.   Yes.
10    Q.   Strike that.
11         At the very beginning of that letter it says, "I have
12    enclosed a preliminary privilege log identifying the
13    documents or pages of documents that we wish to snap back."
14         Do you see that?
15    A.   Yes.
16    Q.   And take a look at the document that's identified as
17    Exhibit A to this letter.
18         Do you see that?
19    A.   And the A looks like it's at APP 15 and is a privilege
20    log.
21    Q.   And what's item number 1 on that privilege log?
22    A.   It is the -- referred to by a Bates number and
23    identified under the column privilege document type a
24    rebuttal expert report of Joseph McAlexander.
25    Q.   When you saw -- when you saw this document in --
```

1    sometime in 2011, this letter, did it -- what impact did it

2    have on you in the context of your earlier discussions with

3    Mr. Magee from August of 2010, if any?

4    A.   Well, first --

5            MR. MATEJA:  Objection, Your Honor.  I'm not sure I

6    understand "impact."  Vague.

7    BY MS. MANGOLD:

8    Q.   Did you have any reaction to it?

9    A.   I can -- I can explain, you know, what steps I took

10   next, if that is an appropriate way to -- to answer the

11   question.

12       I guess the -- the issue that was raised with me, I -- I

13   had an associate that was going through just the

14   correspondence file for the Combined Public

15   Communications/Securus case.  The issue was raised that this

16   appears to be someone else's document but how is it that

17   Securus is claiming -- putting a document like that on their

18   privilege log, is it their privilege, which struck me as odd.

19       I looked at the privilege log and I realized pretty

20   quickly from the description what I at least thought the

21   document likely was, given that I have only been involved in

22   one other contempt proceeding and this was central to that

23   contempt proceeding, the -- the particular McAlexander

24   rebuttal report.  It appeared to be one and the same from the

25   description.

1    Q.    What'd you do next?

2    A.    Next we took steps -- I recall that at that time that

3    the -- that Mr. Magee had reached out to me in relation to

4    some of -- it appeared that some -- the same document, or a

5    subpart of the same documents that were included in this

6    privilege log, Exhibit 11.  I went back to look to see if I

7    had that correspondence still.

8          At that point we attempted to determine whether or not

9    there had been any permission given by Value-Added

10   Communications, if and what the scope -- if not, then what

11   the scope of the potential issues were.

12         And I went and talked to my partners at Jones Day and

13   the ALAS partners at Jones Day to determine what obligations

14   we had and what steps Jones Day should take to notify -- if

15   any, to notify its current and former clients.

16   Q.    And what did Jones Day do?

17   A.    Subsequent to my departure from the Jones Day

18   partnership and joining Alston & Bird, it appears Jones Day

19   did determine that the proper course was to notify

20   Value-Added Communications about the -- what appeared to be

21   production of documents subject to this protective order in

22   this Northern District of Texas case.

23   Q.    Take a look at what's been marked as -- or, I'm sorry,

24   what's in evidence as Exhibit 13, which is in your binder.

25   A.    Yes.

Q.    Tell me what that is.

A.    Exhibit 13 is a letter response that I wrote to

Mr. Lowenstein at the Bell Nunnally firm and Mr. Magee of the

Gruber Hurst firm after receiving a demand from them that I

take certain steps if they had not already been taken to

sequester and remove the documents that had been improperly

produced in previous cases.

Q.    What steps, if any, did you take or had you taken in

that regard?

A.    We had -- we had immediately taken steps to segregate

the documents, determine what we could find that had been

improperly produced in the case, determine if there were

others, and we had segregated and expunged them from our

records.  And they were never provided to anyone by our side.

And I stated that in my response letter to Mr. Magee and

Mr. Lowenstein.

Q.    Has the protective order in this case ever been

modified, the one you looked at, at the very beginning of

your testimony?  Has -- has that protective order ever been

modified?

A.    Not to my knowledge.  I believe that judge -- that was

part of the motions that had been filed by the T-Netix

parties as part of the former contempt proceeding to enforce

the protective order and Judge Sanderson denied the relief to

modify the protective order.

```
 1              MS. MANGOLD:  Thank you, Ms. Clouston.
 2       I have no further questions at this time.
 3              THE WITNESS:  Thank you, Ms. Mangold.
 4              MR. MATEJA:  Cross-examination, Your Honor?
 5              THE COURT:  Yes, sir.
 6              MR. MATEJA:  I don't want to be presumptuous
 7    either, Your Honor, but there's also other defense counsel as
 8    well.    But if you don't mind, Jeff, I'm going to take
 9    the --
10              MR. LOWENSTEIN:  Be my guest.
11                         CROSS EXAMINATION
12    BY MR. MATEJA:
13    Q.   Ms. Clouston, my name is Bill Mateja.  I'm with Fish &
14    Richardson and I represent Gruber Hurst.
15         First, thank you.  You agreed to accept the subpoena
16    that we had issued and we appreciate that very much.
17         Now, one thing that I'd like to find out a little bit
18    more about, because I had never seen this McAlexander report
19    because it supposedly was subject to the protective order,
20    is -- tell the court what this report is.
21    A.   Well, I haven't seen it in quite some time.  It is
22    subject of the protective order.
23    Q.   Okay.
24    A.   I don't believe that that is in dispute.
25    Q.   Okay.
```

```
 1   A.   It was, you know, discussed in --
 2   Q.   No.  No.  No.  You can just answer my question about
 3   it's a rebuttal report that talks about what?
 4   A.   It addresses infringement or invalidity contentions and
 5   contains a rebuttal to some of the technical expert testimony
 6   that Value-Added Communications and Value-Added
 7   Communications' engineers had put forth about what's talked
 8   about in patent cases as prior art, prior art on systems that
 9   had been developed by Value-Added Communications, prior art
10   in other published and unpublished patents, technical
11   documents.  And this was a rebuttal that came from the
12   T-Netix outside retained expert --
13   Q.   All right.
14   A.   -- rebutting some of the prior art contentions.
15        It's -- it's quite long, as I recall, and incorporated
16   testimony from various witnesses, both technical witnesses
17   and others, as well as documents that have been exchanged in
18   the case.
19   Q.   So the report itself is actually a report that's
20   prepared by the expert that T-Netix hired in that case; is
21   that right?
22   A.   Yes, sir.
23   Q.   Okay.  And it relates to invalidity contentions that
24   have been made in that case by your client, which is
25   Value-Added Communications, right?
```

1    A.    Yes, sir.

2    Q.    And the invalidity contentions, just because I want to

3    make sure we understand this, invalidity has to do with,

4    example, if there is prior art that exists out there in the

5    world then it might make a patent invalid because the art

6    already existed prior to the patent; is that right?

7    A.    Yes.  That's a part.  I mean, that's what -- generally

8    what the invalidity contentions we're discussing.

9    Q.    All right.  I'll be honest with you.  I had no idea what

10   it meant until this case.  Okay?

11        So -- so that I understand this then, is -- does the

12   report have to do with invalidity contentions?

13   A.    That is my recollection.  I mean, that's the -- on the

14   face of it what the title is.

15   Q.    Okay.  So if in the case that Mr. Magee called you

16   about, okay, the other side in that case, had asked for

17   documents that related to invalidity contentions, do you

18   believe that this report would have been responsive to a

19   discovery request along those lines?

20             MR. COOK:  Objection, Your Honor, completely

21   irrelevant, calls for speculation.

22             MR. MATEJA:  It doesn't call for speculation, Your

23   Honor.  She's a lawyer, handles these kind of cases all the

24   time.

25             THE COURT:  Overruled.

1          THE WITNESS:  Depending upon what the requests were

2   from the Pinnacle Telmate lawyers and the CPC counsel, it --

3   it could have been.

4   BY MR. MATEJA:

5   Q.   Okay.  I mean, just generally if they request documents

6   that relate to invalidity contentions related to the patent

7   that's in the lawsuit, then this report could have been

8   responsive to that.  Is that correct?

9   A.   I mean, depending, again, what -- what the request was.

10  Q.   I didn't give you the specifics.

11  A.   Okay.

12  Q.   I've just given you the general.

13  A.   It could be.

14  Q.   Okay.  Okay.  Now, the invalidity contentions themselves

15  though, I mean, that's actually kind of a term of art that's

16  different than an expert report that may deal with

17  invalidity; is that correct?

18  A.   Typically that's true, as I understand it.

19  Q.   So, I mean -- and, again, I'm no patent litigator, but

20  as I understand it in patent litigation cases a party might

21  file a pleading that's called their -- their invalidity

22  contentions; is that right?

23  A.   Yes.

24  Q.   Okay.  I mean, it's a pleading.  Is it styled invalidity

25  contention up at the top?

```
 1   A.   Usually the parties exchange some sort of proposed terms
 2   and what they believe the scope of the patents would be on
 3   each side.   How -- how terms including words in the patent
 4   should be interpreted.   And then they could come to agreement
 5   on that or not.   Then there may be expert testimony --
 6   Q.   Right.
 7   A.   -- if you do not agree about what those terms may be,
 8   regarding what the claims are, what is valid and what may not
 9   be -- what may be invalid.
10   Q.   Thank you.
11        Let's -- let's turn our attention, if we can, already
12   admitted into evidence is VAC Exhibit Number 4, which was
13   previously marked Gruber Hurst Exhibit 23.   If I could --
14             THE COURT:   I'm sorry, which number?
15             MR. MATEJA:   It's VAC Exhibit Number 4.
16             THE WITNESS:   Mr. Mateja, is it in the white
17   notebook?
18   BY MR. MATEJA:
19   Q.   Well, I'm going to try to stick to the white notebook as
20   much as I can.   It's your declaration that you have referred
21   to a number of times.
22        If we can let's go ahead and turn to paragraph 15 of
23   that declaration.
24             MR. MATEJA:   And, Beverly, if we can, it's at the
25   very bottom.
```

BY MR. MATEJA:

Q.   And correct me if I read this wrong.

     You have referred to your declaration a number of times.

     In paragraph 15 it reads "Subsequently, in or about July 2011, in preparation for upcoming discovery --" let's go to the next page, which is page 6.

          MR. MATEJA:  And let's blowup that paragraph.

          THE COMPUTER OPERATOR:  I'm sorry.

          MR. MATEJA:  No.  You're doing fine, Bev.

     Your Honor, by the way, this is Beverly Congdon, who is with the Gruber Hurst firm who is assisting.  I forgot to introduce Bev.

BY MR. MATEJA:

Q.   Okay.  So up at the very top, preparation for depositions.  "I asked one of my associates at Jones Day to review discovery-related correspondence that were in the files transferred in or about November 2010 to Jones Day by CPC's former counsel Stites & Harbison."

     And CPC is Combined; is that right?

A.   Yes.

Q.   "During that review, the Jones Day associate brought to my attention two documents she found while reviewing the discovery correspondence: an August 27, 2010 letter from Magee to Stites & Harbison referencing Gruber Hurst's inadvertent production of privileged documents and (2) the

1   privilege log Enclosed with Mr. Magee's letter.  I

2   immediately recognized that among the materials identified in

3   the privilege log was the McAlexander rebuttal report, one of

4   the AEO designated documents subject to the protective order

5   in this litigation.  This is the first time that I had seen

6   either Mr. Magee's letter or the attached privilege log."

7        Did I read that correctly?

8   A.   Yes, you did.

9   Q.   And if we look at the next paragraph, I mean that's the

10  extent in your declaration at least of talking about what it

11  is that you actually see in this July 2011 time frame; is

12  that correct?

13  A.   Yes.  That is correct.

14  Q.   Okay.  In the declaration it doesn't say anything about

15  how you actually saw the McAlexander report, does it?

16  A.   It -- it does not.

17  Q.   Okay.  I mean, even if you look at paragraph 16, I mean,

18  we start talking about other things, but I mean there's no

19  mention made of how you have seen the report or had a copy of

20  the report given to you or have anything with you actually

21  physically possessing or looking at the report; is that

22  correct?

23  A.   As soon as I saw the correspondence --

24  Q.   Right.

25  A.   -- this is pointing to, I -- I knew Mr. Mateja what the

1  report was --

2  Q.   Right.

3  A.   -- because, again, it had been central to the prior

4  proceeding before Judge Sanderson.

5  Q.   Okay.  I mean, the truth is -- is that you never looked

6  at the report in July of 2011, did you?

7  A.   I -- we looked at the documents.  I don't recall if I

8  looked at it or maybe looked at the first page.  I did not

9  review it carefully, go through any part of the report.

10  Q.   Right.

11  A.   I looked at the correspondence and in that point of July

12  2011 we were attempting to determine if this was improperly

13  obtained --

14  Q.   Right.

15  A.   -- and produced --

16  Q.   Right.

17  A.   -- if there had been permission given.

18        There were many other documents that had that --

19  Q.   And you did answer my question.  I understand that.

20  A.   Okay.

21  Q.   My question is focused on the report itself.

22  A.   Okay.

23  Q.   I mean, the truth is that you personally never looked at

24  the McAlexander report in July of 2011; is that correct?

25  A.   I believe I did.  I -- I did not go through every page,

1    but I believe I had the related Bates number pulled and

2    looked at the first couple of pages of it to confirm that it

3    was what I thought it was.

4    Q.   Now, tell me where in your declaration it says that you

5    actually looked at the report.

6    A.   I don't know if it -- if it does, Mr. Mateja.

7    Q.   Well, it doesn't, does it?

8    A.   I'm not sure if it does.  I can tell you I recognized at

9    that time in July 2011 what appeared to be a concern under

10   the protective order and we were taking steps to

11   determine --

12   Q.   You know --

13   A.   -- if there was a concern --

14   Q.   -- and I'm sorry to interrupt --

15   A.   -- and what to do.

16   Q.   -- but you have answered my question to a certain

17   extent, but I want to make sure I get a full-fledged answer.

18        I mean, it's not in here.

19        Let's take a look at paragraph 16.  In 16, let's take a

20   look at it, is there anywhere in paragraph 16 where it says

21   that you physically looked at the McAlexander report?

22   A.   No, it does not.

23   Q.   In paragraph 17 it doesn't say that you physically

24   looked at the McAlexander report, does it?

25   A.   It does not.  Paragraph 17 addresses the timing of when

1    I departed from the partnership of Jones Day and joined

2    Alston & Bird.

3    Q.   And we'll come back to that in just a second, but

4    because you went back through the prior correspondence in the

5    case, did you see the correspondence from the Stites &

6    Harbison firm that indicated that they sent back the

7    McAlexander report and that they destroyed any copies that

8    they might have electronically?

9    A.   I -- I'm not sure at that point in time if I had seen

10   that or if it was subsequently, but prior to today, yes, I

11   have seen those.

12   Q.   In fact --

13   A.   -- that correspondence.

14   Q.   -- you know that Stites & Harbison represented to my

15   client, Gruber Hurst, that they had deleted the McAlexander

16   report and that they had sent back the electronic hard drive

17   that Gruber Hurst originally sent to them that had the report

18   on it.

19   A.   I'm not sure I know that.  If they filed something in

20   this proceeding -- in this particular hearing I haven't been

21   privy to it, but I saw the correspondence that we were

22   referring to earlier from Mr. Magee.

23   Q.   Okay.  Well, I'm talking about correspondence from

24   Ms. Christina Ryan who actually was a lawyer with Stites &

25   Harbison.

1      I mean, you're aware that Stites & Harbison told Gruber

2  Hurst before July of 2011 that they had destroyed the

3  McAlexander report and that they had sent back the copy that

4  was on the external hard drive to Gruber Hurst.

5  A.   I saw correspondence to that effect at some point in

6  time.

7  Q.   Okay.  But you're telling the court today that you

8  actually saw the McAlexander report.

9  A.   I did see the -- Mr. McAlexander report.

10  Q.   But you didn't put it in your declaration, did you?

11  A.   Not in the paragraphs that we have looked at, but that

12  wasn't the -- the focus of -- what -- what I was asked to

13  testify about.

14      I was -- I was asked, Mr. Mateja, and subpoenaed by you

15  to be here, to put forth a timeline of what had occurred.  I

16  assumed that it was uncontested --

17  Q.   But wouldn't it be --

18  A.   -- that Mr. Gruber Hurst --

19  Q.   -- important to put you -- wouldn't it be important to

20  put in your declaration that you actually physically saw the

21  report and that -- what you did with the report?

22      Because there's nothing mentioned in your declaration.

23  A.   In the letter that I sent back to Bell Nunnally --

24  Q.   Right.

25  A.   -- and Gruber Hurst that appears to be part of this

1  record, I did discuss what I had -- the steps I had taken,

2  the steps that we had taken to make sure that there was --

3  there was an improper disclosure from our side of the report.

4  So I -- I'm sorry, I'm missing the point of --

5  Q.   But, Ms. Clouston --

6  A.   -- that's not what I was asked to do.  I was asked to

7  put together a timeline.

8              THE COURT:  Ms. Clouston, sometimes when we are

9  called as witnesses, as lawyers we sort of get on in our

10  advocacy role as opposed to our witness role.

11      I'm going to ask you to listen what he's asking you and

12  just answer that.  And you've got a lawyer, very capable

13  here, to object when it's appropriate.

14  BY MR. MATEJA:

15  Q.   When you put together the declaration you did it in

16  conjunction with counsel for Value-Added Communications; is

17  that correct?

18  A.   Yes.

19  Q.   Okay.  And it was T-Netix this contempt proceeding?

20  A.   Yes.

21  Q.   Okay.  And some of the issues that the court knows are a

22  part of this proceeding is -- is what remedy needs to occur

23  in order to right the supposed wrong, i.e., if there was an

24  offending document like the McAlexander report, the court

25  would need to know about it so it could remedy that and make

1   sure that it either went back to the right party or was

2   destroyed.

3       So in your declaration you say nothing about the fact

4   that you-all had the document, what you did with the document

5   to destroy it, nothing along those lines.  Is that right?

6   A.   That is correct.

7   Q.   Okay.  But yet Ms. Stites -- or excuse me, Ms. Ryan at

8   Stites & Harbison said that you never got the document

9   because they destroyed it and they sent back the external

10  hard drive back in August of 2010.  Isn't that right?

11             MS. MANGOLD:  Objection.

12             THE WITNESS:  I don't know what Ms. Ryan --

13             THE COURT:  Let me ask you to just stop for a

14  moment.

15      What is your objection?

16             MS. MANGOLD:  The objection is what Ms. Stites said

17  about whether the Jones Day law firm actually received it.

18  There's no foundation for that.

19             MR. MATEJA:  She said she had reviewed the

20  documentation from the Stites & Harbison law firm, Your

21  Honor.

22             THE WITNESS:  You're incorrect.  I said I had

23  reviewed the Gruber Hurst correspondence that went to

24  Stites & Harbison that I believe we've already discussed.

25             THE COURT:  Mr. Mateja, you probably need to

```
 1   rephrase your question then.
 2            MR. MATEJA:  Okay.  Actually, I'm going to move on,
 3   Your Honor, to paragraph 17.
 4   BY MR. MATEJA:
 5   Q.   So, Mrs. Clouston, on paragraph 17 we see in this
 6   paragraph, and correct me if I read this wrong, but "Around
 7   the same time I left Jones Day and joined Alston & Bird LLP."
 8        "Around this time I left Jones Day and joined Alston &
 9   Bird.  In October 2011, Jones Day notified VAC of the
10   apparent misuse of T-Netix/Securus and/or its outside
11   counsel, Gruber Hurst of VAC's confidential information in
12   further violation of the protective order."
13        So tell me, when did you leave Jones Day?
14   A.   It was in August of 2011.
15   Q.   August of 2011.  Okay.
16   A.   Yes, sir.
17   Q.   Okay.  Did you know that in this case that the motion to
18   reopen the case was not filed until August of 2012, some ten
19   days after Jones Day notifies VAC?
20   A.   I have not reviewed the document in this proceeding, so
21   no.
22   Q.   Okay.  Go with me.  I'm not making that up.
23        So if Jones Day notified VAC in October 2011, it took
24   VAC ten months after it was told by Jones Day about the
25   McAlexander report, to actually file a motion to reopen this
```

```
 1   case.  Is that right?
 2   A.    If -- if your dates are correct.  That appears to be
 3   right.
 4            MR. MATEJA:  They are, Your Honor --
 5   BY MR. MATEJA:
 6   Q.    Or they are, Mrs. Clouston, yes.
 7   A.    You can't escalate me like that.
 8                        (Laughter)
 9   Q.    Now, it's July of 2011 when you become aware of the
10   McAlexander report in the Combined production.  I mean, I
11   know that you have told the court that you visited with some
12   of your partners, but, in fact, I mean, you could have
13   contacted VAC in July of 2011.  Isn't that correct?
14   A.    Could I?
15         Are you asking steps and things I could have done?
16   Q.    Well, you could have called them up when you saw that
17   they had this.  And obviously this document was subject to a
18   protective order, as you stated, I don't -- there's no
19   contention otherwise.
20   A.    And I -- I -- I did not do that.
21   Q.    Okay.
22   A.    And --
23   Q.    You answered my question.
24         And you could have contacted them before you left,
25   whenever that was, sometime in August of 2011?
```

```
1    A.   I could have, but it wouldn't have followed the protocol
2    set forth at Jones Day for this type of situation.
3    Q.   Okay.  Now, Jones Day could have contacted VAC in August
4    of 2011, after you left; is that correct?
5    A.   I -- I --
6              MR. COOK:  Objection, calls for speculation.
7              THE WITNESS:   -- What Jones Day could or couldn't
8    have done, I believe --
9    BY MR. MATEJA:
10   Q.   All they have got to do is pick up the telephone and
11   call the CEO of VAC.
12             MR. COOK: Objection, Your Honor.  He's asking her
13   to testify what Jones Day could have done after she left
14   Jones Day.
15             THE COURT:  Mr. Mateja, let's move along.
16   BY MR. MATEJA:
17   Q.   All right.  The boom line is that from the time that you
18   at Jones Day find out about the report, I mean, it takes the
19   rest of July, September, August, and into October before
20   Jones Day notifies VAC about the possession of a document
21   that was very important, that you knew it had been part of a
22   contempt proceeding previously.  Isn't that correct?
23   A.   Yes.  I assumed they were going through the
24   protocols --
25   Q.   You answered my question.
```

1    You answered my question.  Thank you.

2    I want to explore just a second, Mrs. Clouston, in the

3 underlying VAC case that VAC sought to reopen and has been

4 reopened and gives rise to this proceeding, the -- the case

5 was actually settled sometime ago.

6    Do you recall what the date of that settlement was?

7    I think you had to refer to something, but I don't

8 remember the date.

9 A.   I believe it was sometime in the fall of 2008 or late

10 2008.

11 Q.   Okay.  And this was after the -- the settlement happens

12 after the hearing in front of Judge Sanderson?

13 A.   Yes, sir.

14 Q.   It appears after you file the motion to enforce the

15 protective order which gave rise to the hearing in front of

16 Judge Sanderson; is that correct?

17 A.   Yes, sir.

18 Q.   And ultimately as a part of that settlement the -- your

19 client, VAC, files a motion essentially to withdraw that

20 motion to enforce the protective order; is that correct?

21 A.   Yes.

22 Q.   And so at least as of the time of the settlement, you

23 know, there was no final order that was issued in that case,

24 VAC had withdrawn its motion to enforce the protective order,

25 and that's where things stood as of that day; is that

```
 1   correct?
 2   A.   I believe procedurally that's where it stood.
 3   Q.   Now, let's turn our attention to another area.  And
 4   let's talk about the time when Mr. Magee calls you up in
 5   August of 2008.
 6        And I believe that the email that counsel for VAC showed
 7   you was an email that you had gotten from Mr. Magee dated
 8   August the 25th.  Is that your recollection?
 9   A.   I believe so.  I believe the year was 2010 instead of
10   2008, as you had --
11   Q.   My bad.  My bad.
12        And let's go ahead and throw that up on the screen, if
13   we can.  That would be Exhibit Number 13.  It's our 13.  And
14   it's already into evidence as VAC Exhibit 10.
15        Okay.  So if we can blow up the date.  That's August the
16   25th.  And then let's go to the very next page, to the second
17   page, Mrs. Clouston.
18        And this is basically an email where Mr. Magee is
19   writing you to kind of confirm the conversation that he had
20   with you the prior day.
21        Correct me if I read this wrong.
22        "Stephanie:  Thank you for taking the time to talk to me
23   last night.  I have attached a copy of the letter that my
24   colleague sent to VAC's CEO earlier this month.
25        "Please would you follow-up with VAC and let me know as
```

 1  soon as you can what its position is with regard to our

 2  clients producing in the two cases identified above marked as

 3  'confidential - attorneys eyes only' the agreements

 4  identified in the letter."

 5       Now, what letter is he talking about?

 6  A.   I believe he's talking about a letter that Gruber Hurst

 7  had sent to Value-Added Communications.  It doesn't appear to

 8  be attached to Exhibit -- well, I'm looking at Exhibit 10.

 9  I'm sorry.

10  Q.   I tell you what.  Why don't we look at the Gruber Hurst

11  Exhibit binder now.  And let's take a look at Gruber Hurst

12  Exhibit 9.

13            MR. MATEJA:  Which, Your Honor, I would go ahead

14  and offer up.  I don't know if --

15            THE COURT:  Is there any objection?

16            MS. MANGOLD:  No, Your Honor.

17            THE COURT:  Did you offer the whole binder or

18  Exhibit 9?

19            MR. MATEJA:  Your Honor, while we're at it, if I

20  can, that would be optimal.

21            THE COURT:  It's fine with me, but are there any

22  objections?

23            MS. MANGOLD:  I have not had a chance to look at

24  the whole thing right now, Your Honor.  We'll look at it

25  though.

 1          THE COURT:  Okay.  Well, let's start with Number 9
 2  and --
 3          THE WITNESS:  Mr. Mateja, I --
 4          THE COURT:  -- and come back to that.
 5          THE WITNESS:  -- I'm not sure, I just opened this
 6  binder and I do see that there is an outline that says Gruber
 7  Hurst position regarding show cause and I'm not sure if it's
 8  privileged and you want it back.
 9          MR. MATEJA:  It's not.
10      Thank you though.
11          THE WITNESS:  I'm sorry, Mr. Mateja, which number
12  would you like --
13  BY MR. MATEJA:
14  Q.   Exhibit 9.  And -- and while you're flipping to 9
15  recall -- and we were just talking about how Mr. Magee was
16  following up on a letter that had been sent to T-Netix as to
17  whether or not T-Netix could turn over in other litigation
18  some agreements that had been entered in the VAC case.
19      And so let's blow up that, if we can, the re lines.
20      If we look at the re lines we see that these are two
21  cases and -- and one of those cases is the Combined case that
22  we've talked about; is that correct?
23  A.   Yes, it is.
24  Q.   And then the other case is the Pinnacle public services
25  case in the Northern District that we've also talked about;

1   is that correct?

2   A.   Yes.

3   Q.   Okay.  So the date of this letter is August the 9th.

4        And let's take a look at the very first paragraph of

5   this document.

6        And in the very first paragraph it says, "We represent

7   T-Netix in the above-named patent infringement suits and its

8   parent and affiliate corporations Securus Technologies and

9   Evercom Systems.  We have received requests for production of

10  documents in these cases that would require our clients to

11  produce copies of the agreements identified in Exhibit A to

12  this letter."

13       Is that correct?

14  A.   Yes.

15  Q.   And then if we take a look at Exhibit A, which I believe

16  is attached, we see that there is a protective order that's

17  been entered in the T-Netix versus Combined Public

18  Communications case; is that correct?

19  A.   Yes.

20  Q.   Okay.  But at least what is -- what is actually listed

21  in the Exhibit A is a settlement agreement and release dated

22  8/1 of '08 and an amended and restated -- it says patient,

23  but I think that means patent license; is that correct?

24  A.   I would assume so.

25  Q.   And -- and essentially this letter is asking if VAC

**VAC App. 096**

1    would agree to allow T-Netix to produce this in the two cases

2    noted on the re line; is that correct?

3    A.   It -- it appears so.

4         Mr. -- someone from the Gruber Hurst firm is the author

5    of this document.

6    Q.   Okay.  Demarron A. Berkley.  And it purports that he is

7    a lawyer with Gruber Hurst, correct?

8    A.   Yes.

9    Q.   So it's apparent from looking at this letter that in

10   these cases there are discovery requests that are being made

11   to T-Netix/Securus, and that they're following up on these

12   requests and they have to reach out to parties in other

13   litigation in order to get documents that would be responsive

14   to those discovery requests.  Is that a fair statement?

15   A.   It appears so from this correspondence.

16   Q.   So when Mr. -- when Tony Magee calls you not only is he

17   following up on this, but I also want to direct your

18   attention if we can to what has been previously marked as

19   Gruber Hurst Exhibit Number 8 --

20            MR. MATEJA:  Which we would offer.

21            THE COURT:  Any objection?

22            MS. MANGOLD:  Your Honor, let me find it.

23            MR. MATEJA:  And while she's finding it, Your

24   Honor, it is the defendant's first set of request for

25   production of documents to plaintiff in the T-Netix versus

```
 1    Combined Public Communications case.

 2              MS. MANGOLD:  No objection, Your Honor.

 3              THE COURT:  It's admitted.

 4    BY MR. MATEJA:

 5    Q.   So, Ms. Clouston, if we can, let's take a look at page 9

 6    of what has been introduced as Gruber Hurst Exhibit 8.  And

 7    let's take a look at requests number 13 and 14, which, again,

 8    is on page 9 of the document.

 9         And correct me if I read this wrong, but it says --

10    Request number 13 says, "All documents or things that could

11    be prior art with respect to any patent-in-suit either alone

12    or in combination with other prior art, including, but not

13    limited to, any documents or things you believe or that

14    others have asserted to be prior art with respect to any

15    patent-in-suit and/or related patents."

16         Did I read that correct?

17    A.   Yes, sir.

18    Q.   And then request number 14, "All documents or things

19    that indicate the existence of potential sources of prior art

20    with respect to any patent-in-suit (regardless of any belief

21    that it may be cumulative to other prior art)."

22         Did I read that correct?

23    A.   Yes.

24    Q.   Now, we've talked about this prior art, how prior art is

25    kind of central to the notion of invalidity connections; is
```

1   that correct?

2   A.   Yes.

3   Q.   Because an invalidity contention could be that the

4   patent is invalid because prior art exists such that the --

5   you could defend on the basis of invalidity of the patent.

6   Is that correct?

7   A.   That's correct.

8   Q.   Okay.  So, again, this is an RFP in connection with that

9   case.

10       And if you will, take a look at the -- the end of the

11  document.  This would be pages -- page 16, that -- the -- the

12  date of the certificate of service is June 23rd, 2010.  Is

13  that correct?

14  A.   Yes.  That's what the document says.

15  Q.   Okay.  So -- so when Mr. Magee calls he's following up

16  on Demarron Berkley's letter that we saw, which is Gruber

17  Hurst Exhibit 9.  And he also tells you that they have made a

18  request for invalidity contentions in the Combined and I

19  believe also the Pinnacle cases; is that correct?

20  A.   Yes.  That's my recollection.

21  Q.   Okay.  And -- and, in fact, they have requested

22  materials that relate to invalidity contentions based upon

23  your review of the RFPs that we just looked at; is that

24  correct?

25  A.   Yes.  In numbers 13 and 14 from the Combined Public

1  Communications.

2      I don't believe you've shown me anything from the

3  Pinnacle discovery requests.

4  Q.   Right.  But at least for Combined; is that correct?

5  A.   It appears so.

6  Q.   So when he calls you on the 24th of August, I mean, he

7  asks you for permission to basically disclose any invalidity

8  contentions and also the two agreements that are subject of

9  Mr. Berkley's letter; is that correct?

10 A.   My recollection is he is asking permission to obtain

11 copies of them in order to then obtain permission to

12 disclose.

13 Q.   Okay.  Okay.  And ultimately it's your understanding

14 that VAC said no.

15 A.   Yes.  That's my understanding.

16 Q.   Okay.  And do you know whether or not Mr. Magee even

17 knew of the existence of the McAlexander report at the time

18 that he called you on August the 24th?

19      MR. COOK:  Objection, calls for speculation, Your

20 Honor.

21      MR. MATEJA:  I just asked if she knew.

22      THE COURT:  Yeah.  He just asked her if she knew.

23 You may answer.

24      THE WITNESS:  I don't recall of him specifically

25 mentioning the McAlexander report.  He did mention invalidity

1   contentions that had -- had been the subject of a prior

2   proceeding.

3   BY MR. MATEJA:

4   Q.   Okay.  So for all you know he had no idea that the

5   McAlexander report existed when he called you on August the

6   24th?

7   A.   I'm not sure.  I think I wouldn't want to speculate.

8   Q.   Well, do you know?

9   A.   He did not specifically mention Mr. McAlexander in the

10  invalidity contention.  He mentioned the invalidity

11  contentions that were a subject of the prior proceeding.

12  Q.   That's right.  That's right.

13       And you have no knowledge as you sit here today that he

14  knew when he talked to you about the McAlexander report?

15  A.   He said he had never seen any reports --

16  Q.   I know that's what you told me before, but I'm asking

17  you --

18  A.   -- and that's what his correspondence says --

19  Q.   -- I'm asking you a very specific question though, and I

20  ask that you answer that question.

21  A.   Okay.  I don't understand.

22  Q.   As you sit here today you have no idea whether or not

23  Mr. Magee knew about the McAlexander report on August the

24  24th, when he called you.

25  A.   I don't know.

1   Q.   Okay.  You don't know that he had any knowledge; is that

2   correct?

3   A.   I -- I don't know.  I can only surmise from the

4   surrounding correspondence that --

5   Q.   Well, no, no.

6   A.   -- what he was asking for.

7   Q.   Okay.

8   A.   But I don't know.  He did not say to me -- he did not

9   name specifically Mr. McAlexander's invalidity report that

10  had been subject of the VAC sanctions proceeding previously.

11       He said he did not --

12  Q.   Okay.

13  A.   -- he did not have them.

14  Q.   I mean, the truth was Mr. Magee was not -- he didn't

15  even work for Gruber Hurst at the time of the original VAC

16  case, this case that we're here today for.

17  A.   I don't know.

18  Q.   Okay.  He didn't start until September of 2008, and you

19  had settled the case by that time; is that correct?

20  A.   I believe so.  I didn't know when he had started with

21  the Gruber Hurst law firm.

22  Q.   Okay.  But if that's true, that he doesn't start up

23  until September, then there wouldn't -- I mean, he wasn't

24  involved in this case at all, the case that we're here for

25  today.

```
 1   A.   I never dealt with Mr. Magee and the -- the -- of the
 2   Gruber Hurst firm in connection with this lawsuit.  I dealt
 3   with several of his other -- of the other Gruber Hurst
 4   partners, but not Mr. Magee.
 5   Q.   Which was Mr. Tautfest and Mr. Lang?
 6   A.   Yes.  As I recall.  And perhaps Mr. Gruber in connection
 7   with the prior sanctions hearing.
 8   Q.   All right.  Now, one thing that I want to make sure that
 9   we clear up, because in the direct examination there was a
10   question asked about, you know, why you didn't think that VAC
11   would give permission to Gruber Hurst to obtain the documents
12   to disclose, and you mentioned that it was because you knew
13   that VAC knew that it was the subject of this prior contempt
14   proceeding; is that correct?
15   A.   Yes.
16   Q.   Okay.  Now, you never told -- I mean, the McAlexander
17   report never came up in your conversation, so you didn't talk
18   about that report or the contempt proceeding or anything
19   related to that during your conversation, did you?
20   A.   I had two phone calls with Mr. Magee --
21   Q.   Okay.
22   A.   -- on or about these same dates that are referenced in
23   these correspondence --
24   Q.   Right.
25   A.   -- and during that phone call I said given the prior
```

1   proceedings surrounding these reports I doubt that they will

2   give permission voluntarily for them to be produced but I

3   will --

4   Q.   Is that your exact words?

5   A.   I can't remember my exact words, Mr. Mateja, but it was

6   something in that that we mentioned that there had been a

7   prior proceeding and that given the prior proceeding I did

8   not think that VAC would give permission, but that I was --

9   he was asking me to see if I could get someone to respond to

10  him --

11  Q.   Right.

12  A.    -- in this relation, and I passed that information

13  along.

14  Q.   Okay.  Did you go into any details about what those

15  proceedings were about?

16       Doesn't sound like it.

17  A.   Mr. Magee appeared to understand what the proceeding was

18  about.  But he -- he didn't ask.  He -- he seemed to be

19  familiar with that there had been some problem previously.

20  Q.   So what did he tell you?

21  A.   He said, "I understand."

22  Q.   And that's it?

23  A.   I -- I don't remember exactly, but it was something

24  along the lines of "I understand."

25  Q.   I mean, could he have understood that in fact it was a

**VAC App. 104**

1    fairly contentious lawsuit, the lawsuit between VAC and

2    T-Netix/Securus?

3          I mean, he could have understood that, correct?

4                MS. MANGOLD:  Objection to what he could have

5    understood.

6                THE COURT:  Sustained.

7    BY MR. MATEJA:

8    Q.   Now, Ms. Clouston, I want to -- I want to talk to you a

9    little bit about the protective order from the initial VAC

10   case.

11         You're familiar with the protective order; is that

12   correct?

13   A.   I am.

14   Q.   Okay.  Did you help draft it?

15   A.   I -- I believe I did.

16   Q.   All right.  And -- and you're familiar with the fact

17   that the protective order allows only certain individuals to

18   have confidential and attorneys eyes only information under

19   that protective order, correct?

20   A.   Without looking at specific provisions I'm not here to

21   give an opinion as to what the protective order said, but it

22   did have various levels, like often protective orders do --

23   Q.   Right.

24   A.   -- in these types of technical information competitor

25   litigation to allow the parties to designate that the

1  opposing side could only allow certain designated

2  outside-of-the-company individuals to obtain information and

3  designated counsel.

4  Q.   And -- and during your direct exam, I'm really just

5  referring to the testimony you've already given, which is

6  page 7, paragraph 16, and this would have been --

7  A.   Can you tell me which exhibit?

8  Q.   That would have been -- I believe it's their Exhibit

9  Number 1.

10 A.   Okay.  I believe it's also attached to your Exhibit 9.

11 Yes.

12 Q.   And it's also our Exhibit 1 as well.

13 A.   I'll go to the one before.

14        MR. MATEJA:  Let's go ahead -- because we have it

15 let's go ahead and put up Gruber Hurst Exhibit Number 1,

16 which, again, is VAC Exhibit Number 1.

17 BY MR. MATEJA:

18 Q.   And so let's take a look at page 7.

19 A.   Okay.

20 Q.   So midway down the page at the very end, last sentence

21 of paragraph 15 it says, "Documents designated counsel eyes

22 only confidential information and contents thereof shall be

23 available only to counsel for the parties, the technical

24 advisors who are assisting them, data processing vendors, and

25 graphics and trial consultants."

1       Did I read that correct?

2    A.   You're referring at the end of paragraph 16 on page 7?

3    Q.   You're right.  My bad, sorry.

4       Did I read that correct?

5    A.   Yes.

6    Q.   Okay.  And so there are certain categories which relate

7    to counsel, technical advisors, data processing vendors, and

8    graphics trial consultants; is that correct?

9    A.   Yes.  That's what the document says.

10   Q.   And if we can look at page 4.  And we'll look at

11   paragraph 9 on page 4.

12      We see that under paragraph 9 that relates to kind of

13   the carve out for counsel to be able to see protected

14   documents; is that right?

15   A.   Yes.  Appears so.

16   Q.   And then paragraph 10 is -- deals with technical

17   advisors; is that correct?

18   A.   Yes.  It appears so.

19   Q.   And then finally trial consultants is paragraph 14,

20   which is on page 6.  Again, another kind of carve out for

21   persons that can possess or see protected information; is

22   that correct?

23   A.   I believe so.

24   Q.   Okay.  Now, in -- in the underlying VAC case when you

25   brought the motion to enforce the protective order, okay, so

```
 1   let's think back, 2008, okay, in that case, I mean, you
 2   argued that it was improper for VAC's counsel, Bell Nunnally,
 3   to produce protected information to Gruber Hurst this case;
 4   is that correct?
 5   A.   Yes.  That was one of the issues that was addressed with
 6   Judge Sanderson.
 7   Q.   Okay.  And -- and the basis for that was that you did
 8   not believe that Gruber Hurst constituted either counsel or
 9   technical advisor or a trial consultant.  Would that be a
10   fair statement?
11   A.   That is correct.
12   Q.   Okay.  And, in fact, I'll tell you what, if you can,
13   let's take a look at VAC Exhibit Number 2.
14            MR. MATEJA:  May I approach, Your Honor?
15            THE COURT:  Yes.
16            MR. MATEJA:  I think it will be easier.
17   BY MR. MATEJA:
18   Q.   Focus your attention to page 28.
19        And then let's take a look at the very last paragraph.
20        This is the transcript from the proceeding in front of
21   Judge Sanderson.
22   A.   Okay.
23   Q.   And then we're going to look at this paragraph right
24   here (indicating), but just so that you can see -- I want to
25   make sure you feel comfortable knowing that this is you
```

1    talking.  Let's see where we've got to go to.

2         Okay.  So Ms. Clouston we see on page 25, line 25.

3         And then let's flip to page 28.

4         Okay.  So correct me if I read this wrong, that this is

5    what you're telling the court.

6         "In addition, the agreed protective order clearly

7    prohibits providing to anyone other than counsel hired for

8    this case documents that have been designated as counsel eyes

9    only confidential information but they also violated that

10   provision of the protective order by first providing the

11   documents to the Gruber firm who we think from the record

12   were not counsel in this case when they were provided the

13   information."

14        That's your statement to the court; is that correct?

15   A.   Yes, it appears so.

16   Q.   So you're telling the court that basically Gruber Hurst

17   is not a party to the protective order, right?

18   A.   Yes.  That was our position.

19        I think that's -- was the -- where the -- where Judge

20   Sanderson essentially came out in his report as well, given

21   that Gruber Hurst did not formally appear during the course

22   of the hearing before Judge Sanderson.

23   Q.   Okay.  Now, you're aware that Mr. Tautfest actually did

24   sign a confidentiality agreement under the protective order

25   that was -- there's -- there's an example of it.  It's the

```
 1   very last document on Movant's Exhibit Number 1.
 2        Were -- were you aware of that?
 3        Okay.  Take a look at the last -- I'm sorry, Exhibit 1,
 4   in your white binder.
 5             MR. MATEJA:  May I approach, Your Honor?
 6             THE COURT:  Yes.
 7   BY MR. MATEJA:
 8   Q.   So the last page of VAC Exhibit 1 is a sample
 9   confidentiality agreement; is that correct?
10   A.   It is.  Pardon me, Mr. Mateja, this one appears blank.
11   Q.   Right.
12   A.   Okay.  Yes, this is a -- a -- well, what typically we
13   attach as addendum -- addenda to confidentiality agreements
14   for experts and others to sign that are permitted to
15   obtain --
16   Q.   Okay.
17   A.   -- documents.
18   Q.   Were you aware that Mr. Tautfest on behalf of Gruber
19   Hurst had actually signed this confidentiality agreement
20   before the hearing in front of Judge Sanderson?
21   A.   I don't recall that.
22   Q.   You don't recall that.
23        So -- so you don't know one way or the other?
24   A.   I seem to recall that that came up during the course of
25   the hearing before Judge Sanderson as a -- an -- an issue on
```

 1   whether that represented -- that Gruber Hurst was in fact

 2   counsel for this case or if they were not.

 3   Q.   Okay.  But notwithstanding, even if they signed it --

 4   and let's just assume that they did sign it.  Okay?

 5        Notwithstanding, your argument to Judge Sanderson was

 6   that Gruber Hurst is not a party to the protective order and

 7   so therefore they cannot receive protected information such

 8   as the McAlexander report?

 9   A.   Our -- our position, as I recall, was that the Gruber --

10   T-Netix's position during the proceedings before Judge

11   Sanderson were that Gruber Hurst was permitted, just as the

12   Bell Nunnally/Pittman firm were permitted, to obtain all

13   documents and information that had been produced in this

14   case, the --

15   Q.   Right.

16   A.   -- the VAC's T-Netix's case.  And we disagreed with that

17   contention.

18   Q.   And that's where you said "By first providing the

19   documents to the Gruber firm who we think for the record were

20   not counsel in this case when they were provided the

21   information," right?

22   A.   Yes.

23   Q.   Okay.  And is -- to the best of your recollection you

24   believe that Judge Sanderson also believed that Gruber Hurst

25   was not a party to the protective order.

1    MS. MANGOLD:  Objection to what Judge Sanderson

2  believed.

3    THE WITNESS:  I believe his --

4    THE COURT:  Overruled.

5    THE WITNESS:  -- the hearing before Judge Sanderson

6  in his report addresses where -- where his decision came out

7  on that disagreement between the parties.

8  BY MR. MATEJA:

9  Q.   And assume with me that if we look at that Judge

10  Sanderson does not believe that Gruber Hurst constitutes

11  counsel, counsel being a term of art under the protective

12  order; is that correct?

13  A.   Yes.  I believe so.

14  Q.   Okay.  And that was what you were arguing on behalf of

15  VAC?

16  A.   I believe that was one of the arguments that we had on

17  behalf of VAC.

18  Q.   And -- and do you know of -- well -- well, I guess you

19  testified that Gruber Hurst just returned the documents that

20  they had that had been given to them by Bell Nunnally; is

21  that correct?

22  A.   Yes.  From the correspondence earlier.

23  Q.   And -- and they didn't become counsel of record in that

24  case, did they?

25  A.   They did not.

1   Q.   And -- and they did not later, after the hearing, sign

2   the protective order saying that they were subject to the

3   protective order, did they?

4   A.   Not that I'm aware of, unless what you were just

5   referring to, that there had been some signature of an

6   addenda by Mr. Tautfest.  I'm not sure that --

7   Q.   That was --

8   A.   -- when that --

9   Q.   -- before the Sanderson hearing.

10   A.   Okay.  Okay.

11   Q.   And, Ms. Clouston, if you can -- I'm not trying to

12   quibble with you here, but on page 34 of the transcript,

13   which is VAC Exhibit Number 2, if you take a look at the very

14   bottom --

15   A.   Is this still my addressing the court?

16   Q.   You are.  And you can tell it easily on this page.

17   A.   Okay.  I just didn't want to have to read every page.

18   Okay.

19   Q.   At the very bottom, it's the last sentence that actually

20   bleeds into the next page, but it says, "And now the Gruber

21   firm as of October 31 has signed Exhibit A being down to the

22   documents that --" I mean, the Exhibit A we're talking about

23   there is the confidentiality agreement, which is Exhibit A to

24   the protective order.  Is that correct?

25        Again, I'm not trying to quibble.  I know it's a long

```
 1  time ago, but --
 2  A.    It -- it is.  I . . .
 3  Q.    I can't remember some things that happened --
 4  A.    It appears --
 5  Q.    -- in 2008.
 6  A.    It appears so from the context of just this page.
 7  Q.    Right.
 8  A.    But I -- I -- I don't want to testify one way or the
 9  other, about what exactly we're talking about in Exhibit A,
10  since we've looked at several Exhibit As today already.
11  Q.    All Right.  But suffice it to say, notwithstanding even
12  if they had signed this confidentiality agreement, your
13  position was they were not subject to the protective order,
14  couldn't get the documents, needed to return the documents;
15  is that correct?
16  A.    Yes.  I believe, at least from this -- these pages, that
17  you're referring to, that one of the issues that's being
18  addressed is even if they had -- Mr. Tautfest signed Exhibit
19  A, he had signed Exhibit A after being provided the documents
20  from the Bell Nunnally firm.  It appears that that's what I'm
21  addressing in the question from the court at this point in
22  time.
23  Q.    All right.  Again, suffice it to say, Gruber Hurst does
24  not become counsel of record in the VAC case on behalf of
25  T-Netix and Securus, they return the documents, and you're
```

**VAC App. 114**

```
 1    not aware of any document that they signed whereby they
 2    agreed to be subject to the protective order at least after
 3    Judge Sanderson had his hearing in the case.
 4    A.    None that I'm aware of after that hearing.  We're
 5    referring to some signature by the Gruber firm on page 34 of
 6    the hearing transcript before Judge Sanderson, but I'm not
 7    aware of anything after that.
 8    Q.    Okay.
 9              MR. MATEJA:  Your Honor, we pass the witness.
10              THE COURT:  Yes, sir.
11        I'm sorry, but we're going to have to take a break.
12        We have to let our court reporter, who has been working
13    diligently, get up and stretch.  So I'm going to let y'all
14    get up and stretch.  About 15 minutes.
15              MR. LOWENSTEIN:  Okay.  Thank you, Your Honor.
16                    (Recess taken at 11:15)
17                  (Proceedings resumed at 11:30.)
18              COURTROOM DEPUTY:  All rise.
19              THE COURT:  Please be seated.
20        Whenever you're ready, sir.
21              MR. LOWENSTEIN:  Thank you, Your Honor.
22                    CROSS EXAMINATION
23    BY MR. LOWENSTEIN:
24    Q.    Good morning, Ms. Clouston.
25    A.    Good morning.
```

 1   Q.   I would introduce myself but I believe we're acquainted?

 2   A.   We are, Mr. Lowenstein.

 3        Nice to see you.

 4   Q.   You too.

 5        I'd like to point you to Exhibit 8 in the white book,

 6   the Movant's Exhibit 8.

 7        Are you with me?

 8   A.   Yes.

 9   Q.   And that was Mr. Suit's -- the first page on that

10   document was Mr. Suit's letter to you dated April 18th, 2008,

11   reflecting that he was forwarding the documents and the

12   letter that he had received from Gruber Hurst, which was the

13   information that Judge Sanderson had asked them to return to

14   Bell Nunnally.  Is that correct?

15   A.   Yes.  It appears so.

16   Q.   Mr. Suit was a -- an associate of Bell Nunnally at the

17   time?

18   A.   Yes.

19   Q.   And the attached letter of April 16th, 2008, in Exhibit

20   8 is the next two pages.  Do you see that?

21   A.   Yes, I do.

22   Q.   Okay.  And this details the information that

23   Mr. Tautfest who wrote this letter from Gruber Hurst says

24   enclosed please find all documents in our possession received

25   from your office, being Bell Nunnally.  Correct?

1  A.    Yes.  It appears so, yes.

2  Q.    Regarding the VAC case.

3        And in there, number 2, he says they are returning the

4  rebuttal expert report of Joseph McAlexander regarding

5  validity of claims?

6  A.    Yes, I see that.

7  Q.    And that's the offending report we've been speaking of?

8  A.    Yes, I believe so.

9  Q.    And if you would turn to the second page of that letter,

10 the very last paragraph, Mr. Tautfest -- this is a letter,

11 again, from me directed to Bell Nunnally?

12 A.    Yes.

13 Q.    And again Bell Nunnally was the law firm representing

14 T-Netix's and Securus in this underlying lawsuit?

15 A.    Yes.  Along with the Pittman law firm.

16 Q.    Along with Mr. Pittman.

17       And in the last paragraph Mr. Tautfest says, "Please be

18 advised that we have deleted the above documents from our

19 database and have destroyed all working copies as well."

20 A.    Yes.  I see.

21 Q.    So as of April 16th, 2008, Mr. Tautfest was directing

22 correspondence to me saying we've destroyed all copies of

23 this rebuttal expert report of Joseph McAlexander?

24 A.    Yes.  That's what this exhibit says.

25 Q.    All right.  And you don't have any document or anything

1  in your declaration, do you, Ms. Clouston, that shows that me

2  on behalf of Securus and T-Netix or Securus and T-Netix

3  itself had any reason to doubt Mr. Tautfest's letter?

4  A.   No, sir.

5  Q.   And since they have been identified individually in

6  here, are you familiar with Dennis Reinhold from Securus and

7  T-Netix?

8  A.   Yes, ma'am.

9  Q.   And you understand he's the general counsel for Securus

10  and T-Netix?

11  A.   Yes, I do.

12  Q.   Okay.  And Rick Smith, did you know him before these

13  cases concluded?

14  A.   Mr. Smith came in near the end and was involved in -- in

15  some of the settlement of the VAC and Securus lawsuits.

16  Q.   Okay.  So it's your recollection, which is correct, is

17  that Mr. Smith came in in the last few months of the

18  litigation to -- as the CEO of Securus and T-Netix and

19  settled the case?

20  A.   That was my first interaction with him, that I recall.

21  Q.   Okay.  And prior to that a Dick Falcone was the --

22  Richard Falcone was the CEO before Mr. Smith.  Do you recall

23  that?

24  A.   Yes.

25  Q.   And you don't have anything in your declaration or any

1    documents that show that either Mr. Smith or Mr. Reinhold

2    were aware or had any -- any information that statements in

3    Mr. Tautfest's letter in Exhibit 8 were somehow incorrect?

4    A.   No, I'm not aware.

5    Q.   This letter is dated April 16th, 2008, from

6    Mr. Tautfest, Movant Exhibit 8.  And you recall that the

7    report and recommendation from Judge Sanderson came out on

8    the 21st of April, a few days later?

9    A.   I don't have that in front of me but that seems about

10   the right time.

11   Q.   So in April 2008 the two things that happened are Judge

12   Sanderson issues his recommendation and the Gruber firm tells

13   me that it's returned all of the -- all of the McAlexander

14   report information it has in its files?

15   A.   Yes.

16   Q.   Okay.  And then in the next few months following that

17   the parties, being VAC and Securus and T-Netix, reached a

18   settlement agreement.  Do you recall that?

19   A.   Yes.  I believe so.

20   Q.   And that settlement agreement was finalized sometime in

21   August 2008?

22   A.   Yes.  I believe we were looking at an Exhibit A to one

23   of the letters that referenced the date earlier and I think

24   that's about the time frame.

25   Q.   Okay.  And do you recall that in conjunction with the

1  settlement -- well, first of all you and I, being the Jones

2  Day firm and the Bell Nunnally and the Pittman firm, we

3  weren't involved in the actual negotiations of the settlement

4  agreements, were we?

5  A.  The settlement agreements were negotiated in principal

6  between the -- the executives of the different companies, I

7  believe.

8  Q.  Okay.  And you weren't involved in the actual

9  negotiations or the documentation of the settlement

10 agreement, were you?

11 A.  Not that I recall.

12 Q.  Okay.  But one thing that we were charged with as

13 counsel in this case were entering the orders to finalize the

14 litigation between Securus, T-Netix, and VAC in this

15 underlying lawsuit.

16 A.  Yes.

17 Q.  And -- and I'm going to show you --

18          MR. LOWENSTEIN:  Your Honor, may I approach?

19          THE COURT:  Yes.

20 BY MR. LOWENSTEIN:

21 Q.  Hand you two exhibits that didn't make it into the

22 notebook -- any of the notebooks.

23          MR. LOWENSTEIN:  Your Honor, may I present you with

24 copies as well?

25          THE COURT:  You may.

```
 1              MR. COOK:  May I have a copy?
 2              MR. LOWENSTEIN:  I made a lot but I didn't make
 3    enough.
 4              THE COURT:  He didn't want to kill those extra
 5    trees.
 6              MS. MANGOLD:  I'm happy to share.
 7    BY MR. LOWENSTEIN:
 8    Q.   I'm handing you 16 and 17 which just continues the
 9    numbering from the Gruber Hurst book.
10              THE COURT:  I guess I would offer 16 and 17.
11              MS. MANGOLD:  No objection, Your Honor.
12              THE COURT:  Mr. Mateja, I assume no objection?
13              MR. MATEJA:  No objection, Your Honor.
14              THE COURT:  Admitted.
15    BY MR. LOWENSTEIN:
16    Q.   I hope you've had a second to review these, but if you
17    need a little more time let me know.
18         Exhibit 16 is an exchange of correspondence between
19    people from my firm or Mr. Pittman and yourself regarding the
20    motions and orders that were going to be submitted to the --
21    to the district court, Judge Fitzwater, to conclude this
22    lawsuit.  Is that correct?
23    A.   It appears so, yes.
24    Q.   And if you'll turn to page 3 --
25    A.   In Exhibit 16?
```

```
 1   Q.   Yes.  One of the things that was included in the package
 2   that our firm sent to you was a motion to expunge the records
 3   that were involved in the contempt proceedings before Judge
 4   Sanderson.  Do you recall that?
 5   A.   Yes.
 6   Q.   And in your email on page 3 you tell Mr. Pittman, "I
 7   will review the draft motion to expunge and proposed order to
 8   expunge that Neal --" Mr. Suit "-- sent to me, and get back
 9   to you on those tomorrow."
10   A.   Yes.
11   Q.   And Nick is Mr. Nick Pittman from the Pittman law firm?
12   A.   Yes.
13   Q.   And Mr. Pittman's response, which is on page 2 at the
14   bottom -- do you see that?
15   A.   Yes.
16   Q.   In the second paragraph he says, "As to the motion to
17   expunge and proposed order it is our understanding that these
18   documents have been agreed upon by the parties as part of the
19   settlement and we are not at liberty to make any changes to
20   them."
21        Do you see that?
22   A.   Yes, sir.
23   Q.   Okay.  And just so we have a time frame reference, since
24   I hadn't mentioned one, we're on -- we're on August 4th,
25   2008.
```

```
 1   A.   Yes.
 2   Q.   And by that time, when we're having this exchange, the
 3   parties had already entered into and signed off on a
 4   settlement agreement.  Isn't that correct?
 5   A.   I don't recall the exact timing, but we -- we are
 6   discussing here that a settlement agreement has been reached
 7   on or about this time.  I haven't reviewed the entire
 8   exhibit.
 9   Q.   Okay.  And in the first page of TN Exhibit 16 in the
10   first sentence you say, "Nick --" and again, that's
11   Mr. Pittman, correct?
12   A.   Yes.
13   Q.   You say, "We have confirmed with our client that the
14   parties agree to the attached joint motions and orders as
15   part of their settlement agreement."  Correct?
16   A.   Correct.
17   Q.   Okay.  And in there is included -- I think it's the --
18   in the package that is T -- TN 16, the third stapled document
19   is called joint agreed motion to withdraw, motion for
20   sanctions, and motion to modify protective order.
21   A.   I'm sorry, hold on one second.
22   Q.   I'm sorry.
23   A.   I think it's my -- okay.  Yes.
24   Q.   Okay.  It's -- for the record it's called joint agreed
25   motion to withdraw, motion for sanctions, and motion to
```

1   modify protective order and withdraw and expunge related

2   documents.  Do you see that?

3   A.   Yes.

4   Q.   In the first paragraph VAC says that it is hereby

5   withdrawing the motion to enforce, I'm summarizing -- but is

6   that correct?

7   A.   Yes.

8   Q.   And in the second paragraph on the first page of that

9   document it says in the light of the withdrawal of these

10  motions the parties request -- and the parties included VAC,

11  correct?

12  A.   That's correct.

13  Q.   That -- that the court withdraw and/or expunge all

14  motions and documents related to the above-referenced

15  documents, including responses, replied -- replies, minute

16  entries, orders, referring motions to the magistrate judge,

17  appendices and the findings of the magistrate judge.

18  A.   Yes.   You have that correct.

19  Q.   Okay.  So VAC was agreeing in August of 2008 that it was

20  going to file this joint motion where it was withdrawing the

21  motion for contempt and agreeing that the court could expunge

22  or otherwise withdraw all of the documents relating to the

23  underlying contempt proceeding.

24       MS. MANGOLD:  Objection on the grounds that this is

25  an unsigned document.  I don't know what they're agreeing to.

```
 1              THE COURT:  Overruled.
 2              THE WITNESS:  I assume that there's -- the actual
 3    filing in the docket somewhere, but -- and yes, it appears
 4    from this correspondence and my memory is that as part of the
 5    settlement the parties agreed that this was -- this was up on
 6    appeal at the time from your clients and that VAC agreed to
 7    withdraw the pending motion as part of the settlement.
 8         It was up to the court to determine what -- how the
 9    court wanted to proceed.
10    BY MR. LOWENSTEIN:
11    Q.   Okay.  In the -- the documents that we were asking the
12    court to withdraw or expunge from the court's records were
13    detailed in the following pages in that document, correct?
14    A.   I believe so.
15    Q.   And I want to direct you to number 18 in that list,
16    which is on page 3 of that document.  And, again, we're on
17    the jointed agreed motion to withdraw.
18    A.   Yes.
19    Q.   Number 18 is the report and recommendations regarding
20    the motion to enforce, and those were the ones that Judge
21    Sanderson issued.
22    A.   Yes.
23    Q.   Okay.
24    A.   That's one of them, I guess.
25    Q.   And those are recommendations -- that report and
```

```
 1   recommendation is something that's been referenced here on
 2   several occasions as somehow relevant to this proceeding,
 3   correct?
 4   A.   I believe so.  I have had questions about the report and
 5   recommendations.
 6   Q.   And then --
 7           THE COURT:  Excuse me, you had questions about
 8   whether they were relevant or --
 9           THE WITNESS:  Well, I mean, I assume they were --
10   I -- I've been questioned about the report and
11   recommendations today.
12           THE COURT:  Okay.
13           THE WITNESS:  I'm sorry.
14   BY MR. LOWENSTEIN:
15   Q.   And that report and recommendations was something the
16   parties agreed to have the court withdraw or expunge from the
17   court's record?
18   A.   Well, the -- we did not object to the court expunging or
19   withdrawing it from the record.  It was up to Judge Sanderson
20   and Judge Fitzwater to determine what was appropriate.
21   Q.   You filed a joint agreed motion where you were asking
22   the court that that occur.
23   A.   I believe so, although the one I'm looking at isn't
24   signed, but my recollection is that something -- something
25   was agreed to between the parties and subsequently filed.
```

```
 1              MR. LOWENSTEIN:  Just so we can clear that up, Your

 2    Honor, I've got the signed copy.

 3              THE COURT:  Do you want to substitute that --

 4              MR. LOWENSTEIN:  I think it's important, because

 5    this has the cover correspondence with it, but I'd like to

 6    add it as an additional exhibit.

 7       May I approach?

 8              THE COURT:  Yes.

 9    BY MR. LOWENSTEIN:

10    Q.   Let's work off Exhibit TN 16 --

11              MR. LOWENSTEIN:  I guess I would ask to offer it

12    into evidence.

13              MR. MATEJA:  No objection, Your Honor.

14              MS. MANGOLD:  No objection.

15              THE COURT:  It's admitted.

16    BY MR. LOWENSTEIN:

17    Q.   Flip through that and agree with me that this is the

18    actual document that VAC agreed to be filed with the court in

19    this matter?

20    A.   Yes, it appears to.

21    Q.   And it was document entry 197 in the court's records?

22    A.   Yes.

23    Q.   And, again, just so that we have a clear record, TN

24    Exhibit 18, which is the file motion in the first paragraph

25    says that VAC hereby agrees to withdraw the motion for
```

1    contempt.  That's shorthand for referring to that.

2    A.    Yes.  I believe so.

3    Q.    Okay.  And in the second paragraph it says the parties

4    request the court withdraw and/or expunge all of those

5    documents that were detailed before when we were talking

6    about Exhibit 16.

7    A.    Yes.

8    Q.    Page 3, number 18 on that list, again, the parties

9    agreed, including VAC, to withdraw the -- have the court

10   withdraw and/or expunge the report and recommendation from

11   Judge Sanderson.

12   A.    Yes.

13   Q.    Okay.  And Exhibit 26 -- and this is going to be a

14   memory test and if you don't remember, you don't remember.

15         Do you recall in -- I'm sorry if I said Exhibit 26.

16         In Exhibit 18, number 26, on page 4, if that's confusing

17   enough, there's a reference to the supplemental appendix to

18   Value-Added Communications' response to T-Netix's objections.

19   Do you see that?

20   A.    I do.

21   Q.    Do you recall that as part of that appendix VAC had

22   filed a copy of the transcript of the proceedings before

23   Judge Sanderson in that supplemental appendix?

24   A.    I -- I don't recall, Mr. Lowenstein.

25   Q.    Okay.  If that's true and the -- and the transcript is

1    attached to that document, then VAC was agreeing to withdraw

2    and/or expunge that exhibit to that supplemental appendix

3    from the court's records?

4    A.    If -- assuming that is true, yes.

5          What the court did, again, was up to this court as to

6    determine what was appropriate.

7    Q.    Okay.  Now, I want you to look at Exhibit 17.

8          And that is the order that Judge Sanderson -- I'm

9    sorry -- Judge Fitzwater entered after TN Exhibit 18 was

10   filed.

11   A.    Yes, it appears so.

12   Q.    And in that order Judge Fitzwater grants the agreed

13   motion to withdraw, motion for sanctions, and motion to

14   modify protective order and withdraw and expunge related

15   documents.

16   A.    Yes.

17   Q.    And the judge signed an order --

18         In the next paragraph it says, "It's ordered that had

19   the following documents, orders, recommendations, minute

20   entries and any document references thereto are hereby

21   withdrawn and are to be permanently sealed."

22         Do you see that at the bottom of the first page of that

23   order?

24   A.    Yes.

25   Q.    And in the very last page of that document, Exhibit 17,

```
 1    you on behalf of VAC agree to the form of that order.
 2    A.    Yes.
 3    Q.    And going back to page 3 of Exhibit 17, that included
 4    sealing and withdrawing number 18, which was the report and
 5    recommendation of Judge Sanderson.
 6    A.    Value-Added Communications agreed to withdraw its
 7    motions.
 8          The order was the court order and we agreed that it
 9    could be sealed.  It was again not -- it was -- it was not
10    our order to seal, but we did not object to it being sealed.
11    Q.    Well, you did not object, you agreed as to form and
12    content to -- to -- to that order.
13    A.    That -- that is correct.
14    Q.    So all of the discussion of that report and
15    recommendation and the transcript from Judge Sanderson were
16    all subject to Judge Fitzwater's order sealing those
17    documents permanently?
18    A.    Yes.
19    Q.    Just so you understand, Ms. Clouston, because I don't
20    think you were here this morning when we discussed this,
21    today Mr. Mateja is representing the Gruber Hurst firm, I'm
22    representing Securus T-Netix and Mr. Reinhold and Mr. Smith
23    individually.  Do you understand that?
24    A.    Yes.
25    Q.    I've heard some discussion from you about things that
```

1    Gruber Hurst in 2010 provided to Combined Communications or
2    in another lawsuit.
3         You don't have anything in your declaration, you didn't
4    have anything in your testimony and you haven't come forward
5    with any document that shows that anyone within Securus or
6    T-Netix ever had a copy of the McAlexander rebuttal report,
7    do you
8    A.    No.
9    Q.    And you don't have any information that anyone at
10   Securus, anyone at T-Netix, Mr. Smith or Mr. Reinhold ever
11   provided a copy of the McAlexander rebuttal report to anybody
12   in those other lawsuits?
13   A.    I'm sorry, can you repeat the question?
14   Q.    Yes.  Let's talk about the -- I'm going to call them the
15   Securus parties so I can shorthand this.
16        When I'm referring to the Securus parties we've got
17   Securus, T-Netix, Mr. Reinhold, and Mr. Smith.
18   A.    Okay.
19   Q.    I'm going to call those the Securus parties.
20   A.    Okay.
21   Q.    You don't have anything in your declaration or any
22   document or anything in your testimony where you have
23   knowledge that any of the Securus parties provided a copy of
24   the McAlexander rebuttal report to Gruber Hurst.
25   A.    No.

Q.   And you don't have any knowledge that they encouraged or
asked Gruber Hurst to provide that document to anybody in the
Combined Communications case or any other lawsuit?
A.   No, sir.
          MR. LOWENSTEIN:  Pass the witness, Your Honor.
          MS. MANGOLD:  Your Honor, I have nothing further.
          THE COURT:  Mr. Mateja.
          MR. MATEJA:  No, Your Honor.
          THE COURT:  Just before you leave, just so I -- so
I can be clear, the -- the agreed motion which was -- became
the amended order by -- or was adopted by Judge Fitzwater in
his amended order didn't expunge anything, it sealed the
docket entries, so that the documents themselves, they exist,
they're -- the access to them is limited.
     So do you believe that that means somehow that the
representations made in that -- in those documents that have
been sealed are somehow not a part of the record anymore?
          THE WITNESS:  I believe they are part of the
record, Your Honor, and I believe that these -- all of these
documents were -- the report itself was public for many
months also and it was then thereafter sealed, but all of the
parties included here, counsel had copies of the report and
recommendations.
          THE COURT:  So then would you -- would it be your
position that the positions that you took back then as VAC's

1    counsel basically VAC is stuck with those positions now?

2           THE WITNESS:  We -- we -- we took those positions

3    in good faith, Your Honor.  We also took the positions to

4    enter the order -- or -- or proposed joint motion to withdraw

5    the pending sanctions based upon representations that were

6    made --

7           THE COURT:  Right.

8           THE WITNESS:  -- DURING the hearing and to us

9    following the hearing with Judge Sanderson.

10      So if those prove somehow untrue --

11          THE COURT:  And I'm not talking the veracity.  I'm

12   mainly talking your legal arguments.  Mr. Mateja had a dream

13   that has become an issue here regarding whether or not --

14   whether or not Gruber Hurst is actually subject to the

15   protective order, and it's -- it's an excellent question.

16      And so I'm asking you in relation to your arguments that

17   you previously made in the hearing, which all that is now

18   sealed, I mean, do you believe somehow that VAC is -- is not

19   bound to I guess the arguments of representations you made

20   about VAC -- about Gruber Hurst not being a party to the

21   protective order?

22          THE WITNESS:  I believe we are bound.

23      I also believe that Gruber Hurst is bound by the

24   representations made to Judge Sanderson that -- they had a

25   choice at the time to either become counsel of record or to

1    give back the documents and say they were not, and they took

2    the position that they gave us back all documents that they

3    had.

4         So while they were not counsel of record in the case,

5    they did make representations to the parties involved in that

6    case as well as to the court.

7              THE COURT:  So -- and I agree with you.

8         But so they chose not to -- to be counsel, and the --

9    the impact of that is that they were not in your estimation,

10   based on your argument, being joined or being considered as

11   subject to the protective order.

12        If they had -- am I getting this right?

13        If they had in fact decided that they were going to join

14   in as counsel of record, then they would have been subjected

15   to the -- subject to the protective order; is that correct?

16             THE WITNESS:  I believe so.

17             THE COURT:  But because they chose the option that

18   they were going to --

19             THE WITNESS:  Return all --

20             THE COURT:  -- return all the documents.

21        Okay.  I'm going to leave you alone.  I'm going to let

22   those -- those lawyers address it for now.

23        Does either party have questions based on my

24   examination?

25             MS. MANGOLD:  I don't have any, Your Honor.

```
 1              MR. COOTER:  I'd like to call Dennis Reinhold
 2   adversely.
 3              THE COURT:  Mr. Reinhold, will you raise your right
 4   hand, please.
 5                         (Witness sworn.)
 6                         DIRECT EXAMINATION
 7   BY MR. COOTER:
 8   A.   Good morning.
 9   Q.   Good morning.
10        We know each other --
11   A.   Yes, we do.
12   Q.   -- in a different context?
13   A.   Yes.
14   Q.   Are you employed, sir.
15   A.   Yes.
16   Q.   How are you employed?
17   A.   I'm employed by Securus Technologies and its various
18   subsidiaries as vice president, general counsel and
19   secretary.
20   Q.   And what are your duties as vice president, general
21   counsel, and secretary?
22   A.   To oversee and manage the legal-related issues for the
23   corporation.
24   Q.   And who do you report to?
25   A.   I report to Richard Smith, the CEO.
```

1    Q.    How long have you had that job, sir?

2    A.    The general counsel job I've had since August 2005.

3    Q.    Okay.  Now, in connection with your role as the general

4    counsel, is it accurate to say that the management of

5    litigation of which the company Securus or its subsidiaries

6    is involved is subject to your supervision?

7    A.    That would be accurate, yes.

8    Q.    And that would apply, would it not, to the case that was

9    originally -- that -- this case that was filed whenever it

10   was and resulted in this protective order that we've been

11   talking about?

12        That's accurate, isn't it?

13        You were in charge of the supervision of this case?

14   A.    Not exactly.  The case was filed quite a bit before I

15   was there.  Once I came there then I was charged with

16   supervision in my general role as general counsel.

17   Q.    By the time of the events of 2008 you -- it was subject

18   to your supervision, right?

19   A.    Yes.  My supervision, yes, over outside counsel.

20   Q.    And it was also subject, and you were subject, to the

21   supervision of Mr. Smith in that time frame; is that

22   accurate?

23   A.    Mr. Smith did not come to Securus until June 2008.  So

24   many of the events that have been discussed happened prior to

25   him joining Securus.

```
 1   Q.   Once he became involved were you subject to his
 2   supervision?
 3   A.   In general, yes.
 4   Q.   And prior to his becoming involved were you -- were you
 5   subject to the supervision of some other CEO?
 6   A.   Yes.
 7   Q.   Who was that?
 8   A.   That was Dick Falcone.
 9   Q.   Now, what is the relationship between Securus and
10   T-Netix?
11   A.   T-Netix is another affiliated entity.  It is an indirect
12   subsidiary of Securus.
13   Q.   Are you also the general counsel of T-Netix?
14   A.   Yes, I am.
15   Q.   And have been since you got there?
16   A.   Yes.
17   Q.   When was T-Netix acquired?
18   A.   I believe it was in the 2003 time frame, so it was
19   acquired prior to my arrival in August of 2008 -- I'm sorry,
20   2005.
21   Q.   Okay.  So by the time you come on board as the general
22   counsel of Securus you're also the general counsel of
23   T-Netix, are you not?
24   A.   Yes.
25   Q.   And therefore at the time in your role as counsel of --
```

1    general counsel of T-Netix by the time of 2008, this case

2    that brings us here, you were also -- the processing of this

3    litigation was also subject to your supervisions at the

4    Knetix (phonetic) level or T-Netix's?

5    A.    Yes.

6    Q.    Now, at the time that there was a motion filed -- well,

7    let me see if I can -- let me see if I can close a loop here

8    for just a moment.

9          There have been some other cases that have been

10   described here this morning.  One is a case called T-Netix

11   versus Globe Tel-Link and others in the Eastern District.

12   A.    I have never heard reference to that case this morning.

13   Q.    I'm sorry?

14   A.    I have never heard reference to that case this morning.

15   Q.    There was a state court case called VAC versus T-Netix?

16   A.    Yes, I'm aware of that case.

17   Q.    Was that case subject or the conduct of that case

18   subject to your supervision as -- as general counsel?

19   A.    Yes.

20   Q.    There was a -- there was some later cases, I don't know

21   when they were actually, T-Netix versus Combined, what's been

22   referred to as the Combined case, was that case subject to

23   your supervision?

24   A.    Yes, it was.

25   Q.    And the Pinnacle litigation, T-Netix versus Pinnacle, in

**VAC App. 138**

1  the Eastern District of Texas, was that case subject to your

2  supervision?

3  A.   Yes, it was.

4  Q.   Now, and is it accurate to say, sir, that as to all of

5  the cases with -- with the exception of the one that you

6  don't recall --

7  A.   Excuse me, I didn't see I didn't recall it.  You

8  mentioned that that case was talked about this morning and

9  I -- and I said I did not hear the reference to that case.

10  Q.   Oh.

11  A.   I did not say I did not recall that case.

12  Q.   Oh, you do recall that case?

13  A.   I'm aware of that case, yes.

14  Q.   Was that case also subject to your supervision?

15  A.   Yes.

16  Q.   Now, as to all of these cases, is it also true that you

17  reported the existence of these cases to your superiors, the

18  prior CEO at Securus and later Mr. Smith at Securus; is that

19  accurate?

20  A.   They were certainly aware of the existence of the cases

21  and I did occasional legal reports, but on the day-to-day

22  mechanics of what was going on with each case, I did not

23  report those specifically to them because I don't report

24  everything to him.

25  Q.   Now, let's deal with the case that -- that brings us

1  here, the protective order that brings us here, the original

2  VAC case.

3      What lawyers were employed by either T-Netix or Securus

4  to do anything in connection with that case?

5  A.    To do anything?

6  Q.    Anything.

7  A.    The Bell Nunnally firm was involved, Nick Pittman of the

8  Pittman firm was involved, and then later the Gruber Hurst

9  firm was involved.

10 Q.    Okay.  So the Gruber Hurst -- when did the Gruber Hurst

11 firm first become involved in connection with the case that

12 resulted in the protective order that brings us here.

13 A.    Actually, I don't know that they were involved prior to

14 the protective order.  They became involved later on.

15      I don't know that they had an active involvement in the

16 actual litigation.

17 Q.    Well, what was -- if they became involved what does it

18 mean to be involved?

19      What -- what -- what was their role as counsel?

20 A.    Well, their role was they wanted some documents in

21 connection with another case, and as we've all heard in

22 testimony this morning they asked for permission, and that

23 was their involvement.

24 Q.    I see.  They were representing one of your entities in

25 some other cases -- in some other case, and Gruber Hurst had

1    made a request for the documents that were produced in this

2    case subject to the protective order; is that correct?

3    A.   I don't recall exactly what the request was, but they

4    did request some documents.

5    Q.   And they were given them, weren't they?

6    A.   I don't know if they were or not.

7    Q.   Have you read the transcript of the hearing in -- with

8    Judge Sanderson?

9    A.   I have not.

10   Q.   Were you there?

11   A.   No, I was not.

12   Q.   Now, in any event, there came a time -- but there's no

13   question, is there, that as of 2008 both Gruber Hurst and

14   Bell Nunnally were employed outside counsel for Securus and

15   T-Netix?

16   A.   On different matters, yes.

17   Q.   Now, the -- what, if any, role did Gruber Hurst have in

18   the state court case VAC versus T-Netix?

19        That was the one that was apparently here in a state

20   court in Dallas.

21   A.   None that I'm aware of.

22   Q.   Were they performing any services or were they involved

23   in any degree whatsoever in that case?

24   A.   Not that I recall.

25   Q.   What involvement, if any, did Gruber Hurst have in the

**VAC App. 141**

1   case of T-Netix versus Globe Tel-Link?

2   A.   They were our counsel of record.

3   Q.   Okay.  Now, those cases were both pending in 2000 --

4   well, when was -- T-Netix versus Globe Tel-Link, when was

5   that pending?

6   A.   I believe 2007 time frame.

7   Q.   As of 2008 was it still pending?

8   A.   I believe it settled in late 2008 or 2009 is my

9   recollection.

10  Q.   The state court case, was that pending -- was that

11  pending in 2008?

12  A.   Which state court case?

13  Q.   VAC versus T-Netix?

14  A.   That case settled with the other case in August of 2008.

15  Q.   As of the time of Judge Sanderson's hearing it was still

16  active?

17  A.   That's the April hearing you're mentioning?

18  Q.   Yes.

19  A.   Yes, it was.

20  Q.   Now, we've also made reference to a case called T-Netix

21  versus Combined pending in the Western District of Kentucky.

22  When was that case pending?

23  A.   I believe it was 2009/2010 time frame.  Actually, I

24  think it was 2010, I believe.

25  Q.   What, if any, role did Gruber Hurst play in connection

1    with that case?

2    A.   They were counsel on our patent litigation case.  We had

3    a couple of different cases pending against Combined.  They

4    were involved in the patent case.

5    Q.   Okay.  And were they so involved -- what's the status of

6    that case now, by the way?

7    A.   It's -- I can't discuss it.  It's under a proposed

8    settlement agreement.

9    Q.   So it's still pending?

10   A.   It should be settled.  We reached a settlement agreement

11   at mediation but --

12   Q.   Gruber Hurst still --

13   A.   -- It's not finalized yet.

14   Q.   Gruber Hurst involved?

15   A.   Yes, they are.

16   Q.   What involvement did Gruber Hurst have, if any, in the

17   Combined case in the Western District of Kentucky -- no,

18   that's the one I just asked about.  I -- I apologize.

19        What about the Pinnacle case, T-Netix versus Pinnacle in

20   the Eastern District?

21   A.   They were our counsel of record.

22   Q.   Was that case pending -- when -- when was that case

23   pending?

24   A.   I believe 2011 time frame.

25   Q.   Is it still pending?

```
 1   A.   No.

 2   Q.   When did it end?

 3   A.   I believe late 2011.  Maybe early 2012.  I don't know

 4   the exact date.

 5   Q.   Now, there came a time, did there not, when you learned

 6   that there was a complaint by VAC about the release after the

 7   2008 case, the -- this case was originally closed, that there

 8   was a complaint by VAC of the release of some confidential

 9   documents that are alleged to be protected by this protective

10   order?

11        You remember that happened?

12   A.   Yes.

13   Q.   When did you first hear about it?

14   A.   I first heard about it after correspondence was sent

15   from the Gruber firm requesting the documents to be taken

16   back or destroyed, was the first time.

17   Q.   When was that?

18        You've got a plaintiff's book up there --

19   A.   Sometime in 2011.

20   Q.   Okay.  Sometime in 2011 you hear that there is this

21   suggestion that there's an issue with respect to some of the

22   documents covered by the protective order in 2011.  Right?

23   A.   Yes.

24   Q.   What, if anything, did you do about it?

25   A.   What did I do about it?
```

1   Q.   Yeah.

2   A.   I didn't have a duty to do anything about it.  I never

3   had the document in my possession, nor was it ever in

4   Securus's position.  Our outside counsel did a callback and

5   told me about it, and so I had no further duty.

6   Q.   Did -- is it so, did you instruct that an -- an inquiry

7   be made of the file -- of the computer disk and systems at

8   Securus itself to see if any of those documents existed on

9   those databases?

10  A.   Yes.

11  Q.   Who did the search?

12  A.   Our vice president of IT directed his direct report,

13  Dave Ellinger, who is the director of IT operations.

14  Q.   When was the report -- when was the search made?

15  A.   I did a search recently, this past week, because I

16  wanted to make sure we did not have the document.  I knew we

17  did not have the document, because I had never seen it, nor

18  had anyone in my office ever seen it, and so we did a search

19  this past week.

20  Q.   You told me about a search by the IT -- the IT guy.

21  When was that search done?

22  A.   I just answered that question.  This last week.

23  Q.   In the past week.

24       Is it your testimony that notwithstanding the pendency

25  of this issue, since at least 2011, until the past week you

1  made no search --

2  A.   No, that is not my testimony.

3        You asked if an electronic search was made.

4        We did not have the document.  When this issue came up

5  before we knew we did not have the document.  I followed up

6  with the Gruber firm.  They acknowledged, sent the letter.  I

7  saw a copy of the letter regarding the document.  We checked

8  our files.  At that time and we did not have the document.

9  We still don't have the document.  We've never had the

10 document.

11 Q.   Then I guess, if that be so, if the court were to order

12 an outside vendor to make its own independent search, you

13 would have no objection.

14 A.   I would have a huge objection.

15 Q.   Why?

16 A.   Because we're a direct competitor with your client.  We

17 will never under any circumstances allow someone to come in

18 and search our data, because there will be extremely harmful

19 competitive information that your client likes to get.  So

20 the answer is no we will not allow that.

21 Q.   Even to provide an independent report to the court for

22 its in camera review.  Is that your testimony?

23 A.   Yes.  That's my testimony.

24 Q.   We know, don't we, sir, that a law firm under your

25 employee -- under your employee (sic) released this

1   confidential document in an unrelated litigation in the

2   Consolidated case and the Pinnacle case?  We know that

3   happened.

4   A.   Well, that's your allegation.  I don't know that

5   happened.  That's your point in this lawsuit, not mine.

6   Q.   Well, have you -- have you read the -- the letters or

7   declarations of Mr. Magee?

8   A.   Yes, I have.

9   Q.   Is it -- having read all of that --

10  A.   It appears that there was some inadvertent disclosure.

11  Q.   I only asked you if they had been produced outside and

12  the answer to that is admittedly yes.

13  A.   I don't have any firsthand knowledge of that as I said

14  before.  We've never had the document, nor have I ever seen

15  the document.  I can only rely upon what the letters say.

16  Q.   Now, and is it so that when that release was made,

17  forget inadvertence/intentional, it was done by law firms

18  employed by Securus and T-Netix?

19  A.   That's certainly your allegation.

20  Q.   Well, it's true, isn't it?

21  A.   I'm not sure.  I believe that the release actually came

22  from Stites & Harbison, but that's just my theory.

23  Q.   You believe what?

24  A.   The document came from Stites & Harbison, which was the

25  former Combined law firm.  But, again, all I know is what

```
 1   I've read in the correspondence.  I was not a party to the
 2   release, as you well know.
 3   Q.   Mr. Reinhold, that's all I have of you at this time.
 4            THE COURT:  Let's keep it in order, Mr. Mateja.
 5        Do you have anything?
 6            MR. LOWENSTEIN:  Just one moment, Your Honor.
 7                          (Pause.)
 8            MR. LOWENSTEIN:  I have no questions, Your Honor.
 9            THE COURT:  Okay.  Does Gruber Hurst have any?
10            MR. MATEJA:  We do not, Your Honor.
11            MR. COOTER:  We rest at this point on our prima
12   facie case.
13            THE COURT:  Mr. Mateja.
14            MR. MATEJA:  Your Honor, at this juncture I have a
15   feeling that you might anticipate that I would stand up to
16   urge what is akin to kind of a directed verdict, except
17   directed findings.
18        And just so that I'm clear, the court had mentioned at
19   the very beginning of this matter that we're here on
20   basically a hearing on a motion to show cause why a show
21   cause should issue in the case.
22            THE COURT:  Right.
23            MR. MATEJA:  And -- and we would argue that the
24   movant has not met its burden of establishing clear and
25   convincing evidence that in fact there is a basis to move
```

1    forward with a contempt proceeding.

2        First, Your Honor, there is no evidence that Gruber

3    Hurst was subject to the protective order in this case.  And,

4    in fact, the evidence that does exists actually indicates

5    that it was not subject to the protective order.  And at

6    least the -- the show cause order that the court issued

7    relates very specifically to the protective order and why

8    Gruber Hurst should not be held in contempt because it

9    violated the protective order.  And I believe, Your Honor,

10   there's not a shadow of a doubt that Gruber Hurst is subject

11   to the protective order.

12       Now, having said that, Your Honor, I don't want the

13   court for one second to think that, you know, we -- we

14   disclosed this document.  We fall on our sword, mea culpa,

15   we're apologetic for it.  We want to give this document back.

16       Okay.  We filed a motion with the court to delete the

17   document because -- and it's our fourth attempt to try to get

18   rid of this document.  We did not intend to send this

19   document out.  I mean, if you -- if -- if we are to put on

20   testimony you would hear that there's kind of the perfect

21   storm of events that transpire.  We did delete the document

22   but we did not delete another copy of it.  We know exactly

23   where the document resides on our computer systems.  I have

24   an expert here who's prepared to report to the court exactly

25   where it's at on the computer systems.

1      And what we'd like to do, Your Honor, is actually -- we

2   would request that basically the court deny their application

3   for show cause, or at least direct findings in that regard

4   and move forward on our motion to delete.

5      And I have the computer expert who is here, Your Honor.

6   He can testify exactly.  He did a forensic review, without

7   looking at the report but looking at metadata.  He knows

8   where it is on our computer systems.  And we're prepared to

9   get it off and he can tell you exactly how to get it off.

10          THE COURT:  I have two main issues.  No, I'm not

11   surprised about your motion, but let me say that at this

12   point it is not as clear to me whether or not Gruber Hurst is

13   subject to the order.

14      It's clear to me that VAC has taken a position to that

15   effect, and so my question that I have to determine, one of

16   them, is whether or not VAC is somehow estopped from saying

17   something different now.

18      But it's -- Judge Sanderson's ruling, in my estimation,

19   because it wasn't adopted by the district court really has no

20   affect.  And so the fact that he made the determination that

21   Gruber Hurst was not subject to the order doesn't preclude me

22   from finding differently.  That's not saying that I would.

23          MR. MATEJA:  Right.

24          THE COURT:  I'm just saying that I think it's an

25   open question.

1    The other thing is that because now evidence has come to
2    my attention that even if Gruber Hurst didn't -- or wasn't
3    subject to the protective order, and that's my conclusion,
4    that Gruber Hurst through one of its representatives actually
5    misrepresented a fact to this court, albeit to the previous
6    judge of this court.  And so then I have the question that
7    I'm springing on you now, as you did your defense to me
8    earlier today --
9              MR. MATEJA:  Right.
10             THE COURT:  -- as to whether or not I should
11   consider recommending to Judge Fitzwater that Gruber Hurst be
12   sanctioned in some way for violating this court's directive.
13   Take that into consideration when determining how to proceed
14   right now.
15       But for right now I'm going to overrule your motion that
16   I basically make a finding that there is no contempt to Judge
17   Fitzwater.
18       I think that because VAC has not had the opportunity to
19   brief or consider whether or not it has evidence to counter
20   your, you know, position regarding Gruber Hurst not being
21   subject to the protective order, that VAC should be given
22   that opportunity.  And I'm going to give them that
23   opportunity before I rule on that issue in the form of any
24   affidavits they want to present as factual basis for their
25   argument as well as any -- as a -- as a brief.

1    And so I'm going to hold off on making that ruling until

2    they have had the opportunity, which is only fair, to attempt

3    to rebut your argument regarding whether or not Gruber Hurst

4    is subject to it.

5            MR. MATEJA:  I understand.

6            MR. LOWENSTEIN:  Can I raise a similar issue?

7            THE COURT:  Yes, sir.

8            MR. LOWENSTEIN:  The evidence before the court is

9    entirely about - as Mr. Mateja has pointed out - as an

10   accidental disclosure of a document by Gruber.  Every

11   declaration, every pleading, every everything points to

12   somehow how Gruber said we got rid of the document it

13   reappears and they produced the document.

14       There is not a shred of evidence, certainly not clear

15   and convincing evidence that anyone within the walls of

16   Securus or T-Netix or Mr. Reinhold or Mr. Smith had anything

17   to do with this.  They have been named individually,

18   Mr. Smith and Mr. Reinhold and the company as well.  And I

19   don't think they have even reached the Rule 11 standard for

20   bringing the claims against them individually, much less

21   shown by clear and convincing evidence that these gentlemen

22   were somehow involved, encouraged, knew about the disclosure

23   of these documents before they occurred in 2010.  And,

24   again -- or in 2008, although that's by agreement, after the

25   parties settled and thought they were buying peace on the

1   2008 issues, there was no evidence that they were involved in
2   that at that time as well.
3       So I would move on behalf of them that the court direct
4   that the clients be found not to have committed any contempt
5   of this court's protective order.
6           THE COURT:  Mr. Cooter or Ms. Mangold.
7           MR. COOTER:  Yes.  Thank you.
8       This is a show cause to issue a show cause.
9           THE COURT:  I'm well aware.  I started out by
10  telling you that.  I know you're really concerned about me
11  exceeding my authority.  I promise you that I won't do that.
12          MR. COOTER:  I'm not concerned about you exceeding
13  your authority.
14          THE COURT:  That's the third time you've said that
15  though.
16          MR. COOTER:  No.  No.  No.  No.
17      The law is that -- first of all, this motion that you've
18  got to be a party to a protective order to be bound by its
19  terms is simply wrong.  The Fifth Circuit has already ruled
20  on that issue in the whitcraft case.  I'll get you the full
21  cite in a minute, basically says, "Nonparties who act with
22  the parties subject to the pro -- to the orders are bound by
23  the order."
24      Now, there's no question that Securus Netflix -- T-Netix
25  would be bound by that order.  And here we've got their

1  lawyers admittedly in the employ of them and their agents and
2  somehow they say because we're not -- we didn't enter our
3  appearance in the case that that's dispositive about whether
4  or not they're bound by the orders.  I'm sorry, Fifth Circuit
5  jurisprudence is directly against them on that point.
6      There's another one, Waffenschmidt versus MacKay, 763
7  F.2d 711 to the same effect.  And the reason, of course, is
8  because if -- it would be bizarre just to treat a protective
9  order as no more than a contract between consenting parties.
10  It is an order of the court to regulate the proceedings of
11  the court.
12      Now, beyond that, we now have Mr. Reinhold testifying
13  that he's in charge of all of these cases and that the
14  lawyers who we've identified are essentially subject to his
15  control and he's subject to Mr. Smith's control.  His hollow
16  undertaking, that we don't know nothing for nothing, is
17  frankly completely at odds with his role in the company and
18  doesn't make any sense.
19      Now, we asked in -- in -- in our pleadings to reopen
20  this case for some limited discovery when the time comes to
21  include an independent expert commissioned by the court to
22  look into these issues.  It's -- we're not bound by the fact
23  that we don't have access to do our own search of those
24  records.  We simply haven't had discovery.
25          THE COURT:  Is there any reason though for that if

```
1    Gruber Hurst is -- in essence is falling on its sword and is
2    saying it was the source of the --
3              MR. COOTER:  I'm sorry?
4              THE COURT:  Is there any reason for that if Gruber
5    Hurst is in essence falling on its sword and saying they were
6    the --
7              MR. COOTER:  Yes
8              THE COURT:  -- source of the document being --
9              MR. COOTER:  Yes.
10             THE COURT:  What is the reason for that?
11             MR. COOTER:  The problem is that nobody was
12   supposed to have the document.
13             THE COURT:  But Gruber Hurst is admitting it had
14   the document even though it's not supposed to have.
15             MR. COOTER:  Well, you've got two strains on that
16   issue.  You have the earlier affidavit and the exchange of
17   letters -- first of all, you have the representations to the
18   court itself:  It's all gone; it doesn't exist.
19        And then you have the:  If those representations be true
20   or those letters be true, we don't have -- this does not
21   exist; and if they're true then as of 2008 they didn't have
22   them, they didn't exist.
23        Now, we know that in 2011, in connection with other
24   litigation, all of a sudden they exist.  And the -- the
25   falling on your sword part is:  Well, we made a mistake, we
```

1    shouldn't have sent them out to whoever we sent them out to,

2    it was inadvertent.

3         That begs the question of where they came to.

4         The fact is if you accept that they didn't exist yet

5    somehow they reappear, well, obviously they came from

6    somewhere.  And you can't reconcile those two statements

7    without knowing what searches have been done, and where, to

8    determine whether or not the representations to the court

9    were truthful that they didn't exist and where they all came

10   from.  That's why that inquiry is necessary.

11        And the other thing is that, you know, this is a -- an

12   odd duck kind of case in a -- in a different way.  They -- if

13   they make a representation to the court and everybody acts

14   on -- essentially the judge did what I think most judges do,

15   he says:  You're an officer of the court, what am I going to

16   do if that's what you say.

17        It turned out it wasn't true.  Well, it either wasn't

18   true or it was true and they later re-acquired the document

19   from some place.  Now, if you look at the some place, what

20   are the -- what are the choices?

21        Well, there's only one common nexus here, and that is

22   the thing which -- the hub to which all spokes are attached

23   is Securus and its affiliates.  They say we don't have them.

24   And given the totality of the circumstance, I suggest to you

25   that that bald statement is not entitled to respect.  It

1   deserves more inquiry by the court.  And, frankly, an inquiry

2   in a -- in a -- in a sophisticated way.  We're not seeking,

3   notwithstanding what Mr. Reinhold said, blanket access to all

4   their files.  Globe Tel and Securus are competitors, and,

5   indeed, fierce competitors all over the country.

6        But how can anybody, if there is a problem with the

7   credibility of the statements that have been made to the

8   court, in good conscience object to a report to the court,

9   whether it be you or whether it be the district court in --

10  in -- in due course.  Because at this point -- you know, the

11  last thing is the serendipitous nature of this.  If it hadn't

12  been Ms. Clouster leaves Jones Day, she thinks it's all

13  resolved, everybody did, she finds out that notwithstanding

14  what everybody thought something happened.  And it just

15  happens that she finds it out because she was retained first

16  at Jones Day -- and maybe -- I can't remember if she took the

17  case to -- to Alston & Bird or not, where she stumbles on

18  this.  And it's just -- it's just complete serendipity that

19  Ms. Clouster was -- tripped on it, essentially.  Well, but

20  for the fact that she ended up representing nonaffiliated

21  parties in this other litigation nobody would have ever

22  known, and that is complete serendipity.

23       Given the facts and circumstances in this case and --

24  I'm not suggesting that you're bound by Judge Sanderson's

25  findings or not, but clearly when you look at that situation

```
 1   he made findings and the case settled.  Okay.  The case
 2   settled.  That would be the most normal event in life --
 3          THE COURT:  It would seem to me that you wouldn't
 4   want him to be bound by his findings, which are that Gruber
 5   Hurst was not a party to the protective order.
 6          MR. COOTER:  I don't -- well, I don't want you to
 7   be bound by his findings and I know you're not bound by his
 8   findings but, again, I don't think that it matters so long as
 9   they are affiliated with people who are parties to it.
10          THE COURT:  And your affiliation argument goes to
11   Gruber Hurst as well as the Securus parties?
12          MR. COOTER:  Absolutely.
13          THE COURT:  So everybody is -- nobody is a actual
14   party to the protective order who's involved now.  Everyone
15   who's involved now is an affiliated party to the agreement.
16          MR. COOTER:  Yeah.  To use the words of the Fifth
17   Circuit they are -- let me just use the right words.
18       "Nonparties who act with the party are subject to the
19   order --"
20       "Nonparties who act with the party subject to the order
21   is also -- are also bound by the order."  That's right out of
22   the Fifth Circuit.
23       Quote, "A party who knowingly aids, abets or conspires
24   with another to evade an injunction or an order of court is
25   also in contempt of that court."
```

1        And clearly this evidence not only gives rise to that

2   but almost -- it almost conclusively establishes that because

3   these are the outside lawyers for this company and all of

4   this litigation, so --

5        THE COURT:  So by -- by virtue of them being the outside

6   counsel in all the other litigation, I'm just asking, do you

7   believe that you have established a conspiracy then under

8   the -- the case that you are citing to evade the court's

9   order?

10       MR. COOTER:  I believe that -- conspiracy is not a

11  word I would use.

12            THE COURT:  Okay.

13            MR. COOTER:  I believe that we have established

14  that they are acting with -- that they are acting with

15  parties to the protective order.

16            THE COURT:  Read to me again though what you just

17  said the standard was.  I -- I could have sworn I heard

18  conspiracy in there.

19            MR. COOTER:  I'm sorry?

20            THE COURT:  I could have sworn I heard conspiring.

21            MR. COOTER:  If I did, I didn't --

22            THE COURT:  I mean, but what does it say?

23            MR. COOTER:  Oh, no.  No.  No.

24       Actually, they're two different cases.  They're two

25  different quotes.

```
 1            THE COURT:  Okay.
 2            MR. COOTER:  The first one is -- looks like
 3   Whitcraft or something, "Nonparties who act with the party
 4   subject to the order are bound by the order."  It's not a
 5   conspiracy theory.  It's either they act with or don't act
 6   with.
 7        There's no question that happened.
 8        It goes further --
 9            THE COURT:  Act with them to do what?
10        Acts with the party, I could have sworn there was
11   another part of that.
12            MR. COOTER:  Act with them in connection with the
13   order in the way documents were dealt with.
14            THE COURT:  That's what that case says?
15            MR. COOTER:  Yes.
16            THE COURT:  Okay.  What's that case again?  That's
17   the 763 --
18            MR. COOTER:  No, let me give you that cite.  That
19   cite looks like F70 F.3d at 570 --
20            MR. MATEJA:  What was that?  570 or F70?
21            MR. COOTER:  I don't know.  You know, age has a way
22   of dealing -- what is this cite?
23            MS. MANGOLD:  You can't read it?
24        Your Honor, 570 F.3d at 272, the name is Whitcraft.
25            THE COURT:  Okay.
```

1          MR. COOTER:  Now, the second -- there's a second

2    case that did use the word "conspiracy" so let me give you

3    that one.

4          THE COURT:  Okay.

5          MR. COOTER:  That's a quote right from the Fifth

6    Circuit.

7          THE COURT:  Okay.

8          MR. COOTER:  "A party who knowingly aids, abets, or

9    conspires --" you know, this isn't an aiding or abetting

10   case, they're subject to the protective order, it doesn't

11   require scienter, it's not a criminal conspiracy kind of

12   concept,   "-- to invade an injunction or order of the court

13   is also in contempt of the court."

14       Or to put it in the court's parlance earlier in

15   response --

16         THE COURT:  Was that the 763 F.2d --

17         MR. COOTER:  That case is 763 F.2d 711, jump site

18   language is on 736.

19       And so I think that this -- now, of course, you know,

20   you get practical about it, what happened was Judge Sanderson

21   gave 'em a choice.  He says you either enter or disgorge the

22   documents.  They -- they took their choice.  They chose not

23   to enter and then told him that they disgorged the documents.

24       Well, if -- if -- if they lied to the court, and it's an

25   open issue, we can't tell right now, all we know is that

1    later something happened that would indicate that one of

2    those statements isn't true, either that they had disgorged

3    or never -- or didn't disgorge.  And you can't tell from

4    this.

5        But for purposes - to use the court's parlance - of

6    sending this for a -- a show cause order as to whether there

7    ought to be a contempt finding there should be enough at this

8    point.

9        And we'll be happy to supplement with more briefing if

10   you'd like.

11            MR. MATEJA:  Can I respond to Mr. Lowenstein's

12   argument?

13            THE COURT:  Sure.

14            MR. MATEJA:  Which also responds.

15       The -- I have a copy of the -- the Whitcraft versus

16   Brown case.  In fact, can I approach, Your Honor?

17            THE COURT:  Yes.

18            MR. MATEJA:  The reason why we have copies of this

19   is because they have already briefed this.  I mention this

20   because I don't know if they need more time to brief this

21   argument.

22       But I think what's important here is that counsel for

23   movant somehow has tried to distance this aiding and abetting

24   conspiracy notion from what they have to establish, but

25   that's not what this case says.  Okay?

 1          And if we take a look at -- let me see where it's at.

 2               It's under key note 12 -- okay.  Head note 7 and

 3    star page 12 on this version, which is page 4 -- and

 4    actually, I tell you what -- actually, I tell you what, can

 5    you -- I'm sorry.

 6          Take a look at page 3, under subsection 2.  And it's

 7    keynotes 2, 3, and 4.

 8          It says:  As the court noted, a movant in a civil

 9    contempt proceeding bears the burden of establishing by clear

10    and convincing evidence 1, 2, and 3.  A court order binds not

11    only the parties subject thereto but also nonparties who act

12    with the enjoined party.  They cite the NLRB versus Laborers

13    International Union case.

14          And the quote is, "Any party who knowingly aids, abets

15    or conspires with another to evade an injunction or order of

16    the court is also in contempt of that court."

17          And so, Your Honor, to Mr. Lowenstein's point is there

18    is no evidence in the record whatsoever that somehow Securus

19    or T-Netix has done anything in combination with Gruber

20    Hurst, acting with Gruber Hurst, conspiring with Gruber

21    Hurst, anything along those lines.  There's no evidence

22    whatsoever.

23          Okay?

24          And for those reasons, Your Honor, at a very minimum the

25    court should grant kind of this motion for a directed finding

 1    vis-a-vis the T-NetixSecurus individuals.  To the point of my

 2    client, okay, this has been an issue that has been kind of

 3    percolating.  And while I think I may have -- you know, we've

 4    talked about --

 5             THE COURT:  It became clear to you in your dream.

 6                      (Laughter)

 7             MR. MATEJA:  That's right.  It became clearer to

 8    me.  And notwithstanding, again, this issue has kind of

 9    percolated out there, and whatever evidence that they have is

10    whatever evidence that they have.

11             THE COURT:  Well, let me put you on the spot a

12    little bit.

13             MR. MATEJA:  Absolutely.

14             THE COURT:  Since one of the -- since it's not

15    necessary that a violation of a protective order be

16    willful --

17             MR. MATEJA:  Right.

18             THE COURT:  -- which I know a -- a -- a lot of your

19    argument goes to sort of the written argument.  There is some

20    of it that goes to a sort of -- it's -- it's -- it's sort of

21    a mitigation type of argument I would characterize it as.

22             MR. MATEJA:  It is.

23             THE COURT:  But just looking at the elements --

24             MR. MATEJA:  Right

25             THE COURT:  -- I can't think of a better word, of

```
 1   civil contempt, do we have an issue as far as Gruber Hurst is
 2   concerned that the order itself -- unmistakably there is an
 3   issue that the order itself exists.
 4             MR. MATEJA:  Right.
 5             THE COURT:  There's no question, right?
 6             MR. MATEJA:  Right.
 7             THE COURT:  The order is -- there is a question as
 8   to whether Gruber Hurst was subject -- is subject to the
 9   order and therefore bound by its terms.
10             MR. MATEJA:  That's right.
11             THE COURT:  Okay.  There is not a question that
12   Gruber Hurst in fact disseminated the document.  Is that
13   correct?
14             MR. MATEJA:  That's not an issue, Your Honor.
15             THE COURT:  Okay.  Is there an issue that Gruber
16   Hurst back when -- in 2008 when Judge Sanderson heard the
17   first motion for contempt that in response to Judge
18   Sanderson's order a representative of Gruber Hurst informed
19   that Gruber Hurst no longer had the document or had purged
20   itself from the document?
21             MR. MATEJA:  I believe what happened at the
22   hearing --
23             THE COURT:  Okay.
24             MR. MATEJA:   -- was that Mr. Tautfest indicated
25   that they would be returning the documents and destroyed the
```

```
 1    documents.
 2            THE COURT:  Okay.
 3            MR. MATEJA:  One thing I would note, Your Honor, is
 4    that if you look at the transcript, okay, there is not an
 5    order from Judge Sanderson that they do this.  Okay?
 6        And I say that with all due respect, in knowing that it
 7    was clear from that hearing, okay, it was clear that we were
 8    going to return the document, we intended to return the
 9    document, we intended to destroy the document, but I dare say
10    that one of the reasons why they haven't asked you for an
11    application to show cause why we shouldn't be held in
12    contempt of Judge Sanderson's order is because there wasn't
13    an order.
14            THE COURT:  Right.  Which is termed it as -- I
15    phrased it in terms of a misrepresentation.
16            MR. MATEJA:  Right.
17            THE COURT:  Is there a -- is there a question that
18    there was not a misrepresentation back then?
19            MR. MATEJA:  There -- the -- there is not.  Because
20    all that Mr. Tautfest says is that they're going to start the
21    process -- I mean, Judge Sanderson clearly wants us to return
22    the documents if we're not going to enter our appearance as
23    counsel of record.  Okay.  We did not enter our appearance.
24    And we did represent to the other side -- actually, we sent
25    it to Bell Nunnally, that here's the copies of what we have,
```

1    the hard copies, and that we've destroyed those records.

2              THE COURT:  Okay.  So are you saying that that

3    which turned out to be a misrepresentation, whether or not

4    willful, whether or not intentional --

5              MR. MATEJA:  Right.  Right.

6              THE COURT:  -- was not made to Judge Sanderson, was

7    only made to the other party?

8              MR. MATEJA:  Help me out here, guys, because I

9    haven't focused as much -- I'll be honest with you, Your

10   Honor.  We've really been focused on the protective order.

11             THE COURT:  Okay.

12             MR. MATEJA:  And not so much the transcript of what

13   transpired.

14             MR. LOWENSTEIN:  It's a matter of a day but during

15   the hearing Mr. Tautfest, and this is my recollection, told

16   the court we're going to return everything, after he said you

17   need to return everything.  The next day he sends a letter

18   saying here's everything.

19        The letter saying here's everything, to my knowledge,

20   was not submitted to the court as Gruber Hurst's

21   representation to the court that it had occurred.

22             THE COURT:  But based on what you saw the -- the

23   misrepresentation, whether intentional or willful or not, was

24   that we are going to move that document, move those

25   documents, and then that didn't happen.

 1          MR. MATEJA:  Your Honor, again, I think we've got

 2     to look at the transcript.  I'm not sure that that was

 3     actually said.

 4          MS. BROWN:  If I might, Your Honor.

 5          THE COURT:  Sure, Ms. Brown.

 6          MS. BROWN:  I don't believe Mr. Tautfest stated

 7     that on the record.

 8          THE COURT:  Okay.

 9          MS. BROWN:  I'm looking at page 69 of the

10     transcript, which I believe is the Movant's Number 2 and it

11     starts at line 14, this is the court, just above that -- let

12     me go to line 12 on page 69, this is Mr. Tautfest speaking,

13     he says, "We do still have those documents, Your Honor."

14          Prior to that he has explained to the court "That's

15     correct, Your Honor.  Your Honor, we do not have the

16     confidential documents.  What we have are discovery responses

17     and accident reports --" which should have been expert

18     reports.  I don't know if he said accident reports or it was

19     transcribed incorrectly.  "We still have those documents

20     because we are working with Mr. Pittman -- Pittman and the

21     Bell Nunnally firm on the overlapping issues, and we helped

22     prepare the witness.  We are giving advice.  And we have been

23     asked to do that by our mutual client.

24          "So we still have those documents."

25          Judge Sanderson says:  Well, I think the short answer is

VAC App. 168

1    that needs to go back right now.  And if you and your firm

2    want to enter a formal appearance as counsel representing

3    T-Netix in this case, then sobeit.  But I think that there

4    all kind of confusions here when you're representing them.

5         So I don't believe that Mr. Tautfest ever said on the

6    record or agreed that he would give them back, because there

7    were -- there were two choices, either enter an appearance as

8    counsel of record or give them back.

9         He certainly wrote letters to the Bell Nunnally firm,

10   but to answer your question about a statement of the court as

11   an officer of the court as to whether or not those would go

12   back, I don't believe he said that in the transcript of the

13   hearing.

14             MR. COOTER:  She stopped too short.

15        Judge Sanderson says.

16             THE COURT:  Where are you -- where are you looking?

17             MR. COOTER:  I'm sorry?

18             THE COURT:  Where are you looking?

19             MR. COOTER:  At page 70.

20             THE COURT:  Page 70 okay.

21             MR. COOTER:  He gives them a choice.

22        "If you wish to enter formally file a motion with an

23   entry of appearance --"

24        " -- that is this case here in the Northern District of

25   Texas -- then I think once you have been enrolled and your

1   firm has been enrolled as counsel of record in the Northern

2   District of Texas then you are therefore entitled to access

3   under the terms of the confidentially (sic) order."

4        And then there's a -- there's a simple sentence.

5        "Yes, Your Honor, and we will return those documents

6   today."

7                MS. BROWN:  That is Mr. Bowers.

8                MR. MATEJA:  That is Mr. Bowers though, Your Honor.

9                MS. BROWN:  That is not Mr. Tautfest.

10               MR. COOTER:  Well, --

11               MR. MATEJA:  Okay.  And he -- and then he has to

12  look them.  He says:  I want those documents returned to

13  counsel whose appearance has already been entered in the

14  case.

15       Mr. Bowers, who is counsel of record, is saying when he

16  gets those documents that he's going to return them.  And, in

17  fact, he did return what Gruber Hurst sent to him.

18       Again, Your Honor, I mean, mea culpa.  It just turned

19  out that when we deleted the document we didn't realize that

20  there was another place where the document was at.  And I've

21  got the computer expert so we can get that in front of you.

22       He can give you a report.  He is a well-known computer

23  forensic expert.  He's been used in lots of cases.  I mean,

24  he very well could be the quote/unquote independent.  I mean,

25  he can tell you what happened, which is that -- I mean,

1   unfortunately -- I have two witnesses who will say that there

2   were -- that it was deleted.  My computer forensic expert

3   will say that there was another place where it was at.  And

4   unfortunately when they were doing the other litigation it

5   got subsumed within this.  And there is -- there's no

6   conspiracy.  There's no Securus/T-Netix is feeding the

7   documents to them.  That just is not the case.

8        And that's why, Your Honor, I think it would be very

9   appropriate for the court to consider directing a finding on

10  behalf of T-NetixSecurus, letting us put up our computer

11  forensic expert so that you can hear.  I mean, we've already

12  paid for him.  He's here for your benefit so you can hear

13  where this document is and so we can get rid of it.  Because

14  we want to get rid of it.  We don't want it.  We didn't want

15  it back when we thought we destroyed it back in 2008.  And

16  that's the appropriate way to handle this case.

17       But the bottom line is, is that the movant has not met

18  its burden of establishing clear and convincing evidence that

19  we are subject to the protective order.  And, you know, even

20  this theory that they have espoused most recently, it doesn't

21  get them there.

22       For all those reasons --

23            THE COURT:  Let -- let me ask you this.

24            MR. MATEJA:  Yes.

25            THE COURT:  Okay.  When Ms. Brown was reading from

1    the -- Mr. Tautfest's statement to Judge Sanderson about

2    why -- why --

3              MR. MATEJA:  Right.

4              THE COURT:    -- Gruber Hurst needed to have access

5    to the documents, all the things that Gruber Hurst was doing

6    in order -- that -- that it needed the documents --

7              MR. MATEJA:  Okay.

8              THE COURT:    -- is there anything about that that

9    lends some support then to -- to VAC's argument that Gruber

10   Hurst was indeed working in concert with a party to the

11   protective order?  A party subject to the protective order.

12             MR. MATEJA:  Well, what he's talking about then are

13   the questions that were going on then, which quite frankly

14   did not exist in 2010 when there is the Combined and the

15   Pinnacle cases.

16        Mr. Tautfest isn't at -- wasn't at Gruber Hurst.  In

17   fact, he leaves soon thereafter.  I mean,  Mr. Tautfest

18   didn't have anything to do with those cases.

19        And -- and the truth is that I can put Mr. Tautfest up

20   on the witness stand.  He will tell you that he directed his

21   paralegal to destroy the electronic version.  There's no

22   doubt that the hard copy went back.

23        Ms. Miller, who is the paralegal, would testify that she

24   destroyed it.

25        Mr. Tautfest would say that he went to the place where

1    it should have been, it was not there, and that it was

2    destroyed.  So, I mean, again a mistake was made.  Somehow

3    that document existed somewhere else.  And it was

4    inadvertent.  We never intended for it to go out.  I mean, we

5    could put on a lot of evidence.  We've got a number of

6    witnesses.

7              THE COURT:  Well, I guess that's what I mean by

8    sort of mitigation sort of evidence.  I mean, because as far

9    as the question goes, since we're not concerned with scienter

10   when it -- as it relates to the -- the civil contempt, then

11   it would seem to me that those are the kinds of things that

12   if I were to certify to Judge Fitzwater that there is --

13   there are facts that would constitute contempt that you would

14   be able to present in the actual show causing hearing.

15        But I would like to hear from the computer expert,

16   because I have a feeling that it may fall to me, it may

17   not --

18              MR. MATEJA:  Right.

19              THE COURT:  -- it may fall to me to make the

20   determination about your motion to purge as well as their

21   corresponding argument against purge and why.

22              MR. MATEJA:  Right.

23              THE COURT:  So I think I would like to hear from

24   your expert.

25        But I also want to confirm with VAC that if Gruber Hurst

1   is not contesting that there is an order, that the documents

2   which were under -- subject to protection under the order

3   were actually disseminated and the only issue is whether or

4   not Gruber Hurst was subject to the protective order for

5   purposes of certifying the civil contempt.

6        Am I missing something regarding additional evidence

7   along those lines?

8        It doesn't seem that there would be a point in that and

9   it comes down to a legal argument at this point.

10            MR. COOTER:  I think the -- I think the -- the

11   facts that the order was disseminated and the document was

12   subject to protective order admit it.

13            THE COURT:  Right.

14            MR. COOTER:  That's true.

15            THE COURT:  Right.

16            MR. COOTER:  I think that the issue is whether or

17   not -- the issue narrowly framed -- the legal issue narrowly

18   framed is whether or not you have to be a party to a

19   protective order --

20            THE COURT:  Right.

21            MR. COOTER:  --  to a court order, to violate it.

22            THE COURT:  Right.  So my question to you is that

23   we're down to a legal argument as opposed to a factual issue.

24            MR. COOTER:  I -- I believe that -- well, I believe

25   that that's true.  And that's the issue that I suspect that

```
 1    we'll have to brief, if -- if it's necessary to brief it.
 2         But we're here at a motion -- we're here at a directed
 3    verdict motion.
 4              THE COURT:  Well, it -- it sounds like that, but
 5    I'm just going to tell you the truth, because this is not
 6    that kind of hearing I'm considering directing a verdict.
 7    I'm considering that as the ultimate arguments upon which I'm
 8    going to consider when I make my determinations here.
 9              MR. COOTER:  Right.
10              THE COURT:  And I think y'all probably figured that
11    out as we were going along, that, you know, there's no
12    directed verdict that's going to happen here.  It's all a
13    part of what I'm going to consider in determining the
14    ultimate issues --
15              MR. COOTER:  Right.
16              THE COURT:  -- before me.
17              MR. MATEJA:  Right.
18              THE COURT:  And so I just wanted to confirm with
19    you, and it sounds like you're at the same place that we all
20    are, is that we're now down to a legal issue of whether or
21    not Gruber Hurst was subject to the protective order.
22              MR. COOTER:  Or -- but let's take it -- let's take
23    it further.
24         There's no question that T-Netix/Securus was.  Okay?
25              THE COURT:  Right.  But that --
```

```
 1              MR. COOTER:  And if that document goes out -- goes
 2    out, they're subject to protective order, they're responsible
 3    too.
 4              THE COURT:  Well --
 5              MR. COOTER:  I mean, they're actually signatories.
 6              THE COURT:  That sounds like a legal issue as
 7    well --
 8              MR. COOTER:  Right.
 9              THE COURT:  -- to me.
10         All that being said, I would like to hear from the
11    computer expert so I can get that testimony in the record and
12    have something before me regarding that.
13         And at the conclusion of that testimony then we'll just
14    order that any further briefing on the legal issues happen --
15    it's going to have to happen within the week.  So I'm going
16    to say by Monday.  And if there are any -- if there is any
17    response to the other side's brief of the legal issues then
18    that response will need to be in to us by the 8th.
19         So by the 1st initial briefs, by the 8th any response to
20    the other parties' briefs.
21         And Mr. Mateja.
22              MS. BROWN:  Judge, --
23              THE COURT:  I'm sorry.
24              MS. BROWN:  -- you had said Monday?
25              THE COURT:  I said Monday, so that's -- what day is
```

```
 1    that?
 2              MS. BROWN:  I believe it's the 4th.
 3              THE COURT:  The 4th and the 8th.
 4              MR. MATEJA:  Your Honor, I do want to put Mr. Cowen
 5    on.  He actually has a flight he needs to leave for by 3:00.
 6              THE COURT:  I'm ready now.
 7              MR. MATEJA:  I don't want to lead you astray
 8    either.
 9              THE COURT:  Okay.
10              MR. MATEJA:  Which is that if the court is not
11    going to consider some sort of directed finding, I do believe
12    I need to put on a little more testimony that relates to this
13    substantial compliance notion, because you have accurately
14    pointed out that if they put on their prima facie case, then
15    I get a chance to put on a case of substantial compliance.
16         And while I have told you things about what Ms. Miller
17    did and what Mr. Tautfest did, it's not in the record.
18              THE COURT:  Okay.
19              MR. MATEJA:  It's not evidence.  So I need to make
20    sure they get up here.
21              THE COURT:  All right.
22              MR. MATEJA:  So without further ado let me go ahead
23    and put Mr. Cowen on.
24              THE COURT:  And -- and let me tell you, because I
25    know it's 1:00 now, the reason I'm not taking a lunch break,
```

```
 1    but I may need to take a break so our court reporter can get
 2    a snack, is because I have a criminal docket at 2:00.  It
 3    shouldn't last more than 45 minutes or so, but I'm going to
 4    handle it in the middle of this, which will give you an
 5    opportunity to go get something to eat and come back if we're
 6    still going.
 7              MR. MATEJA:  All right.
 8              THE COURT:  But I am going to have to give her an
 9    opportunity to take a break prior to that time.
10                        (Witness sworn.)
11              MR. MATEJA:  Your Honor, I don't know if counsel
12    has had an opportunity to go through our exhibits yet, but as
13    I'm in my case I would like to go ahead and much like they
14    did in their case and offer them en masse.  So it would be
15    Exhibits 1 through --
16              MR. COOTER:  We're going to have to look at them.
17              THE COURT:  Ms. Mangold, did you have an -- an
18    opportunity to look through those?
19              MR. COOTER:  We have copies, but we haven't looked
20    at them.  We've been trying the case.
21              THE COURT:  Well, you were busy at the podium, but
22    she was actually looking at them.
23              MS. MANGOLD:  I've been looking at other things,
24    Your Honor, but we'll look through them right now.
25              THE COURT:  All right.
```

```
 1              MR. MATEJA:  So it would be just for the record
 2   Gruber Hurst Exhibits 1 through 26 inclusive of I believe
 3   Exhibit 9 has an A, B and C, 10 has a 10-A, 15 has a 15-A.
 4              THE COURT:  And you're offering 1 through 25 with
 5   those -- 1 through 26 with those subsections?
 6              MR. MATEJA:  That's right, Your Honor.
 7              THE COURT:  I'm sorry, 1 through 29 with those
 8   subsections?
 9      I see you've got some tabs in there that don't have
10   exhibits.
11              MR. MATEJA:  Just in case I had another --
12              THE COURT:  Okay.
13              MS. MANGOLD:  Your Honor, I'm almost through.
14              THE COURT:  Sure.
15              MR. COOTER:  Frankly --
16              THE COURT:  Yes, sir.
17              MR. COOTER:  We're going to object -- everything is
18   okay, except for 24.  It appears to be a resume of Mr. Cowen.
19   I presume that's Mr. Cowen.
20      I didn't know that we were going to be dealing with
21   whether or not the thing should be purged or not today.  That
22   really wasn't part of today's proceeding.  And the resumes
23   for experts are generally hearsay.  I just looked at it.  I
24   didn't have it until -- until just now.  So object to 24.
25   They can have the rest.
```

```
 1              MR. MATEJA:  Your Honor, we were offering --
 2              MR. COOTER:  Wait a minute.  Wait a minute.
 3              There's also some kind of a graphic, which is
 4    Exhibit 25.  I'll object to that.  I have no idea what it's
 5    supposed to depict or who prepared it.
 6         This is --
 7              THE COURT:  You're referring to 24 and --
 8              MR. COOTER:  24 and 25 are the problems.
 9    Everything else is fine.
10              THE COURT:  Exhibits 1 through 23 and 26 are
11    admitted.
12              MR. MATEJA:  Your Honor, we were trying to offer 24
13    just for the sake of efficiency.
14              THE COURT:  I understand.
15                        DIRECT EXAMINATION
16    BY MR. MATEJA:
17    Q.   Okay.  Mr. Cowen, could you introduce yourself to the
18    court please?
19    A.   My Name is David Laurence Cowen.
20    Q.   And, Mr. Cowen, would you tell the court what it is that
21    you do for a living?
22    A.   I am a computer forensics investigator.
23    Q.   And how long have you been doing that?
24    A.   I've been doing computer forensics since 1999.
25    Q.   All right.  And have you testified in court before?
```

```
 1   A.   I have.

 2   Q.   Have you testified a number of times?

 3   A.   Yes.  In fact, it's listed at the end of my CV.

 4   Q.   Okay.  And so tell the court who it is that you're

 5   currently employed by.

 6   A.   Gruber Hurst.

 7   Q.   Okay.  But actually the firm that you're with is?

 8   A.   I'm sorry.  Gruber Hurst has hired us in this

 9   engagement.   I -- I work for a company called G-C Partners.

10   Q.   Okay.  Are you one of the owners of that company?

11   A.   That is correct.

12   Q.   C would be the -- the G-C is the C of Cowen?

13   A.   That's correct.

14   Q.   Okay.  And tell the court what kind of training that you

15   have in computer forensics, please.

16   A.   I've --

17             MR. COOTER:  In the interest of time, I know your

18   schedule is tight, I won't object to him as a computer

19   forensics expert.

20             THE COURT:  Okay.

21             MR. COOTER:  I mean, I may want to voir dire him

22   later, but for right now he would be qualified as far as I'm

23   concerned.

24             MR. MATEJA:  Any problems with the --

25             MR. COOTER:  He's smiling and nodding his head.
```

 1      And you're welcome.

 2              MR. MATEJA:  Any problems though with the resume?

 3              MR. COOTER:  I don't have any way to deal with

 4      this.  The resume is hearsay.

 5              MR. MATEJA:  Okay.

 6              THE COURT:  I'm not concerned about the time,

 7      because I'm going to make you come back after my criminal

 8      hearings if you're not done.  So you go right ahead.  You

 9      need to prove up something in the resume that's not entered

10      then you go right ahead.

11      BY MR. MATEJA:

12      Q.   So I want to highlight a few things from your CV though.

13           So let's talk about your experience in dealing with

14      computer forensics.  I mean, what kind of training have you

15      had?

16      A.   I've gone through training through a number of

17      organizations, including the High-tech Crime Investigator's

18      Association, attending conferences from Guidance software.

19      I've gone through training, excuse me, from ASR Data.  I've

20      also written books that are used in college courses and

21      training and actually taught a class for SMU on forensics.

22      Q.   Okay.  And tell me the books that you have written on

23      the field of computer forensics.

24      A.   I coauthored Hacking Expose Computer Forensics, both the

25      first and second edition.  We're starting work on the third

1    edition now.

2         I coauthored the Anti-Hacker Tool Kit, third edition, as

3    well as just completed and is in printing now the Infosec

4    Guide to Computer Forensics, which is a beginner's guide.

5    Q.   All right.  Have you worked in conjunction with law

6    enforcement before?

7    A.   We've trained law enforcement as well as our cases

8    sometimes get picked up criminally if they start civilly.

9    Q.   Okay.  And when you say trained law enforcement, are we

10   talking about state and local, Feds, combinations thereof?

11   A.   A course that we created for a company called Paravin we

12   trained for Secret Service, FBI and other entities.

13   Q.   Okay.  Basically your educational background you went to

14   UTD, University of Texas at Dallas, got a BS in computer

15   science?

16   A.   That's correct.

17   Q.   And you are designated as a CISSP individual?

18   A.   I'm certified by ISE squared, and it's the Certified

19   Information Systems Security Professional.

20   Q.   Do you speak routinely?

21   A.   I do.

22   Q.   And what do you speak on?

23   A.   Computer forensics.

24   Q.   All right.  And so you were hired by Gruber Hurst in

25   this matter to undertake what?

1    Describe that to the court.

2    A.   It was explained to me that a document was produced.

3    They knew some of the time frames of the important dates of

4    what happened as far as the document was concerned.  They

5    provided me with access to the servers that the documents

6    resided on.  I did my own inquiry, asking questions regarding

7    what other computers existed during the time.

8    What was unique about this is that we had to make sure

9    during our inspections not only did we go out and look but

10   made sure that we never saw the contents of the offending

11   document.  So we were limited in that aspect of the

12   investigation.

13   However I have found definitive findings regarding the

14   existence of the document that was inadvertently produced.

15   Because of the limitations I haven't found any existence of

16   the document that was deleted.

17   Q.   And you say "the document that was deleted," what are

18   you referring to there?

19   A.   The April 16th, 2008, actions.  That was five years ago.

20   The majority of the artifacts I still find are around the

21   2010 and forward period.

22   Q.   Okay.  Now, in order to kind of make all this make

23   sense, you helped us put together a demonstrative aid that's

24   already been introduced into evidence as Defense Gruber

25   Hurst's Exhibit 26; is that correct?

```
 1   A.    That's correct.
 2              MR. MATEJA:  Bev, could you help me?  Could we pull
 3   that up on the screen?
 4              THE COURT:  I don't think that's in.  You could
 5   still use it as a demonstrative exhibit, but --
 6              MR. MATEJA:  Okay.  Okay.  But it's not in?
 7              THE COURT:  It's not in.
 8              MR. MATEJA:  Okay.  Let's go ahead and can you put
 9   it up?
10        It has not been previously admitted.
11   BY MR. MATEJA:
12   Q.    Now, you are familiar with this diagram, are you not?
13   A.    Yes.
14   Q.    Okay.  And you were instrumental in helping put it
15   together?
16   A.    Correct.
17   Q.    And can you describe to the court generally what does it
18   describe?
19   A.    So what it's showing you is kind of the life cycle of
20   this document, where I found that it existed originally and
21   how it came to be where it is today.
22        And we're kind of divided into three groupings on two
23   different computers.
24        So the computer on top, which is called File_01, that
25   was the primary computer, primary server for Gruber Hurst
```

VAC App. 185

1    prior to January 2011.

2    Q.    Okay.  So when we do File_01, I've got a little laser

3    point here, this is File_01; is that correct?

4    A.    Correct.  That's a representation of File_01.  That's

5    the Gruber Hurst that was their primary server prior to

6    January 2011.

7    Q.    Okay.  Now above File_01 is a 500 gigabyte server, is

8    that what this is?

9    A.    These are actually disk drives that are attached to

10   File_01 and the 500 gigabytes is an proximate, but it's

11   basically the -- the disks that are contained within it

12   physically that it had access to.

13        And then on April 25th, 2008 they needed additional

14   storage space and they added this two terabyte volume.

15        On April 28 of 2008 they actually performed a migration

16   of data that existed prior on the 500 gigabyte drive onto the

17   two terabyte drive

18   Q.    So whatever was there before the 28th got moved over

19   from the 500 gigabyte drive to the two terabyte drive?

20   A.    It got copied over, that's correct.

21   Q.    Okay.  Okay.  So in the context of the McAlexander

22   report -- and you're familiar with that report generally; is

23   that right?

24   A.    By name and by Bates number.

25   Q.    Okay.  Okay.  Tell us what it was while you were

1   reviewing Gruber Hurst computers what it was that you found.

2   A.   So what I found is I found the actual -- and I didn't

3   expect to find the 500 gigabyte drive, the deletion records

4   for the Securus_Global_New directory that was originally made

5   back in 2007.

6        This is where the second copy of the offending document

7   resided, and it continued to reside until March 28, 2008,

8   when it's copied in its entirety, this whole folder --

9   Q.   Is it March or April 28th?

10  A.   April.

11  Q.   April 28Th.

12  A.   April 28th, 2008.

13           THE COURT:  So they tell us when we delete

14  something on our computer it never really goes away, it's

15  just overwritten.  So are you saying that when it was deleted

16  and it was sent to be overwritten or whatever then it -- it

17  was still there?

18           THE WITNESS:  No, ma'am.

19           THE COURT:  Okay.

20           THE WITNESS:  In this case I'm saying this was

21  another copy.

22           THE COURT:  Okay.

23           THE WITNESS:  This copy was never deleted.

24  BY MR. MATEJA:

25  Q.   Okay.  Do you believe there was one copy and then

VAC App. 187

1  another copy?

2  A.    Based on the facts that were told to me that there were

3  deletions that they knew that were performed on April 16th,

4  2008, I found no evidence to contradict that.  I found

5  nothing that showed that there could not have been another

6  location.      What I do know is that this location con --

7  con -- existed from October 8th, 2007, and did -- was not

8  deleted until later on, after the migration.

9       In other words, this was at the time of the migration

10  from the 500 gig to the 2 terabyte this was a -- an active or

11  a nondeleted file.

12  Q.    Okay.  And so the facts that you were told was that this

13  offending document, the McAlexander report, was deleted; is

14  that correct?

15  A.    That's correct.

16  Q.    Okay.  And at least for the -- the file names that you

17  see, is that consistent with what you see?

18  A.    The file names I'm seeing -- typically there's --

19  there's two key indicators in my searching, and one is the --

20  the directory, named after the Bates range that the documents

21  were produced under, and then the secondary is the actual

22  Bates names of the offending document of itself.  I found

23  those in the deleted -- in the deleted folder on the 500

24  gigabyte -- excuse me, on the 500 gigabyte drive.  This was

25  deleted sometime after April 28th, 2008.  They -- they kept a

1   copy when they migrated in case something went wrong.

2       I then found that they were originally copied on April

3   28th, 2008, to the two terabyte drive in this

4   Securus_Global_new folder.  But in August 29th 2010 they made

5   a new folder called Securus - Combined - Production.  Now --

6   Q.  Before you go there I want to make sure one thing is

7   clear for the judge.

8       This Securus_Global_New folder that we've talked about,

9   that's a folder in what?

10  A.   It's a folder on the drive and it's under the Summation

11  directory.

12  Q.   Okay.  So it's in Summation.

13      What is Summation?

14  A.   Summation is a legal review software.

15  Q.   Okay.  And now it's not called Securus Global?

16  A.   No.

17  Q.   It's called Securus_Global_new?

18  A.   That's correct.

19  Q.   Okay.  What does that indicate to you?

20  A.   If I were to speculate it would mean that there was more

21  than one.

22  Q.   Okay.  And so in any event, this folder that's on the

23  500 gigabyte drive on April the 28th it moves over to the two

24  terabyte drive and it moves over under the folder

25  Securus_Global_new; is that right?

1    A.    Correct.

2    Q.    And then subsequently on August the 9th of 2010 the data

3    is moved into a new folder that's called Securus - Combined -

4    Production; is that correct?

5    A.    Correct.  And what's interesting, it's not just the

6    McAlexander report, it's about 600,000 documents that are all

7    moved en masse from one directory to the other after this

8    directory is created.  And we know this because of the

9    artifacts of this file system is that it assigns a number

10   every time a file is created, and it's a little internal

11   index it uses to reference the file.

12        The number sequence for Securus_Global_New is between

13   200,000 and around 600,000 for the documents we care about.

14        The numbers for Securus - Combined - Production are

15   around the two million range.  However, inside of that two

16   million range directory you find the set of documents with

17   the 200,000, to 600,000 number.  Meaning these documents that

18   were originally in the Secure Global New directory were

19   simply moved.  It's not a copy.  It didn't come from another

20   location.

21   Q.    Now, assume with me one fact here, Mr. Cowen, which is

22   that there was another folder that had the offending

23   document, the report, that it was destroyed, but that it

24   continued to exist in this new older Securus_Global_new.

25        Okay.  Can you look at the offending document in this

1   folder as it's transferred over and as it's transferred to

2   the Securus Combined database to ascertain if anybody -- and

3   I'll use a -- probably an inartful way of saying it, but has

4   anybody touched that document?  Have they accessed it?  Have

5   they done anything to this offensive document?

6   A.    So this is where it becomes a little difficult.

7         My understanding is that in 2011 when they switched to

8   key companies Gruber Hurst got new computers.  There are only

9   two computers from this time frame that I understand still

10  exist, both of which are -- I've examined, the first being

11  File_01 and the second being a desktop that at one point was

12  used by Ms. Miller.  It was just luck that it still existed

13  in the computer room.

14        My examination --

15  Q.    Who is Ms. Miller?

16  A.    My understanding she was one of the paralegals who was

17  working on the case.

18  Q.    Okay.

19  A.    My review does not show that anyone other than the

20  administrator user at the time that Gruber Hurst had

21  questions of did this document still exist in 2012 -- there

22  is no indication that anyone else ever accessed it.

23  Q.    Okay.  So -- so that I make sure I'm clear, the evidence

24  that you see with regard to the offensive document is that

25  nobody appears to have accessed it except for the IT

1    administrator?

2    A.    That's after 2010.

3    Q.    Okay.

4    A.    In April -- after April 20, 2008 and when you're looking

5    at the 2010 time frame, it's obvious that someone found it

6    underneath the Securus_Global_New directory --

7    Q.    Okay.

8    A.    -- and moved the documents over.

9    Q.    Okay.  Okay.  Can you ascertain between the time period

10   of 10/08/07 -- well, actually, you -- you can see when it's

11   moved on August the 9th.  Can you tell whether there was

12   anything else done with, to, related to the document during

13   this time frame?

14   A.    Again, I know they're produced at some point but all the

15   interactions that occur on the individual computers --

16   Q.    Right.

17   A.    -- they're not logged by the server.  The server is only

18   logging certain information and that information only stays

19   for a certain amount of time.  So the artifacts that I'm

20   relying upon are the file catalogs, it's called the master

21   file table, for each of these drives that let's me see this.

22   And I'm looking at the records that show access from the

23   server.

24        So from the artifacts present for me to examine, no, I

25   don't see any other accesses.

```
 1   Q.   And at least --
 2              THE COURT:  So -- let me ask a question.
 3        So it could have been on an individual's computer and
 4   not on the server?
 5              THE WITNESS:  If it was ever copied off, yes,
 6   ma'am.         THE COURT:  I'm sorry, Mr. Mateja
 7              MR. MATEJA:  No, that's all right.
 8   BY MR. MATEJA:
 9   Q.   You had access to Gruber Hurst's current server; is that
10   correct?
11   A.   I had access to it, but I was hesitant to do the same
12   procedure that I did with File_01.  I'll explain.
13   Q.   Okay.
14   A.   In order to honor the -- the plaintiff's requests, facts
15   request of not disturbing any metadata, not changing anything
16   about the documents based upon our review, we actually
17   powered down File_01, we attached to it in a read only
18   fashion, and extracted only the artifacts that we knew would
19   be of relevance.
20        We didn't make a copy of the server, so can't say what
21   else could be recovered, because we would get the offending
22   document and then we would be violating the protective order.
23        On the server, this is a -- a production server by
24   GHJHFS is the name of it.
25   Q.   And that's right here on this diagram?
```

```
1    A.    Correct.

2

3    Q.    GHJHFS; is that correct?

4    A.    That's correct.  We did not take the server down as a

5    running production server.  However, what we found, which was

6    fortunate for us, is that the administrator user on File_01

7    actually searched on GHJHFS for the offending document and

8    found it in those two locations, and that was logged.  So we

9    didn't have to go and disturb the document after he did.

10   Q.    Okay.  So the know the offending document is at SECURUS

11   - COMBINED - PRODUCTION\IMAGES\Securus Global and also in the

12   folder SECURUS - COMBINED - PRODUCTION\IMAGES?

13   A.    That's correct.

14   Q.    Is that the only place that you know of where this

15   offensive document is?

16   A.    That's correct.

17   Q.    Okay.  Now, you are aware though that in the -- in the

18   Combined Pinnacle litigation that an external hard drive with

19   documents, including the report, was sent to Combined's

20   counsel and Pinnacle's counsel?

21   A.    That's my understanding.

22   Q.    And it's your understanding that those external hard

23   drives were sent back to Gruber Hurst?

24   A.    Yes.

25   Q.    And that they still reside with Gruber Hurst?
```

164

```
 1   A.   Yes.
 2   Q.   Okay.  So -- so we've actually got four places where the
 3   document is.
 4        It is the two places that are located on the GHJHFS
 5   computer; is that correct?
 6   A.   That's correct.
 7   Q.   And then the two external hard drives?
 8   A.   That's correct.
 9   Q.   Are there any other places that the document is at?
10   A.   Not that I found.
11   Q.   Now, Mr. Cowen, have -- have -- in any of your
12   searching -- because you spent -- how much time have you
13   spent on this project?  Roughly?
14   A.   About -- billable 16 hours.  I've done a lot more than
15   that.
16   Q.   Okay.  Have you have seen any indicia, based on your
17   training -- I mean, you do all sorts of computer forensics,
18   you look at hack jobs, that kind of stuff, any evidence that
19   somehow Gruber Hurst was trying to segregate this McAlexander
20   report so that it could utilize it however it saw fit?
21   A.   The -- the offending document itself, which is a pretty
22   small set in the base range, was never in my review separate
23   or apart.  It was always included as part of a mass transfer
24   of all the images contained within the secured database
25   called Securus_Global_New.
```

1  Q.   Mr. Cowen, Defense Exhibit 25, I mean, does it fairly

2  and accurately represent everything on Gruber Hurst's

3  computers and is it consistent with your testimony?

4  A.   It doesn't represent everything on Gruber Hurst's

5  computers, obviously, but it is exactly what I reviewed and

6  asked the graphics person to make and summarize.

7          MR. MATEJA:  Your Honor, we would move for the

8  introduction of what's been marked as Defense Exhibit 25.

9          MR. COOTER:  I don't think it's admissible.  You

10 have looked at it.  It is whatever it is, but I don't think

11 it's admissible.

12     You know, It's compounded by the fact that I just saw

13 this for the first thing two minutes ago.

14         THE COURT:  Are you offering it as a summary of the

15 testimony?

16         MR. MATEJA:  I'm offering it as a -- to show the

17 court where the documents are at.

18         THE COURT:  Then that objection is sustained.

19         MR. MATEJA:  Okay.  Well, then I'm offering it as a

20 demonstrative aid, to aid the court.

21         THE COURT:  You can use it as a demonstrative aid,

22 but it can't be in evidence.

23         MR. MATEJA:  Okay.  Your Honor, we'd like to

24 introduce it as a summary of his testimony.

25         THE COURT:  It's admitted.

```
 1              MR. MATEJA:  Thank you, Your Honor.
 2        Your Honor, we'll pass the witness.
 3              MR. COOTER:  That's not what 1001 speaks to.  1001
 4   speaks to voluminous documents that get distilled to a
 5   summary.  There's no testimony about that.
 6              THE COURT:  Okay.  You're objecting to my ruling
 7   and I'm taking note of that.  You can go right ahead with
 8   your cross-examination if you'd like.
 9              MR. COOTER:  I'm sorry, are you admitting it or
10   denying it?
11              THE COURT:  I've already admitted it.
12              MR. COOTER:  I have many age infirmities.
13              THE COURT:  Me too.  I understand.
14                        CROSS EXAMINATION
15   BY MR. COOTER:
16   Q.   When were you retained, sir?
17   A.   I believe about three weeks ago.
18   Q.   Three weeks ago.
19        And who was it -- what were the circumstances that led
20   to your retention three weeks ago?
21        Somebody call you?
22        What happened?
23   A.   I originally talked to Mr. Mateja back in November of
24   2012.  He described the case and what it was.  And I offered
25   what I thought at the time would be a good idea, which was
```

1   imaging the server.

2       They obviously heard back and said that was not a good

3   idea to do anything with the server and not to copy the

4   documents against.  So we did not move forward at that point.

5   N. February of this year I was working at the end of January

6   with Mr. Mateja on another case and he said I've been

7   retained by Gruber Hurst, I think we found a way for you to

8   move forward and do your investigation.

9   Q.   Who gave you the task?

10      Who told you what it was you were supposed to do?  Was

11  it Mr. Magee?

12  A.   It was -- I mean, really the task came from Mr. Mateja.

13  I mean, he's the one who directed the investigation.  I've

14  had conversations with Mrs. Brown and Mr. Magee and anyone

15  else I could get my hands on who knew facts on the matter.

16  Q.   Who did you talk to in connection with this

17  investigation that you made?

18  A.   I talked to Mr. Mateja.  I talked to Mr. Magee.  I

19  talked to Mrs. Brown.  I've talked to the IT person who was

20  assigned to Gruber Hurst prior to early 2011 when they

21  switched companies.  I've talked to the IT person for the new

22  entity that is now managing Gruber Hurst computers.  And

23  obviously I've made inquiries about can I talk to anyone else

24  who has a computer from that time frame.  Because I'm only

25  interested in computers.  The computer evidence is what I'm

 1    focused on.

 2    Q.   All right.  Let's take a look at the graphic, if it's in

 3    evidence.  I don't have the ability to pull it up, judge.

 4    But do you have it there?

 5           MR. MATEJA:  We can pull it up.  It's Exhibit 25.

 6    BY MR. COOTER:

 7    Q.   Now, I just want to make sure that I understand.

 8         The scope of your task was exactly what?

 9         What exactly were you asked to do?

10    A.   Find out everything I can about the existence of the

11    McAlexander -- McAlexander report, where it existed on the

12    server, what happened to it, any possible copies of it, track

13    it down, find out what happened to it.

14    Q.   All right.  Now, you apparently looked at -- that's not

15    going to work.

16         You apparently looked at -- what is this server here

17    (indicating)?

18    A.   So that's -- those two disks on top belong to one server

19    called File_01.

20    Q.   Okay.  So this document existed in this folder?

21    A.   Correct.

22    Q.   Where'd it come from?

23    A.   It was originally loaded onto the system.

24    Q.   By who?

25         What was its source?

A.    My understanding was it was from the original Bell
Nunnally production.

      I don't know.

Q.    You don't know.

A.    I don't know.

Q.    Okay.  So you don't know where it came from.

      And is it also true that you don't know who had copies
of it?

A.    I -- I know that it came to exist on October 8th, 2007,
on the server.

Q.    Right.

A.    And I -- I don't have any of the systems available to me
other than two that exist in that time frame to have any idea
to know who accessed it outside of the server.

Q.    Okay.  Well, then I guess what I said is right.

      Not only do you not know where it came from, you don't
know who had copies of it at various places, could have been
Securus, could have been Bell Nunnally, could have been a lot
of places, and you don't know where it was.

A.    So I've never been retained to look at Securus or Bell
Nunnally.  If engaged to I would be more than happy to go and
identify whether or not those specific files are there.

      I can tell you my understanding is October 8th, 2007, is
around the time the documents were to be delivered to Gruber
Hurst, so my assumption was that they were from the original

**VAC App. 200**

1    delivery.

2        I have no indication idea that they were ever copied on

3    from any other source.  These are the same documents that

4    existed the entire time.

5        As far as where else they could have gone, unfortunately

6    the evidence that would have showed me that for the

7    individuals who were accessing it no longer exists for the

8    time frame, except for the one computer that Ms. Miller has.

9    And I have no evidence --

10   Q.   It doesn't exist?

11        Why doesn't it exist?

12   A.   The machines were replaced in 2011.

13   Q.   Well, did anybody keep a backup of what existed that

14   would tell us where all this went?

15   A.   The data was transferred, obviously, but the forensic

16   data, the things that I would be interested in, did not

17   exist.

18   Q.   Does that old server continue to exist?

19   A.   That is what I examined, sir.  That's File_01.

20   Q.   Now, if I understand what you've said, you have examined

21   no computers, made no inquiry.

22        Have you looked at emails --

23   A.   I have not.

24   Q.   Wait a minute.

25        -- at any relevant time having to do with this report?

1  A.   I have not, because we don't want to capture the report

2  itself, sir, until we have some understanding of what we're

3  allowed to do.

4      I simply looked at the artifacts of the system relating

5  to what files would be stored on it.

6  Q.   That's all right.  Just so we're clear on this record,

7  if there are emails amongst people, both inside and outside

8  Gruber Hurst, relating to -- or dealing with this document,

9  you didn't inquire of what those emails might say as to who

10 got it, when they got it, and where they got it; is that

11 right?

12 A.   Not to date.

13     With the agreement that I would be allowed to do so even

14 though it may contain a copy of the offending document, I

15 would be happy to do so.

16 Q.   Now, it's also true, is it not, that apparently, if I

17 understand your chart, something happened on April the 28th

18 of 2008 to this document and other documents.

19 A.   They were migrated to a new disk.  That's correct, sir.

20 Q.   Just confirm for me that the documents that existed to

21 include this report that were on this 500 gig server,

22 whatever it is, I'm not a computer guy, were never deleted

23 from the Gruber Hurst system.  Is that your evidence?

24 A.   I'm saying that in order for them to have been copied on

25 April 28th by definition they could not have been deleted,

1    yes, sir.

2    Q.   Now, why was it copied as opposed to deleted?

3    A.   Well, I was informed by the IT person is that he copied

4    it but didn't delete the old data -- because he didn't just

5    copy this folder, he copied every Summation database.

6    Q.   Who instructed him to copy it as opposed to delete it,

7    if anyone?

8    A.   And that's what I was trying to get to.

9         It was his decision of whether or not to delete the old

10   version, since at that point they would no longer be using

11   that disk.  He chose to retain it in case something went

12   wrong.  He didn't reload the data on.  He was worried about

13   something going wrong in the process.

14   Q.   What's the significance, if you know, on the date of

15   April the 28th, 2008?

16        Why -- why all of a sudden this was happening that day?

17   A.   Well, the disk was attached on April 25th, 2008.  That's

18   when they formatted the volume, made it ready for use.  They

19   needed additional storage space.  They were running out of

20   storage space on the Summation server.  So they attached the

21   second two terabyte disk on April 25th, 2008.  He performed

22   the copy of data into the new location with more storage and

23   made it available on April 28th of 2008.

24   Q.   Well, are you aware of any significance of either -- to

25   the dates of either April the 25th or April the 28th of 2008?

VAC App. 203

1  A.   Not to my investigation, no, sir.

2  Q.   Now -- now, this was 600,000 documents did you say?

3  A.   That was just what was moved from the Securus_Global_New

4  directory to the Securus - Combined directory.  There's many

5  more documents than that on the server.

6  Q.   And the McAlexander report was just one of 600,000?

7  A.   Yes, sir.

8  Q.   Did you make any inquiry as to what rest of 'em were?

9  A.   No, sir.

10 Q.   Or why they were all of a sudden copied as opposed to

11 deleted?

12 A.   Well, in this case, sir, this was -- the copy you're

13 seeing there would be no deletion involved.  This was a

14 movement of data from one disk to another so that they would

15 be available on a large volume so the firm could keep

16 operating, and doing their review.

17 Q.   Have you ever had any conversations with anyone about

18 why this was done on April the 28th, as opposed to some other

19 time?

20      Have you inquired?

21 A.   I have talked to the IT person.  They said they ran out

22 of space, they got approval to buy the equipment and that was

23 the day they did it.

24 Q.   Have you talked to any of the lawyers at Gruber Hurst

25 about why that date was the time that all this was done?

1  A.   I informed them of the dates I discovered.  They didn't

2  tell me it was --

3  Q.   Who did you tell?

4  A.   I've told Mrs. Brown, I've told Mr. Magee, I told

5  Mr. Mateja.

6  Q.   Not only did you not look at emails that would refer to

7  these documents, you looked at no attachments to emails.  Is

8  that right?

9  A.   Absolutely correct.

10 Q.   You referred -- you looked at no one's individual

11 desktop to see what's on those desktops having to do with

12 this report or documents -- other documents; is that right?

13 A.   Since they were replaced in 2011 and we had a tight time

14 frame I didn't see the relevance.  I would be more than happy

15 to go back today and look.

16 Q.   Did you look at anybody's laptop?

17 A.   No other computers, except for the ones I've discussed

18 today, so that's File_01, GHJHFS, and the desktop computer

19 that Ms. Miller used.

20 Q.   Did you ask to look at anybody's laptop?

21 A.   I've asked for any other machines that were in operation

22 prior to the 2011 change --

23 Q.   Did anybody give you any?

24 A.   They said they didn't think any existed --

25 Q.   Whose the "they"?

A.    Mrs. Brown, Mr. Mateja, Mr. Magee.

Q.    So that we can't rule out, can we, based on the
examination that you did, that not only did this document
exist on this two -- two 2 -- this -- whatever this is, 2 TB,
whatever that means, server, you can't rule out that it
exists in almost any other place, laptops, desktops, cell
phones, any organization outside of Gruber Hurst.  You can't
tell us that either, can you?

A.    I can say that based upon my current investigation I can
tell you based upon what I have reviewed and what had existed
from that time frame.  However, anything else as of today on
any replaced machines, I would be more than happy to look,
but, no, we have not reviewed those systems --

Q.    Well, then I guess you can't tell us where else these
documents might exist, other than these particular places
that are on your chart.

A.    Not without additional examination.  That is correct,
sir.

Q.    Anybody asked you to do any more work in that regard?

A.    I -- I limited the date range until the specific 2008,
2010, 2009 time frame, because that's what I was interested
in, is what happened to the data, was it ever -- when was it
deleted, could I find any record to that, what other copy
existed, how did it get produced.  That -- that was the focus
of my investigation.

1   Q.   Looks to me like what you did was you looked for a

2   document with the -- certain parameters that were supplied to

3   you by Gruber -- Gruber Hurst.  You looked for a name

4   parameter and a Bates number, and those are your parameters

5   to go do searching, right?

6   A.   Without having to make a full copy of the server, which

7   would again take a copy of the offending document, that's

8   pretty much the limitations that I have, sir.

9   Q.   You have no idea based on the examination that you made

10  as to how many paper copies there were that were produced of

11  this report and to whom they were disseminated; is that true?

12  A.   Paper copies would be outside of the realm of my

13  expertise, sir.

14  Q.   I'm sorry?

15  A.   I would not have any expertise in paper copies.

16  Q.   For this record confirm for me at some point you learned

17  that we were not -- our side took the position that we were

18  not comfortable having people do anything that would damage

19  the metadata -- metadata.

20  A.   Of those documents, yes, sir.

21  Q.   Okay.  And what is metadata?  What's the significance of

22  that?

23  A.   Metadata reflects information about the data by

24  definition.  Data about the data.

25  Q.   Okay.  Did you do anything -- I'm just interested in the

 1  state of affairs today for purposes of further endeavors, did

 2  you do anything that would in any way disturb the metadata?

 3  A.   My procedures were such to make sure we did not effect

 4  any of the metadata on the disk --

 5  Q.   So if one had wanted to do anything to make a -- an

 6  examination of what information might be revealed by the

 7  metadata, that information continues to exist, right?

 8  A.   Not only exists but the metadata of the documents

 9  themselves have been captured as part of my investigation.

10  The -- the master file tables, what contains the metadata for

11  these documents, they're -- these are text documents and TIFF

12  images.  They contained no interior metadata themselves like

13  an office document would so --

14  Q.   If we -- I didn't mean to interrupt.  I apologize.

15  A.   As far as my understanding today there is no other

16  additional metadata about those files other than what I have

17  already captured and preserved.

18  Q.   Well, if someone wanted to conduct an examination of the

19  metadata would it tell us who created the file, how many

20  copies were made of the file, where the file was sent, who

21  got 'em, all of that?

22       Would the metadata tell us that?

23  A.   It would tell us who created it.  That's one of the

24  things logged is the owner of the file, so what user was

25  logged in when the data was copied up.  I have that number

1    but I was not able to look it up to a name, again, without

2    access to the server.

3         As far as other copies, other things, I could do a hash

4    comparison analysis to see if any other file exists without

5    that data.  But doing that, again, requires contents of the

6    file.  So there's a lot of limitations and restrictions on

7    what you can do with just the metadata.

8    Q.   I'm not suggesting that we're asking you to do these

9    things.  I'm just seeking information that if somebody wanted

10   to look into what that metadata might tell us, would it -- it

11   would tell us who produced it?

12   A.   No, sir.

13   Q.   Right?

14   A.   No.

15   Q.   Would it tell us how many copies had been made and

16   disseminated?

17   A.   No.

18   Q.   Would it tell us where they went?

19   A.   No.  We would have to look at the systems that accessed

20   the document to make the production and we would have to talk

21   to the individuals who were involved.

22   Q.   Other than -- other than the conversations that you told

23   me you had with this IT person, did you -- did you talk to

24   anybody else at Gruber Hurst at all about anything?

25   A.   Again,  Mr. -- Mrs. Brown, Mr. Magee.  I had some

1    passing conversations asking for a key to the server room

2    with Mr. Magee.  But -- I've talked to Josh, the paralegal,

3    to ask, you know, do you have any other, you know, is that --

4    your computer has been replaced, Mr. Magee, and he said --

5    and Mr. Magee represented to me that his computer from that

6    time frame no longer existed.

7    Q.   Well, --

8    A.   I didn't have anyone else as far as I knew from that

9    time period to ask any questions to.

10             MR. COOTER:  Your Honor, given -- given the way

11   this was disclosed to us I've done all I can do at this

12   point.  This is not normally how one would do -- conduct a

13   cross-examination of an expert like this.

14             THE COURT:  All right.  Okay.

15             MR. COOTER:  So what I would like to do is cease

16   today.  I'd like to -- well, I can tell you for sure that

17   we're going to want to be heard further on this.

18        Having said that, that's probably as much as I can do at

19   the moment.

20             THE COURT:  Okay.  Has everyone had a turn?

21             MR. LOWENSTEIN:  I have no questions of this

22   witness, Your Honor.

23             THE COURT:  Okay.  You may step down.

24             MR. MATEJA:  May he be excused, Your Honor?

25             THE COURT:  Yes.

```
 1        How far do you think we'll get?
 2              MR. MATEJA:  We'll let Ms. Brown tell Your Honor.
 3              MS. BROWN:  Mr. Tautfest -- I can probably -- I can
 4    finish my part in 20 minutes probably.  I can be as succinct
 5    as possible, but I'm sure that they will have some questions
 6    for him.
 7              THE COURT:  Of course.
 8        Because it's going to take you about 20 minutes to get
 9    through your part, which would put me right at 2:00 and not
10    give them an opportunity to bring the prisoners in, we're
11    going to take our break right now.
12        And we're going to adjourn until 20 til 3:00.
13                        (Recess taken at 1:30.)
14                     (Proceedings resumed at 2:38.)
15              THE COURTROOM DEPUTY:  All rise.
16              THE COURT:  Please be seated.
17        Ms. Brown, you may proceed.
18              MS. BROWN:  Thank you, Your Honor.
19                        (Witness sworn.)
20              MS. BROWN:  May I proceed, Your Honor?
21              THE COURT:  Yes.
22                        DIRECT EXAMINATION
23    BY MS. BROWN:
24    Q.   Would you please state your name and spell your last
25    name.
```

```
1    A.    Eric Tautfest, T-a-u-t-f-e-s-t.

2    Q.    Mr. Tautfest, you were employed during 2007/2008 by

3    Gruber Hurst; is that correct?

4    A.    Yes.

5    Q.    And you were a partner there?

6    A.    Yes.

7    Q.    What types of cases did you work on?

8    A.    Patent cases.

9    Q.    And I want to call your attention in specific --

10   specifically to matters for Securus.

11         Is that a client that you represented while you were at

12   Gruber Hurst?

13   A.    Yes.

14   Q.    And we've also heard T-Netix and Securus mentioned at

15   the same time.  Did you represent T-Netix while you were at

16   Gruber Hurst?

17   A.    Yes.

18   Q.    I want to call your attention specifically to the Global

19   Tel-Link case.  Can you tell me generally what your

20   involvement was in that case?

21   A.    Sure.

22         I -- I came in.  I joined the firm after that case had

23   been filed.  I came in and basically took over the day-to-day

24   operations of that case on the plaintiff's side for Securus.

25   We had a -- a number of defendants.  We were asserting
```

1   several patents in that case.  And it was pending in the
2   Eastern District of Texas.
3   Q.   You mentioned "several patents in that case."  Is one of
4   the patents one that you call the '323 patent?
5   A.   Yes.
6   Q.   And in conjunction with your representation of Securus
7   in the Global case -- is it okay if I call it the Global
8   case?
9   A.   Sure.
10  Q.   In conjunction with your representation of Securus in
11  the Global case where the '323 patent case was involved did
12  you become aware of some litigation that was ongoing that
13  also involved the '323 case in the Northern District of
14  Texas?
15  A.   Yes, I did.
16  Q.   What litigation was that?
17  A.   That was the back case and also the '702 patent in
18  involved.
19  Q.   So both the '323 and the '702 patent?
20  A.   To the best of my recollection it was both patents, yes.
21  Q.   And when you say VAC you mean Value-Added
22  Communications?
23  A.   Yes, ma'am.
24  Q.   And you understand them to be the movant in today's
25  proceeding, correct?

A.    Yes.

Q.    Now, I want to talk to you about your involvement, if
any, on behalf of Securus in the VAC case.  Before I ask you
some questions I want you to think about that mind set.

      With respect to the two patents that you were talking
about, '323 and '702, what is your understanding of how the
prosecution of those patents related to the VAC case?

A.    When you say "prosecution," in terms of the plaintiff
prosecuting the suit as opposed to prosecuting applications
that become patents --

Q.    Correct.

A.    -- I just want to make about that.

      As far as prosecuting a patent case goes, from the
plaintiff's side whenever you've got the same patent being
litigated in another case or having been litigated
previously, defendants are always going to want to know what
positions are you've taken in those cases in case you take
contradictory positions or something different than what your
position you're taking in the current case.

      So since those patents were being concurrently litigated
in the Northern District of Texas we had a lot of
coordinating to do.  We would need to coordinate infringement
positions, for example --

Q.    And when you say "we," who do you mean?

A.    Bell Nunnally and Pittman firm.

1   Q.   Bell Nunnally and -- Bell Nunnally and the Pittman firm
2   represented who?
3   A.   They represented T-Netix in the VAC case.
4   Q.   Okay.  And then who is the "We" that coordinated in the
5   Bell Nunnally and the Pittman firm?
6   A.   Gruber Hurst firm.
7   Q.   Okay.  And so you were explaining the types of
8   coordinated efforts that you would need to take.  Could you
9   explain that to the court?
10  A.   Sure.
11       There's also been some discussion today about
12  invalidity.  Those issues were being coordinated.  One of the
13  things that we did was we prepped witnesses together.  These
14  are witnesses that would be produced by T-Netix in the VAC
15  case would probably also be produced by Securus in the
16  Eastern District case, the Global case.
17  Q.   And just to break that down, so you're saying "we," I
18  want the record to be clear:  When you say "we prepared
19  witnesses together," you mean counsel for Gruber Hurst along
20  with counsel at Bell Nunnally and the Pittman firm would prep
21  witnesses on behalf of Securus, your mutual client; is that
22  right?
23  A.   Yes.  Thank you for clarifying.  I just think of it
24  working together collaboratively, so I just kind of think of
25  "we" as a functioning unit for those purposes.

```
1   Q.   And so -- and you obviously were retained by Securus

2   initially at the outset to be involved with the Global case,

3   correct, in their representation?

4   A.   That's right.

5   Q.   But at some point as you talked about witness prep,

6   depositions, you expanded that -- the Securus retention was

7   expanded and not just for the Global case but also include

8   the VAC case?

9   A.   Yes.  We had the various issues that I mentioned

10  previously that we had to coordinate.  And my firm and the

11  Bell Nunnally and Dick Pittman worked -- would work together

12  to coordinate all of the issues in the case that were

13  overlapping.

14  Q.   And -- and -- and we'll get into this a little bit more

15  in detail later, but you were -- you were not counsel of

16  record in the VAC case, right?

17       You didn't enter an appearance?

18  A.   I didn't -- that's correct.  I had not entered an

19  appearance.

20  Q.   Okay.  But in terms of having been retained by Securus,

21  you represented Securus's interests in conjunction with the

22  VAC litigation as well?

23  A.   That's right.

24  Q.   As Securus's counsel?

25  A.   Yes.
```

**VAC App. 216**

1  Q.    I want to talk to you, shifting gears a little bit,

2  about obtaining the McAlexander report.

3       How did -- how is it that you came to receive the

4  McAlexander report?

5  A.    Naturally, the defendants in the Global case wanted to

6  know -- wanted discovery on issues in the VAC case.  And so

7  we got requests for production.  They wanted to know what

8  kinds of -- what documents had been produced.  They wanted to

9  know interrogatory responses.  They wanted depositions,

10 expert -- they wanted everything from the VAC case.

11      Obviously, they wanted to see the positions that were

12 being taken in that case as they compared to positions in the

13 Global case.

14 Q.    So the -- you felt like the McAlexander report was

15 responsive to those discovery requests?

16 A.    Sure.  It's a -- it was a rebuttal report.  I never read

17 it myself, but -- never got to it, but it was a validity

18 rebuttal report, so it was ostensibly -- I know Joe

19 McAlexander.  He was also a consulting expert in the Global

20 case.  His -- that report would have been a rebuttal to the

21 defendant's invalidity expert report in that case.

22      So any position that Securus or T-Netix had taken

23 regarding claims construction positions, infringement

24 positions, validity positions, those are the kinds of things

25 that the defendants in the Global case wanted to see.

1  Q.   And you talked about knowing McAlexander.  By which

2  party was he retained in the VAC case?

3  A.   Securities, T-Netix.

4  Q.   So it was your client's expert report?

5  A.   That's correct.

6  Q.   And so you obtained it from which -- which firm?

7  A.   From Bell Nunnally.  I contacted Jeff Lowenstein.  They

8  put those -- those materials together for us.

9  Q.   And I want to turn your attention to Exhibit Number 1.

10  You can look in the black notebook, actually.

11      And if you would go to page 4.

12      And Exhibit Number 1, which is already admitted, it is

13  the agreed protective order in the VAC case, correct?

14  A.   Yes.

15          MS. BROWN:  And if you could, Bev, highlight

16  paragraph 9.

17      Counsel.

18  BY MS. BROWN:

19  Q.   Mr. Tautfest, I want to draw your attention to the

20  definition of the term "counsel" in the agreed protective

21  order.  And I would like for you to look for me three lines

22  down, where it says, "The term counsel shall mean only

23  outside attorneys retained by the parties to work on this

24  litigation."  Do you see that language?

25  A.   I do.

1    Q.    Did I read it correctly?

2    A.    Yes.

3    Q.    Okay.  It further says that the term "counsel" includes,

4    "supporting personnel employed by the outside counsel, such

5    as technical advisors."

6         Do you see that language?

7    A.    Yes.

8    Q.    And did I read that correctly?

9    A.    Yes.

10   Q.    And is it your testimony before this court that you were

11   retained by Securus to work on the VAC litigation?

12   A.    Yes.  Once we became aware that there were overlapping

13   issues, absolutely, we were working on both litigations.

14        MS. BROWN:  And then, Bev, if you could pull out

15   paragraph 10, where we talk about technical advisors.

16        Page 4 of the same document, Exhibit 1.

17   BY MS. BROWN:

18   Q.    About four lines down it starts to define the term

19   "technical advisor."  It says "The term technical advisor

20   shall mean any outside person who is not an employee of the

21   party."  Do you see that language?

22   A.    Yes.

23   Q.    Did I read that correctly?

24   A.    Yes.

25   Q.    It further goes on, and I'm -- the document's in

1    evidence so I'm moving on and I want to ask you some

2    questions.

3        It further goes on to define "technical advisory" as a

4    consultant.

5        Do you see that at the bottom of page 4?

6    A.   I do.

7    Q.   And then if you go to page 5, the very top of the

8    page --

9            MS. BROWN:  And if you can do that plus paragraph

10    11, Bev.

11    BY MS. BROWN:

12    Q.   At the top of the page it says, "To consult concerning

13    technical, financial, or other aspects of this case for the

14    preparation or trial thereof."

15        Do you see that language?

16    A.   I do.

17    Q.   So "technical advisor" per this document includes any

18    outside person who's a consultant and includes those who

19    prepare for trial for the case for litigation?

20    A.   Right.

21    Q.   Can you explain to the court whether or not the things

22    that you were doing in the VAC case on behalf of Securus fell

23    into that definition?

24    A.   Sure.  From our point of view we're clearly providing

25    consulting services, or assistance, to help prepare the case

1   for trial.  We had to coordinate all those issues.  We spent
2   a lot of time working together.
3        So I think in our minds it was very clear that we were
4   helping -- we were helping each other prepare our mutual
5   cases for trial.
6   Q.   And -- and we don't have to go back to it, but when we
7   talked about counsel, you also felt as if you fell into the
8   definition of "counsel" as is in the protective order,
9   correct?
10  A.   Absolutely.
11  Q.   Now, I want to look at paragraph 11 of the -- on page 5
12  of Exhibit 1.  Because it talks about "Should counsel for a
13  receiving party find it necessary for maintaining, defending,
14  or evaluating this litigation to disclose a producing party's
15  confidential information or counsel eyes only confidential
16  information to any of the persons described in paragraph
17  10 --" paragraph 10 is technical advisor, right?
18  A.   Right.
19  Q.   "Counsel for the receiving party shall first obtain from
20  such person or service written confidentiality agreement, in
21  the form attached hereto as attachment A."
22       So that goes to the technical advisor, correct?
23  A.   Right.
24  Q.   Now, I notice, and I'll give you a chance to look
25  through the document, a similar requirement for Exhibit A to

1   be executed for the counsel provision in paragraph 9.

2       Did you see any such language for counsel requiring them

3   to execute Exhibit A?

4   A.   No.

5   Q.   So that Exhibit A as to the confidentiality only goes to

6   the technical advisor --

7   A.   That's my understanding --

8   Q.   -- correct?

9   A.   -- yes.

10  Q.   Would you turn to Defendant's Exhibit 2, which has

11  not -- I don't believe there's any objection but I want to

12  make sure.

13      I think it's in.

14      Okay.

15      And do you have that?

16  A.   I do.

17  Q.   Okay.  And so Defendant's Exhibit 2 is -- can you

18  describe for the court what that is.

19  A.   It's a -- my signature on a acknowledgement for the

20  protective order.

21  Q.   And -- and what date did you execute that agreement?

22  A.   October 30th, 2007.

23  Q.   And, Mr. Tautfest, can you explain to the court whether

24  or not you had obtained documents from -- Securus documents

25  from the VAC litigation before you had signed this

1    confidentiality agreement?

2    A.   We did receive them before.

3    Q.   And on what basis did you deem it was appropriate for

4    you to have received those documents in the VAC case that you

5    were working on with Bell Nunnally?

6    A.   Because we were also counsel for T-Netix in the VAC

7    case.

8    Q.   Can you explain why it is that you later went and

9    executed Exhibit 2?

10   A.   Sure.  I didn't -- I thought it was really sort of belt

11   and suspenders.  An issue had been raised as to whether or

12   not we should have -- we should have received some

13   confidential information and so went ahead and executed this

14   acknowledgement.

15   Q.   All right.  And -- and just to jump back one additional

16   area I don't think we talked about, you talked about

17   invalidity contentions and deposition preparation, and I

18   believe that there may have been some hearings that took

19   place in both the VAC case and the Global case that you were

20   preparing for.

21        Did you prepare for any hearings in conjunction with

22   Bell Nunnally as part of -- as representing Securus in the

23   VAC case?

24   A.   For the Markman hearing specifically I can recall.

25   Q.   And what types of things would you have done to prepare

1   for that hearing with the Bell Nunnally lawyers?

2   A.   Markman is a -- it's named I believe after a 1996

3   federal circuit case where the federal Circuit Court of

4   Appeals ruled that construction of, in essence, what certain

5   terms in a patent claim mean are issues of law and that the

6   court should construe those prior to trial, construe those

7   terms.

8        It's a very critical part of the patent case.  And so we

9   coordinated together on what terms we thought should be

10  construed and how those terms should be construed.

11  Q.   And in doing that did you also have any meetings with

12  experts in preparing for those hearings?

13  A.   In fact, we met with Joe McAlexander.

14  Q.   I want to turn your attention to the hearing that took

15  place before Judge Sanderson that we've talked about.

16       So you were present at that hearing, correct?

17  A.   Yes.

18  Q.   And I want to -- I want to be clear for the court:  Did

19  you make any representation at that hearing to Judge

20  Sanderson or anyone otherwise on the record about what you

21  were going to do with the McAlexander rebuttal report?

22            MR. COOTER:  Objection.  You know, most of the

23  leading is okay but at this point it's -- we're down to other

24  things.  So I object to the form of the question.

25            THE COURT:  Overruled.

```
 1              THE WITNESS:  I did not.
 2    BY MS. BROWN:
 3    Q.   In fact, I want to turn -- the transcript is in the
 4    white notebook, Mr. Tautfest.  And it is at tab 2, I believe
 5    it's Exhibit 2 in the white notebook, which is the movant's.
 6    A.   Okay.
 7         All right.
 8    Q.   And if you would turn to page 69 of Exhibit 2.  Starting
 9    at line 5.
10    A.   All right.  I'm there.
11    Q.   And I'm going to read what you are saying, Mr. Tautfest,
12    starting at line 5.  You say "That's correct, Your Honor.
13    Your Honor, we have -- we do not have the confidential
14    documents.  What we have are discovery responses and accident
15    reports."
16         I want to stop right there.  Did you have any accident
17    reports?
18    A.   I think that's a typo.  It would have been expert
19    reports.
20    Q.   Okay.  So you had discovery responses and expert
21    reports, correct?
22    A.   Right.
23    Q.   Okay.  Let me keep reading.  "But we still have those
24    because we are working with Mr. Pittman and the Bell Nunnally
25    firm on the overlapping issues and we help prepare the
```

1    witnesses.  We are giving advice in that case and we've been

2    asked to do that for our mutual client.

3        Can you identify for the court who that mutual client

4    was that you were referring to?

5    A.    Securus/T-Netix.

6    Q.    And then you go on to say, "So we do still have those

7    documents, Your Honor."

8        Do you see that language?

9    A.    Yes.

10   Q.    Did I read your statements correctly that you made

11   during the hearing on page 69?

12   A.    Yes.

13   Q.    And if we go on you'll see that the court then spoke,

14   starting at line 14 and said, "I think the short answer is

15   that needs to go back right now.  If you and your firm want

16   to formally enter an appearance as third counsel representing

17   T-Netix in this case, then sobeit, but I think there are all

18   kinds of confusions when you're here representing T-Netix or

19   Securus in an Eastern District case so let's get that back

20   right now."

21       Did I read that correctly?

22   A.    Yes.

23   Q.    Mr. Tautfest, the last thing I read to you before the

24   court spoke was that "So we do still have those documents,

25   Your Honor."

1    Did you have any further statements about having the

2  documents or what you would do with them after the court made

3  that statement on the record?

4  A.   No, I did not.

5  Q.   And why is it that you didn't further talk about what

6  you were going to do with the documents at that point?

7  A.   I wasn't -- I wasn't quite sure what we were going to do

8  at that point.  I was a little taken aback by the fact that

9  he -- the judge was indicating that we were not counsel in

10  the case, given the overlap and coordination of working

11  together though we had done.

12    I also note, I don't know if this means anything, but on

13  the very front of the transcript when I were turning to it

14  just now it also has my name as counsel on the front of it.

15    So I wasn't sure what we were going to do at that point.

16  That's why I didn't say anything.  But I understood what he

17  was saying, I just didn't know what we were going to do

18  Q.   Right.

19    And so you had two choices per Judge Sanderson:  You

20  either were going to enter an appearance of counsel on the

21  record or you were going to return the documents?

22  A.   Yes.

23  Q.   Okay.  And what did you ultimately decide to do?

24  A.   That same day we decided we would go ahead and return

25  the documents to Bell Nunnally and destroy whatever else we

1    had in our possession.

2    Q.    And as it relates to the Global litigation, once you

3    returned those documents that you've testified are -- were

4    responsive to discovery requests in Global, what, if any,

5    conversations did you have with your opposing counsel in

6    Global about those very documents that you returned?

7    A.    So just to keep the timeline straight we had clawed back

8    those documents much earlier before the hearing that we were

9    just looking at and the defense counsel in that case were --

10   they understood the issue but they also understood that those

11   materials were discoverable and they wanted copies.  They

12   would respect the provision in the protective order that

13   would allow us to claw back those documents.  And so they --

14   we had a great relationship with all of the defense counsel,

15   so we didn't have any problems getting the documents back and

16   all the defense counsel confirmed that they had deleted 'em,

17   those documents, but they wanted to know when they would be

18   able to get them.

19        And so I told -- I can recall at least one discussion

20   with counsel for ICS, one of the defendants in our -- in the

21   Eastern District case, that we would try to get from VAC

22   redacted copies of the documents and produce those if we

23   could.  Otherwise, the defendants in the Eastern District

24   case would have to subpoena those materials themselves.

25   Q.    And I -- I do want to talk to you about the claw back.

```
 1   I'm glad you brought that up.
 2        So we talked about how you obtained the report.  Under
 3   what circumstances was it that you ended up clawing back the
 4   report from the folks that you produced it to in the Global
 5   case?
 6   A.   Well, there's a protective order in the Eastern District
 7   case that has a claw back provision.  It happens in almost
 8   every case I've been involved in.  In fact, it happened in
 9   that case with the defendants as well, where they, at least a
10   few of the defendants, had to claw back documents.  It
11   happens.  There are cases with a lot of documents and things
12   will inadvertently get produced.  So it's fairly routine.
13        I -- I don't recall sitting here right now whether it
14   was a letter I got from Stephanie Clouston or if Jeff
15   Lowenstein at Bell Nunnally notified me that there was an
16   issue, but it was very clear that there was a problem with --
17   or that VAC had taken issue with us producing some documents
18   in the Eastern District case.  And so immediately, I think it
19   was within 24 hours, we -- I sent out letters to all the
20   defense counsel invoking the claw back provision of the
21   protective order and asking that those documents be returned
22   to us or destroyed and that counsel confirm that they were
23   destroyed.
24   Q.   And that claw back I think you testified was well before
25   the hearing and that was before Judge Sanderson?
```

```
 1   A.    Yes.

 2   Q.    Correct?

 3   A.    Yes.

 4   Q.    Okay.  So you decided that you were going to return the

 5   documents, I think we were talking about that.

 6         So what actions did you take after the hearing once you

 7   made the decision to return the documents?

 8   A.    So I met with our team, it was a small number of people

 9   at the firm, but principally with Lisa Miller, our paralegal

10   who was assigned to the case, and said, all right, here's

11   what we've got to do, we've got to send back the originals to

12   Bell Nunnally and we've got to get into Summation, get the

13   documents off of there, get them off the system, and round up

14   any copies anybody has and get them and delete them.  And

15   that's -- and so we did that.  And Lisa went in and worked

16   with the IT guy and deleted the -- the documents off of --

17   out of Summation.

18         And so when she reported back to me that it had been

19   done, everything was deleted, and that the originals were

20   packaged up to be sent back before I sent back the letter

21   to -- to Jeff Lowenstein confirming what we had done I pulled

22   up Summation on my computer in my office, did a search for a

23   couple of the documents.  I think there are, you know, a

24   couple of dozen documents listed on that.  I think it's April

25   16 is the date of the letter that I sent to Jeff Lowenstein
```

1   cataloguing the documents that we were sending back, searched

2   for several of those documents, none of them came up.  So I

3   felt sure that they -- that those documents had been deleted

4   from the system, signed the letter, and sent it to Mr.

5   Lowenstein.

6   Q.   You talked about instructions that you gave Lisa Miller,

7   paralegal with Gruber Hurst at the time, to delete the

8   Summation documents.

9   A.   Right.

10   Q.   Do you know exactly what she did to delete those

11   documents or did you just give her that instruction?

12   A.   I don't know exactly what she did because, frankly, I

13   don't know exactly how all that is set up.

14   Q.   All right.  So Lisa would probably be a better person to

15   talk about how she got rid of those documents from Summation?

16   A.   Yes.

17   Q.   All right.  I want to turn your attention to Exhibit 3.

18   We're back in the black binder.

19        MS. BROWN:  And if we could highlight the top part.

20   BY MS. BROWN:

21   Q.   This looks like this is an email from you to several

22   lawyers at Bell Nunnally and some other folks in the cc line;

23   is that correct?

24   A.   Yes.

25   Q.   And this is at 6:00 p.m. on April the 16th, 2008?

A.   Right.

Q.   And that's the day of the hearing with Judge Sanderson, right?

A.   Right.

Q.   And what you say in this email is, "Jeff, pursuant to Judge Sanderson's ruling today, we sent over all documents received from your firm relating to the VAC case, except for the TN documents from T-Netix."

     And what are the TN documents from T-Netix?

A.   Those are actually -- TN is Bates number abbreviation prefix that meant those documents actually came from T-Netix.

Q.   So those were not documents that were being -- were the subject of the hearing before Judge Sanderson?

A.   That's correct.  Totally different set of documents.

Q.   And then you further say, "If the courier is unable to find someone at your office to accept the documents, due to the hour, he will bring them to you first thing in the morning."?

A.   Right.

Q.   So you sent this the very evening of the hearing to Jeff Lowenstein?

A.   Right.

Q.   Can you turn to Exhibit 4, please.

     And GH Exhibit 4 is a letter from you to Jeff Lowenstein at Bell Nunnally dated April 16th, 2008?

1    A.    Right.

2    Q.    Okay.  Again, the day of the hearing?

3    A.    Yes.

4    Q.    Now, I see the McAlexander report is number 2 on a list

5    of 21 documents; is that right?

6    A.    Right.

7    Q.    So is it safe to say there were a number of documents

8    that went back to Bell Nunnally?

9    A.    Yes.

10   Q.    And these were the hard copy documents?

11   A.    That's correct.  The originals we received from Bell

12   Nunnally.

13   Q.    And do you know what was done to gather the hard copies

14   in the Gruber Hurst office that you sent back to Bell

15   Nunnally?

16   A.    Lisa had those.  I never keep originals, because I'll

17   lose 'em.  So I always just deal with copies.  And at that

18   firm we use Summation, so I only look the documents in

19   Summation.

20   Q.    And did you task Lisa -- what did you task Lisa with,

21   with respect to any copies of the documents that may have

22   been in Gruber Hurst's offices?

23   A.    Delete -- to shred them.

24         You mean physical copies?

25   Q.    Physical copies, yes.

A.   Shred those.

Q.   Then your letter says, "Please be advised that we have deleted the above documents from our database and have destroyed all working copies as well."

It's the very last part of Exhibit Number 4.

A.   Yes.

Q.   And then it's signed by you.

Who drafted Exhibit Number 4 for you?

Did you draft that yourself?

A.   Lisa drafted it.

Q.   And the statements that are made in Exhibit 4, those are accurate and correct statements as to actions that you took for folks on behalf of Gruber Hurst to -- on April 16th, 2008?

A.   Yes.

Q.   Is there any doubt in your mind, Mr. Tautfest, that action was taken to delete the documents from the database?

A.   No.   Because I went into Summation and confirmed that I could no longer access those documents, just to make sure that they weren't there.

Q.   All right.   If you'll turn to Exhibit 5.

And Exhibit 5 is a letter from Bell Nunnally to Stephanie Clouston, and it's dated April 17th, 2008.   And that's the day after the hearing, right?

A.   Yes.

1    Q.   And Jeff Lowenstein says "Following yesterday's hearing

2    in front of Judge Sanderson, we received from Gruber Hurst

3    Johansen Hail all documents previously provided to GHJH

4    subject to the protective order in the above-referenced

5    matter."

6         And the "above-referenced matter" is the VAC case,

7    correct?

8    A.   Right.

9    Q.   "GHJH has also confirmed that GHJH has deleted the above

10   documents from its database and has destroyed all working

11   copies of the documents.  Please let me know if you would

12   like me to send the documents to you or maintain them at our

13   office."

14        Did I read that correctly?

15   A.   Yes.

16   Q.   So it's your understanding that Bell Nunnally was

17   communicating with the VAC lawyers that they had gotten the

18   hard copies back?

19   A.   Yes.

20   Q.   And they had confirmed with Gruber Hurst that the

21   electronic copies were deleted?

22   A.   Yes.

23   Q.   All right.  And then on Exhibit 6 to follow, that's a

24   letter dated April 18th, so the very next day Stephanie

25   Clouston writes back to Jeff Lowenstein.

1       She says, "Dear Jeff:  We have received your letter of

2   April 17, 2008, notifying us that Gruber Hurst Johansen Hail

3   has returned to you all copies of documents that contain any

4   information designated by VAC as confidential under the

5   agreed protective order.  Please send all of these documents

6   to my office at your earliest convenience."

7       And it's signed by permission by Stephanie Clouston.

8       Do you see that?

9   A.   Yes.

10  Q.   So it's your understanding that VAC understands the hard

11  copies have been returned, the deletion has occurred, and

12  she's now asking them to be returned to VAC?

13  A.   Yes.

14  Q.   And if you will turn to Exhibit 7.

15      Exhibit 7 is also dated April 18th, 2008.  So Jeff --

16  Neal Suit at Bell Nunnally writes back the very same day to

17  Ms. Clouston.  And he says, and tell me if I'm reading this

18  correctly, "Per your request earlier today, I'm enclosing

19  with this letter all of these documents returned to Bell

20  Nunnally and Martin LLP by Gruber Hurst Johansen & Hail

21  related to the above-referenced case, along with a letter

22  from Eric Tautfest confirming the enclosed documents were all

23  documents Gruber Hurst Johansen & Hail received regarding the

24  VAC case.  Should you have any questions, please do not

25  hesitate to contact me."

**VAC App. 236**

1     Did I read that correctly?

2  A.    Yes.

3  Q.    And so Bell Nunnally has now to your understanding, and

4  you're copied on this letter, sent the hard copies that you

5  provided back to them over to VAC's counsel?

6  A.    Right.  Yes.

7  Q.    So, Mr. Tautfest, and I know that you very vigorously

8  argued to Judge Sanderson that you were counsel in the case

9  and you had a right to receive these documents --

10  A.    Right.

11  Q.    -- but nonetheless you made the decision to provide them

12  back.  Right?

13  A.    That's correct.

14  Q.    And why is it that you made that decision?

15  A.    Well, we wanted to respect what the judge had instructed

16  us to do, even though I had a -- a different view.  But we

17  felt there were other ways that we could possibly get those

18  documents other than make an appearance and cause confusion

19  in the case at that -- at that stage.

20      And so it was our intent, we knew these issues would

21  come up again, our intent was to work with -- with VAC's

22  counsel through Bell Nunnally to try to get redacted copies

23  of those documents; otherwise, they would be subpoenaed.  I

24  mean, I think everybody knew that this issue was not going

25  away in terms of the defendants in the Global case wanting

**VAC App. 237**

1   these documents and being entitled to them and so there would

2   be -- if we couldn't get copies through the VAC they'd be the

3   subject of a third-party subpoena.

4        So we felt that that -- that there were ways to deal

5   with that document production issue.  And so we decided to go

6   that route.

7              MS. BROWN:  Pass the witness, Your Honor.

8                          CROSS EXAMINATION

9   BY MR. COOTER:

10  Q.   Hello.

11  A.   Hello.

12  Q.   I'm Dale Cooter.  We haven't met before?

13  A.   We have not.  Nice to meet you.

14  Q.   Have you been in court all day?

15  A.   I have.  I've been sitting back there, waiting.

16  Q.   Happy to have you.

17  A.   Thank you.

18  Q.   Now, it was your view when you first got these

19  documents -- and we're just -- we'll focus on the McAlexander

20  report just because it's the one that everyone talks about.

21       It was your view that you were authorized to get those a

22  as counsel for T-Rex-- T-- whatever you call that thing.

23  A.   T-Netix.

24  Q.   Thank you.

25       T-Netix and Securus.  Is that accurate?

```
 1   A.   Yes, sir.
 2   Q.   You considered yourself at the time to be bound -- when
 3   you got those documents, to be bound by the terms of the
 4   protective order; is that right?
 5   A.   Yes, sir.
 6   Q.   And at the time that you first got the documents confirm
 7   for me that you hadn't executed anything like a
 8   confidentiality agreement, Exhibit A.
 9   A.   That's correct.
10   Q.   So you got the documents, you hadn't executed Exhibit A,
11   and did you then take those documents and produce those to
12   others in cases that you were dealing with?
13   A.   We produced them attorneys eyes only to the defendants
14   in the Global case.
15   Q.   Okay.  A completely different case, whether it be
16   related or not, it was different, pending elsewhere, fair?
17   A.   Yes.
18   Q.   Now, and it's also true that at some point you learned
19   that apparently Ms. Clouston or colleagues at Jones Day had
20   some problems with the fact that you had, A, gotten the
21   documents yourself, by "you" I mean Gruber Hurst, and, B,
22   disseminated them in another case.  Do you remember that
23   coming up?
24   A.   I'm not sure that I -- I don't mean to parse words but
25   I'm not sure I understood that they were upset that we got
```

1    them ourselves, but my understanding was they felt that those

2    documents should not have been produced in the Eastern

3    District case.

4    Q.   And the -- an upshot of that was that Ms. Clouston and

5    her colleagues filed a motion to hold T-Netix and Securus in

6    contempt for violating the protective order; is that right?

7    A.   I don't know if it was Securus and T-Netix.  I don't

8    remember exactly.  I think there were -- that was one of the

9    issues brought up in that motion.

10   Q.   They were seeking to have the court here issue a

11   contempt citation as to someone involving the misuse of those

12   documents; is that right?

13   A.   As I understand it.

14   Q.   Now, there came a time, did there not, when the matter

15   came on for hearing in front of Magistrate Judge Sanderson?

16   A.   Yes, sir.

17   Q.   And you were physically in attendance at that meeting,

18   were you not?

19   A.   Yes, sir.

20   Q.   Why were you there if, I'm just curious, as a

21   threshold?

22   A.   Well, there were a couple of reasons.

23        First of all, we had been subpoenaed to produce

24   documents, as I -- as I -- as I recollect.  And so I had

25   produced some documents to Ms. Clouston, pursuant to the

1  subpoena that she gave us that I knew would be at issue in

2  this --

3  Q.  Speak up a little bit, if you would.  I'm an old guy.

4  A.  Yes.

5  Q.  Speak into that microphone.

6  A.  I'll just get closer to it.  Forgive me, I've got a

7  little bit of a sore throat.

8  Q.  That's all right?

9  A.  I can't talk as loud as I normally can.

10       We had produced documents pursuant to a subpoena that

11  Jones Day had served on us, I mean, the Gruber Hurst Johansen

12  Hail firm, when I say "we."  And that Those documents were

13  subpoenaed for that hearing, so I wanted to be there for

14  that.  Plus there were some allegations about documents that

15  we had received that in -- in my view were clearly relevant

16  in the Eastern District case and I wanted to know the

17  deposition of that and to be available to speak if needed.

18  Q.  Now, you've testified that at the time of this hearing

19  you believed that you were subject to the provisions of the

20  protective order, right?

21  A.  Yes.

22  Q.  And you expressed that view to Judge Sanderson?

23  A.  Right.

24            MR. COOTER:  What was the date of the hearing --

25            MS. MANGOLD:  April 16th.

```
 1              MR. COOTER:  What?
 2              MS. MANGOLD:  April 16.
 3              MR. COOTER:  All right.
 4   BY MR. COOTER:
 5   Q.    I proffer to you that the hearing was actually held on
 6   April the 16th.  We have a transcript of it here, okay?
 7   A.    Okay.
 8   Q.    Now, was there anybody else there from the Gruber Hurst
 9   firm or was it just you?
10   A.    Also an associate by the name of Michael Lang was there.
11   Q.    And who is Mr. Lang?
12   A.    He's an attorney at Gruber Hurst Johansen Hail.
13   Q.    Okay.  Now, at the hearing by some vehicle, I don't care
14   what the vehicle is for right now, the view that you were
15   counsel in this case, this -- the VAC case, was conveyed to
16   Magistrate -- Magistrate Sanderson, right?
17   A.    Yes.
18   Q.    Magistrate Sanderson didn't agree with that.  Do you
19   remember that?
20   A.    I do.
21   Q.    And the upshot was but you were contending in the view,
22   notwithstanding what Magistrate Sanderson said, that you were
23   counsel in -- in the case, right?
24         I mean, he didn't change your mind, did he?
25   A.    I had my opinion but I respected the instructions that
```

1   he gave us.

2   Q.   And he basically gave you two choices.  He basically

3   said, look, either give all those documents back or enter an

4   appearance in the case.  Right?

5   A.   Yes.

6   Q.   And you elected to give all the documents back, as

7   opposed to enter an appearance in the case?

8   A.   Yes, sir.

9   Q.   When I say "you" I mean Gruber Hurst --

10  A.   I understand.

11  Q.   -- right?

12       Now, at the time it's true, is it not, that Gruber Hurst

13  was counsel, I don't care of record or otherwise, for both

14  Securus and T-Netix?

15  A.   Yes.

16  Q.   Taking directions from Mr. Reinhold?

17  A.   We worked some with Mr. Reinhold but also associated

18  with general counsel Melissa Dramin (phonetic).

19  Q.   Now, once the decision was made to give all the

20  documents back, get rid of the documents, was it part of that

21  decision to purge the files, records, databases, at Gruber

22  Hurst from each and everything -- each and every copy,

23  electronic or written?

24  A.   Yes, sir.

25  Q.   Now, and at some point -- when was that first -- when

VAC App. 243

1    was that decision communicated, if it was, to Magistrate

2    Judge Sanderson?

3    A.   I don't know that it was.

4    Q.   When did you first make the determinations to do that?

5    A.   To do what?

6    Q.   Purge the files of these documents and records?

7    A.   On April 16th, 2008, after the hearing.

8    Q.   Now, it wasn't -- you don't think it was communicated,

9    that decision communicated to the judge?

10   A.   I don't know whether it was or not.  I did not

11   communicate that to the judge.

12   Q.   Now, the way it went forward, it's not -- it's true, is

13   it not, that on -- Magistrate Judge Sanderson issued a report

14   and recommendation to the District Judge about contempt.

15   You've seen that, have you not?

16   A.   Yes.  At the time.

17   Q.   I proffer to you that that is dated, his report, April

18   the 21st of 2008.  Okay?

19   A.   Okay.

20   Q.   I'll -- I'll show it to you in the book if you -- you

21   don't have to take my word for it.

22   A.   I trust you.

23   Q.   The report said whatever it said, was recommending a

24   contempt.

25        And did you get the report when it was issued on or

1    about April the 21st?

2    A.   I believe that I did.

3    Q.   Did you read it?

4    A.   Yes, sir.

5    Q.   Now, at that time had the documents been purged from

6    Gruber Hurst?

7    A.   Yes, sir.

8    Q.   I want you to take a look at Exhibit Number --

9              MR. COOTER:  Is this 5 now?

10             MS. MANGOLD:  Yes.

11   BY MR. COOTER:

12   Q.   -- Exhibit Number 5 in plaintiff's white book.

13        Have you got it?

14   A.   Yes, sir.

15   Q.   This is a letter from you to Mr. Lowenstein at Bell

16   Nunnally dated April the 16th, the day of the hearing.

17   Right?

18   A.   Yes, sir.

19   Q.   Saying find all the documents.

20        And take a look at the last line of the letter.

21        It says, "Please be advised that we have deleted the

22   above documents from our database and have destroyed all

23   working copies as well."

24        Do you see that?

25   A.   I do.

1  Q.    It wasn't true, was it?

2  A.    I believe it to be true.  I don't know that it was not

3  true.

4  Q.    I'm sorry?

5  A.    I don't know that it was not true.  I believed it then.

6  Q.    We're going to test that.

7        What was the process?

8        You're in court with the magistrate judge, you make a

9  decision to delete the files, and how did you manage to

10 accomplish all of that that very same day, where you say we

11 have -- we have deleted the following documents from our

12 database?

13       How did you -- how could you physically do it that same

14 day?

15 A.    These are electronic files, where all you have to do is

16 hit the delete button and they're gone.  It doesn't require

17 physical effort to do that.

18 Q.    Who did it, if anyone, on April the 16th, deleted

19 everything from the database --

20 A.    I instructed.

21 Q.    -- so it didn't exist anymore?

22 A.    I instructed Lisa Miller, our paralegal in the case, to

23 do that.  We may have had some discussion about working with

24 the IT folks do that.  I don't remember.  But our documents

25 were in the Summation database and those documents are put

1    into the database, the load files, so those load files would

2    have to be deleted.  And she understood that and she took

3    care of it and confirmed to me that it was done.  And I

4    verified that that was done.

5    Q.   How'd you -- how'd you go about verifying it that day?

6    A.   Yes.  I went to -- I pulled up the Summation program on

7    my computer.  It's a tool that we use to electronically view

8    the documents on our screen and take notes, whatever, on

9    those documents and be able to preserve that.

10        Searched for some of these documents to see if they

11   would come up in the Summation database and they did not.

12   And so I knew that they had been deleted.

13   Q.   Okay.  Now, if you take a look at Exhibit Number 6.

14   This is the day after the hearing with Magistrate Judge

15   Sanderson.  There's a letter from Mr. Lowenstein to

16   Ms. Clouston dated April the 17th, basically telling her that

17   Gruber Hurst has -- has confirmed that you had deleted all

18   the documents from its database, destroyed all working

19   comments.

20        Did you -- did you see this letter at or about the time

21   it went out?

22   A.   I believe that I did.  I don't see it cc-ed on the

23   letter, but I -- I think I got a copy.

24   Q.   Doing this chronologically, and the day after that, on

25   April the 18th, Jones Day writes back to Mr. Lowenstein,

1    okay, whatever you have send over here at your earliest

2    convenience.  Have you seen that letter?

3    A.   Yes, sir.

4    Q.   On or about the 18th, when it -- when it came in?

5    A.   Yes, sir.

6    Q.   That same day somebody at Bell Nunnally sends another

7    letter to Stephanie Clouston saying here are all the

8    documents and these are all the documents Gruber Hurst

9    Johansen and something, I can't read it, received regarding

10   the VAC case.  Do you see that?

11   A.   Yes, sir.

12   Q.   And attaching a copy of your letter, your first letter,

13   of April the 16th to that effect?

14   A.   Yes, sir.

15   Q.   Now, the next thing chronologically that happens is on

16   April the 20-- and I think it -- think I got this date right.

17        On April the 23rd -- excuse me, 21st, Judge Sanderson

18   makes his recommendation to the District Court.  And you read

19   that.

20   A.   I did.

21   Q.   Now, in fact, as of April the 23rd -- April the 21st, on

22   the day that Judge Sanderson made his recommendation to the

23   District Court involving a finding of contempt, in fact, all

24   the documents from the database had not been deleted at

25   Gruber Hurst.  Isn't that so?

```
1    A.   I don't know that to be the case.

2    Q.   You were here this morning and heard a forensic expert

3    testify about when things happened?

4    A.   Yes.

5    Q.   I call your attention to -- to Defendant's Exhibit 25.

6    That's this chart.  Let me show it to you.

7              MR. COOTER:  May I approach the witness for a

8    moment?

9              THE COURT:  You may.

10   BY MR. COOTER:

11   Q.   You saw that this morning?

12   A.   Yes, I did.

13   Q.   You remember these?

14   A.   I do.

15   Q.   It appears based on this forensic examination that the

16   documents as of April the 23rd, the date of the magistrate's

17   report had not been deleted, rather five days later, after

18   the magistrate's recommendation to the District Court they

19   weren't deleted, they were copied and moved.  Isn't that

20   so?

21   A.   I don't know that to be the case, but I heard that

22   testimony this morning, just as you did.

23   Q.   Is that the first time you ever heard that?

24   A.   Yes, sir.

25   Q.   Do you have any reason to doubt it?
```

```
 1   A.   I don't.
 2   Q.   Now, when did you leave Gruber Hurst?
 3   A.   In July of 2008.
 4   Q.   July of 2008.  So shortly after these events that are
 5   depicted in this timeline?
 6   A.   Yes, sir.
 7   Q.   And when you left Gruber -- where did you go, I'm just
 8   curious?
 9   A.   I went to the Ware firm.
10   Q.   TO the what?
11   A.   To the Ware firm.
12   Q.   That's where you are now?
13   A.   Yes, sir.
14   Q.   Okay.  And when you left Gruber Hurst, did this case
15   remain with -- these cases remain with Gruber Hurst?
16   A.   Yes.
17   Q.   Who took over for you?
18   A.   I don't think anyone took over for me immediately.
19        I think sometime thereafter Mr. Magee was hired.
20   Q.   That wasn't until some years later, wasn't it?
21   A.   No.  I think it was later that same year.
22   Q.   Okay.  Well, in any event you didn't have an immediate
23   replacement at Gruber Hurst to take over?
24   A.   No, sir.
25             MR. COOTER:  Your Honor, that's all I have of this
```

```
 1   witness at this time.
 2             MS. BROWN:  I just have a brief couple of
 3   questions.
 4             MR. LOWENSTEIN:  I don't have any questions.
 5             THE COURT:  Yes, ma'am.
 6             MS. BROWN:  I didn't mean to cut Mr. Lowenstein
 7   out.
 8             MR. LOWENSTEIN:  She just forgot about me.
 9             MS. BROWN:  I'm very selfish that way.  I
10   apologize.
11                     REDIRECT EXAMINATION
12   BY MS. BROWN:
13   Q.   A few questions.
14        Mr. Tautfest, I know you were shown Exhibit 25.  Do you
15   have any personal knowledge regarding how the system worked
16   at Gruber Hurst with respect to the servers?
17   A.   No.
18   Q.   And when you left in July of 2008 did you have any
19   reason to believe that the McAlexander report or any of the
20   other documents that you had instructed to be deleted and
21   that you had returned still existed in any form at Gruber
22   Hurst?
23   A.   I had no idea.
24   Q.   And did you tell anyone when you left that you felt like
25   those documents still existed at Gruber Hurst?
```

```
 1  A.   No.
 2  Q.   Do you have any reason to tell anybody that you thought
 3  they existed?
 4  A.   No.  I thought they were -- I thought they were deleted.
 5            MS. BROWN:  No further questions, Your Honor.
 6            THE COURT:  Mr. Cooter.
 7            MR. COOTER:  I don't know if Mr. Lowenstein has
 8  anything.
 9            THE COURT:  Well, you're next and then him.
10            MR. COOTER:  Okay.  I have nothing either.
11            MR. LOWENSTEIN:  Me either, Your Honor.  Thank you.
12            THE COURT:  You may step down.
13            MS. BROWN:  Your Honor, may Mr. Tautfest be
14  excused?
15            THE COURT:  Yes, ma'am.  I'm assuming no one has
16  any objection to that?
17       No one wants to go past today, right?
18            MR. COOTER:  I want him to sit here all day.  I
19  have no objections.
20                      (Laughter.)
21            THE COURT:  Ms. Brown.
22            MS. BROWN:  Yes.  We now call Lisa Miller to the
23  stand.
24                      (Witness sworn.)
25            THE COURT:  Have a seat.
```

```
 1                       DIRECT EXAMINATION
 2    BY MS. BROWN:
 3    Q.   Could you please state your name for the record.
 4    A.   Lisa Miller.
 5    Q.   Ms. Miller, where were you employed during -- during
 6    2007 to 2009?
 7    A.   Gruber Hurst Johansen Hail.
 8    Q.   What position did you have there?
 9    A.   Paralegal.
10    Q.   Do you still currently work for Gruber Hurst today?
11    A.   No, ma'am.
12    Q.   When did you leave?
13    A.   January 2009.
14    Q.   And while you were at Gruber Hurst what types of cases
15    did you work on?
16    A.   I had IP and then general litigation.
17    Q.   And when you say "IP" you mean intellectual property?
18    A.   Yes.
19    Q.   Did you work on cases where Gruber Hurst represented
20    Securus and T-Netix?
21    A.   Yes.
22    Q.   And, in fact, did you work on the Global Tel-Link case?
23    A.   Yes.
24    Q.   In connection with the Global Tel-Link case, which
25    partner did you primarily report to at Gruber Hurst?
```

VAC App. 253

1   A.   Eric Tautfest.

2   Q.   Now, while you were working on the Global case is what

3   I'll call it for purposes of the record, is that okay?

4   A.   Yes.  That's what I call it.

5   Q.   While you were working on the Global case on behalf of

6   Securus, did you work with any other law firms in

7   conjunction -- conjunction with Gruber Hurst's representation

8   of its client?

9   A.   I worked with Bell Nunnally a little bit, their

10  paralegal.

11  Q.   And can you explain to the court how it is that you

12  worked with Bell Nunnally in conjunction with Securus's

13  representation in the Global case?

14  A.   When we were talking about getting documents back and

15  forth I would work with her about -- I think it was during

16  this time, about getting documents back and forth that way.

17  And when we would move documents over to the storage shed,

18  that was who I dealt with to get access.

19  Q.   And what was your understanding as to the case that the

20  Bell Nunnally case was handling for Securus?

21  A.   It's been a long time.  I knew they had a separate --

22  Q.   What client -- who was adverse to them in that case?

23  A.   Oh, VAC.

24  Q.   And VAC is Value-Added Communications, right?

25  A.   Yes, ma'am.

1    Q.   Now, we've been talking about the McAlexander report.

2    You've heard reference to that, correct?

3    A.   Yes.

4    Q.   And have you ever read the McAlexander report?

5    A.   No.

6    Q.   Do you recall it being an issue in 2008 with respect to

7    your representation of Securus?

8    A.   Yes.

9    Q.   And what is it that you recall the issue was?

10   A.   I remember Eric coming back and -- or actually calling

11   and talking to me when he got back from the hearing saying

12   that we were going to be returning some documents.

13   Q.   And when you say "the hearing," you mean the hearing

14   that was before Judge Sanderson?

15   A.   Yes.

16   Q.   In April of 2008?

17   A.   Yes.  We had already snapped back some things but, yeah,

18   that's when I was told to start.

19   Q.   And -- and tell me about your involvement in the -- you

20   talked about snapping back.

21        Were you involved in producing documents in -- to the

22   other parties in the Global case?

23   A.   Yes.

24   Q.   And do you recall producing documents including the

25   McAlexander report to parties in the Global case?

A.   Yes.

Q.   Were you involved in the claw back of those documents?

A.   In what type of involvement?  I mean, I knew we were doing it, yes.

Q.   Okay.

A.   I took part in a lot of those conversations.

Q.   Okay.  Did you attend the hearing before Judge Sanderson?

A.   No, ma'am.

Q.   So you said you talked to Mr. Tautfest after the hearing before Judge Sanderson.  And what is it that you were instructed to do?

A.   He told me that we were going to have to get all the documents out of any working notebooks and on the system and destroy it all.  If there was copies get 'em in the recycle bin so they could be shredded and return -- delete all the electronic copies off the system and then return the originals back to him so that he could prepare a letter and have them returned over to Bell Nunnally.

Q.   Okay.  So as to the physical documents, the paper documents in your offices, can you explain to the court what it is that you did to gather up those documents to be returned?

A.   Yes.  We had working notebooks for each attorney.  And so I went in their offices and just pulled the expert reports

1   of whatever document list I have.  I put them all in -- I

2   destroyed them in one area where you have a recycle bin and

3   the other ones I took to Eric so he could return the

4   originals.  And then -- do you want me to go on about

5   Summation?

6   Q.   No?

7   A.   Okay.  We had them in notebooks.

8   Q.   Is there any doubt in your mind that you covered the

9   ground to look for those physical documents in the office to

10  be returned?

11  A.   No.  I did that.  I have no doubt.

12  Q.   Who all was working on the case?

13  A.   At that time me, Eric, Michael Lang.  That would be the

14  three main people that was working on it.  I had help here

15  and there.

16  Q.   You had what, I'm sorry?

17  A.   I had help here and there, but . . .

18  Q.   Okay.  So you gathered documents from your files,

19  Mr. Lang's files, and Mr. Tautfest's file?

20  A.   Oh, and Mr. Gruber.  He always had a working notebook,

21  whether he was involved in the meetings he always had a

22  working notebook.  So I went and got it out of his office as

23  well.

24  Q.   Was there anybody else in the Gruber Hurst office that

25  was charged with or involved with collecting the physical

1    copies of the McAlexander report and other documents that you

2    returned to Bell Nunnally?

3    A.   No.

4    Q.   Now I want to talk to you about the electronic copies of

5    the documents.  And -- and I'm talking about the McAlexander

6    report because that's the one that people are focusing on.

7    Is it your understanding there was a number of documents that

8    you returned, correct?

9    A.   Yes.

10   Q.   So as to the electronic documents, what were the

11   instructions from Mr. Tautfest in terms of returning or

12   deleting those electronic documents?

13   A.   He had just told me to make sure I got them off the

14   system, if I need to talk to IT or whomever.  And I worked

15   with Summation and -- I knew how to go into the back end of

16   it and get rid of documents or delete them out of the system

17   and then delete them off Summation itself, purge and --

18   Q.   So I want walk you through that process step-by-step.

19        So you said you knew how to go into Summation and delete

20   the documents.  So what's the first thing you did in that

21   regard?

22   A.   I would have gone into the actual database that we had

23   opened.  And then you go in and you mark them.  There's a way

24   where you can just mark the documents.  And then you say

25   delete and it says purge, because that's the only way to get

1   them out of the actual database.  If you just delete them

2   they're still -- you can still see them.  And then there's a

3   back end that you go in the back way.

4   Q.   Did you hit the purge portion?

5   A.   Yes.  And then you have to go in the back end of it also

6   through the actual hard drive of the, like the C drive, S

7   drive, might have been S.  I can't remember what it was

8   called over there.  Then you go in and there are actual

9   physical documents that are on the hard drive in folders

10  labeled whatever numbers these are.  You have to go in and

11  actually hit manually delete and move them out of the

12  folders.  That way they don't reappear in the back end of it.

13  So there's two processes to it.

14  Q.   And so you performed --

15  A.   I did both.

16  Q.   -- performed both of those processes to delete the

17  documents from the Summation database?

18  A.   Yes.

19  Q.   And we don't need to pull up Defendant's Exhibit 25

20  unless you need to see it.  But I think you heard testimony

21  about a Summation database called Securus Global New?

22  A.   Yes.

23  Q.   Okay.  And do you know what Securus Global New is?

24  A.   I do not remember.  That's not how we opened our case.

25  It was called Securus Global.

1   Q.   Okay.  Were you involved in naming the database for --

2   the databases for the cases that you were working on?

3   A.   There were times, yes, there would be some cases if we

4   pulled up we could name them ourselves as a paralegal.

5   Q.   So as you are opening an original Summation database for

6   a case where you're loading documents in and preparing them

7   for review and production --

8   A.   Uh-huh.

9   Q.   -- would it be your practice to name an original load

10  with the nomenclature New?

11  A.   No.  I've never done that actually that I could ever

12  recall.

13  Q.   And as you were deleting the documents from the

14  Summation database pursuant to Mr. Tautfest's instructions

15  from the Securus Global case and returning them back to Bell

16  Nunnally do you have any recollection as whether or not you

17  were working in this New database that's referred to --

18  A.   I do not.

19  Q.   -- in Defendant's Exhibit 25?

20  A.   I don't recall it being New.

21  Q.   I want you to turn to Exhibit 4, if you would.  Gruber

22  Hurst 4.

23       Just briefly look at this.  Is this a document that you

24  drafted?

25  A.   Yes, ma'am.

1   Q.   And tell me the circumstances of your drafting Exhibit

2   Number 4.

3   A.   I had gotten a list from Eric of what I needed to pull.

4   And so I just prepared the letter form, the cover letter.

5   Q.   And if you can look at page 2.

6                   MS. BROWN:   And I want to go to and pull out,

7   Bev, the very last sentence before the signature on page 2 of

8   Exhibit 4.

9   BY MS. BROWN:

10  Q.   And in this document that you drafted it states, "Please

11  be advised that we have deleted the above documents from our

12  database and have destroyed all working copies as well."

13       Did I read that correctly?

14  A.   Yes, ma'am.

15  Q.   Is that a sentence that you wrote in Exhibit Number 4?

16  A.   I did.

17  Q.   At the time you wrote this sentence were you the one

18  that was responsible for deleting the documents from the

19  database?

20  A.   I was.

21  Q.   And destroying all working copies?

22  A.   Yes, ma'am.

23  Q.   Did you have any concern that the statement made in

24  Exhibit Number 4 was not an accurate representation?

25  A.   No, I was not concerned at all.

1  Q.   As you sit here today, knowing the actions that you

2  took, are you confident that you deleted the copies that you

3  knew to exist on the system, the Summation system in the

4  Global case?

5  A.   Yes, ma'am.

6  Q.   And are you confident that you gathered all the physical

7  copies of the documents that were to be returned to Bell

8  Nunnally?

9  A.   Yes, ma'am.

10 Q.   I think -- remind me when you left Gruber Hurst,

11 Ms. Miller?

12 A.   January 2009.

13 Q.   Okay.  January 2009.

14      And when you left Gruber Hurst in 2009 did you have any

15 concern that the McAlexander report or other documents still

16 existed in physical or electronic form at Gruber Hurst?

17 A.   No, ma'am.

18 Q.   Did you communicate to anyone that you thought they

19 might exist at that time?

20 A.   No.

21 Q.   And do you know who worked on the case after you, once

22 you left?

23 A.   No, I do not.

24         MS. BROWN:  Pass the witness.

25         THE COURT:  Mr. Lowenstein, got anything?

```
 1        You're next.
 2              MR. COOTER:  May I proceed?
 3              THE COURT:  Yes.
 4                        CROSS EXAMINATION
 5   BY MR. COOTER:
 6   Q.   At the time -- I want to focus your attention on the
 7   month of April of 2008.  Well, I'll tell you what, let's back
 8   up.
 9        I want to talk about the structure of this computer
10   system that was in existence at the time at Gruber Hurst.
11        There -- there were one or more servers, right?
12   A.   Not early that I recall, no.
13   Q.   Well --
14   A.   That I know of.  I don't know how all the servers were
15   operating.
16   Q.   Okay.  There was a -- there was a database that
17   everybody had access to, and I suggest to you was probably
18   called the S drive.  Do you recall an S drive there?
19   A.   I recall that sounds familiar, an S drive.
20   Q.   And an S drive was a drive in a -- was a drive in a
21   server somewhere from what -- that anybody in the law firm
22   could access for common documents, right?
23   A.   It was where our document depository was.
24   Q.   All right.  Now, you've made reference to a Summation
25   database.  Is the Summation database synonymous with the S
```

1  drive?

2  A.   I thought the Summation database was the S drive, but

3  maybe -- I could be wrong.

4  Q.   Well, Summation -- Summation is a litigation management

5  piece of -- litigation management software, right?

6  A.   Yes.

7  Q.   If people are writing emails back and forth out of the

8  Gruber Hurst law firm at the time they -- a copy of those

9  would reside on the S drive.  It didn't have anything to do

10  with Summation.  Is that right?

11  A.   Correct.  It would have nothing to do with Summation.

12  Q.   So Summation is a completely different tool than the

13  global S drive tool available to everybody in the law firm,

14  right?

15  A.   Summation is a completely different drive than just our

16  normal working station type --

17  Q.   Now, in addition to that--

18  A.   -- program.

19  Q.   -- the -- I suspect that the -- and you can confirm this

20  for me, part of this I'm doing because I know how my place

21  works, there are desktops that the paralegals and the lawyers

22  have, and on those desktops there are drives called C drives?

23  A.   True, yes.

24  Q.   And the C drive enables anybody in the law firm to get

25  into the S drive, take the document, copy it to their C

1   drive, if they want to work on one or more documents, right?

2   A.   Yes.  If that's --

3   Q.   Happens all the time, doesn't it?

4   A.   Yes.

5   Q.   Now, if I understand what you've told us, you went to

6   purge Summation, right?

7        You didn't make a total purge of the S drive, or purport

8   to.  Is that right?

9   A.   Yes.  I did not go on the S --

10  Q.   You did not do that.  And you're not aware of anyone

11  else who did that, are you?

12  A.   No.

13  Q.   Now, at the time in April of 2008 how many people -- and

14  by "people" I mean the paralegals, I don't care about the

15  billing department --

16  A.   Okay.

17  Q.   -- how many paralegals and lawyers were working on these

18  cases for Securus T-Netix?

19  A.   We had our team and then I did have some -- we had other

20  paralegals --

21  Q.   I'm sorry?

22  A.   We had our team, which was me, Eric and Michael, and

23  then Mr. Gruber was -- of course, oversaw everybody or

24  reported to him at the end, but we would have other

25  paralegals, if I got really busy on something I would have

```
 1    another paralegal help me.  It just depends.  You just kind
 2    of ask around at that point to help out, but . . .
 3    Q.   So you were -- you were -- you were on the team.
 4    A.   I was primarily responsible.
 5    Q.   Okay.
 6    A.   It was my responsibility, yeah.
 7    Q.   And Michael, who is Michael?
 8    A.   Maybe Lang, he was an associate there, or was when I was
 9    there.
10    Q.   He was on the team.
11    A.   Uh-huh.
12    Q.   Mr. Tautfest was on the team.
13    A.   He was.
14    Q.   Did I mispronounced that?
15         I apologize to him.
16         And Mr. Gruber.
17    A.   Yeah, Mr. Gruber was.
18    Q.   He also had a function in connection with this
19    litigation, did he not?
20    A.   Yes, he was -- I mean, it was his case.  He was
21    origination, but . . .
22    Q.   Now, confirm for me that to your knowledge at the time
23    that these statements were being made that everything had
24    been deleted no one had made a search of anyone's C drive.
25    A.   I did not personally go to everybody's C drives.
```

1    Q.    Well, did anyone make a search of anyone's C drive --

2    A.    Not that I'm --

3    Q.    -- to see whether or not the individual lawyers had the

4    documents on their desktops?

5    A.    I did not.  And I did not ask that.

6    Q.    Indeed, confirm for me, I'm a betting man, that some of

7    these lawyers in addition to the desktop had laptops.

8    A.    We had a firm laptop.  I don't know if they had personal

9    laptops.

10   Q.    The -- okay.  Let's take firm laptops.  Who had a firm

11   laptop?

12   A.    We had one and I would check it out if we had a hearing.

13   Q.    Do you know if anyone made an inquiry or attempt to see

14   if these desktops -- excuse me -- these documents existed on

15   anyone's laptop?

16   A.    I'm trying to think if I would have grabbed the laptop

17   or not.  I don't recall.

18   Q.    Was there one laptop for the whole firm?

19   A.    I just used one for us.  I don't know if they had them

20   for different sections.

21   Q.    Well, do you know whether or not the lawyers -- do you

22   know whether or not the lawyers had their own laptops,

23   whether they were issued by the firm or themselves?

24   A.    I wouldn't know.  I don't know.

25   Q.    Did anyone make inquiries as to whether any of these

1   documents existed on a laptop?

2   A.   I do not recall that one.

3   Q.   Just to show you how up-to-date I am, and for no other

4   reason, anybody check the cell phones?  You can keep these

5   things on cell phones now.

6   A.   I did not ask about cell phones.

7   Q.   Okay.  That's fine.

8        Now, whatever happened here happened.  And you left.

9   When did you stop working on the Securus T-Netix -- T-Netix?

10  A.   Whenever the settlement -- I worked on it up until I

11  left.  So whenever the settlement and everything was done, I

12  handled the case all the way through the settlement agreement

13  or I was involved until that part.

14  Q.   Did you have any interface with -- about this problem

15  with the what was alleged to have been misuse of confidential

16  documents with anyone at either at Securus or T-Netix?

17  A.   Did I have -- I did not speak with clients about it,

18  no.

19  Q.   Do you know if anyone else did at Gruber Hurst, actually

20  talk to the people at Securus or T-Netix about this alleged

21  problem?

22  A.   I do not know.

23  Q.   And when you -- you left in '09 you say?

24  A.   January 2009.

25  Q.   And are you still a paralegal somewhere?

VAC App. 268

```
 1   A.    NO.  I'm an executive director of a law firm.

 2   Q.    You're what?

 3   A.    I'm an executive director of a law firm.

 4         MR. COOTER:  My condolences to you, ma'am.

 5   I have no further questions.  Thank you.

 6         MR. LOWENSTEIN:  No questions, Your Honor.

 7         MS. BROWN:  Nothing further from me, Your Honor.

 8         THE COURT:  You may step down.

 9         MS. BROWN:  And may this witness also be excused?

10         THE COURT:  Any objection?

11         MR. COOTER:  No.

12         THE COURT:  You may be excused.

13   Thank you.

14         MR. MATEJA:  Your Honor, at this time Gruber Hurst

15   will called Mr. Tony Magee to the witness stand.

16                   (Witness sworn.)

17         THE COURT:  Please have a seat.

18   Thank you.

19   Whenever you're ready.

20                   DIRECT EXAMINATION

21   BY MR. MATEJA:

22   Q.    Tony, could you introduce yourself.

23   A.    My name is Anthony Magee.

24   Q.    And you're not from these parts originally?

25   A.    Not from these parts originally.
```

1   Q.    Where are you originally from?

2   A.    I'm from Glasgow, Scotland.

3   Q.    All right.  And how long have you been in the States?

4   A.    About 20 years.

5   Q.    All right.  And during this entire time that you've been

6   in the States has it been as a lawyer?

7   A.    Well, when I first came I was a barrister, but I -- I

8   trained to be an attorney, took the bar exam.  So I didn't

9   become an attorney until a little bit later.

10  Q.    All right.  And when you moved to the States did you

11  move into this area?

12  A.    Yes.  Lived in Dallas ever since I got here.

13  Q.    And, just briefly, could you recount for the judge which

14  firms that you've worked while you've been here?

15  A.    Yeah.  I joined McKool Smith in July of 1993.  And I

16  left there on the Labor Day of 2008.

17  Q.    All right.

18  A.    And then I started at Gruber Hurst Johansen Hail on

19  September 2nd, 2008, which is the day after Labor Day.

20  Q.    All right.  So everything that we've heard about in

21  connection with the VAC case, the 2008 VAC case, was over and

22  done with by the time that you got to Gruber Hurst?

23  A.    That's right.

24  Q.    Okay.  And when you came to Gruber Hurst, I mean, I

25  guess you didn't come to work on that case because it was

1   over and done with, right?

2   A.   That's correct.

3   Q.   At some point in time though you do begin to represent

4   VAC --

5   A.   Yes.

6   Q.   -- while you're working at Gruber Hurst; is that right?

7   A.   Not VAC.

8   Q.   Not VAC.  I'm sorry.

9        T-Netix/Securus?

10  A.   That's right.

11  Q.   Okay.  And when is that, roughly?

12  A.   I'm trying to remember the first time.  I know they were

13  a client of the firm.  They were one of Mr. Gruber's clients.

14  And I do know that we worked on a number of cases.

15       The ones that I can remember filing where I took it from

16  the beginning was the Combined case and the Pinnacle case,

17  and they were both filed very close together in -- in

18  September of 2009.

19  Q.   Okay.  September and maybe even October?  Was one filed

20  in one month and the other in the other?

21  A.   I think Combined was probably filed in September and

22  Pinnacle in October.

23  Q.   And let me just ask this general question.

24       When you came on board at Gruber Hurst, I mean, were you

25  kind of fulfilling a role that was needed at that time?

1    A.   Yeah.   They asked me to come over and head-up the IT

2    section.

3    Q.   So back to your representation of T-Netix and Securus,

4    you filed the Combined cases, you filed the Pinnacle cases.

5    That's roughly in the fall of which area again?

6    A.   2009.

7    Q.   All right.   And at some point in time is there discovery

8    requests that are served by the opposing parties in those

9    cases?

10   A.   Yes.

11        In June of 2010 we received a request for production

12   from Combined in the Combined case.

13   Q.   All right.

14   A.   And I think we had already received requests for

15   production from Pinnacle, too.

16   Q.   At this point in time have you ever heard of the

17   McAlexander report?

18   A.   No.

19   Q.   Okay.   Had you ever heard that there was a contempt

20   proceeding that related to the McAlexander report?

21   A.   No.

22   Q.   Were you aware of any kind of findings that might have

23   been made by Judge Sanderson in connection with that

24   report?

25   A.   No, I didn't know.

1   Q.   Okay.  You had never heard of the report?

2   A.   I don't think I had heard of Jerry [sic] McAlexander.

3   Q.   Okay.  Okay.  So discovery gets served in those cases.

4        And I guess I'm going to turn your attention to the

5   black binder, which are Gruber Hurst's exhibits.

6        And let's take a look at Exhibit Number 8, which has

7   already been introduced and admitted.

8        And this is defendant's first set of request for

9   production.  And this is -- just happens to be the Combined

10  case; is that correct?

11  A.   That's correct.

12  Q.   And, likewise, there were discovery requests in the

13  Pinnacle case; is that correct?

14  A.   Yeah, I believe that's correct.

15  Q.   So tell me what your thinking is, Tony, as far as trying

16  to respond to this first set of requests for production of

17  documents in the Combined case.  And, likewise, in the

18  Pinnacle case.

19       How are you going to go about responding to these

20  requests?

21  A.   Well, I obviously worked with my team.  There's 51

22  document requests so this is a significant undertaking.

23  Q.   All right.

24  A.   So I obviously wanted to figure out what are we going to

25  being producing, where are we going to be getting it from.

1          But one thing I -- I did understand that there had been

2     previous litigations, patent litigations that T-Netix and/or

3     Securus had filed.  And I knew that -- I suspected there had

4     been document productions in those prior cases.  So I was

5     interested to know what -- what productions had been made in

6     the prior cases.

7     Q.   Do the cases relate to similar patents?

8     A.   Well, I didn't work on the Global case but I did

9     understand that there was an overlap between the patents that

10    were being asserted in the Combined and the Pinnacle case and

11    earlier cases that had been filed, including the Global case.

12    Q.   Okay.  So based and armed with that information, what do

13    you do next in terms of responding to the discovery

14    requests?

15    A.   Well, I thought it would make sense to -- rather than

16    reinvent the wheel, because of the overlap in patents and the

17    likelihood that the documentation had been produced in the

18    earlier case by the Securus parties that would be pertinent

19    to my case that we would try to reproduce what we had already

20    produced in the -- in the Global case, because a lot of

21    effort had gone into gathering it, collecting it, and viewing

22    it, processing it, Bates numbering it, and producing it.

23          That seemed to me that would be a very proficient way to

24    deal with the production in these two cases.  That wasn't the

25    whole thing.  Because also there was documents that were

1   specific to the Combined case and specific to the Pinnacle

2   case and we were working on gathering those two.  So it was

3   part of a three part process.

4   Q.   Okay.  But at least as to one of the parts you thought

5   that it made sense to not reinvent the wheel, basically

6   gather the documents that had been produced in the Global

7   case and then essentially reproduce those in connection with

8   Combined and Pinnacle?

9   A.   Correct.

10  Q.   Okay.  And is that what you did?

11  A.   That is what I did.

12  Q.   Okay.  So why don't you tell the court, if you will what

13  it is you instructed -- what did you do to make that happen?

14  A.   The first thing was to locate the Global production.  So

15  I -- my paralegal at the time was Josh Ellis.  He had been at

16  the firm for a short period of time.

17  Q.   It wasn't Lisa Miller?

18  A.   No, Lisa had already left.

19  Q.   Did you know Lisa?

20  A.   Oh, I knew Lisa.  I worked with here for a few months.

21  Q.   Did you find her to be a good worker?

22  A.   Yeah.  I was sorry she left.  I thought she was a very

23  competent paralegal.

24  Q.   Okay.  And so since Lisa's gone you're working with

25  Josh?

```
 1   A.    Yes.

 2   Q.    What do you do with Josh?

 3   A.    Well, I asked Josh if he could find the Global

 4   production.

 5         And so he went away and tried to find it.  And he

 6   reported back to me that he couldn't find the Global

 7   production anywhere in our system.

 8         So that obviously presented a bit of a glitch in my plan

 9   of efficiency.  So I -- you know, I'm a bit dogged sometimes,

10   so I thought I'm not going to give up at the first hurdle.

11   Maybe somebody else has them, maybe the document vendors that

12   had been used previously on the Global case might have them.

13   So I asked Josh to get in touch with them.

14         And the firm in question that I knew of was called

15   Equivalent Data.  So Josh contacted Equivalent Data to see if

16   they had the document.

17         And they couldn't find them in their whatever system or

18   archives they had.

19   Q.    Okay.  But Equivalent Data is looking in their system

20   for the production in the Global matter; is that correct?

21   A.    That's correct.

22   Q.    Okay.  So but they're not necessarily looking at what

23   y'all might have on your computer system; is that correct?

24   A.    No.  They're looking at their end.

25   Q.    All right.
```

1   A.   Josh had already are reported to me that he couldn't

2   find the documents in -- in our system.

3   Q.   Okay.  And so what do you do next?

4   A.   Well, I talked to a couple of guys at Equivalent Data.

5   We threw around some ideas.  And there was a guy I talked to

6   called Chip Coons (phonetic) who said, well, we have an

7   archive, we could maybe open it up and take a look.

8        And so I wanted to know what that would cost because

9   when people start talking about opening up archives that's

10  almost like opening up somebody's wallet, too.  So I wanted

11  to know what it would cost.

12

13  Q.   Right?

14  A.   And he told me it would cost one or two thousand

15  dollars.  I thought that would be a good investment.

16       I said go ahead, open up the archive and let's see what

17  in there.

18       So he opened up the archive and discovered some

19  documents that had been produced in the Global case but only

20  a small fraction.  The vast bulk of what I was looking for

21  was not in there

22  Q.   And so since we couldn't find it in Archives, what did

23  you have to do then?

24  A.   Well, what happened, I think this was about on the 4th

25  of August, is that Josh and the guys from Equivalent Data put

1    their heads together to figure out if there was some strategy

2    for finding these documents.

3        And what -- what Equivalent Data suggested was if we

4    could find the volume IDs for these documents that had been

5    produced in the Global case maybe that would give us some

6    data with which to go back to our archive and have another

7    look to see if we could find what you're -- what you're

8    asking for.

9    Q.   Okay.

10   A.   And so two guys from Equivalent Data and Josh got

11   together by a thing called Go To Meeting, which is a -- I

12   think -- it's a system where you can invite somebody to come

13   onto your computer.

14   Q.   All right.

15   A.   And they can either just watch or they can take control

16   of your keyboard and they can look around, you know, they

17   could demonstrate something.  Or there's various things you

18   can do once you're on somebody's computer.

19       But the purpose of that, as I understood it, was to

20   enable Equivalent Data to see if they could find the volume

21   IDs.

22   Q.   All right.  And so does in fact this happen?

23       Is there a Go To Meeting that's conducted between your

24   firm and Equivalent Data?

25   A.   There is.  And Josh came and reported to me later that

1   rather than find the volume IDs the Equivalent Data guys

2   actually were able to find the entire Global production.

3   Q.   All right.  And so they were successful, right?

4   A.   Yes.  At the time it seemed like a good thing.

5   Q.   Okay.  In hindsight -- of course you don't have to

6   answer that question, (laughter) and so they find it.  And so

7   what happens then?

8   A.   Well, what they found was the -- the images -- and I

9   think David Cowen talked about this a little earlier.  You

10  have a TIFF file and a text file.  So basically when you make

11  a production, an electronic production for the use of

12  something like Summation or any other kind of document

13  management system, you create a vast body of images and you

14  have -- and they're single page images and they have the --

15  what's called the TIFF --

16  Q.   Yes?

17  A.   -- and they have the text.

18  Q.   Yes.

19  A.   And then they have -- but there's thousands and

20  thousands and thousands of them.  In this case there were

21  hundreds of thousands of them.

22       And so the challenge is, well, you've got all these

23  single page TIFFs, how do you know what is and isn't a

24  document.

25       So you also have what's called a load file.  And the

```
 1    load file is a sort of computer program that can take all
 2    those TIFFs and because of the data embedded in it can say
 3    this hundred images are of that document and go pull them in.
 4          So that was my first document.
 5          This hundred doc images are the second document.  It's a
 6    way of pulling them into documents so when you load that all
 7    up on your computer system you can start looking at them as
 8    documents rather than just as individual pages.
 9          So --
10    Q.    It sounds like quite an elaborate process?
11    A.    It is somewhat elaborate.  And I've come to learn more
12    and more about it, you know, through working on electronic
13    discovery.
14          But the key thing, and the reason I mentioned that was
15    that what the Equivalent Data guys discovered were not only
16    were the images there but the load files were there, too.
17    Q.    Okay.
18    A.    And so --
19    Q.    That helps, right?
20    A.    It helps.  Because you don't have to create all those
21    files, it's already there.
22          So what their advice to us was, look, all you need to do
23    is take all those files and the load files and the images and
24    basically put them on a hard drive, send them off to your
25    opposing counsel and there's your document production.
```

1      It seemed like a perfect solution.

2  Q.   Is that what you did?

3  A.   That is what we did.

4  Q.   Okay.  And who actually -- did Josh --

5  A.   Well, yeah, Josh is the paralegal, he did the mechanics

6  of it working with Equivalent Data.

7  Q.   Okay.  At this point in time do you know about the

8  McAlexander report?

9  A.   No.

10 Q.   Okay.  So external hard drives are sent to Combined's

11 counsel and Pinnacle's counsel, which basically has on it the

12 Global production from that prior case?

13 A.   Yes.  It has that but also as I said earlier there was

14 other stuff we were gathering, case specific documents, they

15 were also produced.

16 Q.   Okay.  Now, I want to talk about some of the other kind

17 of very specific things.

18      We've seen -- and I think you've had a chance because

19 you were in the courtroom, but you saw a letter that Demarron

20 Berkley, who was an associate in your law firm, that he had

21 sent to VAC's CEO.  Do you remember that letter?

22 A.   I do.

23 Q.   Okay.  And that letter, just for everybody's

24 recollection sake, is Exhibit Number 9, Gruber Hurst 9.

25      And so let's just pull that up very quickly.

1        And this letter, Tony, tell us -- explain what this is

2    all about.

3    A.   Well, this is one of a series of letters, because I knew

4    that T-Netix and Securus had been involved in multiple

5    lawsuits and they had been involved in multiple settlements.

6    And so what tends to happen is every time we have a lawsuit,

7    opposing counsel wants to see copies of any settlements that

8    are reached in the previous lawsuits.

9        And the reasons they want to see that is that --

10   Q.   Okay.

11   A.   -- it's relevant to damages issues.  It's one of the

12   Georgia-Pacific factors.

13       If the court is trying to determine what the damages

14   ought to be there's a case out there called Georgia-Pacific

15   which sets forth the relevant factors.

16       One of the relevant factors would be have these patents

17   been licensed previously and if so on what terms, in terms of

18   the royalty rate, what's a previous royalty base, et cetera,

19   et cetera.

20       So defendants in patent cases are always interested in

21   seeing copies of licenses given in other cases.

22   Q.   Okay.  And so is Exhibit Number 9 basically some of the

23   diligence that has to be done in order to garner that

24   information?

25   A.   Well, I believe that Combined had specifically asked for

1  copies of licenses in their document production.

2  Q.   And in fact you and I have looked at the request for

3  production of documents and we saw that somewhere amongst

4  those 50 plus requests?

5  A.   I think it's Number 25 --

6  Q.   Okay.

7  A.   -- and 26, but I may be wrong.

8  Q.   Okay.  So, now, in addition to getting settlements and

9  license agreements, are there other things that you need to

10 focus on getting from other parties?

11 A.   Well, there was another thing that I thought we needed

12 to get hold of because there had been prior lawsuits.

13      The -- I think it's requests 13 and 14 in the Combined

14 requests were asking about prior art.

15      And I think you put that up on the screen earlier.

16      You know, as I read the way that was phrased, 13 and 14,

17 particularly where it said "or has been asserted to be prior

18 art," that if there had been any invalidity contentions

19 served in any prior suit that those invalidity contentions

20 would be responsive to those requests.

21      So I was interested in tracking down whether there were

22 any prior invalidity contentions in either Global or VAC.

23 Q.   All right.  To that end I want to turn your attention to

24 what has been marked as Gruber Hurst Exhibit 10, which is

25 previously admitted.

1          And against the backdrop that you've sent the external

2    hard drives, you're trying to get license and settlement

3    agreements, you're trying to get invalidity contentions,

4    let's take a look at this email.

5               MR. MATEJA:  And let's blow up the first three

6    paragraphs.

7    BY MR. MATEJA:

8    Q.   And, Tony, I'm just going to read this.  Tell me if I

9    read it wrong.  But this is an email from Christina Ryan at

10   the Stites Harbison firm that is representing Combined at

11   that time.  It's dated Thursday, August the 19th.

12        It's an email to you.  It says, "Dear Tony, I have left

13   two voicemails requesting that you contact me to discuss

14   pending discovery matters in this case.  Due to the

15   time-sensitive nature of these issues, I am following up via

16   email in the hopes of receiving a quick reply."

17        "First, T-Netix identifies or refers to various

18   responsive documents in its responses to CPC's requests for

19   production numbers 13, 14, 15, 16, 25, 26, 32, 37, 45, and

20   46, and CPC's interrogatories numbers 3 and 5.

21        "These documents relate to patent invalidity and

22   unenforceability or are agreements related to the patents in

23   Suit.  Accordingly, they are highly relevant to the claims

24   and defenses at issue in this litigation."

25        So I read that right, correct?

1   A.   You appear to have done it.

2   Q.   I mean, is this exactly what we were talking about

3   before, vis-a-vis agreements and invalidity contentions?

4        Is this the kind of stuff she's referencing?

5   A.   That's not what I understood it to be.

6   Q.   Okay.

7   A.   And about these licenses, I think perhaps one thing I

8   should mention is that they typically do have a

9   confidentiality provision in them.

10  Q.   All right.

11  A.   And so you wouldn't want to turn them over without

12  contacting the other party to those agreements to get their

13  consent.

14  Q.   Okay.  But in any event, she's following up with you

15  because these were documents that she believes she's

16  requested in her request for production; is that correct?

17  A.   That's right.

18  Q.   And the next paragraph, which is actually the third

19  paragraph, at the bottom, it says, "Second, we received the

20  external hard drive and disc containing T-Netix's production.

21  One of our staff noted that an import/load file indicates

22  some of the documents in the production have been coded as,

23  'Privileged.'

24       "The attached spreadsheets lists the document numbers in

25  question.  Please advise if these documents were produced

1  intentionally."

2  A.   Okay.

3  Q.   So what does that mean to you?

4  A.   Well, it raises the possibility that we have

5  inadvertently produced privileged documents to the other

6  side.

7  Q.   Okay.  When it says it's been coded as privileged, how

8  does that work?

9  A.   Well, what she's referring to, as I understand it, is

10  this load file I mentioned earlier.  When you have a load

11  file it contains a certain amount of coding and the parties

12  can sometimes agree as to how much coding it will be, but it

13  will typically have the Bates number and it -- it may just

14  have, you know, very minor information, possibly the name of

15  the document, possibly who it's from.  But typically it's

16  very limited.

17       The thing that surprised me when I read this was it said

18  that there was coding suggesting it had been privileged,

19  because that would normally be coded and would be kept sort

20  of internal to our side.  We wouldn't necessarily give that

21  to somebody else.

22  Q.   Okay.  Now, when this email comes in on Thursday, August

23  the 19th, I mean, you in fact know that you're out of town at

24  that time; is that correct?

25  A.   Yes.  I think that's why she had left a couple of voice

1    mails and I haven't responded.

2    Q.   Okay.  You've had a chance to kind go back and figure

3    out whether you were in town or out of town and you know you

4    were out of town; is that right?

5    A.   Yeah.  Because I think I asked Michael Lang to contact

6    her because I was out of town.

7    Q.   And in fact let's take a look, if we can, at Gruber

8    Hurst Exhibit 12, which has been previously admitted.

9         And let's start from the bottom up, because it's an

10   email chain.

11        And we see Mr. Lang, who is an associate at Gruber

12   Hurst; is that correct?

13   A.   That's right.  And he still is.  I know Ms. Clouston

14   elevated him to partner this morning but he's actually still

15   an associate.

16   Q.   I think he would have preferred the promotion.

17        But so the first email, which is on page 3 of the

18   document, we see that Mr. Lang is getting back to Christina

19   Ryan; is that correct?

20   A.   Yes.

21   Q.   I don't want to go through all of this but could you

22   summarize for us what this is telling?

23   A.   He's giving her an update -- as I said, there were

24   numerous parties that have license agreements with Securus

25   and he was giving her an update on where we stood concerning

1    getting consents from other parties to those agreements.  And

2    he listed three particular parties and then he said we'll

3    keep you informed as we hear back from the other entities.

4    Q.    Okay.  Okay.  Now, I'm going to come back to Exhibit 12

5    here in a second.  But I actually want to go back to Exhibit

6    10, because Ms. Ryan, she references that there is a

7    spreadsheet that she has attached, which is also marked as

8    Gruber Hurst Exhibit 10-A; is that correct?

9    A.    That's correct.

10   Q.    And so if we look at Gruber Hurst Exhibit 10-A we see

11   this spreadsheet and we see a series of Bates numbers; is

12   that correct?

13   A.    That's correct.

14   Q.    And so this is her -- you know, Bev has just pulled up

15   some random numbers here, but, I mean, these numbers are

16   Bates numbers that correspond to the documents that they have

17   determined to be coded as privileged; is that right?

18   A.    That's -- that's what I understood her to be doing with

19   that document.

20   Q.    Now, I mean, this spreadsheet, it doesn't have any

21   description of the documents.  It doesn't say that this is

22   a -- a letter or an email or an expert report.  It just gives

23   Bates numbers; is that correct?

24   A.    That's right.  What you can see on the screen is exactly

25   what you see if you open up that Excel spreadsheet, it's

1    simply a list of Bates numbers.

2    Q.   Okay.  Now, you've had an opportunity to go back -- I'm

3    kind of jumping ahead here, but we know what the Bates number

4    was for the McAlexander report; is that correct?

5    A.   I know what it is, yes.

6    Q.   Do you remember it off the top of your head?

7    A.   I think it's ST200646 through ST 200760.

8    Q.   Okay.  And that's what I have it down as, as well.

9    A.   Okay.

10   Q.   Have you had a chance to check whether or not it's

11   actually listed on this --

12   A.   It's not listed on this spreadsheet.

13   Q.   Okay.

14        So at least -- when she sends this to you, you still

15   don't know about the McAlexander report, do you?

16   A.   No.

17   Q.   And even if it had been spelled out it's still not on

18   the spreadsheet, is it?

19   A.   No, it's not.

20   Q.   And when you get this you're out of town, Michael Lang

21   has sent an email, as we've seen on that next day on that

22   Friday morning, you get back in town on that following

23   Monday; is that correct?

24   A.   I believe that's correct.

25   Q.   If we can turn back to Gruber Hurst Exhibit 12.

1        We see on page 2 -- kind of going up the chain there's

2    an email that Ms. Ryan pens to Michael Lang, copies you,

3    says, "Michael, thank you for your email, please advice as to

4    when we can expect to receive the agreements identified

5    below.

6        "Also, T-Netix's discovery responses stated that some

7    materials related to prior art, validity, and enforceability

8    would not be produced absent court order.  Please advise

9    whether these materials will be produced pursuant to the

10   protective order in place or if it is necessary to involve

11   the court."

12       And at that point is when you're back in the office and

13   you respond to this email, as we see in the email right above

14   it, where it says, "Christina, I will call you to discuss

15   this in more detail tomorrow morning.  Lattice has indicated

16   that it will not be producing a witness," blah, blah, blah,

17   blah, blah.

18       "Best regards, Tony."

19       Is that correct?

20   A.   Yes.  We had been trying to set up some third-party

21   depositions.  We sent out some notices.  But as I'm telling

22   her the respondents to the notices not going to be available

23   on those particular dates.

24   Q.   Okay.  And then if we can just take a look at the first

25   page of Exhibit 12.  So true to what you said on the 23rd is

1   you do call her back.  And in this email Christina is

2   summarizing or confirming that conversation.

3       "Tony, it was good speaking with you this morning.  I

4   spook with one of our E-Discovery paralegals and we can

5   simply delete the privileged documents from the production

6   off our system.  This appears to be the most efficient way to

7   address the issue, as we have already uploaded the majority

8   of the production.  Please provide a privilege log with the

9   relevant document numbers as soon as possible."

10      Is that correct?

11  A.   That's what she says.

12  Q.   So is that correct, Tony, that that morning basically

13  y'all agreed that you would put together essentially a

14  privilege log that responded to her telling you that you

15  might have some documents that you need to claw back?

16  A.   That's correct.

17  Q.   Okay.  And is that what you start to do?

18  A.   Yes.

19  Q.   Okay.  And tell the court in that regard -- the

20  McAlexander report is not even on there, okay, so we haven't

21  even gotten into the McAlexander report yet.

22      What is it that you start to do in order to be able to

23  provide that privilege log?

24  A.   Well, I know that I produced the documents that were

25  produced in the Global case.

1   Q.   Right.

2   A.   So my first -- the first thing that comes into my head

3   is, well, I need to get a copy of the privilege log that was

4   used in the Global case and see what -- what's on it.

5   Q.   Okay.

6   A.   And sort of compare it to what I just received from

7   Christina.

8   Q.   Okay.  So do you get the privilege log?

9   A.   I do.  I asked Michael Lang if he could dig it out.  I

10  knew that he worked on Global, asked if he could dig it out

11  and send it to me.

12  Q.   And if we look at Gruber Hurst Exhibit 11, we see that

13  Mr. Lang is sending on August 1, 9:55 a.m. privilege log and

14  the file name is 26918_1.doc; is that correct?

15  A.   That's correct.

16  Q.   And we actually have a copy of that document.

17       If you could turn to tab I believe it's 26.

18  A.   I've got it.

19  Q.   Okay.  And is this a true and correct copy of the

20  privilege log that was sent to you by Mr. Lang?

21  A.   Yes, it is.

22  Q.   Now, this one was not executed or signed; is that

23  correct?

24  A.   This one, as you probably saw from the email, this was

25  sent to me electronically.

1  Q.   Okay.  So this was just a copy of the one that was

2  ultimately produced in the Global case?

3  A.   That's -- that was my understanding.

4  Q.   Okay.  So if you can just pull that document out from

5  the binder.

6      Just so we can give the court kind of sort of the

7  magnitude of this document let's just flip through.

8      It's quite a number of pages, right?

9  A.   It's 41 pages if you include the certificate of service

10  and the signature block.

11  Q.   And how many documents are listed on the priv log in the

12  Global case?

13  A.   It's 288.

14  Q.   Okay.  And so you've got 288 documents that are

15  designated as privileged, you've been told by Christina Ryan

16  that you may have an issue, so what do you do next?

17  A.   Well, I want to know -- obviously this is a privilege

18  log, I just want to check whether -- whether anything that's

19  on the privilege log was included in the production that we

20  have made to Global -- to Combined.

21  Q.   Okay.  This sounds like a pretty painstaking process?

22  A.   Yeah.  I mean, it was -- it's a big document.  It wasn't

23  something that you could do in a few minutes.  It's a long

24  process.

25  Q.   Okay.  So you get this on the 24th, right?

```
 1   A.   That's correct.
 2   Q.   Okay.  And you heard Ms. Clouston earlier, she testified
 3   that sometime on the 24th is when the two of you talked; is
 4   that correct?
 5   A.   Yes.
 6   Q.   At the time that you talked with Ms. Clouston do you
 7   know about the McAlexander report?
 8   A.   No.
 9   Q.   You're positive?
10   A.   I'm positive.
11   Q.   One hundred percent positive?
12   A.   Yes.
13   Q.   Okay.  Now, if you dig through this privilege log from
14   the fourth amended privilege log, ultimately you would find a
15   document that is called the rebuttal report of Joe -- is it
16   Joe McAlexander?
17   A.   Yeah.  I think it -- you can see it on page 23.
18   Q.   All right.
19   A.   Right at 166.
20        MR. MATEJA:  Let's turn to page 23 if we can, Bev.
21   BY MR. MATEJA:
22   Q.   It's number 166 on the priv log; is that correct?
23   A.   That's correct.
24   Q.   So it's roughly kind of right in the middle of this
25   privilege log; is that right?
```

```
 1   A.   Yeah, give or take.
 2   Q.   Okay.  Now, when you -- okay.  I'm just looking at this.
 3   There's nothing in here that talks about invalidity
 4   contentions, is there?
 5   A.   That's correct.
 6   Q.   Okay.  Would you have any reason to know that this had
 7   anything to do with invalidity?
 8   A.   I have no reason to know that, no.
 9   Q.   I mean, even if for some reason you had looked at this
10   and gone, aha, the Joseph McAlexander report.  You had never
11   heard of the report before, you had no idea it related to
12   invalidity contentions?
13   A.   That's correct.
14   Q.   So when you're talking to Ms. Clouston about having to
15   get invalidity contentions it has nothing to do with this
16   report, does it?
17   A.   No.
18           MR. COOTER:  Objection to the leading.  All of
19   these questions are leading.
20           MR. MATEJA:  I'll rephrase, Your Honor.
21           THE COURT:  You volunteer.  I never rule, you just
22   volunteer.
23       Go ahead.
24   BY MR. MATEJA:
25   Q.   When you talk with Ms. Clouston, okay, are you calling
```

1   her because of the McAlexander report?

2   A.   I called her -- this is why I called her:  I knew that

3   Demarron at my instruction had sent a letter to VAC asking

4   for consent to produce copies of two documents, the

5   settlement agreement in the VAC case and the patent license

6   agreement that was signed in conjunction with that settlement

7   agreement.   I knew that we had not received a response

8   from VAC.  We sent the letter on the 9th of August.  And now

9   it was the 24th of August.

10      As you saw from some of the correspondence, Combined was

11  asking us about those documents.

12      I knew -- I knew that Stephanie had previously

13  represented VAC.  And I knew Stephanie from other cases that

14  we had been involved in on the other side.  So I thought why

15  don't I just call her and see if she can move the ball along.

16      So I did.  And that was -- I just called her to see if

17  she could get her client to focus on this issue.

18  Q.   Okay.  And we see it the very next day that there is an

19  email from you to Ms. Clouston which has been introduced as

20  Gruber Hurst Exhibit 13 --

21          MR. MATEJA:  And, Bev if we could pull that up, in

22  particular the second page.

23          THE WITNESS:  Could you tell me which exhibit

24  number?

25          MR. MATEJA:  Yes.  It's Gruber Hurst Exhibit 13.

1      If we can blow that up, Bev, the paragraph.

2  BY MR. MATEJA:

3  Q.   And could you read that to the judge, Tony?

4  A.   Yes.

5      "Stephanie:  Thank you for taking the time to a talk to

6  me last night.  I have attached a copy of the letter that my

7  colleagues we want to VAC's CEO earlier this month.  Please

8  would you follow-up with VAC and let me know as soon as you

9  can what its position is with regard to our clients producing

10  the two cases identified above marked as confidential -

11  attorneys eyes only the agreements identified in the letter.

12      "Also, please let me know whether VAC is agreeable to

13  our client disclosing to these defendants VAC's invalidity

14  contentions that were served in its litigation with our

15  clients.  I have not seen these contentions because of the

16  prohibitions contained in the protective order, but I

17  understand they were designated as confidential under the

18  protective order in place in that litigation.

19      "I appreciate your assistance.  Please call me if you

20  have any questions."

21  Q.   All right.  Now, you used the term "invalidity

22  contentions."  What are you mean by that term?

23  A.   Well, I mean, what Ms. Clouston talked about his

24  morning.  Typically an accused infringer would file in the

25  patent case in which it states forth -- it sets forth its

1   contentions as to why the asserted patent claims are
2   invalid.
3   Q.   All right.  Now, when you're using the term "invalidity
4   contentions" and the fact that they were subject to a
5   protective order, in your mind does that have anything to do
6   with the McAlexander report?
7   A.   No.
8   Q.   Okay.  But you do have an understanding that there was a
9   protective order in place in the VAC litigation?
10  A.   Yes.  And I understood that the invalidity contentions
11  that had been served by VAC in those proceedings had been
12  marked as confidential under the protective order.
13  Q.   Okay.  And it's not uncommon in the cases that you deal
14  with for protective orders to be in place, is it?
15  A.   I would say it's invariable.
16  Q.   Okay.  So it's -- it's commonplace that you're going to
17  have documents that are subject to the protective order that
18  you need to pull together to respond to discovery requests.
19  A.   That's right.
20  Q.   So we've talked about the conversation with
21  Ms. Clouston, but obviously, Tony, you've got a job to do.  I
22  mean, you have got to get a privilege log now to Christina
23  Ryan over at Stites & Harbison because you've got a potential
24  claw back issue --
25  A.   He has an objection.

1          MR. COOTER:  I'll let him finish.  I didn't mean to

2     interrupt.

3     BY MR. MATEJA:

4     Q.   What do you do next?

5          MR. COOTER:  I object as compound and leading.  He

6     really shouldn't lead this witness this way on these issues.

7     It's got about 16 clauses in it.

8          THE COURT:  Okay.  I thought he was recapping the

9     testimony and then asking a question.

10         Would you repeat that.  Can you repeat that?

11         THE WITNESS:  I wish you would because actually I

12    got distracted by seeing Mr. Cooter stand up and I wasn't

13    listening.

14    BY MR. MATEJA:

15    Q.   Okay.

16         You know what --

17         MR. COOTER:  I'm short, not to worry.

18    BY MR. MATEJA:

19    Q.   Tony, I really didn't need to summarize that testimony.

20    But all I really wanted to ask you was:  What did you do

21    next?

22                        (Laughter.)

23         But I did.

24    A.   I had spoken to Christina Ryan.  She had raised the

25    possibility that we had produced -- inadvertently produced

1   privileged documents.  When I had that conversation with her

2   I had to do an investigation to assure that was the case.

3       But the agreement we came to over the telephone and she

4   confirmed it in the email was that I would figure out if we

5   produced privileged documents that we needed to snap back and

6   I would create a privilege log and I would send it to her and

7   that she would then delete the documents that were on the

8   privilege log from their database.

9       Because she had told me that they had already loaded the

10  majority of the documents that we had sent on the hard drive

11  and then she would send me back the hard drive.

12  Q.   Okay.  And if we look at Gruber Hurst Exhibit 14 which

13  has already been introduced into evidence and if we take a

14  look at -- basically let's look at the header and the first

15  paragraph.

16      It's an email from you to Christina Ryan dated August

17  the 25th, the same day as your confirmatory email to

18  Ms. Clouston.

19      It says "Christina:  As I stated over the telephone

20  yesterday, as a result of your recent inquiry, we have

21  discovered that a batch of privileged documents appear to

22  have been inadvertently included on the hard drive that we

23  sent you earlier this month.  We are developing a preliminary

24  privilege log identifying these documents, which I anticipate

25  being able to send to you tomorrow.  Once you received the

 1    log, please take immediate steps to delete the identified
 2    documents from your database.
 3        "Also, please return the hard drive to me once you are
 4    done with it.  I appreciate your cooperation."
 5        Did I read that correct?
 6    A.   Yes.  And -- and having read that, I have to correct
 7    what I just said, because obviously I did tell her during the
 8    conversation that I determined we had produced some
 9    privileged documents.
10    Q.   Okay.  But you're still in the process of putting
11    together a preliminary privilege log; is that correct?
12    A.   That's correct.
13    Q.   You say you're going to get it to her the next day but
14    it actually takes you two days to do it; is that right?
15    A.   Yeah.  I don't -- the privilege log is not completed
16    until the 27th.
17    Q.   All right.  So describe to the judge what you had to do
18    with this 40 page, 244 entry privilege log to figure out
19    whether documents that Stites & Harbison had are documents
20    that are on the priv log.
21    A.   Well, obviously it's a privilege log.  It's not a snap
22    back log.  So the first thing I have to do is figure out --
23    Q.   Now, when you say "snap back" does that mean claw back?
24    A.   Yes.
25    Q.   Okay.

1    A.    I have heard people say "snap back."

2    Q.    Okay.  I just want to make sure we've got our

3    nomenclature the same.

4    A.    Okay.

5         So I can't assume everything on the privilege log has

6    been produced.  I need to find out whether anything on the

7    privilege log has been produced.

8         So I think the first thing I did was I skinnied down

9    that 41 page privilege log that we've just seen into a

10   much -- well, I say a much shorter document, it was a

11   document about half the size and it had maybe about 130

12   entries on it.

13   Q.    Okay.  And then what do you next?

14   A.    Well, then I have to look at those documents to figure

15   out, okay, they've been -- they were on a privilege log

16   originally, they have been produced, do I want to assert

17   privilege and claw them back --

18   Q.    Okay.

19   A.    -- in the Combined litigation.

20        My inclination was not to want to claw back 133

21   documents unless I had to.  So I set about reviewing the

22   documents to see what their content was, to determine whether

23   or not they were -- truly were privileged or whether their

24   content was so insignificant that it was not worth snapping

25   them back.

```
 1    Q.    Okay.  And then what do you do next?

 2    A.    Well, I -- I got it down to about 15 documents that I

 3    felt needed to be snapped back.

 4    Q.    Okay.

 5    A.    In the process of doing that I looked at this -- I

 6    noticed that there's this thing -- there's this thing called

 7    the McAlexander rebuttal report.  And in the -- in the

 8    privilege logs that I got from Michael Lang it was stated

 9    that it was privileged, attorney work product, which caused

10    me to scratch my head a little bit because I had trouble

11    understanding why an expert report would be marked as

12    privileged.

13    Q.    All right.  And so what do you do next?

14    A.    So I went to talk to Michael Lang.

15    Q.    All right.

16    A.    And I said, look, can you help me out, I'm going through

17    these documents, there's one here called an expert report and

18    yet it says it's privileged, can you explain.

19         At that point he said, well, it's not privileged, it was

20    subject to a protective order and we weren't supposed to have

21    it and we snapped it back.

22    Q.    Okay.  Is that the extent of the conversation?

23    A.    Yeah.  It wasn't much more in depth than that.  My

24    concern was do I have to snap this back, and if I do, what is

25    my basis for snapping it back.  I knew -- understood it
```

1   wasn't privileged.  What I am now told is it's subject to a
2   protective order.
3        So what I did in this sort of evolving privilege log is
4   I took out the reference to it being privilege and I put in
5   that it was confidential subject to a protective order, or
6   words to that effect.
7   Q.   You could have left it as privileged, that would have
8   been incorrect though.
9   A.   I don't think I could have left it the way it was
10  because that wouldn't have been correct.  I mean, I'm trying
11  to -- I'm sending a privilege log to Christina Ryan on the
12  basis of which she is going to give me documents back --
13  Q.   Right.
14  A.   So I want to make sure that it's an accurate log.
15  Q.   Right.  Okay.
16  A.   And this document is not privileged but I have -- but I
17  still have to snap it back because I'm told it's subject to a
18  protective order.
19  Q.   Okay.  And ultimately do you put together this kind of
20  skinnied down privilege log and send it to Christina Ryan?
21  A.   On the 27th of August --
22  Q.   Okay.  And let's take a look at Gruber Hurst Exhibit 15,
23  which has been previously admitted.
24  A.    Okay.  So on the 27th of August I send a letter Joel
25  Beres and Christina Ryan, counsel for Combined.  And I'm

```
 1   basically sending them the -- the privilege log that she had
 2   requested.
 3   Q.   Now, correct me if I read this wrong, you're sending it
 4   to Christina, sending it to Beres.
 5        "Dear counsel:  Following my recent discussion with
 6   Christina Ryan regarding our inadvertent production of
 7   privileged documents in this litigation, I have enclosed a
 8   preliminary privilege log identifying the documents or pages
 9   of documents that we wish to snap back and require you to
10   remove from your database.  Please note that item 1 on the
11   log is not being snapped back on the basis of attorney-client
12   privilege or attorney work product.  Rather, this is a
13   document relating to invalidity contentions that is protected
14   from disclosure by a protective order in prior litigation
15   involving our client, but was inadvertently included in our
16   document production.  As indicated in previous discussion, we
17   are willing to produce this document to you pursuant to a
18   court order or with the consent of the party whose
19   confidential information is referred to in the document,
20   namely, Value-Added Communications, Inc., VAC.  We are in
21   discussions with VAC and will let you know its position as
22   soon as we can."
23        The next paragraph reads, "Please confirm promptly that
24   you have deleted all copies of the documents identified in
25   the enclosed privilege log.  If you would like us to provide
```

**VAC App. 305**

```
 1   replacement copies of any of the documents with respect to
 2   which only some pages have been snapped back, please let me
 3   know."
 4        And -- and I think that's all we need to look at right
 5   now.
 6        So you actually attached the privilege log, which has
 7   been marked as Gruber Hurst Exhibit 16-A -- excuse me --
 8   15-A?
 9   A.   Yes.
10   Q.   And you've got that in front of you, do you not?
11   A.   I do.
12   Q.   And let's take a look at the third page, which would be
13   the first entry on that log.
14        And you're not trying to hide anything.  You have the
15   McAlexander report number 1.  Is that correct?
16   A.   That's correct.
17   Q.   And, in fact, you're not saying it's privileged or work
18   product protected, you're saying it's covered by a protective
19   order; is that correct?
20   A.   That's right.
21   Q.   Okay.  And we see the Bates numbers there are which the
22   same numbers you told us a little bit earlier, which were not
23   on Ms. Ryan's log; is that correct?
24   A.   That's correct.
25   Q.   I mean, the truth is that you could have buried this
```

 1    document if you wanted to, Tony; is that right?

 2              MR. COOTER:  Objection to the form of the question.

 3              THE WITNESS:  I --

 4              MR. MATEJA:  Hold on just a second.

 5              THE COURT:  Overruled.

 6              MR. MATEJA:  I could not bury it because I -- I was

 7    being opened about what it was.  I mean, it's not in my

 8    nature to bury it.  That's not the way I operate.

 9    BY MR. MATEJA:

10    Q.    Suffice it to say though that this letter spells out

11    what the document is, that it was subject to a protective

12    order; is that right?

13    A.    Yeah.  What I was trying to do in this letter, and I

14    think I did it successfully, was to say I am snapping this

15    document back but I'm not snapping it back on the basis of

16    privilege, I'm snapping it back because it's subject to a

17    protective order.

18         I didn't want there to be any doubt as to the basis for

19    which I was snapping it back.

20    Q.    Okay.  Now, when you sent this letter to the two

21    lawyers, what was your expectation -- just your expectation

22    as to what would happen next?

23    A.    Well, my expectation was that they would press to get a

24    copy of it, because, as I said in my letter, it seemed to me

25    related to invalidity contentions.

1   Q.   All right.

2   A.   And we had already been -- already been talking about

3   invalidity contentions per se, and Christina was anxious to

4   know when -- when they were going to be getting that kind of

5   stuff.

6   Q.   Okay.

7   A.   So my expectation was that this would just result in

8   them pressing for the document and that we would resolve the

9   issue one way or the other.

10  Q.   But in order to have been able to have given them that

11  document what would you have had to have gotten?

12  A.   Well, I would have had to get consent from VAC --

13  Q.   All right.

14  A.   -- or a court order.

15  Q.   Okay.  And did you expect that at some point in time in

16  the future that you were going to have to get back in touch

17  with VAC?

18  A.   Yes.  I mean, since they had asked for this and since it

19  was obvious that it existed.  They didn't ask specifically

20  for the report but since they asked for prior art information

21  and since I had made it clear in my snap back that I was

22  taking back a -- a report that related to invalidity issues,

23  my expectation was that they would want a copy of that, even

24  though I snapped it back.

25  Q.   Okay.  Now, you told the court that Mr. Lang had told

1    you that you weren't supposed to have that document?

2    A.    Yes.

3    Q.    Is that what I heard?

4    A.    Yes.

5    Q.    Okay.  Did you feel like at this juncture now that you

6    could just delete any reference to this document in Gruber

7    Hurst's computers or even on the external hard drives?

8    A.    No.  Obviously it was a concern to me that he said we

9    weren't supposed to have it, but the fact is we did have it.

10   And the fact is I had made it very apparent to Combined and

11   to Pinnacle that it existed.  And they had basically given it

12   back to me.  That was my point was I said you have to give it

13   back to me.  They sent me back the hard drive.  So I have it.

14        At that point I don't feel comfortable destroying it

15   because there could be exfoliation issues.  If Combined or

16   Pinnacle then move the court to compel its production I don't

17   feel at all comfortable going to the judge and saying, well,

18   I used to have it but I've since destroyed it.

19   Q.    And did you feel as though that document was indeed

20   responsive to live discovery requests made by Combined and

21   Pinnacle?

22   A.    Yes, because they had asked for anything that indicated

23   the existence of prior art or -- you know, I think it was

24   items 13 and 14 of the request.

25        If I had been in their shoes I would have been

1    interested in getting a copy of that expert report because it

2    would be relevant to invalidity issues in the case.

3    Q.   Now, ultimately you do hear back from the lawyers that

4    represent Pinnacle; is that correct?

5    A.   That's correct.

6    Q.   And in front of you is Gruber Hurst Exhibit 16.  Is this

7    the email that you receive from the law firm representing

8    Pinnacle?

9    A.   That's correct.

10   Q.   And could you just read it?  It's pretty short.

11   A.   Yes.  It's from Alan Seutter to me.

12        He says, "In response to your August 27th, 2010 letter

13   to Frank Cimino and Jon Falkler regarding drawback of

14   inadvertently produced documents by T-Netix, we confirm

15   destruction of the specified ranges from our files, including

16   images and associated text."

17   Q.   Now, in addition to hearing from the law firm

18   representing Pinnacle, I mean, you've actually had a number

19   of conversations with Christina Ryan by this point in time,

20   correct?

21   A.   Yes.

22   Q.   And what has she indicated that she was going to do?

23   A.   She indicated that once she got the privilege log she

24   would have the documents listed destroyed -- you know,

25   deleted from her database --

1  Q.   Okay.

2  A.   -- and would send me back the hard drive.

3  Q.   And does she send you a letter on the 24th marked as

4  Government's Exhibit 17, which is previously admitted?

5  A.   That's correct.

6  Q.   And could you read that to the court, please?

7  A.   "Dear Tony:  Enclosed please find CPC's supplemental

8  responses to interrogatories numbers 2 and 4 as well as CPC's

9  supplemental document production number CPC00740-7069.  Note

10  that the supplemental document production is designated

11  'confidential - attorneys eyes only' under the protective

12  order.  We also return the external hard drive bearing

13  plaintiff's document production, per your request."

14      "Should you have any questions, please feel free to

15  contact us."

16  Q.   So you have gotten this letter.  You have already talked

17  to Ms. Ryan.

18      Did you actually go the extra mile to confirm that they

19  had destroyed this document?

20  A.   I did, because -- fast-forwarding a little bit now, but

21  in August, late August 2012, with the consent of Mr. Kula,

22  T-Netix and Securus sent me copies of the -- the motion to

23  reopen the case.

24      In fact, they may have come directly from Mr. Kula's

25  office.  I can't remember.  But I couldn't see them at first

1   because everything was under seal.  But with the requisite

2   consents I got a copy of the -- the papers that be had been

3   filed in this case.

4       And when I read those papers, it -- it -- it seemed to

5   me that what was being said was in understanding all these

6   claw-back efforts that Ms. Clouston, who was Ms. Ryan's

7   successor counsel, had a copy of this document.  And I

8   couldn't understand how that could be, because Christina Ryan

9   had already confirmed to me that it had been destroyed.

10      So I contacted Mr. Beres.  I said, look, it's important,

11  I know you've already confirmed this once but I want you to

12  redouble your efforts and call me back and let me know,

13  confirm that you have in fact done this.

14      And he actually went to quite some efforts, because

15  Christina Ryan had -- she was unmarried when I was litigating

16  against her, she subsequently got married, had a family, she

17  left the practice of law.  But Mr. Beres called me and told

18  me that he had tracked her down and talked to her and he

19  confirmed over the telephone that they had indeed complied

20  with the claw-back request.

21  Q.   Okay.  Now, Ms. Clouston says that she actually saw the

22  document.

23      Did you hear that testimony?

24  A.   I did hear her say that, yes.

25  Q.   Okay.  But yet we're hearing from Ms. Ryan, Mr. Beres,

1    we've got a letter that says that the document was destroyed;
2    is that correct?
3    A.    That's correct.
4    Q.    Okay.  Do you know which version is correct?
5    A.    Well, I don't know.  But -- well, I -- I -- I believe
6    what Christina Ryan told me.  I believe what Joel Beres told
7    me.  I -- I don't know what to make of what Ms. Clouston
8    said.
9    Q.    Okay.  And in that same vein, Ms. Clouston also said
10   that she told you in one of two conversations about the
11   contempt proceeding.  Is that statement true?
12   A.    Absolutely incorrect.
13   Q.    Okay.  She didn't tell you anything about the contempt
14   proceeding in any conversations you had with her?
15   A.    No.  Her -- her testimony was interesting, because --
16   because she had assumed that I was talking to her about an
17   expert report that I knew nothing about.  And because she
18   said that I was talking about an expert report she said that
19   -- that she told me that that expert report had been the
20   subject of a previous proceeding.  But I hadn't called her
21   about an expert report.  I didn't know an expert report
22   existed.  She and I did not discuss an expert report.
23        So all I can assume is that her testimony that she told
24   me there had been a previous proceeding was a misrecollection
25   of events.

VAC App. 313

1   Q.   Tony, when -- when you got the -- when you heard about

2   the motion to reopen that's given rise to this proceeding, I

3   mean, tell me what your immediate thoughts were.

4   A.   When I saw the motion?

5   Q.   Yeah.  Um-hum.

6   A.   Well, I was very concerned about it.

7   Q.   Okay.  Was that the first you had heard about it?

8   A.   Yes.

9   Q.   So nobody from VAC called you up and said what are you

10  doing with this document?

11  A.   No.

12  Q.   And when you get that motion to reopen, what do you set

13  out to do?

14  A.   Well, I want to make sure that -- that my firm does

15  whatever needs to be done to allay the concerns that were

16  expressed in the motion.

17  Q.   All right.

18  A.   I mean, I had some concerns about what was being alleged

19  because it didn't gel with what I understood had happened,

20  but I understood that they were saying that this document was

21  still out there, so I wanted to reach out to VAC's counsel

22  and try to resolve the issue.

23  Q.   And did you do that?

24  A.   I did.

25  Q.   And what happened?

1   A.   Well, Jeff Lowenstein and I visited the law firm of

2   McDole Williams on the 7th of September and we had a meeting

3   with Mr. Kula and Mr. Williams in person.  And then -- I -- I

4   thought that was going to be the -- the people involved in

5   the meeting.  But what actually happened is that when we got

6   into the conference room Mr. Cooter and Ms. Mangold were

7   joined by teleconference.

8   Q.   Okay.  And what was the result -- what -- what did you

9   offer in that meeting is probably the first question?

10  A.   Well, what I offered was to do what they wanted us to do

11  to alleviate what they thought was some risk of ongoing harm

12  to their clients.  So it was kind of an open-ended approach.

13       But specifically what I was willing to do, given that

14  they had made it -- that they had indicated in their

15  pleadings that Ms. Clouston had a copy of this document --

16  and also implied that her client, Combined, had a copy of it.

17  And they reiterated that belief in the phone conversation.

18       I offered to take whatever steps were necessary to

19  ensure in the Combined case that Ms. Clouston complied with

20  the protective order.  Because we had a protective order in

21  our case, too.

22  Q.   All right.

23  A.   And the protective order we had in our case would have

24  not permitted her to give a copy of that document to her

25  client.

1  Q.   All right.

2  A.   Because the document had been marked as attorneys eyes

3  only.  So I offered to take whatever steps we needed to take

4  proceedings in that case to ensure that this document was not

5  misused.  And Mr. Cooter told me that I didn't need to do

6  that because he could handle Ms. Clouston.

7  Q.   So to that end there's actually a letter that you

8  jointly write with Mr. Lowenstein which is marked as Defense

9  Exhibit 18; is that correct?

10      I'm sorry -- yeah, 18.

11 A.   We did -- yeah, we did send that letter.

12 Q.   And the gist of this letter is -- I'm just going to

13 summarize here, because it's a pretty lengthy letter, but --

14 and correct me if I'm wrong, is that you're saying that you

15 have heard from VAC who believes that Ms. -- Ms. Clouston is

16 in possession of the McAlexander rebuttal report; is that

17 correct?

18 A.   That's the gist of it.

19 Q.   Okay.  And then what else -- just kind of summarize what

20 the letter says thereafter.

21 A.   Well, we were basically asking her to -- we're --

22 basically, if you look at page -- the second page.  Paragraph

23 in the middle --

24 Q.   Okay.  And let's just read that to the court.

25 A.   Yeah.

1      "As stated above, we are surprised to learn from current

2   counsel for VAC that you possess a copy of the McAlexander

3   rebuttal report.  VAC's counsel has alleged it is concerned

4   that Combined, a competitor of VAC, would have access to the

5   allegedly confidential information contained in the

6   McAlexander rebuttal report.  As you are aware of, and

7   subject to, the protective order, and as a result of your

8   continuing obligations to VAC, as its prior counsel in the

9   Northern Distrct of Texas litigation, there is no

10  justification for your failure to immediately purge the

11  McAlexander rebuttal report from your files.  If VAC's

12  counsel is incorrect and you are no longer in possession of

13  the McAlexander rebuttal report, please so confirm.

14  Additionally, please conduct an additional review of the

15  production and file in the Combined litigation and confirm

16  that the report, including all hard copies, electronic

17  copies, and any related metadata, has in fact been completely

18  purged."

19  Q.   Okay.  So you send that letter and you got get a

20  response from Ms. Clouston; is that correct?

21  A.   We -- Yes.  We did get a response.

22  Q.   And that response is marked as Gruber Hurst Exhibit 19

23  which was previously admitted.  Is that correct?

24  A.   That's correct.

25           MR. MATEJA:  And before we look at that document,

1   Bev, if you would, let's go to the second page, and the

2   second and the third paragraphs.

3   BY MR. MATEJA:

4   Q.   You've told the court that you have a meeting with VAC's

5   counsel where the impression is given to you that

6   Ms. Clouston has the McAlexander report.

7        Is that correct?

8   A.   Correct.

9   Q.   Okay.  You write the letter that we saw, which was

10  Exhibit Number 18.  And then the response comes back in from

11  Ms. Clouston.  And in particular let's take a look at really

12  I guess at the second paragraph that's blown up.

13       Correct me if I read this wrong that, "With regard to

14  the cause number 3:09-CV-743 (Louisville), I did discover a

15  copy of the McAlexander rebuttal report included in the

16  discovery materials that I inherited when I took over

17  representation of CPC.  I recognized the document as subject

18  to the protective order.  As a result, the document was

19  segregated and purged from our electronic database and all

20  copies were destroyed.  In addition, I do not have any hard

21  copies of the McAlexander rebuttal report in my possession.

22  Further, I never disseminated the document to anyone at CPC

23  or produced it to CPC or to anyone else."

24       Is that what that says?

25  A.   It does say that.

1  Q.   Does that run counter to what you were hearing on

2  September the 7th?

3  A.   The implication during the conversation on the 7th was

4  that Stephanie Clouston had a copy of it.

5  Q.   This isn't the last word from Ms. Clouston, because

6  there's a declaration in this case.

7  A.   Correct.

8  Q.   You've looked at the declaration?

9  A.   I have.

10  Q.   It's already in evidence.

11      Is there anywhere in that document where she says that

12  she actually discovered a copy of the report, that she looked

13  at it, she had it segregated and purged?

14  A.   Well, no.  I've read it, I don't believe it's in there.

15  Q.   Now, you had the September meeting with counsel for VAC.

16  Do you have an opportunity to talk with VAC's counsel another

17  time to discuss the fact that you have possession of this

18  report?

19  A.   Yes.  You know, there was some briefing that went back

20  and forth, and the first issue for the judge was whether to

21  reopen the case.  And so the first round of briefing was on

22  that issue.  And I thought we were -- you know, based on our

23  briefing and what we understood about the situation was that

24  the -- the judge would not reopen the case.

25      But the judge did reopen the case.  And so that was

1    another round of opportunity to focus on the issue.

2    Q.    Okay.  And so what did you do next?

3    A.    So we decided that we -- you know, talked within the

4    firm and we decided that we should make a proposal to VAC's

5    counsel akin to what they had asked for in their application

6    to show cause, which was that a forensic expert come into our

7    office and look at our server to determine where the document

8    was and how to purge it.  So we offered to do that.

9         And, in fact -- so -- so we had a phone conversation

10   about that on the -- on the 6th of November.

11   Q.    Okay.  And tell us about that phone conversation.

12   A.    Well, it was a conference call.  I know that Mr. Cooter

13   was on the call, I expect maybe Ms. Mangold, I can't recall

14   exactly.

15        Ms. Mangold is shaking her head.

16        Jack Lowenstein was on --

17   Q.    All right.

18   A.    -- in his office.  And in my office it was Mark Shank,

19   one of my partners, and me.

20   Q.    Do you make a proposal?

21   A.    Yeah.  Mark Shank made the proposal.

22   Q.    And what did he propose?

23   A.    He just proposed that we would hire an expert at our

24   firm's expense to come in and find where the document was on

25   our system and -- and purge it.

1  Q.   Okay.  And what was the response to that proposal?

2  A.   Well, Mr. Cooter, I think he may have gone off-line for

3  a few seconds to talk it over, but he came back and said that

4  he wasn't accepting our offer.  He didn't think that it

5  resolved any issue in the -- in the case.

6  Q.   Okay.  Where did you leave things then with VAC's

7  counsel?

8  A.   Well, I think Mark reiterated the offer in somewhat more

9  emphatic terms.

10  Q.   Okay.

11  A.   Mark Shank, because we felt it was a good proposal.

12  Q.   All right.

13  A.   And we thought it had been dismissed too lightly.

14       And Mr. Cooter said, well, why don't you write to me,

15  make your proposal in writing.

16  Q.   And did you do that?

17  A.   I did.  On the 9th of November I sent a letter to

18  Mr. Cooter and I proposed that we go ahead and do what we had

19  suggested.  And -- and I suggested a potential forensic

20  expert to do it, who was Mr. Cowen.

21  Q.   All right.  And this is --

22  A.   I -- I sent Mr. Cowen's resume with that letter on the

23  9th of November to Mr. Cooter.

24  Q.   And if I had marked that resume and put it on the letter

25  I might have gotten it in.

1  A.   You might have.

2                         (Laughter.)

3  Q.   But in any event, Gruber Hurst Exhibit Number 20 is the

4  proposal in writing that follows up the phone conversation

5  that Mark Shank and you have.  And, I mean, I'm just going to

6  read it relatively quickly but not too fast.

7            THE COURT:  What if I told you that I already read

8  it?

9            MR. MATEJA:  Then I'll tell you I'm not going to

10 read it, because I'm moving on.

11 BY MR. MATEJA:

12 Q.   And so the response to that is Exhibit 21; is that

13 right?

14 A.   Yeah, I got an email from Mr. Cooter.

15           MR. MATEJA:  And Your Honor can tell me you've read

16 this one, I'm moving on.

17           THE COURT:  I've read it.

18 BY MR. MATEJA:

19 Q.   All right.  And then there is a response to Number 21 --

20 it's actually not a response, but it's a --

21 A.   Okay.

22 Q.   -- kind of a supplement, which is number 22; is that

23 right?

24 A.   That's correct.

25 Q.   And I will commend it to the court's attention.

```
 1              THE COURT:  Okay.
 2              MR. MATEJA:  Pass the witness, Your Honor.
 3              MR. LOWENSTEIN:  I don't remember the order.
 4       Do I get to go next or does Mr. Cooter?
 5              THE COURT:  If you want to go next.  I was going to
 6   call Mr. Cooter, but if you want to go next.
 7              MR. LOWENSTEIN:  I'll be brief.
 8              THE COURT:  Okay.
 9              MR. LOWENSTEIN:  If I can escape from your jury
10   box, Your Honor.
11                         CROSS EXAMINATION
12   BY MR. LOWENSTEIN:
13   Q.   Mr. Magee, just a few questions.
14        When you were doing this entire document production
15   process in the 2010 time frame, did you receive a copy of the
16   McAlexander rebuttal report from the client, Securus,
17   T-Netix, Mr. Reinhold, Mr. Smith, anyone from within the
18   Securus parties holds?
19   A.   No.
20   Q.   Did you send a copy of it to them?
21   A.   No.
22   Q.   Did anyone from Securus, including Mr. Smith or
23   Mr. Reinhold, ever direct you to produce a copy of the
24   McAlexander rebuttal report to anyone in the litigation you
25   were involved with?
```

1    A.    No.

2              MR. LOWENSTEIN:  Pass the witness

3              MR. COOTER:  I don't know how much time I have.

4         What is your practice here?

5              THE COURT:  Let's see how far we get.

6                        CROSS EXAMINATION

7    BY MR. COOTER:

8    Q.    Sir, it's true, is it not, that at some point you became

9    aware that there was a protective order that had been issued

10   in this case that precluded the dissemination of the

11   McAlexander, whatever the fellow's name, rebuttal report, to

12   anyone other than counsel?

13        You learned that at some point, didn't you?

14   A.    I wouldn't put it quite the way you put it.

15        I was aware that there was a protective order that meant

16   that we shouldn't have given it to Combined --

17   Q.    Said what?

18   A.    There was a protective order that meant we shouldn't

19   have given it to Combined and Pinnacle.  That's what I

20   understood.  So we need to snap it back from them.

21   Q.    Well, and we can agree, can't we, that you did give it

22   to Combined and Pinnacle?

23   A.    Inadvertently.

24   Q.    Gruber?

25   A.    It's Gruber Hurst, actually.

1  Q.  Oh, sorry.  I'm getting -- I'm confusing you -- your

2  firm with a client of mine actually.  His name is Gubler

3  (phonetic).

4      In fact, your law firm did disseminate it, didn't it?

5      That happened?

6  A.  I think that's clear from our affidavits.  We did that,

7  and that was inadvertent.

8  Q.  Now, if I understand this correctly, at some point there

9  was a document production request that comes in from both

10  counsel, the then counsel in the Combined and Pinnacle cases,

11  right?

12  A.  I believe that's correct.

13  Q.  And what was your -- your role on the team, if you will,

14  to respond to that production request?

15  A.  Well, I was -- I was in charge of the -- the effort.

16      I was the -- you know, it was Mr. Gruber's client but I

17  was basically handling the cases and I had a team of people

18  that I worked with

19  Q.  And who else was on the team to -- that was involved in

20  this effort to respond to the document production request

21  from Pinnacle and Combined?

22  A.  It was primarily Demarron Berkeley, who was our

23  associate.  He was our patent associate.  And I would -- I

24  would consult with Mr. Lang from time to time, but he wasn't

25  primarily involved in that.

1    Q.   And is it your practice -- was it your practice at the

2    time to advise -- to instruct people on your team to go out

3    to all involved who might have document -- responsive

4    documents to collect them if they be producible to be

5    produced?

6        By "all involved" I mean all involved to include the

7    clients.

8    A.   Yeah, we would typically work through the client to --

9    to be obtain documents.

10   Q.   Now, and was that done in collecting the documents that

11   ultimately constituted the response to the document request

12   from the Pinnacle counsel and the Combined counsel?

13       Did you follow your normal --

14   A.   Could you say the question again, because I got confused

15   at the end.

16   Q.   I want to strike the question.  I'll shoot it.  It was

17   awful.

18       Was that the practice that you followed, your normal

19   practice in that regard, to respond to these request for

20   production from Combined and Pinnacle?

21   A.   Yeah.  We always work with the client to find out what

22   exists and what's responsive and what is producible, what is

23   privileged, et cetera, et cetera.

24   Q.   And others on your team, not you, are involved in that

25   collection -- that data collection process primarily; isn't

1   that so?

2   A.    I might have been involved, too.  I -- I tend to roll up

3   my sleeves and get involved with projects.

4   Q.    Were you primarily involved in this project for

5   collecting data in connection with the Pinnacle demand or the

6   Combined demand or were others primarily responsible for the

7   collection of the information?

8   A.    I hadn't thought about that.

9         Let me think.

10        I was probably less involved on some parts of it than

11   others, because I do remember setting Demarron the task to

12   reach out to those different parties to see if we could get

13   consent to produce the prior license letters, and he produced

14   those letters that we saw an example of earlier.

15   Q.    And who, if you know, did the other members of your team

16   to use a phrase I hate, reach out to, to collect that data?

17   A.    Who did they reach out to?

18   Q.    Yeah.  Who did they -- who did they go looking for the

19   data from, if you know?

20   A.    Well, our primary point of contact is the -- is

21   Securus's intellectual property manager.

22   Q.    Who is that?

23   A.    Her name is Stephanie Prichard (phonetic).

24   Q.    Okay.  Was he contacted, if you know?

25        And only if you know.

```
 1   A.    Stephanie is a lady.
 2   Q.    I'm sorry?
 3   A.    Stephanie Prichard.
 4   Q.    Oh, I'm sorry.
 5         Was the contact made, if you know, and only if you know?
 6   A.    I know that she was involved in discussions regarding
 7   responding to this discovery request.
 8   Q.    Now, at some point it's true, is it not, that you became
 9   aware of the fact that it had been represented way back in
10   2008 that all of the documents that Grubler Hurst -- Gruber
11   Hurst - I apologize to Mr. Gruber - had been eliminated,
12   destroyed, purged from your database, that that
13   representation had been made by the firm?
14   A.    I saw Mr. Tautfest's letter, and I think I saw it after
15   your client had filed its motion to reopen the case.
16   Q.    You saw what?
17   A.    I saw Mr. Tautfest's April the 16th letter to Bell
18   Nunnally.
19   Q.    Of what date -- what year?
20   A.    2008.
21   Q.    Okay.  And the representation was made that your firm
22   had no such documents or records or copies of documents,
23   electronic or otherwise; is that accurate?
24   A.    Well, I think the letter speaks for itself.  I think
25   what it said was, here, we're handing back the original
```

1    documents that you gave us, we've deleted copies from our

2    database, and we've destroyed working copies.  That's what

3    the letter said.  I didn't write it.  I saw it after you

4    filed your motion to reopen the case.

5    Q.   Now, at some point in 2010, in the August time frame of

6    2010, there are discussions between yourself and Ms. Clouston

7    about these very records that have been subject to the

8    earlier protective order and that have been the subject of

9    the earlier letter saying they're gone.  You had discussions

10   with her about those documents?

11   A.   No, I did not.

12   Q.   In 2000 -- well, let's do it this way.

13        When were the documents.  Give me the dates, sir - WE'VE

14   got an affidavit that you signed, if it would be helpful to

15   you - that suggested that the documents were actually given

16   to counsel for Pinnacle and Combined as of August the 8th?

17   A.   August the 7th was when --

18   Q.   August the 7th.  I was off by a day.

19        Okay.  So by the 7th they're already out the door.

20   A.   Well, you say "they".  I think the document we've been

21   talking about throughout this entire process has been the

22   McAlexander rebuttal report.  That document was included in

23   the production that went out to Combined and Pinnacle on the

24   7th of August, along with about 600,000 other pages of

25   documents.

1   Q.   And you knew that that production and the way that

2   you've described it was discovered were in the hands of the

3   Pinnacle counsel and the Combined counsel no later than the

4   second week of August.  Is that right?

5   A.   I knew that that production had been made.

6        That is correct.

7   Q.   Now, at some point -- and tell me if you can from your

8   recollection, we can look at again some emails if it would

9   help you, you and Ms. Clouston had discussions where you

10  sought to have Ms. Clouston try and get back to voluntarily

11  release documents some of which were included in the

12  documents already out the door?

13  A.   That is incorrect.

14  Q.   In August did you have discussions with Ms. Clouston

15  about VAC voluntarily producing copies of anything?

16  A.   Yes, I did.

17  Q.   What --

18  A.   Actually, let me correct that.

19       What I asked for was whether her client would consent to

20  there being produced.  I didn't ask her for copies of

21  anything.  She said I did, but that's not what I did.

22  Q.   You asked if -- if they would consent.

23       What did you ask her to consent to being with --

24  produced?

25  A.   Well, I didn't ask her to consent to anything.

1    I asked her if she would find out what her client's

2    position was.  We had written a letter to her former client

3    and they hadn't responded.  I asked her if she could find out

4    what their position was.  That was the purpose of my call to

5    her.

6    Q.  When you talked to her and you asked her to find out

7    from VAC whether they would consent to produce something,

8    what was the something you were asking for their consent for?

9    A.  I asked if they would consent to our clients producing

10   three things:  One, the settlement agreement that was entered

11   into in the VAC case; two was the amended patent license

12   agreement that was entered into in conjunction with the

13   settlement agreement in the VAC case; the third thing was the

14   invalidity contentions that VAC had served in the VAC

15   litigation.

16   Q.  Now, would the invalidity documents include, as you

17   believe -- as you use the words, the Alexander (sic) report?

18   A.  It would not.

19   Q.  What did Ms. Clouston say to you when you made this

20   request of her?

21   A.  She said that she would get in touch with her client.

22   Q.  Her client being VAC?

23   A.  VAC.  Her former client.

24   Q.  Okay.  Did she express her view as to whether or not she

25   expected VAC to comply?

1   A.   I do not believe that she did.  I know she testified to

2   that this morning, but that was not my recollection of what

3   she did.

4   Q.   Now, what was your view, if you had one, as to your

5   expectations as to whether VAC would consent?

6   A.   My expectation was that Stephanie would speak to them

7   and get back to me.

8   Q.   Did you have a view one way or another whether or not

9   you expected to get the cooperation of VAC on this issue?

10  A.   I didn't have an expectation.  I was asking for their

11  consent and I hadn't yet received a response.

12  Q.   Now, at some point -- when did you first become aware of

13  the -- the original protective order that had been issued in

14  this case?

15  A.   I think it was probably the 26th of August.

16  Q.   Of 2010?

17  A.   Of 2010.

18  Q.   And how did you first become aware of it?

19  A.   Well, because, as I mentioned earlier to Mr. Mateja, I

20  was scratching my head a bit about this entry on the Global

21  protective -- privilege log about this expert report that was

22  said to be privileged.  So I talked to him about it.

23       And he said it's not privileged, it's subject to a

24  protective order, we're not supposed to have it, we've got to

25  get it back.

1       And that's why in my final privilege log I put subject

2    to a protective order.

3    Q.   And who is it, again, just refresh my recollection, who

4    said we're not supposed to have it?

5    A.   Michael Lang.

6    Q.   An employee of Gruber Hurst, right?

7    A.   Correct.

8    Q.   When he told you that, what did you do in response to

9    his statement that we're not supposed to have it?

10   A.   I snapped it back.

11   Q.   From?

12   A.   From Combined and Pinnacle.

13   Q.   Okay.  I've heard that.

14   A.   You asked me and I -- I answered the question.

15   Q.   What did you do at the time, in 2010, to cure the fact

16   Mr. Lang says we're not supposed to possess it, we're not

17   supposed to have it?

18   A.   I sat on it.  I -- I got it back and I kept it.

19   Q.   Well, then is it so that notwithstanding what Mr. Lang

20   told you, we're not supposed to have it, in 2010 you did

21   absolutely nothing to remedy that problem that you had

22   something that you weren't supposed to have?

23   A.   Well, I had it.  I can't alter the fact that I have it.

24   It's an electronic document.  I can't give it to anybody.  It

25   exists.  I had it and I kept it.

1       And my expectation was that this issue would progress,

2   it would be resolved --

3   Q.   Now --

4   A.   -- promptly, but it wasn't.

5   Q.   -- in -- you had it.  You did nothing to remedy the

6   situation or even attempt to remedy the situation until

7   sometime in 2012, two years later --

8   A.   Well, I disagree with you characterizing --

9   Q.   Listen -- listen -- listen to me, sir.  Let me finish.

10       -- some two years later, after pleadings had been filed

11   in this case to reopen it, isn't that so?

12   A.   What I did was I Clawed it back from the parties I had

13   given it to.  That's what I did.

14   Q.   And kept it.

15   A.   Yes.  It was an electronic document that existed on our

16   computer.

17   Q.   Now, when you -- at any point once you learned that you

18   weren't supposed to have the document from Mr. Lang, as you

19   described it, did you -- and did you also know at that time

20   that this document that you weren't supposed to have had been

21   disseminated in the Pinnacle and Combined cases?

22       Did you know that?

23   A.   I think I discovered that it was one of the documents

24   that had been produced.  That's why I put it on the snap-back

25   log.

1  Q.  Did you tell -- once you knew all of that did you tell

2  Ms. Clouston that, oh, by the way, this -- this document, we

3  have it, which Mr. Lang says we're not supposed to have, or

4  did -- did -- did you do that?  And then it was out the door?

5  A.  I had already spoken to Ms. Clouston the day before, or

6  two days before, I should say.

7  Q.  Did you ever -- did you ever tell her, by the way, I

8  heard we're not supposed to have this, I know it now, too

9  late, we have it and we sent it out.  Did you ever tell her?

10  A.  I didn't have that conversation with her.

11  Q.  Why not?

12  A.  She didn't pursue the issue.  She passed me on to her

13  client and her client told me they were not going to give

14  consent.

15  Q.  Did you ever pass that information along to VAC itself,

16  who's cooperation you were seeking, that you had this

17  document that Mr. Lang says you're not supposed to have and

18  you've already sent it out the door?

19      Did you tell them?

20  A.  I did not tell them.

21  Q.  Why not?

22  A.  I don't know that the opportunity arose.  I mean, I --

23  this was something that I expected to develop and it didn't.

24  I think I would have had that conversation at a point in time

25  in the -- in the near future but the way events occurred it

 1    didn't happen.

 2    Q.   Now, what role, if any, did you have in helping prepare

 3    the opposition to the motion to reopen the case?

 4         Did you -- by way of example did you submit an

 5    affidavit?

 6    A.   I did.

 7              MR. COOTER:  Your Honor, I have a copy of the

 8    affidavit.  It is not marked because I didn't expect this to

 9    go this way.

10         I would like to mark it.  But I don't have extra copies.

11         Do I have extra copies?

12              MS. MANGOLD:  Just those two.

13              MR. COOTER:  Which two?  Show me.

14         The court's indulgence.

15         I've got it.

16         I'd like to mark this one.

17         Do we have any stickers, exhibit stickers?

18         Does the court have one I can steal, borrow?

19              THE COURT:  Did you get one?

20              MS. MANGOLD:  We have it.

21              MR. COOTER:  You want to show that?

22              MS. MANGOLD:  Your Honor, we'll mark that as 16.

23              MR. COOTER:  The court's indulgence.

24              THE COURT:  Sure.

25                        (Pause.)

```
 1   BY MR. COOTER:
 2   Q.   I'm going to show you --
 3             MR. COOTER:  May I approach the witness?
 4             THE COURT:  Yes.
 5   BY MR. COOTER:
 6   Q.   I'm going to show you what we have marked as Plaintiff's
 7   Exhibit 16.  Just confirm for me that that's a true copy of
 8   the affidavit that you filed in connection with the pleadings
 9   to reopen this case.
10   A.   Yes.  It's a declaration.
11   Q.   I called it an affidavit.  I apologize.  I do that all
12   the time.
13             MR. COOTER:  I move 16.
14             MR. MATEJA:  No objections, Your Honor.
15             THE COURT:  It's admitted.
16   BY MR. COOTER:
17   Q.   I want you to take a look at --
18             MR. COOTER:  Is this Plaintiff's 11?
19             MS. MANGOLD:  Yes.
20   BY MR. COOTER:
21   Q.   Plaintiff's Exhibit Number 11, if you would.
22   A.   Which binder is that --
23   Q.   It's in the white book.
24        It's in the white book.
25             THE COURT:  While you're doing that, Mr. Cooter, is
```

1    the affidavit that's number 16 attached to a pleading to do

2    with reopening the case?

3            MS. MANGOLD:  Yes, Your Honor, it is.  It's

4    attached to Exhibit -- or document docket number 220-1 filed

5    on September 28th, 2012.

6            THE COURT:  Okay.  I can look at it that way.

7            MS. MANGOLD:  Thank you.

8    BY MR. COOTER:

9    Q.   Let me know when you have Exhibit Number 11, sir.

10   A.   I have it.

11   Q.   Now, I asked you whether or not the document to include

12   this report were part of the contentions of what we're going

13   to call generically the invalidity questions.

14   A.   Yes.  I remember that question.

15   Q.   And you answered they were not.

16   A.   Correct.

17   Q.   Take a look at -- there's a letter from you, it's in

18   evidence as Exhibit 11, to Christina Ryan and her colleague

19   at Stites & Harbison.  Did you send that letter on or about

20   that date?

21   A.   Yes, I did.

22   Q.   Now, it's dated August the 27th, right about the same

23   time you're talking to Stephanie Clouston about whatever

24   you're talking to her about, right?

25   A.   Say that one more time.

1   Q.   This is within a day or two of these conversations that

2   you're having with Stephanie Clouston?

3   A.   It's a conversation.

4   Q.   In the first paragraph of the letter did you tell

5   Christina Ryan and her colleagues: Please note that the item

6   on the log is being snapped back on the basis of -- is -- is

7   not being snapped back on the basis of attorney-client

8   privilege or attorney work product.  Rather, it is a document

9   related to invalidity contentions that is protected from

10  disclosure by a protective order in the prior litigation?

11       Did you write that?

12  A.   I did write that.

13  Q.   What document are you referring to?

14  A.   In that -- I'm referring to the McAlexander report in

15  that letter.

16  Q.   Well, then which is accurate, what you told Ms. Ryan,

17  that it was part of the invalidity contentions, or what

18  you've told us today, that you don't consider it part of the

19  invalidity contentions?

20  A.   I think you're misconstruing what I wrote and I think

21  you're misconstruing what an invalidity contention is.

22       What I said in this letter is that the document is a

23  document relating to invalidity contentions, and there's not

24  an insignificant distinction.

25       What I was talking about with Ms. Clouston two days

1  earlier, three days earlier, was invalidity contentions,

2  which are a term of art in patent litigation.  They are a

3  document that a party files or serves saying these are our

4  invalidity contentions.  They are not expert reports.  And I

5  was not intending to discuss expert reports with Ms. Clouston

6  in my August the 25th email.  I was intending to address

7  invalidity contentions, period.

8       Now, by the time I write this letter on the 27th I

9  understand that this expert report exists, that it relates to

10  invalidity, that it's been -- I'm snapping it back, but I

11  understand now, on the 27th that this is a document that

12  relates to invalidity.  And I understand -- you're shaking

13  your head, but I haven't finished my answer yet.

14  Q.   I'm -- I'm not --

15  A.   Okay.

16  Q.   Go ahead.

17  A.   And what I'm saying is I'm happy to ask for consent to

18  produce it to you, but I haven't previously asked Stephanie

19  Clouston to give consent to production of the McAlexander

20  report.

21  Q.   Are you finished?

22  A.   Okay.

23  Q.   When you found out, however you found it out, from

24  Mr. Lang that you weren't supposed to have the document, why

25  didn't you just send it back to VAC, all copies, electronic,

1  and printed?

2       Why -- why didn't you just send it back?

3       Why did you keep it?

4  A.   There are a couple of things.

5       There are no printed copies of the report.  I know you

6  keep suggesting there are, but there are not.

7       All there exists is an electronic copy.  I cannot send

8  an electronic copy back to VAC.  I cannot send it back to

9  VAC.

10      I can send them a copy, but I still have what I have.

11      I cannot send it back to them.

12 Q.   Can you delete it?

13 A.   I could delete it.

14 Q.   Why didn't you?

15      When you found out that this had happened, why didn't

16 you?

17 A.   Because its existence was made known to Combined and

18 Pinnacle.  I fully expected them to demand a copy of it.  I

19 fully expected to have to come back to VAC and say these guys

20 are demanding a copy of this, do you consent or not.

21      And I do not want to go to the judge in the Combined

22 case or the Pinnacle case and say I had this document but I

23 destroyed it.

24 Q.   Why didn't you go to the court and tell 'em what had

25 happened, therefore you needed to send it back, delete it,

1   get rid of it?

2        Why didn't you just tell the court?

3   A.   I didn't think I needed to tell the court at that point.

4   This was an ongoing issue which I expected to be resolved.

5   Q.   At all times -- at all times, sir, in connection with

6   your involvement in the things that you've testified to here,

7   confirm for me that you and your law firm were serving as

8   counsel to Securus and VAC at all times.

9   A.   I wasn't counsel for VAC.  I think you misspoke.

10  Q.   Or not VAC.  Thank you.  You're absolutely right.

11       Securus and T-Netix.

12  A.   I was counsel --

13            MR. MATEJA:  Judge, at all times, I'm not sure what

14  at "all times" means.  I just want to make sure I get

15  clarification on it, Your Honor.

16  BY MR. COOTER:

17  Q.   At all times having to do with your involvement in this

18  case as you've testified to it, just confirm for me that at

19  all times your -- who were your clients?

20  A.   My clients were -- let me see.

21       In the Combined case?

22  Q.   Yeah.

23  A.   It was T-Netix, Inc.

24  Q.   Okay.  In the Combined case?

25  A.   T-Netix, Inc.  That's the one I just said.  I'd have to

VAC App. 342

1   look at the pleadings in Pinnacle, but it may have -- it may

2   have been T-Netix, it may have been Securus.  I suspect it

3   was T-Netix.  It may also have been Securus.  I just don't

4   remember.

5           MR. COOTER:  Your Honor, that's all I have of this

6   witness at this time.

7       If I haven't moved 16 I do.

8           THE COURT:  He went second.  It's back to you.

9                   REDIRECT EXAMINATION

10  BY MR. MATEJA:

11  Q.   Tony, at the time that you talked with Michael Lang,

12  okay, in 2010, now, I believe you testified previously you

13  thought that was on the 26th; is that correct?

14  A.   Yes.

15  Q.   Okay.  That's the 26th of what?

16  A.   August, 2010.

17  Q.   Okay.  And obviously you had a lot of time to kind of go

18  back through your records and emails and you kind of pieced

19  things back together; is that correct?

20  A.   Yes.

21  Q.   Okay.  This isn't just something that automatically just

22  came to your mind that, oh my gosh, I had a conversation with

23  Michael Lang on the 26th; is that correct?

24  A.   That's correct.

25  Q.   Okay.  Does he walk through what happened with Judge

 1   Sanderson, anything of that --

 2   A.    No.

 3   Q.    Okay.

 4   A.    I first understood what had happened before Judge

 5   Sanderson when I read VAC's papers.

 6   Q.    Okay.

 7   A.    I had never seen the transcript.  I had never seen the

 8   recommendation.  So I didn't know about that.

 9   Q.    And I mean what you knew back then was what Lang told

10   you?

11   A.    Correct.

12   Q.    And he told you, if I'm remembering this correctly

13   through your prior testimony, was it was subject to a

14   protective order, it needed to be snapped back and we didn't

15   need to have it.  Is that right?

16   A.    That's correct.

17   Q.    All right.  Was that the extent of it to the best of

18   your recollection?

19   A.    Yes.  Because my concern was am I going to snap this

20   back, and if so, on what basis.  So I got the information I

21   needed from him.

22   Q.    You mentioned a couple of times to Mr. Cooter, and I'm

23   quoting, you expected the situation to develop.  Okay.  And

24   that was in reference to the fact that Gruber Hurst possessed

25   the McAlexander report, that it had been snapped back from

1  Combined and Pinnacle, and you expected the situation to

2  develop.

3      Can you kind of further refine that for the judge?

4  A.   Well, I had already had an email exchange with

5  Christina, which I think was in evidence earlier --

6  Q.   Right.

7  A.   -- where she had been following up, okay, what about

8  these license agreements, what about these prior art

9  documents.  And so I knew that they were interested in

10  getting them.

11      I understood by the 27th of August, when I sent the

12  letter to her, that this McAlexander report was something

13  that she would be interested in getting a copy of.

14      And so I assumed that shortly after the snap back she

15  would come to me and say, "Now I want a copy of it, do what

16  you need to do to get it," something to that effect.

17  Q.   Now, obviously that request did not come, did it?

18  A.   It didn't.  And -- and it's kind of interesting.  What

19  happens, as I think Ms. Clouston mentioned, we got into very

20  deep settlement mode in that -- in that case, and we had a

21  long mediation before the magistrate judge out in Kentucky.

22  And, actually, I disagree with Ms. Clouston's

23  characterization of it as unsuccessful.  I think we were on

24  the verge of settling at the end of that meeting and the

25  judge sent us away to, you know, just reflect on it.

1          And so what -- what actually happened was before we came

2     back for our next session Ms. Clouston got involved in the

3     case and the settlement cart -- the settlement carriage went

4     in the ditch.  That's my recollection of what happened.  So

5     we did get into that protracted mode of focusing on

6     settlement.  So I think the parties weren't focused on

7     discovery issues as they otherwise might have been.  But for

8     one reason or another that request that I had anticipated

9     didn't come.

10    Q.    It didn't come in that case or the Pinnacle case, right?

11    A.    It didn't come in the Pinnacle either.

12    Q.    The Pinnacle case actually settled a while back; is that

13    right?

14    A.    Yeah.  I can't remember when that happened.  It was

15    either as Mr. Reinhold said late 2011 or early 2012.

16    Q.    The Combined case, however, continued to continue; is

17    that correct?

18    A.    It did.

19    Q.    And -- and tell us what the status of that is.

20    A.    Well, as -- I think as Mr. Reinhold pointed out, there

21    were a number of cases between T-Netix, Securus and Combined,

22    three, two patent suits, one tortious interference suit, all

23    in federal court in Kentucky.  And we had tried in vein to

24    settle the patent cases on a number of occasions.  But the

25    magistrate judge in the tortious interference case ordered a

1  mediation in that case, and that was conducted by the

2  magistrate judge in the Bowling Green division.  He was able

3  to -- to get the case settled.

4      So on the 5th of February, this year, a mediation

5  agreement was signed by the parties.  And I drafted a very

6  elaborate license agreement to go along with it and it's --

7  that -- that agreement is going back and forth in the course

8  of being nailed down.  In fact, we had a status conference in

9  the Kentucky patent cases a week or so ago at which we

10 explained the status to the magistrate judge there and he's

11 basically entered a docket -- put in a docket entry saying

12 the case has settled, parties are working on the formal

13 settlement documents.  And he's given us until a date in

14 April, I think April the 12th, to file dismissal papers.

15 Q.   As long as either one of those cases existed did you

16 feel as though you could destroy the McAlexander report?

17 A.   No.  I -- I felt I had to -- I had to keep it, so that

18 if -- if the judge in either of those cases ordered that it

19 should be produced that it actually existed.  I don't know

20 that anybody else had it.  I mean, I -- I just knew about the

21 copy I had.

22 Q.   Okay.  And -- and you told the court earlier that you

23 basically sat on the document.

24      Did that -- did you do anything with that document at

25 any other litigation with respect to any third party, with

1  respect to Securus or T-Netix?

2      Did you do anything with the electronic copy, other than

3  sit on it?

4  A.   No.  In fact, I haven't even read the document.

5      And as far as I know nobody that currently works at the

6  firm has even read it or looked at it.

7              MR. MATEJA:  Pass the witness, Your Honor.

8              MR. LOWENSTEIN:  No further questions, Your Honor.

9              MR. COOTER:  No.

10             THE COURT:  You may step down.

11             THE WITNESS:  Thank you.

12             MR. MATEJA:  Gruber Hurst rests, Your Honor.

13             MR. LOWENSTEIN:  Your Honor, I have no witnesses.

14      There is a document which is the settlement agreement

15  we've been discussing -- if I can get out of here I'll

16  approach the podium.

17             THE COURT:  How'd you get stuck over there anyway?

18             MR. LOWENSTEIN:  The very short straw, Your Honor.

19      The settlement agreement we've been discussing between

20  these parties, Your Honor, that resulted in 2008 has got a

21  confidentiality provision in it.  Because it's got that in

22  there and because of the kind of proceeding we're going

23  through anyway I didn't want to pop it out and try to start

24  introducing it.  So I have not had a discussion with VAC

25  about this.

1          There are only a handful of provisions I would like to

2     bring to the court's attention which have to do with the

3     disclaimer of representations that is included in this

4     agreement.

5               THE COURT:  The question is does your -- it's the

6     subject of a protective order?

7               MR. LOWENSTEIN:  No.

8               THE COURT:  Okay.

9               MR. LOWENSTEIN:  It's got a confidentiality

10     provision and it says the court can order me to -- to produce

11     it or -- let me hand it, just so that you guys aren't working

12     in a vacuum.

13          But I can read you the confidentiality provision, if you

14     would like, but it -- it basically says the terms of it are

15     confidential and it can't be produced unless the parties

16     agree to it or -- let me see -- As required by law or a third

17     party to which all or substantially all of its assets are

18     sold.  So I didn't want to offer it.  There are a handful of

19     provisions.   My proposals are to provide the court a

20     redacted version that only has those provisions that I want

21     to rely on with respect to the disclaimer of reliance or read

22     those provisions into the record, whatever satisfies VAC and

23     the court, just so we can get those provisions before the

24     court.

25               THE COURT:  And have y'all talked about it yet?

1          MR. LOWENSTEIN:  We haven't, Your Honor.  I

2     apologize.  It did not occur to me until I was sitting in

3     your jury box exactly what to do with it.  I did bring copies

4     of it in the event it was brought up, but as far as what I

5     really cared about getting in front of you, that was really

6     it.  It -- it -- it's three paragraphs -- well, four

7     paragraphs in the contract that have nothing to do with the

8     financial terms or the license or anything else, so I did not

9     want to give the court the entire thing.

10          MR. COOTER:  Obviously we haven't reviewed it, the

11     first I've heard about it, but we'd have to talk to the

12     client about it anyway.  So we're going to be -- we're going

13     to be making submissions to you over the next couple of weeks

14     and if you would just -- you know, if he gives us whatever it

15     is he wants to do then we can respond to it with you at some

16     time during that next two-week period.  We would be happy to

17     do it.

18          THE COURT:  We -- we can do that.

19        And if it looks like you're not going to be able to get

20     an agreement let me know why it's important in a motion and

21     it could be that you could get the order that you need, if

22     it's -- if you need to.

23          MR. LOWENSTEIN:  I appreciate that, Your Honor.  I

24     just didn't want to close our evidence without leaving that

25     dangling piece of evidence out there.

```
 1              THE COURT:  So dangling.
 2              MR. LOWENSTEIN:  So the Securus parties rest, Your
 3    Honor.
 4              THE COURT:  Okay.
 5              MR. COOTER:  Can we take up just a little
 6    housekeeping, while we have you for a few minutes.
 7         If I understand what you've instructed us to do -- I
 8    just want to make sure that this is what you've instructed us
 9    to do, is that you want briefs by us, and the dates that
10    you've said, on essentially two issues, and that is whether
11    or not a contempt can be rendered against Gruber party -- or
12    excuse me, Gruber Hurst as a nonsignatory to the protective
13    order --
14              THE COURT:  Not quite.
15              MR. COOTER:  Not quite.  Okay.  Well, that's why
16    we're trying to clarify.
17              THE COURT:  In my mind the issue is whether or not
18    Gruber -- Gruber Hurst is subject to it, the provisions of a
19    protective order, and taking into consideration in your
20    brief, you know, the facts that were developed here regarding
21    the previous position VAC has taken.
22              MR. COOTER:  And Gruber Hurst, I suppose.
23              THE COURT:  And whether VAC is estopped now from
24    it, since it --
25              MR. COOTER:  All right.
```

1    THE COURT:   -- it would appear at first blush that

2    a judge relied on those representations, so . . .

3    MR. COOTER:  Right.  Okay.  She's asking further

4    clarification, because she's --

5    THE COURT:  I'm sorry?

6    MR. COOTER:  My partner is asking further

7    clarification because she's got to write the brief.

8    THE COURT:  Got you.

9    MS. MANGOLD:  Was there a second issue, Your Honor,

10   also about the availability of -- in the order here as to the

11   individuals --

12   MR. COOTER:  Well, not just -- it would be as to

13   Smith, Reinhold and the actual signatories to the agreement,

14   which would be Securus and T-Netix.  I mean, they're on the

15   document.

16   Do you need that briefed?

17   THE COURT:  I mean, I'm prepared to go with -- with

18   what I've heard here, but I know that you hadn't heard that

19   argument before this morning --

20   MR. COOTER:  Right.

21   THE COURT:   -- and so my purpose was to give you

22   an opportunity --

23   MR. COOTER:  Okay.

24   THE COURT:   -- to respond to what was -- what was

25   new.

1          MS. MANGOLD:  Thank you, Your Honor.

2          MR. COOTER:  Thank you.

3          THE COURT:  And then -- and then I gave until March

4    8th to respond to any brief that was submitted.

5          MS. BROWN:  Your Honor, just so it seems like

6    that's one issue.

7          And then the second issue had to do with whether a

8    misrepresentation was made to the court?

9          THE COURT:  Right.

10         MS. BROWN:  Do we -- you would like briefing on

11    that if we --

12         THE COURT:  I would.  I -- I -- I want to know, I

13    do.  And I think we probably asked enough questions about it

14    that it's probably clear what I was thinking about it.

15         And I know you've put some evidence in, so if you could

16    discuss that as well as what -- if -- any recourse the court

17    might have -- any recourse the court has, if any, that's too

18    many anys, you know what I mean, to possibly impose sanctions

19    for violation of Judge Sanderson's directive.  In his FCR

20    that's what he calls it, a directive.

21         MS. BROWN:  Right.

22         MR. MATEJA:  Your Honor, just, if you don't mind,

23    to that point, I mean, there's no evidence in the record that

24    either Mr. Tautfest or Ms. Miller didn't do what they said

25    that they did.  And I -- I bet you everybody in this

1    courtroom believes that they believe that they had deleted

2    the document.

3              THE COURT:  Well, there's no evidence in the record

4    that they intentionally or willfully or -- didn't do it.

5              MR. MATEJA:  Right.  Right.

6              THE COURT:  But the fact that it exists I think is

7    circumstantial evidence that it didn't happen.  That's just

8    me thinking based on what I've heard here.

9              MR. MATEJA:  And I agree.

10             THE COURT:  Yeah.

11             MR. MATEJA:  I mean, it's possible that they didn't

12   do that.  It's just that there's no evidence beyond just that

13   circumstance.  And if there was to be a Rule 11 motion for

14   sanctions, for example, that the court -- I mean, that they

15   filed or that you did sua sponte, I mean, as I understand

16   Rule 11 is that there would have to be some sort of intent.

17   There would have to be some sort of willful, deliberate

18   conduct that just is not present in this case.  I mean, we

19   can brief this.

20             THE COURT:  Tell me about it.

21             MR. MATEJA:  I mean, --

22             THE COURT:  Tell me about it.

23             MR. MATEJA:  -- all I'm just going to do is tell

24   you the testimony that we heard and that they didn't put on

25   any evidence to --

VAC App. 354

```
 1              THE COURT:  Okay.  And that would give them a
 2   chance to respond and me a chance to decide whether or not I
 3   agree with you.  That's all I ask, is that you tell me about
 4   it.
 5              MR. MATEJA:  Your Honor, another little
 6   housekeeping matter.  In your binder I have prepared kind of
 7   our position on the legal issues and the facts that I
 8   would --
 9              THE COURT:  It's one of the -- oh, okay.
10              MR. MATEJA:  -- that I would bring to your
11   attention.
12              THE COURT:  Okay.
13              MR. MATEJA:  As you know, I got into this case a
14   little bit later and I think I've been able to kind of refine
15   exactly where we stand.
16              THE COURT:  Okay.
17              MR. MATEJA:  The only thing it doesn't do the job
18   on is estoppel and the issues in front of the court.
19              THE COURT:  Okay.
20              MR. MATEJA:  So we'll -- we'll brief that along
21   with the other issue, but we would commend that position
22   statement to you.
23          And I think -- yes.  And we've given a copy of that
24   position statement as well to opposing counsel and counsel
25   for Securus/T-Netix.  And I think that's it.
```

1          THE COURT:  Okay.  And, Mr. Lowenstein, if you

2   decide that you don't want to brief, don't feel like you have

3   to brief any issue just because you've been a party here.  So

4   it's up to you.

5          MR. LOWENSTEIN:  I appreciate that, Your Honor.

6          THE COURT:  Okay.  Housekeeping matters done, are

7   we ready to adjourn?

8          MR. MATEJA:  Let's call it a day, Your Honor.

9          THE COURT:  Okay.  Well, we are adjourned pending

10  all the submissions we've discussed.

11      And thank you-all.

12                    (End of proceedings.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              INDEX - FEBRUARY 25, 2013

 2     WITNESS NAME                              Page  Line

 3
       STEPHANIE CLOUSTON
 4
          DIRECT EXAMINATION BY MS. MANGOLD................. 12    3
 5
          CROSS EXAMINATION BY MR. MATEJA .................. 44   20
 6
          CROSS EXAMINATION BY MR. LOWENSTEIN ............. 83   21
 7
       DENNIS REINHOLD
 8
          DIRECT EXAMINATION BY MR. COOTER ................. 102   24
 9
       DAVID COWEN
10
          DIRECT EXAMINATION BY MR. MATEJA ................. 147   21
11
          CROSS EXAMINATION BY MR. COOTER .................. 164   20
12
       ERIC TAUFEST
13
          DIRECT EXAMINATION BY MS. BROWN .................. 179   1
14
          CROSS EXAMINATION BY MR. COOTER .................. 205   1
15
          REDIRECT EXAMINATION BY MS. BROWN................ 217   23
16
       LISA MILLER
17
          DIRECT EXAMINATION BY MS. BROWN .................. 219   11
18
          CROSS EXAMINATION BY MR. COOTER .................. 229   11
19
       TONY MAGEE
20
          DIRECT EXAMINATION BY MR. COOTER ................. 236   2
21
          CROSS EXAMINATION BY MR. LOWENSTEIN ............. 289   5
22
          CROSS EXAMINATION BY MR. COOTER .................. 289   25
23
          REDIRECT EXAMINATION BY MR. MATEJA............... 308   25
24

25
```

| Motion | Description | Page | Line |
|--------|-------------|------|------|
| MR. MATEJA | Motion for Directed Findings .... | 116 | 3 |
| MR. LOWENSTEIN | Motion for Directed Findings .... | 119 | 22 |

| Movant Rests | | Page | Line |
|--------------|--|------|------|
| MR. COOTER............................................ | | 116 | 2 |

| Respondent Rests | | Page | Line |
|------------------|--|------|------|
| MR. MATEJA.............................................. | | 314 | 2 |
| MR. LOWENSTEIN......................................... | | 316 | 16 |

SHOW CAUSE EXHIBITS

MOVANT'S EXHIBITS

| Exhibit | Description | Identified | Admitted | Denied |
|---------|-------------|------------|----------|--------|
| 1 | Protective order..... 9 | | | |
| 1 thru 15 | En Masse .............. | | 10 | |
| 10 | 8/10 email ............ 33 | | | |
| 11 | Letter................ 40 | | | |
| 13 | Letter................ 43 | | | |
| 2 | 4/16/08 transcript .. 18 | | | |
| 3 | Sanderson report..... 29 | | | |
| 6 | 4/17/08 letter ....... 28 | | | |
| 7 | 4/18/08 letter ....... 28 | | | |
| 8 | 4/18/08 letter ....... 29 | | | |
| 9 | Correspondence ....... 39 | | | |

**RESPONDENT'S EXHIBITS**

| Exhibit | Description | Identified | Admitted | Denied |
|---------|-------------|-----------|----------|--------|
| GH 8 | RFP ................... | | 66 | |
| GH 9 | 8/9/10 Letter ........ | 62 | | |
| GH 16 | Magee declaration.... | 303 | 303 | |
| GH 25 | ....................... | | 164 | |
| GH 1 thru 23 | En masse .............. | | 147 | |
| GH 24 | Cowen Resume.......... | 146 | | |
| GH 25 | Cowen Summary ........ | 147 | | |
| GH 26 | En masse .............. | | 147 | |
| TN 16 | ....................... | | 89 | |
| TN 17 | ....................... | | 89 | |

< Dates >
10/08/07 159:16
April 16 197:19
April 16, 2008
18:22
April 16.
208:20
April 16th
208:18
April 16th,
2008 84:18,
85:20, 87:4,
151:25, 155:9,
199:20, 201:8,
210:25
April 17, 2008
28:16, 202:21
April 17th,
2008 201:17
April 18, 2008
29:5
April 18th
202:18
April 18th,
2008 28:22,
84:9, 203:9
April 20, 2008
159:10
April 2008
29:24, 87:10
April 25th,
2008 153:19,
170:21, 170:25
April 28 153:21
April 28th
154:15, 154:17,
170:4, 171:2
April 28th,
2008 156:6,
156:8
April 28th,
2008. 154:18
August 1, 9:55
258:16
August 2005
103:19
August 2008
87:20
August 2010
33:15, 36:3

August 2012
277:18
August 24th,
2010 33:22
August 25th,
2010 33:18
August 27, 2010
50:6
August 27th,
2010 276:9
August 29th
2010 156:10
August 4th,
2008 90:23
August, 2010
309:7
FEBRUARY 25,
2013 1:18, 4:1
February, 2013.
322:8
January 2009
219:23, 228:19,
228:20, 235:6
January 2011
153:7, 153:11
July 2011
38:23, 49:12,
50:19, 51:19,
52:17
July,
september,
august 59:25
June 2008
104:14
June 23rd, 2010
67:16
March 28, 2008
154:13
March 8th
318:15
may. 88:24
November 2010
49:25
October 2011
57:15, 58:4
October 31
81:20
October 8th,
2007 155:13,
167:14, 168:3

September 28th,
2012 303:22
September 2nd,
2008 237:1
'08 65:1
'09 235:5
'323 180:8,
180:14, 180:16,
180:21, 181:7
'702 180:19,
180:21, 181:7
(2) 50:8


< 0 >
05-CV-0654 14:1
05-CV-0654-D
1:5
05-CV-654-D 4:6
09-CV-743 284:9


< 1 >
1 10:12, 41:7,
74:12, 74:15,
78:3, 78:8,
130:24, 145:20,
146:8, 146:10,
146:11, 146:13,
147:16, 185:13,
271:8
1. 9:22, 13:20,
74:9, 74:16,
78:1, 185:10,
186:17, 188:11,
272:12
10 33:9, 75:16,
146:9, 186:16,
188:16, 250:4,
254:10
10-A 146:9,
254:12, 254:14
10. 33:11,
61:19, 62:13
1001 164:9
11 39:10,
39:13, 39:21,
120:9, 187:9,
188:10, 258:15,
303:10, 303:13,

304:1, 304:10,
319:24, 320:2
11. 39:14,
40:17, 42:16
1100 3:40
11:15) 83:15
11:30. 83:16
12 29:23,
130:16, 130:17,
135:23, 253:12,
254:8
12. 256:4,
257:3
1280 2:6, 2:16
12th 313:4
13 43:9, 43:12,
66:11, 66:14,
68:3, 249:18,
249:21, 250:24,
262:23, 275:21
13. 61:18,
263:3
130 268:11
133 268:19
14 66:11,
66:22, 68:3,
75:19, 135:22,
193:10, 249:18,
249:21, 250:24,
266:13, 275:21
1400 2:45, 3:5
1445 2:37
15 41:5, 49:5,
49:12, 74:21,
83:13, 146:9,
250:24, 268:25,
270:20
15-A 146:9,
272:5
15. 10:13
1535 3:40
16 14:10,
15:18, 50:25,
53:1, 53:2,
67:15, 74:6,
75:2, 89:7,
89:9, 89:17,
89:24, 91:6,
91:15, 95:7,
162:20, 250:24,

265:9, 303:18,
308:23
16-A 272:5
16. 53:1, 96:3,
276:3, 302:14,
302:24, 303:5
166 260:25
166. 260:22
16th 198:20,
208:24, 212:9,
213:10, 215:4,
294:10
17 53:5, 53:7,
57:11, 89:7,
97:21, 97:24,
277:1
17. 57:9, 89:9,
97:4
1700 2:5, 2:15
1717 2:28
17th 214:8
18 93:12,
93:16, 95:21,
96:5, 96:13,
97:6, 97:25,
282:5
18. 282:6,
284:5
18th 214:16,
214:20
19 283:17
197 95:18
1993. 236:22
1996 190:24
1999 148:5
19th 250:16,
253:2
1:00 145:6
1:30. 178:17
1st 144:1

< 2 >
2 25:17, 29:10,
29:18, 81:12,
85:2, 90:12,
130:21, 130:24,
135:21, 155:16,
173:8, 189:9,
189:15, 190:6,

191:25, 192:1,
199:24, 227:16,
256:5, 277:5
2. 18:18,
76:13, 130:20,
192:4, 227:14
20 21:1, 178:8,
178:12, 178:16,
236:11, 287:23
20-- 215:7
200,000 157:19,
157:23
2000 109:19,
295:5
20015 1:31,
1:39
2003 105:9
2005 105:11
2007 109:22,
189:20, 219:15
2007. 154:11
2007/2008 179:6
200760 255:11
2008 5:25,
20:24, 60:14,
61:15, 70:20,
76:1, 92:16,
104:9, 105:10,
105:17, 109:4,
109:23, 109:24,
110:2, 111:23,
120:14, 120:15,
123:11, 133:3,
153:21, 169:22,
170:19, 171:4,
173:24, 198:20,
218:5, 221:16,
222:1, 231:20,
237:3, 294:3,
314:10
2008. 30:22,
60:15, 61:10,
82:4, 110:5,
138:24, 171:2,
211:11, 216:18,
216:19, 229:14,
236:23, 294:13
2009 109:24,
173:25, 219:16,
228:21

2009. 237:25,
238:13
2009/2010
110:14
2010 34:17,
41:14, 61:14,
98:22, 110:15,
139:23, 152:1,
157:8, 159:11,
173:25, 238:18,
289:9, 294:23,
294:24, 298:9,
299:8, 299:13,
309:3
2010. 21:1,
56:17, 120:13,
159:8, 298:10
2011 41:12,
51:14, 52:7,
54:9, 58:15,
59:6, 59:10,
111:15, 112:11,
113:16, 123:13,
158:13, 166:1,
172:17, 173:1,
312:5
2011. 12:16,
39:20, 57:20,
57:21, 58:19,
111:19, 112:10,
112:13, 168:17
2012 57:24,
159:2, 299:25
2012. 111:19,
165:5, 312:5
202/537-0700
1:32, 1:40
21 199:25,
288:7, 288:13
214.662.1557
3:42
214/740-1410
2:47
214/740-1484
3:7
214/747-5070
2:31
214/855-6815
2:40
214/978-4000

2:18
214/979-1122
2:8
21st 87:6,
211:11, 211:19,
215:8, 215:12
22 288:16
220-1 303:21
23 147:16,
260:23
23. 48:21,
260:20
23rd 215:8,
215:12, 216:7,
257:3
24 147:13,
147:14, 147:18,
196:15
24. 146:24,
147:5
244 267:18
24th 68:9,
68:20, 69:8,
70:1, 260:3,
260:6, 262:11,
276:25
25 77:2,
146:10, 147:14,
163:7, 226:3,
227:3, 249:10,
250:24
25. 77:2,
147:10, 163:14,
166:10, 215:21,
218:1
2500 2:38
25th 61:13,
61:21, 171:4,
266:18, 305:23
26 96:10,
96:13, 146:8,
146:11, 147:16,
152:6, 249:12,
250:24
26. 96:12,
258:20
26918_1.doc
258:17
26th 298:8,
309:4, 309:6,

309:14, 322:8
272 128:14
27th 267:16,
270:19, 270:22,
304:14, 305:25,
306:3, 311:2
28. 76:18, 77:3
288 259:17
288. 259:16
28th 153:24,
157:4, 169:21,
170:19, 171:4,
171:22
29 146:13
2:00 178:13
2:00. 145:8
2:38. 178:18


< 3 >
3 29:21, 89:23,
90:5, 93:13,
96:5, 97:24,
130:20, 130:21,
250:25, 253:21
3. 130:24,
198:12
30th 189:20
32 250:24
3232 2:44, 3:4
34 81:11, 83:4
37 250:24
3: 1:5, 4:6,
14:1, 284:9
3:00. 144:12,
178:16


< 4 >
4 33:10, 48:20,
96:13, 130:17,
186:17, 187:5,
199:18, 199:19,
201:3, 201:6,
227:5, 227:24,
228:7, 277:5
4. 38:21,
38:22, 48:23,
75:10, 75:11,
130:21, 185:12,

200:25, 227:6,
227:11, 227:17
40 267:18
41 259:12,
268:9
44th 17:9
45 145:9,
250:24
46 250:24
4th 144:9,
144:10, 244:5


< 5 >
5 187:7,
188:10, 201:16,
212:2, 212:5
5. 192:5,
192:8, 201:15,
250:25
50 249:9
500 1:30, 1:38,
153:13, 153:16,
153:22, 153:25,
154:9, 155:16,
156:4, 156:5,
157:3, 169:25
5000 2:29
51 240:2
5301 1:29, 1:37
570 128:9,
128:10, 128:14
5th 312:19


< 6 >
6 28:13, 202:17
6. 14:11,
49:14, 75:20,
214:5
600,000 157:12,
157:19, 157:23,
171:6, 171:10,
295:17
68th 17:11
69 135:20,
135:23, 192:4,
193:7
6:00 198:20
6th 286:5

< 7 >
7 74:6, 75:2,
130:16, 203:9
7. 28:20,
74:18, 203:8
70 137:5
70. 137:4
711 121:22,
129:7
736. 129:8
75201 2:7,
2:17, 2:30
75202 2:39
75204-2429
2:46, 3:6
75242 3:41
763 121:21,
128:7, 129:6,
129:7
7th 280:23,
284:22, 284:23,
295:10, 295:11,
295:12, 295:17


< 8 >
8 29:3, 65:23,
84:4, 84:18,
87:2, 239:12
8. 29:4, 66:10,
84:5, 87:5
8/1 64:25
8th 143:25,
144:1, 144:10,
295:9


< 9 >
9 39:10, 39:15,
39:21, 62:23,
63:5, 63:18,
66:9, 66:12,
75:11, 75:12,
146:9, 248:4,
249:2
9. 62:17,
63:18, 67:21,
74:10, 185:17,

188:25, 248:4
9th 64:7,
157:8, 159:17,
262:11, 287:12,
287:18
[sic] 239:8


< A >
A. 1:27, 2:35,
65:10, 188:20,
206:1
a.m. 258:16
aback 194:4
abbreviation
199:5
Abercrom 13:17,
17:21
abets 126:13,
128:23, 131:3
abetting
128:24, 130:12
ability 166:8
able 10:2,
25:9, 75:13,
140:21, 176:5,
195:13, 214:1,
245:7, 257:25,
266:24, 274:7,
312:17, 316:7,
320:22
above 62:7,
85:17, 135:22,
153:13, 200:23,
202:3, 212:14,
227:20, 256:16,
263:13, 282:22
above-named
64:11
above-reference
d 92:11,
201:23, 201:25,
203:15
absence 9:2
absent 34:12,
256:11
Absolutely
34:20, 126:2,
132:1, 172:13,
186:14, 188:9,

279:8, 299:14, 308:1
accept 36:20, 44:24, 123:19, 199:11
accepting 286:24
access 15:22, 20:7, 100:10, 122:13, 124:18, 137:12, 139:13, 151:11, 153:18, 160:3, 160:15, 160:17, 176:5, 201:13, 221:3, 229:24, 230:4, 282:25
accessed 158:10, 159:3, 159:6, 167:19, 176:23
accesses 160:6
accessing 168:12
accident 136:3, 136:4, 192:10, 192:12
accidental 119:25
accomplish 213:2
Accordingly 251:3
accurate 103:21, 103:24, 104:4, 104:13, 106:20, 107:10, 201:7, 205:18, 228:7, 270:12, 294:16, 305:8
accurately 144:19, 163:8
accused 15:4, 23:18, 264:2
acknowledged 113:22
acknowledgement 189:17, 190:11
acknowledging 28:22

acquainted 83:25
acquired 105:8, 105:10
Act 121:11, 126:8, 126:10, 127:18, 127:20, 127:24, 128:2, 130:25
acting 127:4, 131:9
action 12:17, 201:11
actions 151:25, 197:1, 201:7, 228:9
active 32:2, 108:6, 110:7, 155:16
Acts 124:3, 127:25
actual 88:2, 88:7, 92:24, 95:15, 108:7, 126:3, 140:22, 154:8, 156:2, 225:6, 225:10, 225:15, 225:17, 317:25
added 153:20
addenda 78:13, 81:4
addendum 78:13
addition 77:6, 230:24, 233:14, 249:13, 276:14, 284:15
additional 28:11, 31:6, 38:10, 38:12, 95:3, 141:13, 153:19, 170:23, 173:21, 175:20, 190:12, 283:10
Additionally 283:9
address 102:16, 257:9, 305:23
addressed 26:12, 76:5,

82:17
addresses 45:13, 53:7, 80:5
addressing 81:14, 82:20
adjourn 178:16, 321:15
adjourned 321:17
adjournment 10:23
administrator 159:1, 159:7, 161:12
admissible 163:15, 163:17
admission 9:22, 10:12
admit 9:17, 141:19
Admitted 10:14, 11:22, 13:20, 18:19, 48:20, 66:7, 89:13, 95:12, 147:17, 152:16, 164:6, 164:17, 185:13, 239:13, 250:5, 253:12, 270:21, 277:1, 283:18, 303:7
admittedly 115:2, 121:16
admitting 123:3, 164:15
ado 145:3
adopted 100:7, 118:9
adverse 221:7
adversely 102:20
advice 136:8, 192:22, 247:2, 256:7
advise 252:5, 256:11, 291:21
advised 85:17, 200:22, 212:13, 227:20

advisor 76:9, 186:20, 187:16, 188:16, 188:21, 189:5
advisor. 186:20
advisors 14:20, 74:24, 75:7, 75:17, 186:16
advisors. 186:6
advisory 187:3
advocacy 55:17
AE 15:14
AEO 15:17, 24:1, 24:3, 25:11, 27:15, 50:11
affairs 175:5
affect 118:10
affidavit 33:3, 38:19, 123:6, 295:7, 301:22, 301:25, 302:25, 303:3, 303:18
affidavits 119:13, 290:25
affiliate 64:12
affiliated 105:2, 125:24, 126:5
affiliates 124:13
affiliation 125:25
affirmatively 34:12
age 128:11, 164:18
agents 121:16
ago 5:23, 60:10, 81:25, 151:25, 163:19, 164:23, 164:24, 165:1, 312:24
agree 48:15, 65:5, 91:11, 95:14, 97:22, 102:1, 209:11, 252:16, 290:15, 315:5, 319:20, 320:12

agreeable
263:15
agreed 13:25,
18:23, 19:7,
44:24, 77:6,
82:25, 90:17,
91:16, 91:21,
93:2, 93:3,
93:14, 94:13,
94:18, 94:22,
95:15, 96:6,
97:9, 98:2,
98:4, 98:7,
100:6, 136:17,
185:14, 185:21,
202:23, 257:16
agreed-upon
9:21
agreeing 92:16,
92:18, 92:22,
96:23
agreement
19:13, 48:12,
64:25, 77:24,
78:9, 78:18,
81:22, 82:11,
87:17, 87:19,
88:8, 91:2,
91:4, 110:24,
111:1, 120:14,
126:5, 169:17,
188:19, 189:19,
189:24, 206:1,
234:19, 262:8,
262:9, 266:4,
297:3, 297:5,
297:6, 312:20,
312:21, 312:22,
314:4, 314:9,
314:19, 316:8,
317:25
agreement.
91:12
agreements
19:13, 62:8,
63:22, 64:15,
68:11, 78:13,
88:3, 88:4,
249:14, 250:8,
251:2, 251:8,

251:17, 254:3,
254:5, 256:8,
263:14, 310:24
agrees 95:22
aha 261:13
ahead 9:17,
23:16, 31:22,
49:5, 61:17,
62:18, 74:14,
74:15, 145:3,
145:19, 149:14,
149:16, 152:14,
164:13, 190:10,
194:20, 243:22,
255:7, 262:1,
287:13, 306:8
aid 152:4,
164:1, 164:2
aiding 128:24,
130:12
aids 126:13,
128:23, 131:3
akin 116:6,
285:25
Alan 276:8
ALAS 42:23
albeit 118:20
Alexander
297:10
allay 280:11
allegation
114:19, 115:9
allegations
12:22, 13:9,
208:7
alleged 16:6,
17:23, 19:12,
111:25, 234:22,
235:2, 280:14,
282:24
allegedly 283:1
alleviate 281:7
allow 13:5,
65:5, 73:25,
74:1, 114:7,
114:10, 195:9
allowed 169:7,
169:17
allows 14:12,
73:17

almost 126:17,
146:19, 173:10,
196:3, 243:15
alone 66:15,
102:15
Alston 11:11,
12:12, 12:13,
12:15, 43:3,
53:8, 57:13,
57:14, 125:7
alter 299:16
although 94:20,
120:14
amended 65:1,
100:7, 100:8,
260:17, 297:4
America 10:6
among 50:10
amongst 169:11,
249:8
amount 27:23,
37:12, 159:25,
252:15
analogy 5:7
analysis 176:8
and/or 17:21,
26:25, 57:16,
66:19, 92:10,
96:1, 96:7,
96:24, 240:8
answer 22:2,
31:16, 31:17,
31:23, 41:21,
45:11, 52:2,
52:24, 55:19,
68:25, 69:22,
114:10, 115:2,
136:11, 136:21,
193:10, 245:10,
306:5
answered 52:23,
59:4, 60:5,
60:6, 113:13,
299:7, 304:7
Anthony 236:5
Anti-hacker
150:8
anticipate
35:11, 35:19,
116:5, 266:24

anticipated
311:24
anxious 273:25
Anybody 99:7,
99:23, 124:21,
158:8, 158:10,
168:18, 172:20,
172:24, 173:2,
173:23, 177:3,
197:9, 209:1,
218:13, 224:8,
230:3, 231:6,
234:11, 299:17,
313:10
anys 319:5
anyway 314:7,
314:13, 316:1
apart 163:4
apologetic
117:5
apologize
21:18, 111:9,
175:18, 217:22,
232:22, 294:4,
303:3, 315:16
APP 41:5
apparent 57:15,
65:13, 275:7
apparently
37:25, 109:10,
166:19, 166:21,
169:20, 206:12
appeal 93:3
Appeals 190:25
appear 62:12,
77:21, 251:6,
266:21, 317:13
appearance
11:9, 27:22,
28:5, 37:11,
37:18, 121:18,
134:8, 134:9,
136:13, 136:18,
137:8, 137:23,
183:18, 183:20,
193:12, 194:16,
204:11, 209:22,
209:25
appeared 22:18,
23:17, 35:17,

42:9, 42:14,
43:5, 52:17,
72:17
Appears 14:12,
14:19, 18:21,
28:15, 28:22,
29:7, 29:12,
29:23, 38:23,
42:1, 43:3,
55:7, 58:8,
60:19, 65:7,
65:19, 68:8,
75:15, 75:18,
77:15, 78:10,
82:3, 82:5,
82:19, 84:14,
84:25, 89:22,
92:25, 95:17,
97:8, 114:25,
146:24, 159:6,
216:6, 257:9
appendices
92:14
appendix 96:14,
96:18, 96:20,
96:24
application
117:17, 133:23,
285:25
applications
181:10
apply 7:16,
103:25
appreciate
44:25, 263:22,
267:4, 316:11,
321:13
approach 76:14,
78:5, 88:17,
95:4, 130:5,
215:23, 281:8,
302:20, 314:6
appropriate
41:21, 55:20,
94:17, 97:3,
138:18, 138:25,
190:1
approval 172:1
approve 24:1
April 87:7,

110:8, 154:16,
157:4, 159:10,
169:21, 170:19,
171:4, 171:22,
198:20, 208:24,
211:10, 211:19,
212:9, 213:10,
214:8, 214:16,
215:4, 215:7,
215:8, 215:12,
216:7, 222:1,
229:14, 231:20,
294:10, 313:3,
313:4
archive 243:13,
243:22, 243:24,
244:12
Archives
242:24, 243:15,
244:3
area 61:8,
190:13, 223:11,
236:18, 238:12
argue 20:8,
116:13
argued 6:1,
7:6, 7:8,
19:17, 76:1,
204:1
arguing 6:15,
80:13
argument 6:9,
79:4, 102:4,
119:14, 119:18,
125:25, 130:1,
130:10, 132:6,
132:8, 139:18,
141:3, 141:16,
142:5, 318:6
arguments
80:15, 101:6,
101:10, 101:13,
142:14
armed 240:18
arose 301:15
arrival 105:10
arrive 10:20
art 45:17,
45:18, 45:23,
46:12, 46:13,

47:23, 66:15,
66:16, 66:18,
66:23, 67:3,
67:8, 80:10,
249:19, 249:23,
256:10, 274:17,
275:20, 305:19,
310:24
art). 66:25
artifacts
152:1, 157:15,
159:25, 160:5,
160:24, 169:8
ascertain
158:8, 159:15
asks 68:10
aspect 151:17
aspects 187:12
ASR 149:25
assert 268:15
asserted 66:18,
240:16, 249:22,
264:4
asserting 180:4
assets 315:7
assigned
165:25, 197:5
assigns 157:15
assistance
24:25, 25:5,
25:9, 187:24,
263:22
assisting
49:19, 74:24
associate
41:23, 50:4,
84:15, 209:3,
232:15, 247:25,
253:15, 253:19,
291:17
associated
210:10, 276:13
associates
49:23
Association
149:24
assume 39:17,
65:3, 79:3,
80:8, 89:11,
92:24, 94:6,

158:2, 268:5,
279:19
assumed 34:15,
54:23, 60:4,
279:12, 311:5
assuming 97:1,
218:25
assumption
168:5
assure 266:3
astray 144:14
attach 78:13
attached 19:16,
22:10, 29:10,
29:11, 29:12,
39:14, 50:14,
62:3, 62:13,
64:20, 74:10,
84:18, 91:11,
96:23, 124:12,
153:15, 160:23,
170:21, 170:24,
188:20, 252:4,
254:11, 263:9,
272:4, 303:18,
303:20
attaching 215:3
attachment
188:20
attachments
172:11
attempt 20:4,
36:13, 36:17,
38:10, 117:7,
119:17, 233:20,
299:24
attempted 42:18
attempting
27:3, 51:20
attempts 20:14
attend 222:17
attendance
207:10
attending
149:24
attention 39:9,
48:19, 50:5,
61:8, 65:21,
76:18, 118:17,
179:13, 179:22,

185:10, 185:20,
191:10, 198:12,
215:21, 229:13,
239:10, 250:3,
288:19, 314:17,
320:19
attorney 209:5,
223:8, 236:15,
236:16, 269:7,
271:10, 304:25
attorney-client
271:9, 304:24
attorneys
15:14, 16:11,
16:14, 16:16,
16:19, 16:23,
25:22, 62:8,
73:18, 185:24,
206:6, 263:14,
277:8, 281:23
author 65:8
authority
121:1, 121:3
authorized
205:14
automatically
309:12
availability
317:22
available
74:23, 167:17,
171:2, 171:19,
208:10, 230:20,
256:25
Ave 2:5, 2:44,
3:4
Avenue 1:29,
1:37, 2:15,
2:37
aware 17:14,
17:15, 31:6,
54:8, 58:15,
77:23, 78:2,
78:17, 81:3,
82:25, 83:3,
83:6, 87:1,
87:3, 106:7,
107:4, 107:11,
109:12, 120:24,
161:23, 171:3,

180:15, 186:13,
231:17, 239:4,
283:2, 290:3,
290:9, 294:2,
298:5, 298:11
away 154:20,
204:17, 242:11,
311:15
awful 292:10


< B >
B. 2:26
back. 40:24,
268:1
backdrop 250:6
background
150:19
backup 168:18
bad 61:16, 75:3
bald 124:15
ball 262:18
Bank 10:6
bar 236:15
barrister
236:14
base 163:3,
248:23
Based 8:13,
21:9, 30:4,
30:14, 68:1,
100:25, 102:3,
102:17, 135:8,
155:8, 160:22,
162:22, 173:6,
173:13, 173:14,
174:13, 216:6,
240:18, 285:17,
319:19
Basically 6:16,
61:23, 68:10,
77:16, 100:21,
116:9, 117:17,
119:6, 121:11,
150:19, 153:17,
180:2, 209:20,
214:8, 241:11,
245:15, 247:4,
247:16, 249:2,
257:15, 266:15,

270:24, 275:8,
282:17, 282:18,
291:11, 313:1,
313:13, 315:4
basis 35:14,
67:9, 76:7,
116:15, 119:14,
190:1, 269:23,
270:9, 271:9,
273:12, 273:15,
304:23, 304:24,
310:11
batch 266:21
Bates 41:8,
52:9, 154:5,
156:1, 156:2,
174:8, 199:5,
241:3, 252:17,
254:15, 254:19,
255:2, 255:5,
255:7, 272:18
bearing 277:9
bears 130:23
became 100:6,
104:17, 108:5,
108:8, 131:18,
131:20, 186:13,
290:2, 294:1
become 58:15,
80:22, 82:23,
101:7, 101:19,
108:2, 180:15,
181:11, 236:16,
298:5, 298:11
becomes 5:11,
38:18, 158:12
becoming 104:20
began 38:6,
39:3
begin 237:10
beginner 150:10
beginning
38:24, 40:22,
44:3, 116:9,
237:23
begs 123:18
behalf 4:18,
11:9, 14:7,
78:17, 80:13,
80:16, 82:23,

86:1, 97:22,
120:18, 138:19,
181:4, 182:22,
187:21, 201:8,
220:15
behind 29:21
belief 66:24,
281:13
believed 22:17,
79:23, 80:1,
208:12, 212:22
believes
251:20, 282:11,
319:13
belong 166:23
below 256:8
belt 190:7
benefit 138:21
Beres 37:9,
40:17, 270:23,
271:2, 278:7,
278:14, 278:22,
279:3
Berkeley 291:16
Berkley 65:10,
67:20, 68:12,
247:25
Best 26:8,
27:9, 79:22,
180:22, 256:21,
310:8
bet 319:12
better 132:12,
198:9
betting 233:13
Bev 49:17,
49:20, 152:8,
185:16, 186:15,
187:9, 227:16,
254:18, 260:23,
262:24, 263:4,
283:21
Beverly 49:7,
49:18
beyond 122:2,
319:23
big 259:25
Bill 4:17,
44:22
billable 162:20

billing 231:22
bin 222:25,
223:11
binder 9:4,
10:10, 13:21,
13:22, 28:13,
43:9, 62:16,
62:22, 63:10,
78:4, 198:13,
239:11, 259:8,
303:14, 320:15
binds 130:24
Bird 11:11,
12:12, 12:13,
12:15, 43:3,
53:9, 57:13,
57:15, 125:7
bit 12:24,
45:1, 73:9,
104:6, 131:25,
183:15, 184:2,
207:21, 207:25,
220:19, 236:16,
242:14, 242:15,
269:8, 272:19,
277:17, 298:13,
320:22
bits 40:7
bizarre 121:23
black 185:11,
198:13, 239:10
blah 256:19,
256:20
blank 78:10
blanket 124:18
bleeds 81:19
block 259:13
blow 61:20,
63:23, 250:10,
263:4
blown 284:7
blowup 49:15
blush 317:13
board 105:12,
238:6
body 16:24,
245:18
book 9:4, 9:12,
11:21, 18:18,
33:9, 39:10,

84:4, 89:8,
112:9, 211:13,
212:5, 303:15,
303:16
books 150:1,
150:3
boom 59:23
borrow 302:10
bottom 49:8,
81:13, 81:18,
90:13, 97:18,
139:1, 187:5,
251:24, 253:13
bound 7:3,
101:13, 101:16,
101:17, 121:8,
121:12, 121:15,
121:19, 122:12,
125:14, 125:19,
125:22, 126:11,
127:19, 132:21,
205:20, 205:21
Bowers 137:17,
137:18, 137:24
Bowling 37:2,
312:17
box 289:3,
315:17
Boyle 5:8
breaches 19:12
break 83:10,
145:6, 145:7,
145:15, 178:15,
182:18
Brief 7:15,
10:23, 11:1,
119:9, 119:15,
130:9, 142:8,
143:24, 217:17,
289:1, 317:6,
317:19, 318:16,
320:4, 321:3,
321:10, 321:11
briefed 38:13,
39:1, 130:8,
318:3
briefing
129:23, 143:21,
285:14, 285:16,
285:18, 318:22

briefly 227:7,
236:20
briefs 144:1,
144:2, 316:22
Bring 5:16,
6:18, 38:17,
178:14, 199:12,
314:17, 315:17,
320:18
bringing 120:9
brings 105:18,
107:16, 107:17,
108:3
brought 39:9,
50:4, 75:25,
195:22, 207:2,
315:18
BROWN 2:35,
4:18, 130:4,
135:16, 135:20,
137:17, 139:9,
144:4, 144:9,
165:20, 165:25,
172:8, 173:5,
177:4, 178:6,
178:21, 187:10,
219:6, 227:15
BS 150:20
bulb 5:25
bulk 244:1
burden 116:14,
130:23, 139:2
buried 272:22
bury 273:3,
273:5
busy 146:2,
232:7
button 213:8
buy 172:1
buying 120:15


< C >
C. 29:19
Call 8:24,
11:5, 11:6,
33:1, 47:5,
59:16, 72:1,
99:10, 99:15,
102:19, 165:2,

179:13, 179:22,
180:8, 180:11,
205:15, 215:21,
219:7, 220:13,
220:14, 256:17,
257:4, 262:18,
263:22, 278:9,
286:7, 286:8,
288:25, 296:22,
304:5, 321:16
callback 112:20
calling 221:20,
262:3
calls 4:6,
13:7, 20:15,
47:4, 59:12,
61:9, 65:20,
67:19, 68:9,
68:21, 71:21,
319:7
camera 114:12
Campbell 37:2
can. 271:20
capable 55:19
capture 169:5
captured
175:13, 175:21
care 10:2,
157:19, 209:6,
210:6, 213:19,
231:21
cared 315:19
carefully 51:17
carriage 311:19
cart 311:19
carve 75:13,
75:20
case. 24:16,
180:7
catalogs 160:1
cataloguing
197:21
categories 75:6
category 15:17
CAUSE 1:21,
4:1, 4:7, 5:2,
6:12, 6:21,
8:1, 8:3, 8:5,
8:6, 8:9, 8:10,
8:13, 63:11,

116:10, 116:21,
117:18, 120:23,
129:20, 133:23,
204:11, 284:9,
286:1
caused 269:7
causing 140:22
cc 198:17
cc-ed 214:13
cease 177:19
cell 173:10,
234:11, 234:12,
234:13
central 26:2,
35:18, 42:7,
51:11, 67:4
CEO 59:17,
62:4, 86:17,
86:21, 103:17,
104:21, 107:9,
248:1, 263:10
certain 19:24,
27:23, 30:2,
32:14, 33:16,
43:15, 52:23,
73:17, 74:1,
75:6, 159:24,
159:25, 174:6,
191:1, 252:15
certainly 37:5,
107:11, 115:9,
120:4, 136:20
certificate
67:16, 259:12
certification
5:11
Certified
150:24
certify 5:6,
5:10, 8:14,
140:20, 322:2,
322:5
certifying
141:12
cetera 248:23,
248:24, 292:16
chain 31:13,
253:14, 256:5
challenge 246:2
chance 63:3,

144:21, 188:23,
247:23, 253:6,
255:14, 320:11,
320:12
change 173:1,
209:17
changes 90:18
changing 160:21
characterizatio
n 311:13
characterize
132:8
characterizing
300:1
charge 104:5,
122:3, 291:9
charged 88:11,
104:7, 224:9
chart 169:21,
173:20, 215:22
check 10:6,
233:19, 234:11,
255:14, 259:21
checked 113:23
Chip 243:12
choice 101:19,
129:11, 129:12,
137:6
choices 124:10,
136:18, 194:15,
209:20
chose 102:2,
102:11, 129:12,
170:15
Christina 37:9,
54:6, 250:14,
253:22, 256:17,
257:4, 258:10,
259:18, 264:24,
265:25, 266:17,
266:19, 270:9,
270:18, 270:23,
271:2, 271:4,
273:25, 276:16,
278:5, 278:12,
279:3, 304:10,
304:22, 310:20
chronologically
214:15, 215:6
Cimino 276:10

Circuit 8:2,
121:9, 121:19,
126:7, 126:12,
128:21, 190:25
circumstance
31:25, 124:14,
319:24
circumstances
19:6, 114:7,
125:13, 164:25,
195:24, 227:10
circumstantial
319:18
CISSP 150:23
citation 207:4
cite 121:10,
128:8, 128:9,
128:12, 131:1
cited 22:17
citing 126:23
civil 130:22,
132:13, 140:18,
141:12
civilly 150:14
claim 191:2
claiming 42:2
claims 29:20,
48:16, 85:4,
120:9, 184:24,
251:3, 264:4
clarification
308:6, 317:16,
317:19
clarify 8:17,
317:3
clarifying
182:24
class 150:2
clauses 265:9
claw 195:9,
195:21, 196:3,
196:6, 196:16,
196:19, 222:12,
257:18, 264:25,
267:23, 268:16,
268:19
claw-back
278:3, 278:17
Clawed 195:3,
300:5

clawing 195:24
clear 8:19,
8:20, 71:10,
94:23, 95:20,
100:6, 116:8,
116:14, 118:2,
118:4, 120:4,
120:10, 130:23,
131:18, 133:19,
139:2, 156:13,
159:4, 169:10,
182:19, 188:2,
191:14, 196:12,
274:18, 290:25,
319:1
clearer 131:20
clearly 77:6,
125:15, 126:16,
134:7, 187:23,
208:8
clicked 5:25
clients 14:8,
35:9, 35:19,
42:25, 62:7,
64:14, 93:3,
120:19, 234:24,
237:20, 263:12,
263:18, 281:8,
291:25, 297:2,
308:10, 308:11
close 105:23,
237:24, 316:12
closed 111:23
closer 207:24
closest 5:7
Clouster 125:2,
125:9
co-counsel
27:13
coauthored
150:5, 150:8
coded 252:2,
252:11, 252:23,
254:21
coding 252:15,
252:16, 252:22
collaboratively
182:25
colleague 62:4,
304:10

colleagues 206:12, 206:23, 263:10, 304:22
collect 291:23, 293:9
collecting 224:9, 241:2, 292:3, 292:23
collection 292:18, 292:25
college 150:1
column 41:9
combination 66:16, 131:8
combinations 150:16
comes 9:18, 122:10, 141:16, 253:1, 258:5, 284:5, 291:3
comfortable 76:25, 174:22, 275:11, 275:14
coming 9:9, 37:25, 206:16, 221:20
commend 288:19, 321:4
comments 214:10
Commerce 3:40
commissioned 122:11
committed 120:19
common 124:11, 230:4
commonplace 264:18
communicate 35:8, 211:4, 228:25
communicated 24:9, 210:19, 211:1, 211:2
communicating 26:11, 202:11
Communication 33:2, 36:4, 36:5, 36:11
Communications

1:12, 12:21, 15:4, 15:8, 17:2, 22:22, 24:15, 32:2, 32:23, 35:5, 35:10, 36:8, 36:16, 36:18, 37:17, 40:2, 42:20, 43:5, 45:15, 45:16, 45:18, 46:8, 55:23, 62:12, 64:22, 66:5, 68:4, 96:15, 98:2, 98:22, 99:24, 180:23, 221:9, 271:18
Communications/ securus 39:6, 41:25
companies 13:3, 13:12, 13:13, 88:5, 158:14, 166:2
company 13:17, 17:22, 103:22, 120:8, 122:7, 126:18, 148:15, 148:16, 150:17
compare 258:9
compared 184:13
comparison 176:8
compel 19:23, 275:13
competent 242:4
competitive 114:9
competitor 73:24, 114:6, 282:25
competitors 15:1, 17:22, 23:10, 23:14, 32:4, 32:12, 32:18, 124:19, 124:20
complaint 111:22, 111:24
complete 125:8,

125:12
completed 150:9, 267:15
completely 47:3, 122:7, 206:8, 230:19, 230:22, 283:13
compliance 29:8, 144:19, 144:21
complied 278:16, 281:15
comply 297:18, 322:5
compound 265:7
compounded 163:18
computers 151:13, 153:4, 154:7, 158:14, 158:15, 159:21, 163:8, 163:11, 166:3, 166:6, 168:25, 172:21, 275:4
con 155:12
concept 21:10, 129:1
concern 52:17, 52:20, 228:6, 228:22, 269:22, 275:5, 310:10
concerned 120:25, 121:2, 132:14, 140:17, 149:4, 149:12, 151:10, 228:8, 280:2, 282:24
concerning 187:11, 254:4
concerns 280:11, 280:14
concert 139:19
conclude 89:20
concluded 86:12
conclusion 118:18, 143:20
conclusively 126:17
concurrently

181:21
condolences 235:11
conduct 106:8, 175:22, 177:16, 283:9, 320:3
conducted 36:12, 245:3, 312:16
Conference 281:2, 286:7, 312:23, 322:6
conferences 149:24
confident 228:10, 228:13
Confidential 14:15, 14:17, 15:12, 15:13, 15:17, 15:19, 20:2, 27:16, 28:25, 34:4, 40:8, 40:12, 57:17, 62:8, 73:18, 74:22, 77:9, 111:24, 114:16, 136:2, 188:14, 190:9, 192:9, 202:23, 234:22, 263:13, 263:20, 264:14, 270:3, 271:17, 277:8, 283:1, 315:5
confidentiality 77:24, 78:9, 78:13, 78:18, 81:22, 82:11, 188:19, 189:4, 189:24, 206:1, 251:14, 314:11, 314:24, 315:3
confidentially 137:13
confirm 52:10, 61:24, 141:7, 142:25, 169:24, 174:20, 196:18, 205:24, 231:1, 233:4, 233:13,

271:21, 276:11, 277:15, 278:10, 283:9, 283:11, 302:24, 307:23, 308:9
confirmatory 266:18
confirmed 91:10, 195:12, 201:12, 202:3, 202:14, 213:20, 214:9, 266:5, 278:6, 278:8, 278:16
confirming 33:14, 197:16, 203:16, 257:5
confused 292:7
confusing 96:13, 290:20
confusion 204:11
confusions 136:15, 193:14
Congdon 49:18
conjunction 55:23, 87:24, 150:11, 180:10, 180:13, 183:22, 190:18, 220:17, 220:22, 262:9, 297:5
connection 67:12, 71:3, 71:7, 103:20, 107:20, 108:2, 108:12, 110:16, 123:13, 128:2, 165:22, 220:9, 232:25, 237:3, 239:5, 241:13, 292:23, 302:25, 307:21
connections 67:4
conscience 124:23
consent 251:18, 262:7, 271:16, 274:9, 277:18,

293:6, 296:12, 296:15, 296:16, 296:18, 296:25, 297:1, 297:2, 297:23, 298:4, 301:7, 306:9, 306:11, 307:11
consenting 121:24
consents 254:5, 277:24
consider 7:21, 119:1, 119:9, 138:18, 142:15, 142:20, 144:17, 305:10
consideration 119:3, 317:6
considered 102:4, 205:20
considering 142:13, 142:14
consistent 33:21, 155:23, 163:9
Consolidated 114:17
conspiracy 126:22, 126:25, 127:8, 127:20, 128:17, 129:1, 130:13, 138:14
conspires 126:13, 128:24, 131:4
conspiring 127:10, 131:9
constitute 5:6, 5:10, 8:14, 140:21
constituted 76:8, 292:4
constitutes 80:9
construction 184:24, 191:1
construe 191:3
construed 191:6
consult 187:11, 291:18

consultant 76:9, 187:4, 187:17
consultants 75:8, 75:19
consultants. 74:25
consulting 184:20, 187:24
contact 36:18, 203:18, 250:18, 253:9, 277:12, 293:13, 293:23
contacted 58:18, 59:5, 59:9, 185:8, 242:21, 278:7, 293:17
contacting 251:17
contain 169:18, 202:22
contained 16:23, 28:25, 34:3, 153:17, 163:5, 175:16, 263:19, 283:1
containing 251:25
contains 45:14, 175:14, 252:15
contend 7:6
contending 209:14
content 98:8, 268:21, 268:22
contention 48:8, 58:25, 67:7, 69:12, 79:16, 305:13
contentions. 263:25
contentious 73:1
contents 74:22, 151:16, 176:9
contesting 141:8
context 21:5, 21:10, 25:22,

41:13, 82:5, 103:5, 154:2
continue 31:2, 168:22, 312:6
continued 154:13, 158:4, 312:6
continues 89:7, 175:11
continuing 283:3
contract 121:24, 315:21
contradict 155:10
contradictory 181:18
control 122:4, 122:5, 244:20
convenience 214:17
convenience. 202:25
conversation 33:22, 33:24, 34:13, 34:17, 36:10, 61:24, 71:18, 71:20, 257:5, 264:22, 266:2, 267:8, 269:20, 281:13, 284:23, 286:4, 286:6, 287:24, 301:3, 301:17, 304:20, 309:13
conversations 34:6, 34:8, 165:20, 171:21, 177:1, 177:5, 195:1, 222:16, 276:16, 279:6, 279:10, 304:18
conveyed 209:8
convince 7:2
convincing 116:15, 120:5, 120:11, 130:24, 139:2
convoluted 8:11
COOK 3:15,

8:23, 10:21,
11:8, 11:10,
39:23, 47:3,
59:12, 59:18,
68:21, 88:25
Coons 243:12
cooperation
298:2, 301:9
cooperation.
267:4
coordinate
181:23, 183:11,
183:13, 187:25
coordinated
182:5, 182:9,
182:13, 191:5
coordinating
181:22
coordination
194:6
Cooter 1:27,
1:28, 1:36,
120:21, 205:5,
208:17, 208:19,
208:21, 212:2,
218:17, 265:14,
281:2, 282:1,
286:7, 286:22,
287:9, 287:13,
287:18, 288:8,
288:23, 288:25,
303:17, 310:13
copied 154:1,
154:14, 156:8,
160:11, 168:7,
170:3, 170:6,
170:7, 170:9,
171:14, 176:4,
203:22, 216:10
corporation
103:15
corporations
64:12
correctly
50:15, 186:2,
186:9, 186:24,
193:6, 193:17,
202:8, 203:12,
203:19, 227:22,
291:2, 310:3

correspond
254:20
correspondence
16:22, 20:14,
37:16, 39:3,
39:5, 39:8,
39:11, 39:19,
40:8, 41:24,
42:17, 49:24,
50:6, 51:6,
51:19, 53:11,
53:12, 53:20,
54:3, 54:5,
54:12, 57:4,
65:19, 69:20,
70:6, 71:24,
80:21, 85:21,
89:17, 93:1,
95:2, 112:5,
115:16, 262:13
corresponding
141:3
Cortez 17:10,
19:18, 19:22,
20:9, 20:16,
20:21, 22:14,
22:23, 23:6
cost 243:14,
243:17, 243:20
costs 22:13
Cotter 4:9
count 19:23,
19:24
counter 119:9,
284:21
Counter-defenda
nt 1:18
country 124:20
county 13:6,
15:7
couple 19:7,
52:10, 110:19,
197:18, 197:19,
207:15, 217:17,
243:10, 253:4,
306:21, 310:13,
316:2
courier 199:10
course 11:23,
13:18, 14:3,

14:21, 19:5,
20:13, 32:8,
39:4, 39:16,
43:4, 77:21,
78:23, 121:22,
124:25, 129:9,
150:17, 178:11,
232:5, 245:10,
312:22
courses 150:1
court-ordered
37:22
court. 126:15,
129:3, 131:5,
256:14
COURTROOM
10:25, 83:17,
178:19, 247:24,
319:12
cover 13:21,
13:22, 95:2,
227:13
covered 112:13,
223:17, 272:15
Cowen 144:11,
145:4, 146:24,
146:25, 147:23,
147:25, 148:1,
148:18, 158:2,
162:17, 163:7,
245:14, 287:15,
287:17
CPC 39:19,
47:10, 49:25,
50:2, 250:23,
250:25, 277:4,
277:5, 284:12,
284:17, 284:18
CPC00740-7069
277:6
create 245:18,
246:25, 266:7
created 150:17,
157:14, 157:16,
175:23, 176:2
credibility
124:22
Crime 149:23
criminal 5:12,
129:1, 145:8,

149:13
criminally
150:14
critical 191:4
CROSS 44:20,
83:21, 164:20,
205:1, 229:11,
289:5, 289:25
Cross-examinati
on 44:14,
164:14, 177:17
CRR 3:39,
322:13
CSR 322:2
culpa 117:4,
138:2
cumulative
66:25
cure 299:8
curious 207:13,
216:23
current 42:25,
160:15, 173:13,
181:20, 282:22
currently
148:11, 219:20,
313:20
cut 217:20
CV 148:9,
149:18
cycle 152:25


< D >
Dale 1:27, 4:9,
205:5
Dallas 1:3,
1:9, 2:7, 2:17,
2:30, 2:39,
2:46, 3:6,
3:41, 17:8,
17:12, 19:10,
109:11, 150:20,
236:19, 322:16
damage 174:22
damages 248:16,
248:18
dangling
316:13, 316:14
dare 133:21

Data 74:24, 75:7, 114:8, 149:25, 153:22, 157:8, 168:20, 168:21, 170:8, 170:16, 171:1, 171:18, 174:1, 175:2, 175:3, 176:4, 176:9, 242:21, 242:25, 243:10, 244:6, 244:9, 244:11, 244:15, 244:25, 245:4, 245:6, 246:7, 246:20, 247:11, 292:18, 292:23, 293:9, 293:12
database 85:18, 158:8, 163:5, 170:9, 200:23, 201:11, 202:4, 212:14, 213:4, 213:11, 213:17, 213:18, 214:3, 214:10, 215:15, 225:6, 225:10, 226:1, 226:5, 226:10, 226:14, 226:23, 227:1, 227:21, 228:2, 229:23, 230:7, 230:9, 266:9, 267:2, 271:8, 276:22, 284:14, 294:5, 294:19
databases 112:25, 210:14, 226:11
date 60:11, 60:13, 61:20, 64:7, 67:16, 87:22, 111:20, 169:16, 170:18, 172:4, 173:24, 189:19, 197:20, 208:17, 215:7, 216:7, 294:12, 304:12, 313:3
dated 28:16,

29:5, 33:18, 61:12, 64:25, 84:9, 87:4, 199:20, 201:17, 202:18, 203:9, 211:10, 212:9, 214:7, 250:16, 266:17, 304:14
dates 58:8, 71:23, 151:9, 171:4, 172:5, 257:1, 295:6, 316:22
Dave 113:3
David 147:25, 245:14
day-to-day 107:12, 180:2
days 57:25, 87:7, 216:8, 267:14, 300:24, 305:17, 305:18
DC 1:31, 1:39
deal 10:16, 40:8, 47:24, 107:16, 149:9, 200:12, 204:22, 241:5, 264:15
dealing 32:9, 128:12, 147:1, 149:19, 169:12, 206:5
dealings 35:1
deals 75:16
dealt 71:2, 71:3, 128:3, 221:3
Dear 202:20, 250:17, 271:3, 277:4
decide 194:19, 320:12, 321:10
decided 102:7, 194:20, 196:24, 204:23, 285:23, 285:24
decision 80:5, 170:13, 197:2, 204:4, 204:7, 210:12, 210:13,

210:19, 211:2, 213:1
Deckelbaum 1:28, 1:36
declaration 49:3, 49:6, 49:11, 50:18, 50:22, 52:12, 54:17, 55:2, 55:4, 55:22, 56:10, 85:25, 86:24, 98:24, 99:17, 120:1, 285:1, 285:3, 303:2
declarations 114:22
declassify 30:2
deem 190:1
deemed 19:20, 19:21, 38:1
deep 311:11
defend 67:9
Defendant 24:6, 66:3, 184:22, 189:9, 189:15, 215:21, 226:3, 227:3, 239:14
Defendant/count er-plaintiff 1:13
defendants 23:18, 23:24, 24:10, 180:4, 181:17, 184:6, 185:1, 195:16, 195:19, 196:5, 196:6, 204:18, 206:6, 248:25, 263:16
defending 188:12
Defense 44:17, 118:22, 152:5, 163:7, 163:14, 195:5, 195:10, 195:12, 196:15, 282:4
defenses 251:4
define 186:19,

187:3
definition 170:4, 175:3, 185:21, 187:22, 188:7
definitive 151:19
degree 19:17, 109:14
Delete 117:6, 117:11, 117:12, 117:19, 154:19, 170:8, 170:10, 170:13, 197:9, 198:2, 198:5, 200:18, 201:11, 213:1, 213:8, 222:25, 224:25, 225:1, 225:3, 225:9, 225:10, 225:20, 225:25, 257:8, 266:8, 267:1, 275:3, 307:3, 307:4, 307:16
deleting 224:21, 226:22, 228:2
deletion 154:9, 171:17, 203:5
deletions 155:9
deliberate 320:3
delivered 29:17, 168:4
delivery 168:6
demand 43:14, 292:23, 292:24, 307:9
demanding 307:11
Demarron 65:10, 67:20, 247:24, 262:6, 291:16, 293:4
demonstrate 244:22
demonstrative 152:4, 152:11, 164:1, 164:2

denied 19:22,
20:7, 30:2,
44:9
Dennis 4:24,
86:5, 102:19
deny 117:17
denying 164:16
departed 53:8
department
231:22
departure 43:2
Depending 47:9,
47:17
depends 232:8
depict 147:11
depicted 216:20
deposition
190:14, 208:9
depositions
49:23, 183:7,
184:10, 256:24
depository
230:5
depth 269:21
DEPUTY 10:25,
83:17, 178:19
Describe 151:7,
152:23, 152:24,
189:16, 267:17
described
105:25, 165:5,
188:15, 295:20,
300:12
description
42:5, 42:10,
254:25
deserves 124:15
designate
14:14, 15:17,
73:25
designated
15:25, 16:11,
16:14, 16:16,
16:19, 16:21,
24:1, 24:3,
25:11, 27:16,
28:25, 34:4,
50:11, 74:1,
74:3, 74:21,
77:8, 150:23,

202:23, 259:18,
263:20, 277:7
designation
16:17
desktop 158:17,
172:14, 172:22,
233:14
desktops
172:15, 173:10,
231:3, 231:4,
233:11, 233:21
destroy 56:12,
133:21, 140:5,
194:21, 222:24,
313:6
destroyed
53:14, 54:9,
56:9, 56:16,
85:18, 85:21,
112:7, 133:12,
134:12, 138:24,
140:8, 140:10,
158:4, 196:18,
200:24, 202:4,
212:14, 214:10,
223:11, 227:21,
275:15, 276:21,
277:16, 278:6,
278:23, 284:14,
294:5, 294:20,
307:14
destroying
228:4, 275:11
destruction
276:12
detail 7:21,
183:16, 256:18
detailed 93:10,
96:2
details 72:14,
84:21
determination
118:10, 141:2
determinations
142:15, 210:22
determine 5:4,
5:9, 6:25,
22:22, 42:18,
42:23, 43:3,
43:21, 43:22,

51:20, 52:18,
93:5, 94:17,
97:3, 118:5,
123:23, 248:18,
268:21, 286:2
determined
254:21, 267:8
determines 8:12
determining
5:13, 25:2,
119:3, 142:20
develop 13:4,
301:16, 310:14,
310:18
developed
45:18, 317:7
developing
266:23
diagram 152:18,
161:6
diagrams 15:5
Dick 86:20,
104:24, 183:12
different
38:14, 47:24,
88:5, 103:5,
109:7, 110:19,
118:7, 124:2,
127:14, 127:15,
153:4, 181:19,
199:9, 204:9,
206:8, 206:9,
230:19, 230:22,
234:2, 293:5
differently
118:12
difficult
158:12
dig 258:12,
258:13, 260:16
diligence 249:3
diligently
83:12
dire 149:2
DIRECT 12:3,
65:21, 71:10,
74:4, 93:12,
102:24, 113:3,
114:6, 117:18,
120:18, 147:21,

179:1, 219:11,
236:2, 289:17
directed 85:10,
113:3, 116:6,
116:7, 131:13,
140:4, 142:9,
142:19, 144:17,
165:19
directing
85:20, 138:18,
142:13
directions
210:9
directive 29:9,
119:2, 319:6,
319:7
directly
121:20, 277:21
director 113:4,
235:8, 235:10
directory
154:10, 156:1,
156:17, 157:13,
157:14, 157:22,
157:24, 159:12,
171:8
disagree 300:1,
311:13
disagreed 79:15
disagreement
80:6
disc 251:25
disclaimer
314:18, 315:11
disclose 68:10,
68:14, 71:13,
188:13
disclosed 35:9,
117:3, 177:15
disclosing
263:16
disclosure
31:10, 55:10,
114:25, 119:25,
120:12, 271:12,
305:2
discover 284:9
discoverable
195:7
discovered

172:5, 243:24,
246:20, 266:21,
285:7, 295:20,
300:16
discovery
14:16, 23:19,
23:22, 37:20,
38:3, 38:6,
38:15, 38:24,
39:3, 47:1,
49:13, 50:6,
65:14, 65:18,
68:6, 122:10,
122:14, 136:2,
184:7, 184:16,
192:10, 192:16,
194:25, 238:14,
239:9, 239:18,
240:19, 246:18,
250:19, 256:9,
264:20, 275:17,
284:10, 293:25,
311:22
discovery-relat
ed 49:24
discuss 55:8,
110:23, 250:18,
256:17, 279:18,
285:12, 305:22,
319:3
discussed
45:10, 57:5,
98:16, 104:15,
172:21, 321:18
discussing
46:16, 91:4,
314:5, 314:9
discussion
98:10, 98:21,
182:12, 195:15,
213:15, 271:3,
271:14, 314:14
discussions
30:12, 41:13,
271:19, 293:24,
294:24, 295:2,
296:2, 296:7
discussions.
40:19
disgorge

129:11, 129:18
disgorged
129:13, 129:17
disk 112:23,
153:15, 169:23,
170:15, 170:21,
170:25, 171:18,
175:8
disks 153:17,
166:23
dismiss 38:12,
38:25
dismissal 313:4
dismissed
30:17, 287:8
dispositive
121:18
dispute 26:3,
45:8
disseminate
290:23
disseminated
132:24, 141:10,
141:18, 174:15,
176:20, 206:15,
284:17, 300:14
dissemination
290:4
distance 130:12
distilled
164:10
distinction
305:16
distracted
265:14
Distrct 283:5
disturb 161:15,
175:6
disturbing
160:21
ditch 311:20
divided 153:3
Division 1:3,
312:17, 322:16
doc 246:10
docket 92:25,
100:8, 145:8,
303:21, 313:1
documentation
57:2, 88:8,

240:23
documents.
136:10
dogged 242:15
Doing 49:17,
138:13, 139:14,
148:4, 148:5,
171:20, 176:9,
187:21, 191:7,
214:15, 222:14,
231:2, 254:22,
269:3, 280:6,
289:8, 303:17
dollars 243:20
done 5:8,
16:17, 21:2,
58:21, 59:14,
59:19, 113:12,
115:7, 123:22,
131:8, 149:14,
158:11, 159:18,
162:20, 171:22,
172:4, 177:15,
190:22, 194:7,
197:14, 197:16,
200:8, 213:20,
213:21, 226:20,
234:18, 237:4,
237:8, 249:3,
251:6, 267:4,
278:10, 280:11,
292:3, 321:14
Donna 1:35,
4:10
door 295:12,
296:5, 300:22,
301:11
doubt 72:2,
86:2, 116:25,
140:5, 201:10,
216:15, 223:17,
223:20, 273:15
down 74:20,
81:20, 141:16,
142:5, 143:2,
160:23, 161:10,
166:18, 178:2,
182:18, 185:23,
186:19, 191:19,
218:23, 235:15,

250:1, 255:12,
268:8, 268:25,
270:18, 278:15,
312:23, 313:25
dozen 197:19
draft 73:14,
90:6, 201:4
drafted 201:3,
201:5, 227:8,
227:19, 312:20
drafting 227:10
Dramin 210:11
draw 5:7,
185:20
drawback 276:10
dream 101:6,
131:18
drive 53:23,
54:11, 56:16,
153:22, 153:23,
153:25, 154:9,
156:5, 156:9,
156:16, 157:4,
157:5, 161:24,
225:15, 225:16,
225:18, 229:25,
230:1, 230:2,
230:8, 230:9,
230:16, 230:20,
230:22, 231:6,
231:7, 231:14,
233:6, 233:8,
247:4, 251:25,
266:11, 266:12,
266:22, 267:3,
275:10, 276:24,
277:9
drives 153:15,
160:2, 162:4,
162:13, 231:4,
233:7, 247:15,
250:7, 275:4
duck 124:2
Due 124:25,
133:18, 199:11,
250:19
DURING 19:1,
21:10, 25:21,
25:24, 26:15,
27:20, 29:9,

31:7, 32:8,
34:17, 36:15,
50:4, 71:20,
72:1, 74:4,
77:21, 78:23,
79:9, 101:2,
134:25, 151:13,
151:15, 159:18,
179:6, 193:6,
219:15, 220:25,
236:12, 267:7,
284:23, 316:5
duties 103:12
duty 112:18,
112:21

< E >
E-discovery
257:7
earlier 40:9,
41:13, 54:4,
62:4, 80:21,
87:22, 118:22,
123:6, 129:4,
195:4, 203:12,
240:17, 240:24,
245:14, 247:18,
249:20, 252:14,
260:5, 263:10,
266:23, 272:19,
293:7, 294:25,
295:1, 298:12,
305:18, 310:21,
313:12
earliest
202:25, 214:17
early 111:19,
166:1, 229:19,
312:5
earnest 38:7
easier 76:16
easily 81:15
east 18:4
Eastern 17:16,
18:4, 23:1,
23:2, 23:8,
23:22, 25:1,
25:7, 26:3,
32:22, 106:2,

106:17, 111:11,
180:5, 182:16,
193:15, 195:17,
195:19, 196:2,
196:14, 206:20,
208:9
eat 145:11
eating 5:23
edition 150:6,
150:7, 150:8
educational
150:19
effect 54:12,
118:5, 121:22,
175:7, 215:4,
270:4, 311:7
efficiency
147:19, 242:15
efficient
10:15, 257:9
effort 38:16,
213:9, 241:1,
291:9, 291:14
efforts 20:10,
20:11, 20:18,
25:4, 38:24,
39:4, 182:9,
278:3, 278:9,
278:11
efiling@cooterm
angold.com
1:33, 1:41
Either 13:5,
14:16, 26:24,
27:21, 27:24,
39:12, 44:16,
50:13, 56:8,
66:15, 76:8,
86:25, 101:19,
102:17, 107:19,
124:7, 127:20,
129:11, 129:17,
136:18, 144:14,
171:3, 171:4,
173:12, 194:16,
209:21, 218:21,
218:22, 234:23,
244:20, 250:2,
312:1, 312:5,
313:5, 313:8,

319:11
elaborate
246:15, 246:16,
312:21
elected 209:24
electronic
53:23, 113:19,
140:5, 202:15,
210:15, 213:7,
223:1, 224:13,
224:19, 224:21,
228:23, 245:16,
246:17, 283:12,
284:14, 294:16,
299:17, 300:8,
306:17, 306:24,
306:25, 313:17
electronically
53:15, 213:24,
259:3
elements 5:5,
132:10
elevated 253:18
eliminated
294:4
Ellinger 113:4
Ellis 241:21
else. 284:18
elsewhere 206:9
em 129:11,
171:12, 175:25,
195:12, 200:12,
222:24, 307:15
email 33:12,
33:13, 33:18,
34:1, 34:7,
40:16, 61:11,
61:12, 61:23,
90:5, 198:16,
198:25, 250:9,
250:14, 250:17,
250:21, 253:1,
253:13, 253:21,
255:1, 255:25,
256:6, 256:7,
256:16, 257:4,
259:2, 262:22,
266:5, 266:17,
266:18, 276:4,
288:8, 305:23,

310:20
emails 169:1,
169:11, 169:13,
172:10, 172:11,
230:14, 296:1,
309:9
embedded 246:7
emphatic 287:4
employ 121:16
employed 12:11,
12:13, 103:7,
103:9, 103:10,
107:19, 109:5,
115:7, 148:11,
179:6, 186:5,
219:15
employee
114:15, 186:21,
298:24
en 10:3,
145:20, 157:13
enable 244:25
enables 231:6
Enclosed 40:23,
50:9, 84:22,
203:16, 271:5,
271:23, 277:4
enclosing
203:12
encouraged
99:22, 120:12
End 7:14,
12:16, 67:14,
74:20, 75:2,
86:13, 111:18,
148:9, 165:11,
224:24, 225:12,
225:14, 225:21,
232:6, 243:5,
250:3, 282:3,
292:8, 311:15,
321:20
endeavors 175:5
ended 125:10,
195:24
enforce 19:4,
44:8, 60:19,
60:25, 61:4,
75:25, 92:2,
93:17

enforceability
256:10
enforcement
18:24, 150:12,
150:13, 150:15
engaged 168:1
engagement
36:20, 148:14
engineers
16:25, 45:16
enjoined 131:1
enough 89:2,
96:14, 129:21,
318:25
enrolled
137:10, 137:11
ensure 281:14,
281:25
enter 14:7,
27:21, 27:22,
28:5, 30:4,
100:23, 121:17,
129:11, 129:13,
134:8, 134:9,
136:13, 136:18,
137:7, 183:18,
193:12, 194:16,
209:21, 209:25
entered 13:25,
19:14, 19:17,
20:20, 27:17,
28:19, 37:11,
37:18, 63:22,
64:21, 91:1,
97:6, 137:23,
149:15, 183:19,
297:3, 297:5,
313:1
entering 88:12
entire 32:8,
91:5, 168:9,
236:12, 245:7,
289:8, 295:14,
315:23
entirely 119:24
entirety 154:14
entities 13:17,
23:9, 23:21,
108:15, 150:18,
254:7

entitled 6:3,
6:5, 6:9,
124:15, 137:12,
204:19, 322:4
entity 105:2,
166:2
entries 92:13,
97:15, 100:9,
268:11
entry 95:18,
137:8, 267:18,
272:10, 298:13,
313:1
equipment 13:4,
172:1
Equivalent
242:21, 242:25,
243:10, 244:6,
244:9, 244:15,
244:25, 245:4,
245:6, 246:20,
247:11
Eric 26:9,
179:5, 203:15,
220:11, 221:20,
223:12, 223:22,
227:12, 232:4
escalate 58:13
escape 289:3
espoused 139:4
essence 122:16,
122:20, 191:1
Essentially
8:4, 9:5,
60:24, 65:4,
77:20, 122:4,
124:4, 125:9,
241:13, 257:16,
316:23
establish
130:13
established
126:22, 127:3
establishes
126:17
establishing
116:14, 130:23,
139:2
estimation
102:3, 118:8

estopped 6:14,
118:6, 317:10
estoppel 321:1
et 248:23,
248:24, 292:16
evade 126:14,
126:23, 131:4
evaluating
188:13
evening 199:15
event 31:24,
109:3, 125:17,
157:3, 217:12,
251:19, 287:23,
315:18
events 31:13,
104:9, 104:15,
117:11, 216:19,
279:21, 301:18
Eventually
20:19
Evercom 64:13
everybody 8:19,
124:3, 125:3,
125:4, 126:3,
204:17, 229:23,
230:20, 232:5,
233:7, 248:3,
319:12
Everyone 126:4,
177:24, 205:13
Everything
107:15, 120:1,
135:2, 135:3,
135:4, 135:5,
146:23, 147:14,
163:8, 163:10,
166:15, 184:11,
197:14, 210:15,
213:11, 233:5,
234:18, 237:2,
268:5, 277:23
evolving 270:1
exact 33:5,
72:5, 72:6,
91:3, 111:20
exactly 30:10,
72:23, 82:8,
104:6, 108:19,
117:12, 117:14,

117:21, 117:24,
163:11, 166:13,
166:14, 198:5,
198:7, 198:8,
207:1, 251:7,
255:3, 286:9,
315:17, 320:23
exam 74:4,
236:15
EXAMINATION
12:3, 44:20,
71:10, 83:21,
102:17, 102:24,
147:21, 158:20,
164:20, 173:7,
173:21, 174:13,
175:10, 175:22,
179:1, 205:1,
216:6, 217:23,
219:11, 229:11,
236:2, 289:5,
289:25, 308:25
examine 160:5
examined
158:16, 168:23,
168:24
example 46:12,
77:25, 181:24,
293:7, 301:22,
319:25
exceeding
121:1, 121:2
Excel 255:4
excellent 101:9
except 116:6,
146:24, 159:6,
168:13, 172:21,
199:2
exception
106:21
exchange 48:9,
89:17, 90:25,
123:6, 310:20
exchanged
32:15, 46:1
Excuse 56:14,
94:4, 106:23,
149:25, 156:5,
215:8, 233:21,
272:5, 316:24

excused 178:3,
218:24, 235:16,
235:19
execute 189:2,
189:19
executed
188:25, 190:6,
190:10, 205:25,
206:3, 258:25
executive
235:8, 235:10
executives 88:5
exfoliation
275:12
Exhibits 9:5,
9:12, 9:16,
11:22, 39:21,
88:20, 145:18,
145:20, 146:8,
146:16, 147:16,
239:11
exist 5:5,
100:9, 123:8,
123:11, 123:12,
123:14, 123:19,
123:24, 139:23,
158:5, 158:16,
159:2, 167:14,
167:18, 168:15,
168:16, 168:21,
168:22, 173:8,
173:19, 175:11,
213:13, 228:11,
229:1
existed 46:14,
69:7, 112:24,
140:12, 151:13,
153:1, 153:22,
155:13, 158:18,
166:16, 166:25,
168:9, 168:18,
169:24, 173:3,
173:14, 174:3,
177:10, 218:8,
218:11, 218:14,
228:23, 233:21,
234:8, 274:16,
275:8, 279:17,
300:8, 313:5,
313:9

existence
66:23, 68:19,
107:8, 107:11,
151:20, 151:21,
166:15, 229:17,
275:20, 307:8
exists 46:12,
67:8, 116:19,
132:15, 168:12,
173:9, 175:12,
176:8, 292:15,
299:18, 306:1,
306:24, 319:17
expanded 183:7,
183:8
expect 7:1,
154:9, 256:8,
274:12, 286:8,
301:25
expectation
273:18, 273:20,
274:4, 274:20,
297:24, 298:3,
299:19
expectations
297:23
expected
297:18, 298:2,
301:16, 307:9,
307:10, 307:20,
310:14, 310:17
expense 286:19
experience
14:3, 149:19
expertise
174:17, 174:19
experts 78:14,
147:4, 191:8
explain 23:4,
41:20, 160:18,
182:10, 187:20,
189:21, 190:5,
220:21, 223:5,
248:6, 269:16
explained
135:25, 151:8,
312:25
explaining 8:7,
182:8
explanation

8:11
explore 60:7
Expose 150:5
express 297:17
expressed
35:10, 208:15,
280:12
expunge 90:1,
90:6, 90:7,
90:16, 91:23,
92:10, 92:18,
93:9, 94:13,
96:1, 96:7,
96:24, 97:11,
100:8
expunged 43:23
expunging 94:15
extent 50:18,
52:23, 269:20,
310:8
external 54:11,
56:16, 161:24,
162:3, 162:13,
247:15, 250:6,
251:25, 275:4,
277:9
extra 89:3,
277:15, 302:2,
302:3
extracted
160:24
extremely 114:8
eyes 14:15,
15:14, 16:11,
16:14, 16:16,
16:20, 16:23,
25:22, 62:8,
73:18, 74:21,
77:8, 188:14,
206:6, 263:14,
277:8, 281:23

< F >
F.2d 121:22,
129:6, 129:7
F.3d 128:9,
128:14
F70 128:9,
128:10

face 46:22
facie 116:2,
144:20
facilities
15:6, 15:7
factors 248:17,
248:20, 248:21
facts 5:6, 5:9,
5:10, 8:14,
20:25, 125:13,
140:21, 141:17,
155:8, 155:18,
160:20, 165:21,
317:7, 320:16
factual 7:14,
119:14, 142:5
failed 36:13,
36:17
failure 283:6
fair 65:18,
76:9, 119:17,
206:9
fairly 73:1,
163:7, 196:8
faith 100:23
Falcone 86:20,
86:21, 104:24
Falkler 276:10
fall 60:14,
117:4, 140:24,
141:1, 238:12
falling 122:16,
122:20, 123:15
familiar 16:3,
16:5, 72:19,
73:11, 73:16,
86:5, 152:18,
154:3, 230:1
family 278:13
far 32:10,
35:22, 132:13,
140:16, 149:3,
151:10, 168:10,
175:19, 176:7,
177:12, 178:5,
181:14, 239:21,
289:24, 313:20,
315:18
fashion 160:23
fast 288:1

fast-forwarding 277:17
FBI 150:18
FCR 319:6
February 165:11, 312:19
federal 13:6, 17:16, 22:19, 190:24, 190:25, 312:13
Feds 150:16
feeding 138:15
feel 76:25, 275:2, 275:11, 275:14, 275:16, 277:11, 313:5, 321:10
feeling 116:5, 140:24
fees 22:13, 322:5
fell 15:16, 187:21, 188:6
fellow 290:5
felt 184:15, 188:6, 197:23, 204:10, 204:22, 206:19, 218:10, 269:1, 287:6, 313:7
few 86:16, 87:7, 87:15, 149:18, 196:6, 217:25, 242:1, 260:1, 286:23, 289:7, 316:19
field 150:4
fierce 124:20
Fifth 8:1, 8:2, 121:9, 121:19, 126:6, 126:12, 128:20
figure 24:24, 39:5, 240:5, 244:7, 253:6, 266:5, 267:18, 267:22, 268:13
figured 142:17
file 20:5, 41:24, 48:3,

58:6, 60:19, 92:17, 95:21, 112:23, 137:7, 155:17, 155:22, 155:24, 157:15, 157:16, 157:17, 160:1, 160:2, 175:14, 175:23, 175:24, 176:3, 176:8, 176:10, 224:3, 245:15, 246:5, 246:6, 252:1, 252:14, 258:17, 264:2, 283:10, 313:4
File_01 153:5, 153:8, 153:9, 153:10, 153:13, 153:16, 158:17, 160:18, 160:23, 161:12, 166:24, 168:23, 172:22
filed 19:3, 22:12, 26:16, 38:14, 44:7, 54:1, 57:24, 94:18, 94:22, 95:15, 96:18, 97:7, 104:1, 104:6, 105:22, 117:6, 180:2, 206:23, 237:24, 238:1, 238:3, 238:11, 240:9, 240:17, 277:25, 294:8, 294:21, 300:3, 302:25, 303:21, 320:1
files 27:4, 37:15, 49:24, 60:24, 87:13, 113:24, 124:19, 168:2, 169:9, 175:20, 210:14, 210:24, 213:1, 213:7, 213:18, 224:2, 224:3, 246:21, 247:1, 247:3, 276:12, 283:7, 305:20

filing 92:25, 237:22
final 61:3, 298:19
finalize 88:12
finalized 87:19, 111:4
finally 5:25, 75:19
financial 15:6, 187:12, 315:21
Find 43:21, 45:1, 59:24, 66:1, 84:23, 152:1, 154:9, 157:22, 166:15, 166:18, 174:2, 188:12, 199:11, 212:11, 242:2, 242:9, 242:11, 242:12, 242:23, 243:7, 244:3, 244:10, 244:13, 244:25, 245:6, 245:7, 245:11, 260:17, 268:6, 277:4, 286:19, 292:14, 296:19, 296:21, 296:24
finding 66:2, 118:12, 119:6, 129:21, 131:13, 138:18, 144:17, 215:14, 244:8
findings 7:15, 92:14, 116:7, 117:18, 125:14, 125:16, 125:19, 125:22, 125:23, 151:19, 239:4
finds 125:3, 125:5
fine 8:16, 49:17, 63:1, 147:15, 234:14
finger 5:24
finish 178:8, 265:3, 300:2
finished 306:5, 306:13

firms 18:5, 27:14, 37:7, 115:7, 220:16, 236:21
firsthand 115:3
Fish 2:27, 44:22
fit 163:1
Fitzwater 5:1, 5:6, 8:12, 14:2, 30:6, 30:14, 89:20, 94:17, 97:6, 97:9, 98:12, 100:7, 119:1, 119:7, 140:20
five 10:21, 10:23, 151:25, 216:8
flight 144:12
Flip 9:24, 77:3, 95:14, 259:10
flipping 63:18
Focus 16:2, 54:19, 76:18, 174:3, 205:12, 229:13, 249:15, 262:20, 285:21
focused 52:4, 134:20, 134:21, 166:6, 311:22
focusing 224:15, 311:21
folder 154:14, 156:4, 156:10, 156:11, 156:14, 156:15, 156:16, 157:3, 157:5, 157:9, 158:3, 158:7, 161:18, 166:25, 170:9
folders 225:18, 225:20
folks 195:25, 198:17, 201:8, 213:16
follow 5:12, 202:17, 292:6
follow-up 62:5,

263:11
followed 35:5,
59:7, 113:21,
292:11
Following
28:22, 29:16,
36:17, 63:20,
65:15, 65:21,
67:19, 87:15,
93:10, 97:15,
101:3, 201:20,
213:3, 250:20,
251:19, 256:1,
271:3, 310:23
follows 287:24
foregoing
322:2, 322:3
forensic
117:21, 138:7,
138:11, 138:20,
168:20, 215:18,
216:6, 286:1,
287:14
Forensics
148:3, 148:5,
148:21, 148:25,
149:20, 150:2,
150:4, 150:5,
150:10, 151:4,
162:23
forget 115:6
Forgive 207:24
forgot 49:19,
217:21
form 97:22,
98:7, 119:13,
188:20, 191:20,
218:8, 227:13,
228:23, 272:24
formal 27:22,
136:13, 313:2
formally 77:21,
137:7, 193:12
format 322:5
formatted
170:22
former 35:9,
42:25, 44:8,
50:1, 115:15,
296:20, 297:16

forth 45:16,
54:22, 59:8,
220:25, 221:1,
230:14, 248:20,
264:3, 285:15,
312:22
fortunate
161:12
forward 35:25,
98:25, 116:16,
117:19, 152:2,
165:10, 165:14,
211:5
forwarded 35:4
forwarding
84:10
found 6:4,
50:5, 120:19,
151:19, 151:21,
153:1, 154:7,
154:8, 155:10,
156:3, 156:8,
159:11, 161:11,
161:14, 162:16,
165:13, 245:13,
306:15, 307:6
foundation
56:25
four 6:19,
13:10, 162:8,
186:19, 315:20
fourth 117:7,
260:17
fraction 244:1
frame 31:7,
50:19, 87:23,
90:22, 104:13,
105:9, 109:22,
110:14, 111:15,
158:15, 159:11,
159:19, 166:5,
167:18, 168:13,
172:18, 173:15,
173:25, 177:10,
289:9, 294:23
framed 141:24,
141:25
frames 151:9
Frank 276:10
Frankly 7:6,

122:7, 124:16,
139:22, 146:21,
198:7
free 277:11
Friday 256:1
front 20:8,
60:17, 60:20,
76:20, 78:19,
87:8, 138:5,
194:9, 194:10,
201:21, 207:8,
272:7, 276:3,
315:19, 321:1
fulfilling
238:7
full 121:10,
174:10
full-fledged
52:24
fully 39:1,
307:9, 307:10
function 232:25
functioning
183:1
future 274:13,
301:18


< G >
G-C 148:15,
148:18
gain 25:9
garner 249:3
gather 200:8,
223:6, 241:11
gathered 224:2,
228:13
gathering
241:2, 241:8,
247:19
gave 60:20,
101:21, 129:10,
165:15, 198:1,
207:19, 209:19,
209:20, 294:19,
318:15
gears 184:2
gel 280:15
general 47:20,
86:8, 103:11,

103:12, 103:19,
103:20, 104:8,
104:19, 105:4,
105:12, 105:13,
105:17, 106:9,
210:11, 220:1,
238:5
generally
46:15, 47:13,
147:4, 152:23,
154:3, 179:23
generically
304:5
gentlemen
120:11
Georgia-pacific
248:17, 248:19
gets 39:23,
137:25, 239:9
getting 20:17,
25:12, 35:15,
102:6, 195:11,
220:24, 221:1,
240:6, 249:13,
249:15, 253:22,
254:5, 274:1,
275:23, 290:20,
310:25, 311:4,
315:19
GH 199:19
GHJH 201:22,
202:3
GHJHFS 161:5,
161:9, 161:13,
162:10, 172:22
gig 155:16,
169:25
gigabyte
153:13, 153:22,
153:25, 154:9,
156:4, 156:5,
157:4
gigabytes
153:16
gist 282:8,
282:14
Given 25:11,
34:15, 42:6,
42:19, 47:20,
51:3, 51:25,

72:1, 72:8,
74:5, 77:20,
80:19, 108:21,
119:11, 124:14,
125:13, 177:14,
194:6, 249:1,
274:7, 275:8,
279:23, 281:9,
283:25, 290:10,
290:13, 295:8,
300:6, 313:3,
321:6
gives 60:9,
126:16, 137:6,
255:1, 316:3
giving 136:8,
192:22, 254:2,
254:4
glad 195:22
Glasgow 236:9
glitch 242:14
Globe 106:1,
109:17, 109:20,
124:19
Goodman 4:10
gosh 309:13
gotten 61:12,
202:11, 206:13,
227:12, 257:24,
274:8, 277:13,
287:20
Government
277:1
grabbed 233:23
grant 131:13
grants 97:9
graphic 147:9,
166:7
graphics 74:25,
75:8, 163:12
great 195:10
Green 37:3,
312:17
ground 223:18
grounds 92:21
groupings 153:3
Grubler 294:3
Gubler 290:21
guess 9:20,
19:5, 31:13,

36:3, 41:22,
80:17, 89:9,
93:21, 95:8,
101:13, 114:1,
140:15, 167:20,
173:18, 237:6,
239:10, 284:7
guest 44:19
Guidance 149:24
Guide 150:10
guy 113:11,
170:1, 197:11,
207:21, 243:11
guys 134:19,
243:10, 244:6,
244:15, 245:6,
246:20, 307:10,
315:1
Gwen 3:2, 4:23
gwenw@bellnunna
lly.com 3:8


< H >
hack 162:24
Hacking 150:5
Hail 2:36,
201:22, 202:21,
203:14, 203:17,
208:5, 209:5,
219:17, 236:25
half 268:11
Hand 9:10,
11:17, 88:20,
102:22, 315:1
hand-delivering
29:7
handful 314:16,
315:8
handing 89:7,
294:18
handle 138:25,
145:10, 282:2
handled 234:19
handles 47:6
handling 221:5,
291:11
hands 165:21,
295:20
happen 21:6,

31:12, 135:11,
142:19, 143:21,
143:22, 241:19,
245:2, 248:11,
273:19, 301:19,
319:18
happening
170:20
Happens 34:25,
60:16, 125:5,
196:3, 196:7,
215:6, 231:10,
239:15, 245:12,
311:10
Happy 89:5,
129:23, 168:1,
169:19, 172:18,
173:16, 205:9,
306:9, 316:5
Harbison 37:1,
50:7, 53:12,
53:21, 54:7,
54:8, 56:15,
57:2, 57:5,
115:12, 115:14,
250:15, 264:25,
267:19, 304:11
Harbison. 50:1
hard 53:23,
54:11, 56:16,
134:12, 140:6,
161:24, 162:3,
162:13, 200:5,
200:8, 202:12,
203:4, 203:22,
225:15, 225:18,
247:4, 247:15,
250:7, 251:25,
266:11, 266:12,
266:22, 267:3,
275:4, 275:10,
276:24, 277:9,
283:11, 284:15
harm 281:7
harmful 114:8
HARRIS 1:22
hash 176:7
hate 293:9
Head 31:9,
31:11, 130:16,

149:6, 255:10,
258:5, 269:8,
286:10, 298:13,
306:5
head-up 238:8
header 266:15
heads 244:7
hear 7:2, 7:18,
106:25, 112:4,
112:11, 117:10,
138:20, 138:21,
140:23, 141:5,
143:17, 254:7,
275:25, 278:20,
278:21
heard 20:24,
21:2, 30:23,
98:21, 106:3,
106:5, 108:12,
112:5, 127:7,
127:10, 133:3,
165:8, 177:21,
179:18, 215:18,
216:11, 216:13,
221:12, 226:4,
237:2, 238:23,
239:1, 239:7,
239:8, 260:5,
261:14, 268:1,
274:25, 279:22,
280:3, 282:11,
299:6, 301:1,
315:25, 318:5,
319:19, 320:9
hearings 20:16,
22:12, 149:14,
190:15, 190:18,
191:8
hearsay 147:4,
149:10
held 6:13,
18:22, 116:23,
133:23, 208:23
Hello 205:3,
205:4
Help 25:2,
25:6, 73:14,
134:19, 152:8,
187:24, 192:21,
223:23, 224:1,

232:7, 232:9,
269:14, 296:2
helped 136:7,
152:4
helpful 295:7
helping 152:20,
188:3, 301:20
helps 246:24,
246:25
hereby 92:1,
95:22, 97:16
hereto 188:20
hesitant 160:17
hesitate 203:18
hide 272:11
High-tech
149:23
highlight
149:18, 185:16,
198:14
highly 14:17,
15:17, 251:3
hindsight
245:10
hire 286:18
hired 5:22,
46:4, 77:7,
148:14, 151:5,
217:9
hit 213:8,
225:13, 225:20
Hoffman 17:11
Hold 5:4,
91:18, 119:16,
206:23, 249:17,
273:1
holding 13:16,
17:21
holds 289:12
hollow 122:5
honest 46:17,
134:20
Honor. 135:24,
193:3, 193:21
HONORABLE 1:21
hope 89:15
hopes 250:21
hour 199:12
hours 162:20,
196:15

Housekeeping
316:19, 320:14,
321:14
How'd 213:22,
314:7
hub 124:12
huge 114:4
hundred 246:8,
246:10, 260:14
hundreds 245:25
hurdle 242:16


< I >
I. 3:2
ICS 24:6,
24:10, 24:13,
195:16
idea 46:17,
69:6, 69:24,
147:10, 165:6,
165:9, 167:18,
168:7, 174:13,
218:9, 261:14
ideas 243:11
identified
41:2, 41:8,
50:10, 62:7,
62:8, 64:15,
86:4, 122:4,
256:8, 263:13,
263:14, 267:1,
271:22
identifies
250:22
identify 168:2,
192:24
identifying
25:10, 40:23,
266:24, 271:6
Ids 244:10,
245:1, 245:6
images 163:5,
175:16, 245:13,
245:18, 245:19,
246:8, 246:10,
246:21, 247:3,
276:13
imaging 165:7
immediate

20:13, 217:12,
267:1, 279:24
immediately
43:20, 50:9,
196:14, 217:8,
283:6
impact 21:19,
22:8, 39:21,
41:12, 102:3
impact. 41:17
implication
284:23
implied 281:12
import/load
252:1
important 55:1,
60:2, 95:1,
130:11, 151:9,
278:7, 316:8
impose 319:5
impression
283:25
improper 55:10,
76:2
improperly
43:16, 43:22,
51:20
in. 152:10,
152:13, 180:1,
189:11, 196:4,
246:8, 287:20
inadvertence
21:4, 21:10
inadvertence/in
tentional 115:7
inadvertent
50:7, 114:25,
123:17, 140:12,
271:4, 291:1
Inadvertently
21:1, 151:20,
196:8, 252:10,
266:1, 266:22,
271:13, 276:11,
290:17
inartful 158:9
Inc. 1:5, 1:12,
1:17, 4:23,
13:11, 271:18,
308:14, 308:16

incarcerated
13:6
inclination
268:19
include 122:10,
169:25, 183:8,
259:12, 291:24,
297:9, 304:3
included 13:11,
42:15, 89:25,
91:14, 92:7,
97:24, 100:17,
163:4, 259:22,
266:22, 271:13,
284:10, 295:15,
296:4, 314:18
includes 15:18,
186:4, 187:16,
187:17
including
13:13, 48:11,
66:16, 92:12,
96:6, 149:23,
161:25, 222:9,
240:17, 276:12,
283:11, 289:16
inclusive 146:8
incorporated
16:24, 45:24
incorrect 57:3,
87:2, 270:6,
279:8, 283:7,
296:6
incorrectly
136:5
independent
114:2, 114:11,
122:11, 138:8
index 157:16
indicate 8:4,
66:23, 129:16,
156:25
indicated
40:18, 53:13,
133:11, 256:18,
271:14, 275:19,
276:19, 276:20,
281:10
indicates
116:19, 252:1

indicating
76:24, 166:22,
194:5
indication
34:18, 159:3,
168:7
indicators
155:25
indicia 162:22
indictment 5:11
indirect 105:2
individual
150:23, 159:21,
160:9, 172:14,
233:10, 246:13
individually
86:4, 98:19,
120:7, 120:10
individuals
73:17, 74:2,
131:14, 168:12,
176:25, 317:23
indulgence
10:8, 302:6,
302:15
industry 15:2,
17:23, 23:10
infirmities
164:18
informal 20:11
information.
77:13
informed 10:21,
133:5, 170:7,
172:5, 254:7
Infosec 150:9
infringement
13:10, 17:20,
17:23, 32:4,
32:17, 33:17,
45:13, 64:11,
181:23, 184:24
infringer 264:2
infringing
15:4, 23:18
inherited
284:11
initial 73:9,
144:1
initially

27:12, 183:3
injunction
126:14, 129:2,
131:4
inmate 23:10
inquire 169:13
inquired 171:24
inquiries
166:4, 234:7
inquiry 112:22,
123:25, 124:16,
151:12, 168:25,
171:12, 233:20,
266:20
inside 157:21,
169:11
insignificant
268:23, 305:16
inspections
151:15
install 13:4
instance 19:9
instead 61:14
instruct
112:22, 291:21
instructed
170:10, 204:8,
213:12, 213:14,
218:7, 222:21,
241:19, 316:20,
316:21
instruction
198:6, 262:6
instructions
198:1, 209:18,
224:20, 226:23
instrumental
152:20
intellectual
220:2, 293:14
intend 117:8
intended
133:20, 133:21,
140:13
intending
305:22, 305:23
intent 39:13,
204:13, 204:14,
320:2
intentional

134:15, 135:9
intentionally
319:15
intentionally.
252:6
interaction
86:19
interactions
159:21
interest 148:23
interested
166:5, 168:21,
173:25, 175:4,
240:11, 248:25,
250:1, 275:22,
310:25, 311:4
interesting
157:11, 279:11,
311:9
interests
183:22
interface
234:21
interference
37:5, 37:6,
312:12, 312:15
interior 175:16
internal
157:16, 252:24
International
131:2
interpreted
48:12
interrogatories
250:25, 277:5
interrogatory
184:10
interrupt
52:21, 175:18,
265:4
introduce
49:20, 83:25,
147:23, 164:5,
236:4
introduced
66:10, 152:5,
239:13, 262:22,
266:14
introducing
314:14

introduction
10:12, 163:14
invade 129:2
invalid 46:13,
48:17, 67:8,
264:4
invariable
264:17
investigation
151:18, 165:14,
165:19, 165:22,
171:5, 173:13,
174:4, 175:13,
266:3
Investigator
148:3, 149:23
investment
243:21
invite 244:17
invoking 196:16
involve 256:13
involvement
108:6, 108:14,
109:16, 111:7,
179:24, 181:3,
222:4, 222:13,
307:22, 308:8
involving 14:4,
16:6, 17:5,
17:15, 17:23,
18:23, 23:20,
24:12, 25:15,
31:6, 32:4,
36:1, 207:4,
215:14, 271:13
IP 220:1, 220:2
irony 7:5
irrelevant
19:20, 19:21,
39:25, 47:4
ISE 150:24
issued 8:1,
8:10, 29:24,
30:2, 30:8,
44:25, 61:3,
93:18, 116:21,
211:6, 211:18,
234:5, 290:3,
298:6
issues 5:13,

42:21, 56:3,
76:5, 82:16,
87:11, 103:14,
117:25, 120:15,
122:12, 136:7,
142:21, 143:21,
143:24, 182:13,
183:10, 183:13,
184:7, 186:14,
187:25, 191:2,
192:21, 204:13,
207:2, 248:16,
250:20, 265:8,
274:19, 275:12,
275:24, 311:22,
316:23, 320:16,
321:1
issuing 30:14
item 29:10,
29:18, 41:7,
271:8, 304:22
items 29:15,
275:21
itself 46:3,
52:4, 86:1,
100:16, 112:24,
123:8, 132:14,
132:15, 133:7,
156:3, 163:2,
169:6, 225:1,
294:17, 301:8


< J >
J. 3:39, 322:2,
322:12, 322:13
Jack 286:11
Jackson 24:22
January 165:11
Jason 3:15,
8:23
Jeff 4:22,
28:15, 44:18,
185:8, 196:10,
197:16, 197:20,
198:25, 199:15,
199:19, 201:20,
202:19, 202:20,
203:9, 280:22
jeffl@bellnunna

lly.com 2:48
Jeffrey 2:42,
11:10
Jerry 239:8
job 6:7,
103:18, 103:19,
264:23, 320:25
jobs 162:24
Joe 37:2,
184:19, 191:9,
260:18, 260:19
Joel 37:9,
270:22, 279:3
Johansen 2:36,
201:22, 202:21,
203:14, 203:17,
208:4, 209:5,
214:24, 219:17,
236:25
join 102:7
joined 53:8,
57:13, 57:14,
102:4, 180:1,
236:22, 281:2
joining 43:3,
104:16
joint 91:11,
91:16, 91:21,
92:17, 94:18,
100:24
jointed 93:14
jointly 282:3
Jon 276:10
Joseph 16:2,
16:8, 29:19,
41:10, 85:3,
85:22, 261:13
Josh 177:6,
241:21, 242:6,
242:8, 242:9,
242:19, 242:21,
243:7, 244:6,
244:15, 245:5,
247:9, 247:10
judges 124:4
Judicial 322:6
July 51:14,
52:7, 54:9,
58:15, 58:19,
216:18, 216:19,

218:5, 236:22
jump 129:7,
190:12
jumping 255:7
juncture 116:4,
275:2
June 238:18
jurisprudence
121:20
jury 289:3,
315:17
justification
283:5


< K >
Karas 1:28,
1:36
keep 115:19,
168:18, 171:19,
192:19, 195:3,
200:11, 234:11,
254:6, 306:20,
306:23, 313:7
Ken 4:13
KENNETH 2:13
Kentucky 32:23,
37:3, 39:7,
110:12, 111:8,
311:12, 312:13,
312:24
kept 156:6,
252:23, 299:11,
299:18, 300:7
Kettleton 17:10
key 130:16,
155:25, 158:14,
177:5, 246:19
keyboard 244:21
keynotes 130:21
kill 89:3
kinds 14:23,
140:19, 184:8,
184:25, 193:14
Kit 150:8
kkula@mcdolewil
liams.com 2:19
Knetix 105:19
know. 272:1
knowing 76:25,

123:22, 133:18,
185:2, 228:9
knowingly
126:13, 128:23,
131:3
knowledge 44:6,
69:15, 70:3,
99:19, 99:22,
115:3, 135:5,
218:2, 233:4
known 125:11,
307:8
knows 56:3,
117:22
Kula 2:13,
4:14, 277:18,
277:21, 280:24


< L >
labeled 225:18
labeling 14:16
Labor 236:23,
237:1
Laborers 131:1
lady 293:19
Lang 26:14,
71:6, 209:3,
209:4, 223:22,
224:3, 232:15,
253:9, 253:15,
253:22, 255:24,
256:6, 258:12,
258:16, 258:23,
269:6, 269:12,
274:22, 291:18,
298:23, 299:9,
299:12, 300:11,
300:21, 301:10,
306:16, 309:2,
309:14, 309:25
language 129:8,
185:25, 186:7,
186:22, 187:14,
189:1, 193:4
laptop 172:20,
172:24, 233:15,
233:18, 233:22,
233:23, 233:25,
234:8

laptops 173:10, 233:14, 233:16, 233:17, 234:4
large 171:19
laser 153:8
last 5:24, 33:20, 34:1, 40:18, 62:3, 74:20, 76:19, 78:1, 78:3, 78:8, 81:18, 85:9, 85:16, 86:16, 97:21, 113:13, 125:1, 145:9, 179:3, 193:19, 200:25, 212:12, 227:16, 263:9, 284:25
late 30:19, 39:20, 60:14, 109:24, 111:19, 277:18, 301:2, 312:5
later 17:10, 22:20, 80:25, 87:7, 106:11, 107:9, 107:24, 108:5, 124:8, 129:15, 149:3, 155:14, 183:16, 190:5, 216:8, 217:10, 217:11, 236:16, 245:5, 295:21, 299:25, 300:3, 320:22
Lattice 256:18
Laughter 58:14, 131:19, 245:11
Laughter. 11:14, 219:5, 265:23, 287:22
Laurence 147:25
lawsuit 12:25, 17:8, 32:3, 47:15, 71:3, 73:1, 85:13, 88:14, 89:21, 98:23, 99:24, 114:20, 248:11
lawsuits 32:3,

32:12, 39:7, 86:14, 99:8, 248:10, 248:13, 249:17
lawyer 47:6, 54:6, 55:19, 65:11, 236:13
lawyers 18:1, 24:23, 26:7, 26:25, 37:7, 47:10, 55:16, 102:16, 107:19, 121:16, 122:3, 126:18, 172:3, 190:23, 198:17, 202:11, 231:3, 231:24, 233:10, 233:14, 234:3, 234:4, 273:17, 275:25
lead 144:14, 265:8
leading 191:19, 261:21, 261:22, 265:7
learn 246:16, 282:22
learned 111:21, 174:20, 206:11, 290:7, 300:10
least 6:19, 18:2, 22:16, 27:12, 31:5, 32:10, 42:5, 50:18, 61:2, 64:24, 68:7, 82:15, 83:1, 113:16, 116:20, 117:18, 155:22, 160:7, 195:15, 196:5, 241:10, 255:18
leave 57:19, 100:5, 102:15, 144:12, 216:17, 219:22, 287:1
leaves 125:2, 140:1
leaving 316:12
led 19:3, 19:6,

23:6, 30:11, 30:13, 164:25
left 57:13, 57:14, 59:5, 59:10, 59:19, 216:22, 217:4, 218:5, 218:10, 228:17, 228:21, 229:4, 234:15, 234:18, 235:5, 236:22, 241:24, 242:3, 250:17, 253:4, 270:5, 270:7, 278:14
legal 101:6, 107:12, 141:16, 141:24, 142:5, 143:2, 143:13, 143:21, 143:24, 156:20, 320:16
legal-related 103:14
lends 139:18
lengthy 282:9
less 5:22, 120:10, 293:3
letter. 62:9, 64:16
letters 87:22, 114:21, 115:5, 123:7, 123:10, 136:20, 196:15, 248:8, 293:6, 293:7
letting 138:19
level 105:20
levels 16:1, 73:22
liberty 90:18
license 19:12, 19:13, 65:2, 249:14, 250:7, 254:3, 262:8, 293:6, 297:4, 310:24, 312:21, 315:22
licensed 248:22
licenses 249:1, 249:6, 251:12
lied 129:14

life 125:17, 152:25
light 5:25, 92:6
lightly 287:8
likelihood 240:23
likely 42:6
likes 114:9
likewise 239:18, 239:23
limitations 151:21, 174:12, 176:10
limited 66:17, 100:10, 122:10, 151:17, 173:24, 252:20
line 19:23, 19:24, 20:23, 59:23, 65:6, 77:2, 135:22, 135:23, 139:1, 192:5, 192:8, 193:10, 198:17, 212:12
lines 47:2, 56:12, 63:23, 63:24, 72:24, 131:10, 141:14, 185:22, 186:19
Lisa 197:4, 197:10, 198:1, 198:9, 200:11, 200:15, 201:5, 213:14, 219:7, 219:14, 241:23, 241:24, 241:25, 242:1, 242:5
list 29:10, 29:18, 93:12, 96:5, 199:24, 223:10, 227:12, 255:5
listed 64:24, 148:9, 197:19, 254:6, 255:15, 255:16, 259:14, 276:21
Listen 55:18,

354

300:2
listening
265:15
listing 29:14
lists 252:4
litigated
181:16, 181:21
litigating
278:12
litigation.
34:5, 185:24,
251:4
litigations
186:14, 240:8
litigator 48:2
little 5:22,
12:24, 45:1,
73:9, 89:16,
131:25, 144:18,
153:8, 157:16,
158:12, 183:15,
184:2, 194:4,
207:21, 207:25,
220:19, 236:16,
245:14, 269:8,
272:19, 277:17,
316:18, 320:14,
320:22
live 275:17
Lived 236:19
living 148:2
LLP 1:28, 1:36,
2:36, 2:43,
203:14
LLP. 57:13
load 213:18,
226:18, 246:5,
246:11, 246:21,
247:3, 252:14
loaded 167:3,
266:10
loading 226:15
local 37:3,
150:16
locate 241:20
located 162:10
location
155:11, 155:12,
158:1, 171:1
locations

161:14
lodge 22:3
log. 50:14
logged 159:23,
161:14, 176:3,
176:4
logging 159:24
logs 269:6
long 6:19,
8:19, 10:18,
16:25, 45:24,
81:24, 103:18,
125:23, 148:4,
221:6, 236:10,
260:1, 311:12,
313:5
longer 133:6,
168:12, 170:14,
177:10, 201:13,
283:8
looked 8:2,
15:20, 21:5,
42:4, 44:3,
51:13, 51:15,
51:16, 51:19,
52:6, 52:9,
52:13, 53:3,
53:5, 54:18,
68:2, 82:9,
145:25, 147:4,
163:16, 166:19,
166:21, 169:1,
169:8, 172:11,
172:14, 174:5,
174:7, 249:7,
261:12, 269:3,
285:3, 285:7,
313:21
looking 51:4,
62:13, 65:13,
73:20, 87:21,
94:20, 117:22,
132:10, 135:20,
137:1, 137:3,
146:3, 146:4,
159:10, 160:3,
195:5, 242:25,
243:3, 243:5,
244:1, 246:12,
261:5, 293:11

Looks 10:6,
33:12, 33:14,
39:17, 41:5,
127:17, 128:9,
174:5, 198:16,
316:7
loop 105:23
lose 200:12
loss 24:12
lost 21:18
lot 7:11, 15:3,
20:24, 22:13,
89:1, 132:5,
140:13, 162:20,
167:23, 176:10,
181:22, 188:1,
196:7, 222:16,
241:1, 309:8
lots 138:7
loud 208:2
Louisville
36:14, 37:2,
37:23, 284:9
loved 13:7
Lowenstein
2:42, 4:22,
28:15, 28:21,
43:13, 44:1,
44:19, 84:1,
96:21, 115:21,
115:23, 129:25,
131:6, 185:8,
196:10, 197:16,
197:20, 197:25,
199:16, 199:19,
201:20, 202:19,
212:8, 214:7,
214:16, 217:20,
218:18, 229:7,
280:22, 282:4,
286:11, 289:3,
321:9
luck 158:18
lunch 145:6


< M >
machines
168:17, 172:25,
173:16

Mackay 121:21
Magistrate
1:22, 5:3,
27:7, 27:18,
36:13, 37:23,
38:2, 92:13,
92:14, 207:8,
209:9, 209:11,
209:15, 210:19,
211:6, 212:25,
214:6, 216:7,
216:9, 311:12,
312:15, 312:17,
312:25
magnitude
259:10
mails 253:5
Main 2:28,
117:25, 223:23
mainly 101:6
maintain 202:6
maintained
25:16, 26:4
maintaining
188:12
majority 152:1,
257:10, 266:11
man 233:13
manage 103:14,
213:1
management
103:21, 230:11,
230:12, 245:18
manager 293:14
managing 166:3
Mangold 1:28,
1:35, 1:36,
44:13, 120:21,
145:23, 208:20,
281:2, 286:8,
286:10
manner 37:24
manually 225:20
March 154:15
Mark 225:7,
225:8, 286:13,
286:16, 287:3,
287:6, 287:25,
302:2, 302:8,
302:14

**VAC App. 385**

marked 15:12, 15:13, 15:14, 43:8, 48:21, 62:7, 65:22, 163:14, 250:4, 254:11, 263:13, 264:14, 269:9, 272:5, 276:25, 281:23, 282:4, 283:17, 287:19, 301:25, 302:23
Markman 190:21, 190:24
married 278:13
Martin 2:43, 3:3, 18:13, 18:16, 28:16, 28:23, 29:6, 203:14
mass 163:4
masse 10:3, 145:20, 157:13
master 160:1, 175:14
Mateja 2:26, 4:18, 44:22, 48:24, 51:8, 52:14, 54:21, 57:6, 59:21, 63:7, 63:15, 72:6, 78:10, 89:11, 98:17, 100:3, 101:6, 115:19, 116:3, 119:24, 144:3, 160:12, 165:4, 165:12, 165:18, 165:24, 172:9, 173:5, 236:3, 260:23, 262:24, 263:3, 298:12
mateja@fr.com 2:32
materials 22:18, 23:20, 37:13, 50:10, 67:25, 185:9, 195:7, 195:20, 256:10, 256:12, 284:11

matter 5:17, 7:10, 7:13, 12:24, 95:16, 116:9, 134:25, 151:6, 165:21, 201:25, 207:7, 243:1, 320:15, 322:4
matter. 201:24
matters 109:7, 125:23, 179:14, 250:19, 321:14
Mcdole 2:4, 2:14, 280:23
Mckinney 2:44, 3:4
Mckool 236:22
me. 203:18
mea 117:4, 138:2
Meaning 13:3, 14:17, 37:14, 157:23
means 65:2, 100:11, 173:9, 194:8, 308:5
meant 46:18, 199:6, 290:9, 290:12
mechanical 3:46
mechanics 107:13, 247:10
mediate 36:17
Mediation 36:13, 37:23, 38:2, 38:10, 38:24, 38:25, 111:2, 311:12, 312:16, 312:19
meet 205:6
Meeting 207:10, 244:16, 245:3, 280:23, 281:1, 281:5, 283:24, 285:10, 311:15
meetings 191:7, 224:5
Melissa 210:11
members 293:8
memo 7:15

memory 26:18, 26:24, 93:1, 96:10
mention 51:2, 69:2, 69:11, 130:8, 251:13
mentioned 55:4, 69:12, 71:13, 72:7, 90:23, 106:24, 116:8, 179:18, 180:7, 183:10, 246:19, 252:14, 298:12, 310:13, 311:10
mentioning 69:2, 110:8
met 9:8, 116:14, 139:1, 191:9, 197:3, 205:5
Metadata 117:22, 160:21, 174:23, 174:25, 175:2, 175:6, 175:8, 175:11, 175:12, 175:14, 175:16, 175:20, 175:23, 176:1, 176:11, 176:14, 283:12
Michael 26:14, 209:3, 223:22, 232:4, 232:14, 253:9, 255:24, 256:6, 256:7, 258:12, 269:6, 269:12, 298:23, 309:2, 309:14
microphone 207:23
middle 145:10, 261:2, 282:19
midway 74:20
migrated 156:7, 169:23
migration 153:21, 155:14, 155:15
mile 277:15
Miller 140:7,

144:22, 158:18, 158:21, 168:13, 172:23, 197:4, 198:1, 213:14, 219:7, 219:14, 219:15, 228:18, 241:23, 319:11
million 157:21, 157:22
mind 39:24, 44:18, 181:5, 201:10, 209:17, 223:17, 264:7, 309:13, 317:4, 319:9
minds 188:2
mine 114:20, 290:21
minimum 131:12
minor 252:18
minute 92:12, 97:15, 121:11, 147:8, 169:3
minutes 10:21, 10:23, 83:13, 145:9, 163:19, 178:8, 178:12, 260:1, 316:19
misconstruing 305:12, 305:13
mispronounced 232:21
misrecollection 279:20
misrepresentati on 134:1, 134:4, 134:14, 135:9, 318:20
misrepresented 118:20
missing 55:11, 141:13
misspoke 307:25
mistake 123:15, 140:11
misuse 57:16, 207:4, 234:22
misused 282:1
mitigation 132:8, 140:16

mode 311:11,
311:21
modified 44:2,
44:5
modify 18:23,
44:10, 91:17,
91:22, 97:10
moment 7:25,
56:21, 105:24,
115:21, 177:23,
215:24
Monday 143:23,
144:6, 144:7,
256:1
month 5:23,
62:4, 229:14,
238:2, 263:10,
266:23
months 38:8,
58:5, 86:16,
87:15, 100:16,
242:1
Morning 4:4,
4:11, 4:12,
4:14, 4:15,
4:20, 4:21,
12:5, 12:6,
22:21, 27:24,
83:23, 83:24,
98:16, 103:1,
103:2, 106:1,
106:3, 106:5,
106:24, 108:13,
215:18, 216:2,
216:12, 253:18,
256:1, 256:18,
257:6, 257:15,
264:1, 297:20,
318:6
morning. 199:13
motions 18:23,
22:12, 26:19,
37:20, 38:12,
38:13, 38:25,
44:7, 89:19,
91:11, 92:7,
92:11, 92:13,
98:3
Movant 1:27,
2:2, 4:8, 5:14,

78:1, 84:5,
87:5, 116:14,
130:12, 130:22,
135:21, 139:1,
180:25, 192:1
movants 6:1,
11:6
move 9:22,
12:15, 26:22,
57:8, 59:21,
116:15, 117:19,
120:18, 135:10,
163:13, 165:10,
165:13, 221:2,
225:20, 236:17,
262:18, 275:13,
303:5
moved 27:1,
153:24, 157:9,
157:13, 157:25,
159:14, 159:17,
171:7, 216:10,
236:17, 308:23
movement 171:18
moves 157:4,
157:5
moving 187:2,
288:5, 288:10
MR. LOWENSTEIN
83:14, 83:20,
83:22, 88:17,
88:19, 88:22,
89:1, 89:6,
89:14, 93:7,
94:11, 94:23,
95:1, 95:6,
95:8, 95:13,
100:1, 119:21,
119:23, 134:25,
177:25, 217:18,
217:21, 218:22,
235:13, 288:22,
289:1, 289:6,
289:21, 313:23,
314:3, 314:8,
314:22, 314:24,
315:15, 316:11,
316:15, 321:13
MS. BROWN 4:20,
21:17, 135:15,

135:17, 137:19,
144:6, 178:7,
178:22, 178:24,
179:2, 185:16,
185:19, 186:15,
186:18, 187:8,
191:23, 198:14,
198:15, 204:25,
217:17, 217:20,
217:22, 217:24,
218:16, 218:24,
219:7, 219:12,
227:18, 229:6,
235:14, 235:16,
318:17, 318:22,
319:8
multiple 38:11,
248:9, 248:10
mutual 136:9,
182:22, 188:3,
192:23, 192:24
myself 83:25,
184:18

< N >
N. 2:3, 165:11
nailed 312:23
Name 8:23,
11:10, 12:9,
44:22, 70:11,
128:14, 147:25,
154:5, 161:5,
174:7, 176:5,
179:3, 179:4,
194:10, 209:3,
219:13, 226:13,
226:18, 236:5,
252:18, 258:17,
290:5, 290:21,
293:16
named 120:7,
156:1, 190:24
namely 271:18
names 155:22,
155:24, 156:3
naming 226:10
narrative 31:16
narrow 40:4
narrowly 141:24

Naturally 184:6
nature 125:1,
250:20, 273:4
Neal 29:6,
90:7, 203:10
near 86:13,
301:18
necessarily
243:3, 252:24
necessary 7:25,
123:25, 132:3,
142:8, 188:12,
256:13, 281:14
need 56:7,
57:6, 89:16,
130:9, 135:3,
143:25, 144:17,
144:25, 145:7,
149:14, 181:23,
182:9, 224:23,
226:3, 226:4,
247:2, 249:14,
257:18, 258:6,
264:20, 265:21,
268:6, 272:2,
282:1, 290:14,
310:6, 311:7,
316:9, 316:10,
318:3
needed 82:13,
139:13, 139:15,
153:19, 170:23,
208:10, 227:12,
238:7, 249:16,
266:6, 269:1,
281:24, 307:16,
307:19, 310:5,
310:12
needs 56:4,
136:12, 144:12,
193:11, 280:11
negotiated 88:4
negotiations
88:2, 88:8
Netflix 121:14
New 5:22,
37:16, 156:11,
157:9, 157:24,
158:5, 158:14,
166:2, 169:23,

171:1, 226:5,
226:7, 226:19,
227:1, 227:4,
318:12
nexus 124:11
Nice 9:12,
84:2, 205:6
Nick 90:10,
91:7, 107:23
night 5:24,
36:10, 62:3,
263:9
night. 33:20
NLRB 131:1
nobody 123:1,
125:11, 126:3,
159:6, 280:5,
313:20
nodding 149:6
nomenclature
226:19, 268:3
nonaffiliated
125:10
noncontroversia
l 9:17
nondeleted
155:17
None 26:18,
83:3, 109:12,
197:22
nonetheless
204:4
Nonparties
121:11, 126:8,
126:10, 127:18,
130:25
nonsignatory
316:25
nor 112:19,
113:8, 115:4
normal 125:17,
230:23, 292:6,
292:11
normally
177:16, 208:2,
252:23
Northern 1:2,
13:9, 19:16,
32:15, 43:6,
64:4, 137:9,

137:11, 180:16,
181:22, 283:4,
322:15
Note 21:23,
130:16, 133:15,
164:13, 194:8,
271:8, 277:6,
304:22
notebook 48:25,
49:2, 88:21,
185:11, 191:25,
192:1, 224:4,
224:6
notebooks
88:21, 222:23,
223:8, 223:16
noted 65:5,
130:22, 252:1
notes 213:25
Nothing 20:25,
21:25, 55:4,
56:10, 56:12,
100:2, 122:6,
155:10, 218:21,
230:18, 235:14,
261:6, 261:18,
279:13, 299:14,
299:23, 315:21
notice 188:23
noticed 269:4
notices 256:24,
256:25
notified 24:13,
57:15, 58:4,
196:11
notifies 57:25,
60:1
notify 42:24,
42:25, 43:4
notifying
28:23, 202:21
notion 67:4,
130:13, 144:19
Notwithstanding
79:2, 79:4,
82:10, 113:15,
124:18, 125:3,
131:21, 209:15,
299:12
November 165:4,

286:5, 287:12,
287:18
now. 193:16
numbering 89:8,
241:3
numbers 68:3,
157:20, 225:19,
250:24, 250:25,
252:4, 254:15,
254:19, 254:20,
255:2, 255:5,
257:12, 272:18,
272:19, 277:5
numerous 254:3
Nunnally/pittma
n 25:9, 79:11
NW 1:29, 1:37


< O >
object 20:22,
31:15, 55:20,
94:15, 98:6,
98:7, 124:23,
146:23, 147:5,
147:10, 148:24,
191:20, 265:7
objecting
164:12
Objection 9:23,
21:12, 21:13,
21:23, 22:2,
22:3, 39:23,
40:11, 41:16,
47:3, 56:18,
56:22, 56:23,
59:12, 59:18,
62:20, 65:25,
66:6, 68:21,
73:4, 79:25,
89:10, 89:11,
89:12, 92:21,
95:10, 95:11,
114:3, 114:4,
163:24, 189:10,
191:18, 219:1,
235:17, 261:21,
265:2, 272:24
objections
9:19, 10:11,

63:2, 96:15,
219:4, 303:6
obligations
42:23, 283:4
obtain 25:6,
32:14, 33:15,
34:11, 35:7,
68:13, 68:14,
71:12, 74:2,
78:14, 79:11,
188:18, 292:2
obtained 24:15,
27:5, 28:2,
51:21, 185:7,
189:22, 195:23
obtaining 25:5,
184:3
obvious 159:11,
274:16
Obviously 6:6,
58:23, 123:20,
163:11, 165:8,
166:3, 168:20,
183:2, 184:12,
240:2, 240:5,
242:14, 259:20,
264:23, 267:7,
267:21, 275:5,
309:8, 311:8,
315:24
occasional
107:12
occasions
93:24, 312:14
occur 37:24,
56:4, 94:19,
159:21, 315:16
occurred 30:11,
54:22, 120:13,
135:7, 203:5,
301:18
occurring 23:5
October 59:25,
189:20, 238:1,
238:4
odd 42:3, 124:2
odds 122:7
off-line 286:22
offending 56:6,
85:6, 151:16,

358

154:12, 155:19,
156:3, 158:3,
158:6, 161:2,
161:13, 161:16,
163:2, 169:18,
174:11
offensive
158:11, 159:5,
161:21
offer 62:19,
62:22, 65:24,
89:9, 95:8,
145:20, 147:18,
281:5, 286:24,
287:3, 315:8
offered 165:5,
281:6, 281:14,
281:24, 286:3
offering
146:10, 147:7,
163:20, 163:22,
163:25
office 29:2,
84:24, 113:9,
175:17, 197:17,
199:11, 200:9,
202:25, 223:18,
224:6, 224:8,
256:15, 277:22,
286:1, 286:13
office. 202:7
OFFICER 4:3,
124:5, 136:22
offices 200:17,
223:5, 223:9
official 322:14
often 73:22
old 168:22,
170:8, 170:13,
207:21
older 158:5
one-witness
8:21, 10:16
one. 128:18,
157:2, 234:9,
302:8
ones 13:7,
93:17, 172:21,
223:12, 237:22
ongoing 15:24,

17:20, 37:20,
38:15, 180:15,
281:7, 307:20
open 118:15,
129:15, 243:13,
243:22, 255:4
open-ended
281:8
opened 63:9,
225:7, 226:8,
243:24, 273:4
opening 226:14,
243:15, 243:16
operate 273:5
operating
171:20, 229:22
operation
172:25
operations
113:4, 180:3
OPERATOR 49:16
opinion 73:21,
209:18
opponents 9:6
opportunity
7:14, 119:8,
119:12, 119:17,
145:11, 145:15,
145:18, 145:24,
178:14, 255:6,
285:11, 285:21,
301:15, 318:9
opposed 55:17,
142:5, 170:6,
170:10, 171:14,
171:22, 181:10,
209:25
opposing 16:22,
33:16, 73:25,
195:1, 238:15,
247:5, 248:12,
321:7
opposition
301:21
optimal 62:25
option 102:11
order. 57:18,
121:13, 126:11,
127:19, 137:13
ordered 97:14,

312:15, 313:8
orders 14:7,
14:10, 73:22,
88:12, 89:19,
91:11, 92:13,
97:15, 121:12,
121:19, 264:16
organization
173:11
organizations
149:23
original 9:21,
70:17, 107:17,
167:6, 168:5,
226:14, 226:18,
294:18, 298:6
originally
17:9, 53:24,
104:1, 111:23,
153:1, 154:10,
156:8, 157:24,
165:4, 167:3,
236:6, 236:7,
236:8, 268:15
originals
197:6, 197:14,
200:6, 200:11,
223:1, 223:13
origination
233:3
ostensibly
184:19
others 43:23,
46:1, 66:17,
78:14, 106:2,
206:5, 292:17,
292:24, 293:4
Otherwise
58:25, 92:19,
191:16, 195:19,
204:16, 210:6,
294:16, 311:23
ought 129:21,
248:19
ourselves
206:19, 226:13
outline 63:10
outset 5:17,
183:3
outside 14:13,

14:18, 14:19,
24:7, 45:20,
57:16, 104:11,
109:5, 112:20,
114:2, 115:1,
126:18, 126:20,
167:19, 169:11,
173:11, 174:16,
185:23, 186:5,
186:21, 187:17
outside-of-the-
company 74:2
overlap 194:6,
240:15, 240:22
overlapping
136:7, 183:14,
186:13, 192:21
overrule 22:1,
119:5
Overruled
21:12, 31:20,
47:8, 80:3,
92:23, 191:21,
273:2
oversaw 232:5
oversee 103:14
overwritten
154:21, 154:22
own 114:2,
122:13, 151:12,
234:4
owner 176:3
owners 148:16


< P >
P. 2:13
p.m. 198:20
Pacific 2:5,
2:15
package 89:25,
91:15
packaged 197:15
pages 40:24,
52:10, 67:15,
82:15, 84:19,
93:10, 246:13,
259:11, 259:12,
271:6, 271:25,
295:17

paid 138:21
painstaking
259:24
pam_wilson@txnd
.uscourts.gov
3:43
PAMELA 3:39,
322:2, 322:13
Paper 174:14,
174:16, 174:19,
223:4
papers 277:24,
278:1, 309:21,
313:4
paragraphs
54:18, 250:11,
283:22, 315:20
Paralegal
140:5, 140:7,
177:6, 197:4,
198:2, 213:14,
219:19, 220:20,
226:13, 232:7,
235:7, 241:21,
242:4, 247:10
paralegals
158:22, 231:3,
231:21, 231:24,
232:2, 232:6,
257:7
parameter 174:8
parameters
174:6, 174:8
Paravin 150:17
Pardon 78:10
parent 13:16,
64:12
parlance 129:4,
129:19
parse 206:17
part 16:11,
34:15, 44:7,
44:8, 46:15,
51:17, 55:7,
56:4, 60:2,
60:23, 90:17,
91:11, 93:1,
93:4, 96:18,
100:13, 100:14,
123:15, 128:1,

142:19, 147:3,
163:4, 175:13,
178:8, 178:13,
190:19, 191:4,
198:14, 200:25,
210:13, 222:16,
231:2, 234:20,
241:9, 304:4,
305:9, 305:10
particular
42:8, 54:2,
173:19, 254:6,
257:1, 262:25,
284:6
particularly
249:22
partner 4:10,
11:11, 12:12,
12:14, 20:3,
26:9, 26:14,
32:1, 32:9,
179:9, 220:10,
253:18, 317:18
Partners 12:20,
24:21, 42:22,
42:23, 58:18,
71:5, 148:15,
286:14
partnership
43:2, 53:8
parts 236:6,
236:7, 241:10,
293:3
party. 186:22
Pass 11:21,
83:8, 100:1,
164:8, 204:25,
229:6, 288:21,
289:21, 301:8,
313:22
passed 72:12,
301:5
passing 35:12,
177:4
past 113:6,
113:9, 113:14,
113:16, 219:2
patent-in-suit
66:15, 66:19,
66:24

patents 12:23,
13:10, 15:5,
23:19, 45:19,
48:10, 180:5,
180:7, 180:8,
180:22, 181:6,
181:8, 181:11,
181:21, 240:13,
240:15, 240:22,
248:21, 251:2
patents. 66:19
path 22:24
patient 65:1
Pause. 115:22,
302:17
PC 2:4, 2:14
peace 120:15
pendency 113:15
pending 14:1,
17:3, 23:2,
32:21, 32:23,
93:4, 100:25,
109:19, 109:21,
109:23, 110:1,
110:2, 110:12,
110:13, 110:19,
110:25, 111:13,
111:14, 111:16,
180:5, 206:9,
250:19, 321:17
pens 256:6
people 23:13,
89:18, 125:24,
169:11, 174:22,
197:3, 223:23,
224:15, 230:14,
231:20, 231:21,
235:2, 243:15,
268:1, 280:25,
291:11, 291:21
Per 187:16,
194:15, 203:12,
273:25, 277:10
percent 260:14
percolated
131:21
percolating
131:16
perfect 117:10,
247:6

performed
153:21, 155:9,
170:25, 225:23,
225:25
performing
109:13
perhaps 26:25,
33:10, 71:7,
251:12
period 152:2,
159:15, 177:13,
241:22, 305:24,
316:5
permanently
97:17, 98:13
permission
35:7, 35:15,
35:23, 42:19,
51:25, 68:10,
68:13, 68:14,
71:12, 72:3,
72:9, 108:13,
203:1
permit 22:2
permitted
19:19, 22:19,
27:15, 78:14,
79:10, 79:11,
281:20
person 163:12,
165:25, 166:2,
170:7, 171:25,
177:2, 186:21,
187:17, 188:19,
198:9, 280:24
personal 218:2,
233:15
personally
52:6, 233:7
personnel 186:5
persons 75:20,
188:15
pertinent
31:13, 31:25,
240:24
phone 13:6,
20:15, 71:21,
72:1, 281:13,
286:4, 286:6,
287:24

phones 173:10, 234:11, 234:12, 234:13
phonetic 105:20, 210:11, 243:12, 290:22, 293:16
phrase 293:9
phrased 134:1, 249:21
Physical 200:19, 200:20, 213:9, 223:4, 223:18, 224:9, 225:17, 228:13, 228:23
physically 51:4, 53:3, 53:5, 55:2, 153:18, 207:10, 213:5
pick 59:16
picked 150:14
piece 39:7, 230:12, 316:13
pieced 309:9
pieces 39:11
pink 13:21, 13:22
Pittman 18:13, 18:16, 20:4, 27:14, 85:14, 85:15, 88:1, 89:18, 90:5, 90:10, 90:12, 91:8, 107:23, 107:24, 136:6, 182:1, 182:2, 182:6, 182:21, 183:12, 192:20
place 19:6, 34:5, 38:2, 124:9, 138:4, 138:12, 140:9, 143:1, 161:20, 173:10, 190:15, 191:11, 231:2, 256:13, 263:21, 264:11, 264:16
places 162:8,

162:10, 162:15, 167:22, 167:24, 173:19
Plaintiff 9:5, 66:4, 112:9, 160:20, 180:3, 181:9, 181:15, 212:5, 277:10, 302:23, 303:10, 303:13
Plaintiff/count er-defendant 1:6
plaintiffs 13:11
plan 6:20, 242:14
play 110:16
pleading 48:4, 48:7, 120:1, 303:18
pleadings 20:12, 26:16, 38:14, 122:9, 281:10, 300:3, 302:25, 308:17
Plus 187:8, 208:7, 249:9
podium 146:2, 314:6
point. 121:20, 129:22, 141:16, 165:10, 177:15, 194:4, 194:11, 307:19
pointed 119:24, 144:20, 312:10
pointing 51:8
points 120:1
pop 314:13
portion 33:13, 225:13
position 20:1, 25:21, 27:9, 27:13, 27:19, 62:6, 63:11, 77:18, 79:8, 79:9, 82:12, 100:20, 101:21, 112:20, 118:4,

119:10, 174:21, 181:19, 184:23, 219:18, 263:12, 271:19, 296:20, 296:22, 317:8, 320:15, 321:4, 321:7
positions 100:20, 100:21, 100:22, 100:23, 181:17, 181:19, 181:23, 184:12, 184:13, 184:24, 184:25
positive 260:12, 260:13, 260:14
possess 75:21, 282:23, 299:9
possessed 34:18, 310:15
possessing 51:4
possession 60:1, 84:23, 112:19, 194:22, 282:12, 283:8, 284:16, 285:12
possibility 252:9, 266:1
possible 166:17, 178:9, 319:22
possible. 257:12
possibly 204:10, 252:18, 252:19, 319:5
potential 31:10, 32:16, 42:21, 66:23, 264:25, 287:14
potentially 36:19
powered 160:22
practical 129:10
practice 39:1, 226:18, 278:14, 289:23, 291:20, 292:11, 292:12

preclude 118:11
precluded 290:4
preferred 253:20
prefix 199:6
preliminary 40:23, 266:23, 267:11, 271:6
prep 182:21, 183:6
preparation 49:13, 49:22, 187:13, 190:14
prepare 136:8, 187:18, 187:24, 188:3, 190:18, 190:22, 192:21, 223:2, 301:20
prepared 46:3, 117:14, 117:23, 147:11, 182:19, 227:13, 318:4, 320:15
preparing 190:17, 191:8, 226:15
prepped 182:14
prescribed 322:6
present 3:15, 5:15, 25:18, 26:5, 26:8, 26:15, 36:14, 88:22, 119:14, 140:22, 160:5, 191:12, 320:4
presented 242:14
preserve 214:1
preserved 175:21
president 103:11, 103:12, 113:3
press 273:20
pressing 274:5
presume 146:25
presumptuous 44:16
pretty 42:4,

163:2, 174:12,
259:24, 276:7,
282:9
previous 40:19,
43:17, 118:20,
240:8, 248:13,
248:23, 271:14,
279:16, 279:20,
317:8
previously
12:17, 28:17,
48:21, 60:3,
65:22, 70:12,
72:19, 101:11,
152:16, 181:16,
183:11, 201:22,
242:18, 248:22,
250:5, 253:12,
262:15, 270:21,
277:1, 283:18,
306:10, 309:3
Prichard
293:16, 293:21
prima 116:1,
144:20
primarily
26:12, 37:8,
220:10, 232:11,
291:16, 291:19,
292:18, 292:22,
292:24
primary 153:6,
153:11, 293:13
principal 88:4
principally
197:4
principals
16:25, 35:4,
36:16, 36:18
printed 306:18,
306:22
printing 150:9
prison 13:3,
15:7, 23:10
prisoners 13:5,
178:14
prisons 13:6
priv 259:14,
260:25, 267:20
privileged

39:14, 40:2,
50:8, 63:12,
252:10, 252:11,
252:22, 254:21,
257:8, 259:18,
266:2, 266:6,
266:21, 267:8,
268:22, 269:7,
269:10, 269:16,
269:17, 269:24,
270:5, 270:14,
271:5, 272:14,
292:16, 298:15,
298:16
Privileged.
252:3
privy 54:3
pro 121:12
probably 33:22,
57:6, 142:17,
158:9, 177:22,
178:7, 178:8,
182:16, 198:9,
229:24, 238:3,
259:2, 281:5,
293:3, 298:8,
318:25, 319:1
problem 25:3,
72:19, 123:1,
124:21, 196:12,
234:21, 235:3,
299:14
problems
147:14, 149:5,
149:8, 195:11,
206:13
procedural 5:16
Procedurally
8:1, 61:7
procedure 5:3,
160:18
procedures
175:7
proceed 11:25,
93:6, 119:3,
178:21, 178:24,
229:9
Proceedings
3:46, 72:2,
72:15, 79:9,

83:16, 90:2,
96:19, 121:25,
178:18, 264:13,
281:25, 322:3
proceedings.
321:20
process 23:22,
24:11, 134:7,
170:17, 212:24,
225:2, 241:9,
246:15, 259:24,
260:2, 267:10,
269:3, 289:9,
292:18, 295:14
processes
225:22, 225:25
processing
74:24, 75:7,
105:18, 241:3
produce 24:8,
35:16, 35:20,
64:15, 65:5,
76:3, 195:18,
206:4, 207:16,
262:7, 271:15,
289:17, 293:6,
296:25, 306:10,
314:25
producible
291:23, 292:15
producing 62:7,
188:13, 196:13,
222:6, 222:9,
240:6, 241:3,
256:19, 263:12,
296:8, 297:2
product 269:7,
271:10, 272:15,
304:25
PRODUCTION\IMAG
ES 161:18
Production\imag
es\securus
161:17
productions
240:10, 240:11
Professional
150:25
proffer 208:23,
211:10

proficient
241:4
program 213:23,
230:25, 246:6
progress 9:1,
299:19
prohibitions
34:3, 263:19
prohibits 77:7
project 162:19,
292:22
projects 292:21
promise 121:1
promises 21:6
promotion
253:20
promptly
271:21, 299:22
proper 35:4,
43:4
property 220:2,
293:14
proposal
285:24, 286:15,
286:16, 286:21,
287:6, 287:10,
287:24
proposals 315:9
propose 286:17
proposed 48:9,
90:6, 90:16,
100:24, 110:23,
286:18, 287:13
prosecuting
181:10, 181:14
prosecution
181:8, 181:9
protected
75:13, 75:21,
76:3, 79:6,
111:25, 271:11,
272:15, 305:1
protection
141:9
protocol 59:7
protocols 60:4
protracted
311:21
prove 101:4,
149:15

provide 35:11,
35:20, 99:23,
114:11, 204:4,
257:11, 258:1,
271:23, 315:9
provided 28:18,
43:24, 77:12,
79:19, 82:18,
98:22, 99:7,
99:19, 151:11,
201:22, 203:23
providing 77:7,
77:10, 79:17,
187:23
provision
14:12, 77:10,
188:25, 195:8,
196:3, 196:16,
251:14, 314:11,
314:25, 315:3
provisions
73:20, 208:12,
314:16, 315:8,
315:10, 315:11,
315:13, 317:5
proximate
153:16
Public 32:23,
36:7, 36:11,
36:16, 36:18,
37:17, 39:6,
41:24, 64:3,
64:21, 66:4,
68:3, 100:16
published 45:19
pull 152:8,
166:8, 166:10,
186:15, 226:3,
227:12, 227:15,
246:8, 248:5,
259:7, 262:24,
264:20
pulled 10:9,
10:10, 52:9,
197:16, 213:23,
223:9, 226:13,
254:18
pulling 246:11
Purge 141:2,
141:3, 210:14,

210:24, 225:1,
225:9, 225:13,
231:13, 231:14,
283:6, 286:3,
286:20
purged 133:6,
147:2, 211:23,
284:13, 285:8,
294:5
purged. 283:13
purport 231:14
purports 65:10
purpose 244:24,
296:22, 318:8
purposes 15:9,
129:19, 141:11,
175:5, 183:1,
220:13
Pursuant 21:7,
37:15, 198:25,
207:18, 208:3,
226:23, 256:12,
271:15
pursue 301:5
put 5:24,
45:16, 54:17,
54:22, 55:1,
55:2, 55:13,
55:22, 74:15,
117:9, 129:4,
131:24, 138:19,
140:3, 140:13,
144:11, 144:18,
144:20, 144:21,
145:4, 152:4,
152:14, 152:20,
178:13, 185:9,
213:17, 223:10,
244:6, 247:4,
249:20, 257:16,
270:2, 270:17,
287:19, 290:8,
298:19, 300:17,
313:1, 319:2,
320:9
putting 6:20,
42:2, 267:10


< Q >

qualified 149:3
quash 26:22,
27:1
questioned 94:7
questions
26:12, 27:7,
44:12, 94:1,
94:4, 102:17,
115:23, 139:22,
151:12, 159:1,
177:13, 177:25,
178:9, 181:5,
187:2, 203:18,
217:17, 217:18,
217:25, 218:16,
235:12, 235:13,
261:22, 277:11,
289:7, 304:5,
313:23, 318:25
questions.
263:23
quibble 81:11,
81:24
quick 27:24,
37:24, 250:21
quickly 9:25,
42:5, 248:5,
288:1
quite 7:5,
14:25, 15:21,
16:24, 24:17,
45:5, 45:24,
104:6, 139:22,
194:3, 246:15,
259:11, 278:11,
290:8, 317:1,
317:2
Quote 126:13,
128:20, 131:3
quote/unquote
138:8
quotes 127:15
quoting 310:14


< R >

raise 11:17,
20:6, 31:11,
39:13, 102:21,
119:21

raised 31:9,
41:22, 41:25,
190:8, 265:25
raises 252:9
ran 171:25
random 254:19
range 156:1,
157:21, 157:22,
163:3, 173:24
ranges 276:12
rate 248:23
Rather 216:8,
240:21, 245:6,
246:13, 271:10,
304:25
re 63:23,
63:24, 65:6
re-acquired
124:8
reach 65:16,
280:17, 293:5,
293:9, 293:10
reached 24:2,
24:5, 24:23,
32:4, 32:10,
32:11, 33:14,
42:13, 87:16,
91:4, 111:1,
120:9, 248:13
reaction 41:19
reading 139:9,
192:19, 203:11
reads 49:12,
271:21
ready 11:3,
20:17, 83:19,
144:13, 170:22,
236:1, 321:15
realize 138:3
realized 42:4
really 20:24,
74:4, 118:9,
120:25, 134:21,
147:3, 154:20,
165:18, 190:7,
232:7, 265:8,
265:21, 265:22,
284:6, 315:18,
315:19
realm 174:16

reappear
123:20, 225:21
reappears 120:3
reason 38:9,
86:2, 121:22,
122:15, 122:19,
122:25, 130:7,
145:6, 216:15,
218:5, 218:13,
234:11, 246:19,
261:9, 261:11,
261:12, 311:23
reasons 131:12,
133:22, 139:6,
207:15, 248:14
rebut 119:18
rebuttal 16:3,
16:4, 25:25,
29:19, 31:8,
34:19, 38:18,
41:9, 42:9,
45:12, 45:14,
45:20, 50:11,
85:3, 85:22,
99:2, 99:7,
99:20, 184:17,
184:19, 184:21,
191:17, 260:18,
269:5, 282:12,
282:24, 283:2,
283:6, 283:8,
284:10, 284:16,
289:10, 289:18,
290:5, 295:15
rebutting 45:23
recapping
265:10
receipt 28:23
receive 79:6,
184:4, 189:25,
204:2, 256:8,
276:4, 289:9
received 56:24,
64:13, 84:11,
84:23, 190:2,
190:9, 199:2,
200:6, 201:21,
202:20, 203:17,
208:8, 214:25,
238:18, 238:21,

251:24, 258:9,
262:10, 266:25,
298:4
receiving
43:14, 188:12,
188:18, 250:21
recent 266:20,
271:3
recently 113:6,
139:4
Recess 11:1,
83:15, 178:17
recognize 13:24
recognized
50:9, 52:16,
284:12
recollect
207:17
recollection
15:23, 16:21,
26:8, 26:9,
27:8, 27:9,
27:12, 27:20,
30:18, 30:19,
31:5, 33:21,
46:21, 61:13,
67:24, 68:13,
79:22, 86:15,
94:21, 109:25,
135:1, 180:22,
226:25, 248:3,
296:1, 297:20,
298:21, 310:9,
311:20
recommendation
29:24, 30:5,
30:8, 30:15,
87:6, 87:11,
93:23, 96:7,
98:1, 98:11,
211:7, 215:9,
215:13, 216:9,
309:24
recommendations
93:16, 93:22,
94:2, 94:7,
94:12, 97:15,
100:18
recommending
119:1, 211:16

reconcile
123:21
records 21:1,
43:24, 90:1,
93:9, 95:18,
96:25, 122:13,
134:12, 154:9,
160:3, 210:14,
210:24, 294:15,
294:25, 309:9
recount 236:20
recourse 319:3,
319:4
recovered 161:2
recused 20:21,
22:14, 22:21
recusing 23:6
recycle 222:24,
223:11
redacted 33:13,
39:17, 195:18,
204:15, 315:9
REDIRECT
217:23, 308:25
redouble 278:9
refer 38:19,
60:12, 172:10
reference
90:22, 96:14,
106:3, 106:5,
106:25, 110:11,
157:17, 221:12,
230:6, 270:2,
275:3, 310:15
referenced
29:13, 71:23,
87:22, 93:23
references
97:16, 254:10
referencing
50:7, 251:9
referred 5:1,
41:8, 49:3,
49:11, 106:13,
172:14, 227:1,
271:17
referring 39:8,
39:12, 54:4,
74:5, 75:2,
81:4, 82:16,

83:4, 92:13,
95:23, 99:12,
147:13, 151:24,
192:25, 252:13,
305:5, 305:6
refers 250:22
refine 310:19,
320:22
reflect 311:16
reflecting
84:10
reflects 175:2
refresh 26:18,
30:18, 298:21
refreshed 26:24
regard 43:19,
62:6, 117:18,
159:5, 173:23,
225:5, 257:22,
263:12, 284:8,
292:12
Regarding
28:17, 29:20,
29:24, 33:15,
33:25, 36:6,
48:16, 63:11,
85:1, 85:3,
89:18, 93:16,
101:7, 113:23,
119:10, 119:18,
141:13, 143:19,
151:12, 151:19,
184:24, 203:17,
214:25, 218:2,
271:4, 276:10,
293:24, 317:7
regardless
66:24
regards 256:21
regulate 121:25
rehashing 20:24
rehearings
22:12
Reinhold 4:24,
36:15, 86:5,
86:25, 98:18,
99:6, 99:13,
102:19, 102:21,
115:18, 120:6,
120:8, 122:2,

124:18, 210:9,
210:10, 289:11,
289:17, 312:5,
312:10, 317:25
reinvent
240:22, 241:11
reiterated
281:13, 287:3
relate 40:10,
47:14, 68:1,
75:6, 240:13,
251:1
related 10:7,
12:23, 13:17,
17:21, 19:24,
46:25, 47:14,
52:9, 66:19,
71:20, 91:23,
92:11, 97:11,
159:18, 181:8,
203:14, 206:8,
239:2, 251:2,
256:10, 261:14,
273:22, 274:19,
283:12, 305:1
relates 46:6,
75:12, 116:21,
140:18, 144:18,
194:23, 306:1,
306:4
relating 92:19,
169:8, 169:12,
199:2, 271:11,
305:15
relation 42:13,
72:12, 101:10
relationship
104:25, 195:10
relatively
5:22, 288:1
release 64:25,
111:22, 111:24,
115:6, 115:11,
115:16, 296:4
released 114:15
relevance
20:23, 160:25,
172:18
relevant 21:3,
93:24, 94:5,

169:4, 208:8,
248:16, 248:20,
248:21, 251:3,
257:11, 275:24
reliance 315:11
relied 317:14
relief 44:9
reload 170:16
rely 115:5,
315:10
relying 160:1
remain 217:5
remedy 56:4,
56:7, 299:14,
299:23, 299:24
remember 17:18,
18:1, 20:12,
23:7, 26:23,
27:19, 30:10,
30:16, 33:1,
36:25, 38:6,
39:15, 60:13,
72:6, 72:23,
82:2, 96:11,
112:2, 125:6,
206:15, 207:1,
209:12, 213:16,
216:4, 221:20,
225:16, 226:8,
237:19, 237:22,
248:1, 255:10,
277:22, 288:22,
293:4, 304:6,
308:20, 312:4
remembering
310:3
remind 228:17
remove 43:16,
271:8
rendered 316:24
RENEE 1:22
renew 21:22
reopen 57:24,
58:6, 60:8,
122:9, 277:20,
279:23, 280:8,
285:16, 285:19,
285:20, 294:8,
294:22, 300:4,
301:21, 303:1

reopened 60:9
reopening
303:19
repeat 99:9,
265:12
rephrase 57:7,
261:23
replaced
168:17, 172:17,
173:16, 177:8
replacement
217:13, 271:24
replied 92:12
replies 92:12
reply. 250:21
reported 3:46,
107:8, 197:13,
232:5, 242:12,
243:7, 245:5
Reporter 3:39,
83:11, 145:7,
322:14
reports 19:23,
19:24, 23:19,
23:25, 69:17,
72:2, 107:12,
136:3, 136:4,
192:13, 192:15,
192:16, 223:9,
305:21, 305:22
reports. 192:11
represent
27:25, 31:2,
36:19, 36:21,
44:23, 64:10,
134:10, 163:8,
163:10, 179:19,
237:10, 276:1
representation
37:8, 124:3,
135:6, 153:10,
180:10, 180:13,
183:4, 191:15,
220:17, 220:23,
221:17, 228:7,
238:10, 284:11,
294:5, 294:14
representations
21:7, 21:9,
28:10, 100:12,

100:25, 101:13,
101:18, 101:24,
123:7, 123:9,
123:23, 314:18,
317:14
representative
133:5
representatives
118:19
represented
12:20, 18:8,
24:10, 53:21,
78:25, 177:9,
179:15, 182:3,
182:4, 183:22,
220:4, 262:16,
294:2
representing
8:24, 18:1,
18:2, 18:5,
18:8, 18:12,
18:14, 23:24,
24:21, 32:2,
32:17, 40:1,
85:12, 98:17,
98:18, 108:15,
125:10, 136:13,
136:15, 190:19,
193:12, 193:14,
250:15, 276:4,
276:15
reproduce
240:25, 241:13
Request 24:13,
26:20, 30:2,
33:15, 33:25,
34:10, 35:2,
35:4, 35:8,
36:6, 47:1,
47:13, 47:17,
66:3, 66:14,
66:22, 67:22,
92:7, 96:1,
108:17, 108:19,
108:20, 117:17,
160:21, 203:12,
238:18, 239:14,
249:7, 251:21,
275:21, 278:17,
291:3, 291:8,

291:14, 292:4, 292:12, 293:25, 297:13, 311:8, 311:24
request. 277:10
requested 8:6, 67:25, 251:20, 270:25
requesting 33:17, 112:6, 250:18
requests 47:9, 64:13, 65:14, 65:16, 65:18, 66:11, 68:6, 160:20, 184:8, 184:16, 194:25, 238:15, 238:21, 239:18, 239:22, 240:1, 240:3, 240:20, 249:9, 249:18, 249:19, 249:25, 250:23, 264:20, 275:17
require 64:14, 128:25, 213:8, 271:7
required 315:6
requirement 188:24
requires 176:9
requiring 189:1
requisite 277:23
research 7:15
reserved 14:18
reside 154:13, 162:6, 230:16
resided 151:12, 154:13
resides 117:13
resolve 274:5, 280:18
resolved 125:3, 286:24, 299:20, 307:20
respect 66:15, 66:18, 66:24, 112:12, 124:15, 133:18, 181:6,

195:8, 200:16, 204:8, 218:3, 221:16, 271:24, 313:15, 315:11
respected 209:18
respond 7:24, 72:10, 129:25, 239:22, 256:16, 264:20, 291:8, 291:14, 292:12, 316:4, 318:11, 318:16, 320:12
responded 27:6, 253:5, 257:17, 296:21
Respondent 4:16, 10:12
RESPONDENTS 2:26, 3:2, 4:17, 256:25
responding 239:25, 240:19, 293:25
responds 130:3
response 20:1, 21:6, 43:12, 43:25, 90:12, 96:15, 129:5, 133:4, 143:24, 143:25, 144:1, 262:10, 276:9, 283:14, 283:16, 283:17, 284:5, 286:21, 288:7, 288:13, 288:14, 292:4, 298:4, 299:1
responses 92:12, 136:2, 184:10, 192:10, 192:16, 250:23, 256:9, 277:5
responsibility 232:13
responsible 37:8, 143:9, 228:2, 232:11, 292:24
responsive

47:1, 47:16, 65:17, 184:16, 194:25, 249:25, 250:23, 275:17, 291:22, 292:15
rest 59:25, 116:1, 147:6, 171:12, 316:15
restart 38:24
restate 40:3
restated 65:1
restricted 15:19
restrictions 176:10
rests 314:2
result 22:9, 266:20, 274:4, 281:4, 283:3, 284:13
resulted 104:2, 108:3, 314:10
resume 146:24, 149:8, 149:10, 149:15, 287:17, 287:19
resumed 83:16, 178:18
resumes 147:3
retain 170:15
retained 28:11, 45:21, 125:5, 164:22, 165:12, 167:25, 183:2, 183:21, 185:3, 185:24, 186:12
retention 165:1, 183:7
Return 6:6, 28:17, 82:13, 82:24, 84:12, 102:13, 102:14, 133:20, 134:7, 135:2, 135:3, 137:15, 137:25, 138:1, 194:17, 194:20, 196:24, 197:2, 222:25, 223:1, 223:12, 267:3, 277:9

returned 28:1, 28:9, 28:24, 29:15, 80:18, 87:12, 137:22, 194:24, 195:2, 196:17, 202:22, 203:5, 203:6, 203:13, 218:8, 223:3, 223:7, 223:19, 224:11, 224:17, 228:14
returning 85:2, 133:12, 221:22, 224:20, 226:24
revealed 175:10
review 39:16, 49:24, 50:4, 51:17, 68:1, 89:15, 90:6, 114:12, 117:21, 156:20, 158:25, 160:22, 163:3, 171:20, 226:16, 283:10
reviewed 57:1, 57:4, 58:1, 91:5, 163:11, 173:14, 173:17, 315:24
reviewing 50:5, 154:7, 268:20
RFP 67:12
Rfps 68:2
Richard 4:24, 86:21, 103:17
Richardson 2:27, 44:23
Rick 86:11
rid 117:8, 120:2, 138:22, 138:23, 198:10, 210:13, 224:25, 307:17
rise 4:3, 10:25, 60:9, 60:20, 83:17, 126:13, 178:19, 279:23
risk 281:7
RMR 3:39,

322:13
robert 24:22
role 55:17,
103:20, 104:8,
105:16, 108:10,
108:11, 109:8,
110:16, 122:7,
238:7, 291:7,
301:20
roll 292:20
Room 3:40,
158:19, 177:5,
281:2
Ross 2:37
Roughly 162:19,
237:18, 238:12,
261:2
round 20:16,
37:22, 37:25,
38:2, 197:8,
285:16, 285:21
rounds 38:9
route 204:24
routine 196:8
routinely 151:1
royalty 19:24,
248:23
Rule 119:13,
120:9, 173:6,
173:9, 261:24,
319:24, 320:1
ruled 6:16,
39:2, 121:9,
190:25
ruling 6:9,
7:17, 118:8,
119:16, 164:12,
199:1
run 284:21
running 21:13,
161:11, 170:23
Ryan 37:9,
54:6, 56:14,
56:19, 250:14,
253:23, 254:10,
256:6, 259:18,
264:24, 265:25,
266:17, 270:9,
270:18, 270:23,
271:4, 272:20,

276:16, 277:14,
278:3, 278:5,
278:12, 278:22,
279:3, 304:10,
304:22, 305:8


< S >
S. 1:35, 2:42,
225:16
s/pamela 322:12
safe 200:2
sake 147:19,
248:4
sample 78:8
sanctioned
119:2
sanctions 16:6,
70:12, 71:8,
91:16, 91:22,
97:10, 100:25,
319:5, 319:25
sat 299:11,
313:13
satisfies
315:12
saw 41:11,
50:23, 51:6,
54:3, 54:12,
54:15, 55:2,
58:22, 67:20,
113:23, 135:8,
151:16, 163:1,
163:18, 216:2,
247:24, 249:8,
259:2, 262:13,
278:18, 279:25,
284:4, 293:7,
294:7, 294:9,
294:10, 294:21
Saying 35:5,
81:1, 85:21,
118:6, 118:12,
118:14, 122:17,
122:20, 134:13,
135:4, 135:5,
137:24, 154:21,
155:1, 158:9,
170:3, 182:18,
192:7, 194:13,

212:11, 214:23,
221:21, 272:14,
272:15, 275:14,
280:16, 282:10,
295:2, 305:20,
306:9, 313:1
sbrown@ghjhlaw.
com 2:41
schedule 148:24
science 150:21
scienter 129:1,
140:17
scope 14:23,
25:2, 27:3,
42:20, 42:21,
48:10, 166:13
Scotland 236:9
scratch 269:8
scratching
298:13
screen 61:17,
152:9, 213:25,
249:20, 255:3
se 273:25
seal 98:6,
277:23
sealed 98:5,
98:6, 100:8,
100:13, 100:17,
101:12
sealed. 97:17
sealing 97:25,
98:12
search 113:2,
113:5, 113:6,
113:9, 113:11,
113:12, 113:17,
113:19, 114:2,
114:8, 122:13,
197:17, 233:6,
233:8
Searched
161:13, 197:21,
214:2
searches 123:22
searching
155:25, 162:18,
174:9
seat 11:19,
219:10, 235:24

seated 4:5,
11:2, 83:18,
178:20
Second 37:22,
38:2, 53:10,
60:7, 61:21,
85:8, 89:15,
90:15, 91:18,
92:5, 95:25,
117:3, 128:16,
150:6, 154:12,
158:17, 170:25,
246:10, 251:24,
254:9, 262:25,
273:1, 282:18,
283:21, 284:7,
295:21, 308:24,
317:21, 318:19
secondary 156:2
seconds 286:23
Secret 150:18
secretary
103:11, 103:13
section 238:9
sections 234:2
Secure 157:24
secured 163:5
Securities
185:4
Security 4:3,
150:25
Securus/t-netix
138:15, 193:1,
321:8
Securus_global_
new 154:10,
156:10, 156:14,
156:23, 157:6,
157:18, 158:5,
159:12, 163:6,
171:7
seeing 39:15,
39:18, 155:24,
171:17, 249:1,
265:14
seek 27:3
seeking 23:25,
124:17, 176:13,
207:3, 301:9
seem 78:23,

125:18, 140:19, 141:15
seemed 72:18, 241:4, 245:9, 247:6, 273:21, 278:1
seems 8:4, 9:16, 87:8, 318:17
seen 14:18, 21:10, 22:18, 34:2, 34:8, 45:2, 45:5, 50:13, 51:2, 53:16, 53:18, 69:17, 113:8, 113:9, 115:4, 162:22, 211:8, 214:18, 247:23, 255:25, 263:18, 268:9, 309:23
segregate 43:20, 162:25
segregated 43:23, 284:13, 285:8
selfish 217:22
send 117:8, 197:6, 202:6, 202:24, 214:17, 247:4, 258:14, 266:7, 266:12, 266:25, 270:18, 270:22, 276:24, 276:25, 282:7, 283:14, 289:14, 304:11, 306:17, 306:19, 306:24, 306:25, 307:1, 307:2, 307:16
sending 129:20, 197:21, 258:16, 270:9, 270:24, 271:1, 271:2
sends 135:3, 214:22, 255:18
sense 14:23, 122:8, 152:3, 240:21, 241:11
sentence 34:2,

74:20, 81:18, 91:7, 137:14, 227:16, 227:24, 228:1
separate 163:3, 221:6
September 70:20, 70:25, 237:24, 238:1, 238:3, 280:23, 284:22, 285:10
sequence 157:18
sequester 43:16
serendipitous 125:1
serendipity 125:8, 125:12
series 30:11, 248:8, 254:15
served 15:8, 208:4, 238:15, 239:9, 249:23, 263:17, 264:13, 297:7
server 153:6, 153:11, 153:13, 159:23, 160:4, 160:10, 160:15, 161:1, 161:4, 161:10, 161:11, 165:7, 165:9, 166:17, 166:21, 166:23, 167:15, 167:19, 168:22, 169:25, 170:24, 171:9, 173:9, 174:10, 176:6, 177:5, 230:3, 286:2
servers 151:11, 218:3, 229:18, 229:21
serves 305:20
Service 13:4, 67:16, 150:18, 188:19, 259:12
services 13:5, 64:3, 109:13, 187:24
serving 307:23

session 311:18
set 59:8, 66:3, 157:22, 163:3, 181:5, 198:8, 199:9, 239:14, 239:22, 256:23, 268:20, 280:8
sets 248:20, 264:3
setting 293:4
settle 38:10, 312:14
settled 30:17, 60:10, 70:21, 86:17, 109:24, 110:5, 111:1, 120:14, 125:16, 312:2, 312:18, 313:2
settlement 30:12, 30:13, 60:11, 60:16, 60:23, 61:2, 64:25, 86:14, 87:17, 87:19, 87:25, 88:2, 88:4, 88:8, 90:18, 91:2, 91:4, 91:12, 93:2, 93:4, 110:24, 111:1, 234:17, 234:18, 234:19, 250:7, 262:7, 262:9, 297:3, 297:6, 311:11, 311:19, 311:21, 313:2, 314:4, 314:9
settlements 248:10, 248:12, 249:13
settling 311:15
Seutter 276:8
seven 6:19
several 15:24, 38:9, 71:4, 82:9, 93:24, 180:4, 180:7, 197:22, 198:16
shadow 116:25

shaking 286:10, 306:4
shall 74:22, 185:23, 186:21, 188:18
Shank 2:36, 286:13, 286:16, 287:6, 287:25
share 89:5
shed 221:2
shifting 184:2
shoes 275:22
Shonn 2:35, 4:18
shoot 292:9
short 37:12, 136:11, 136:24, 193:10, 241:22, 265:19, 276:7, 314:8
shorter 268:10
shorthand 95:23, 99:11
shortly 8:25, 216:19, 311:5
shouldn't 6:2, 123:16, 133:23, 145:9, 265:8, 290:10, 290:12
Show 1:21, 4:1, 4:7, 5:2, 6:12, 6:21, 8:1, 8:3, 8:5, 8:9, 8:10, 8:13, 63:11, 86:25, 88:16, 116:10, 116:21, 117:18, 120:23, 129:20, 133:23, 140:22, 158:25, 160:3, 163:22, 211:13, 215:22, 234:10, 285:25, 302:5, 302:13, 302:19, 302:23
showed 61:11, 155:11, 168:11
showing 152:25
shown 68:5, 120:10, 218:1
shows 85:25,

99:1
Shred 120:4,
200:18, 200:21
shredded 222:25
sic 114:15,
137:13, 297:10
side 11:16,
14:14, 20:14,
34:23, 43:24,
46:24, 48:11,
55:10, 74:1,
134:10, 143:24,
174:21, 180:3,
181:15, 252:10,
252:24, 262:17
sides 13:3,
15:25, 19:12,
33:16, 38:14
sign 77:24,
78:14, 79:3,
80:25
signatories
143:12, 317:25
signature 81:4,
83:4, 189:17,
227:16, 259:13
signed 78:18,
79:2, 81:20,
82:11, 82:17,
82:18, 82:25,
91:1, 94:21,
94:24, 97:13,
189:23, 197:24,
201:2, 203:1,
258:25, 262:9,
295:7, 312:20
significance
170:18, 171:3,
174:25
significant
240:3
similar 119:21,
188:24, 240:13
simple 137:14
simply 121:9,
122:14, 157:24,
169:8, 255:5,
257:7
single 245:19,
246:3

sister 13:12,
13:13
sit 69:15,
69:24, 219:3,
228:9, 313:18
site 129:7
sites 19:25
sitting 196:9,
205:8, 315:16
situation
31:14, 36:1,
59:8, 125:15,
285:18, 299:24,
310:14, 310:17
size 268:11
skinnied 268:8,
270:18
sleeves 292:21
small 163:3,
197:3, 243:25
smiling 149:6
Smith 4:24,
86:11, 86:13,
86:16, 86:21,
86:25, 98:18,
99:6, 99:13,
103:17, 104:13,
104:14, 107:9,
120:6, 120:7,
122:5, 236:22,
289:11, 289:16,
317:25
SMU 150:2
snack 145:8
snap 25:6,
40:24, 266:6,
267:21, 267:23,
268:1, 269:22,
270:15, 271:7,
274:18, 290:14,
310:10, 311:5
snap-back
300:17
snapped 222:2,
269:1, 269:19,
271:9, 271:25,
274:21, 299:3,
304:23, 304:24,
310:5, 310:16
snapping 222:5,

268:23, 269:23,
273:11, 273:12,
273:13, 273:16,
306:2
sobeit 136:14,
193:13
software
149:24, 156:20,
230:12
sold 315:7
solution 247:6
Somebody 165:2,
176:13, 214:22,
242:17, 243:16,
244:17, 244:23,
252:25
Somehow 87:2,
93:24, 100:11,
100:13, 101:4,
101:12, 118:6,
120:2, 120:11,
121:17, 123:20,
130:12, 131:7,
140:11, 162:25
someone 35:7,
42:1, 65:8,
72:10, 114:7,
159:11, 175:22,
199:11, 207:4
Sometime 30:19,
36:3, 38:23,
41:11, 59:6,
60:10, 60:14,
87:19, 112:10,
112:11, 156:6,
217:9, 260:6,
299:25
sometimes
55:15, 150:14,
242:15, 252:16
somewhat 26:24,
246:16, 287:3
Somewhere
12:16, 92:25,
123:21, 140:12,
230:3, 235:7,
249:8
soon 37:24,
51:6, 62:6,
140:1, 257:12,

263:11, 271:20
sophisticated
124:17
sore 207:25
sort 5:11,
21:18, 48:9,
55:16, 132:6,
132:7, 140:15,
140:16, 144:17,
190:7, 246:6,
252:23, 258:9,
259:9, 270:1,
320:2, 320:3
sorts 162:23
sought 23:19,
60:8, 296:3
sound 72:16
sounded 36:12
sounds 30:21,
142:11, 143:1,
143:13, 230:1,
246:15, 259:24
source 122:17,
122:23, 167:5,
168:8
sources 66:23
space 153:20,
170:23, 170:24,
172:1
speaking 85:6,
135:23, 257:6
speaks 164:9,
164:10, 294:17
specific 31:17,
69:21, 73:20,
168:2, 173:24,
179:13, 241:7,
247:19, 247:22
specifically
69:1, 69:11,
70:11, 107:14,
116:22, 179:14,
179:22, 190:21,
249:5, 274:16,
281:9
specifics 47:18
specified
276:12
speculate 69:9,
157:1

speculation
47:4, 47:5,
59:12, 68:21
spell 179:3
spelled 255:21
spells 273:7
spend 7:11
spent 162:18,
187:25
spoke 193:9,
193:20
spoken 265:25,
300:23
spokes 124:12
sponte 320:1
spook 257:7
spot 131:24
spreadsheet
254:11, 254:15,
254:24, 255:4,
255:16, 255:22
spreadsheets
252:4
springing
118:22
squared 150:24
ST 2:28, 255:11
ST200646 255:11
staff 252:1
stage 204:12
stand 116:5,
140:4, 219:8,
235:22, 265:14,
320:23
standard 120:9,
127:7
standpoint
10:17
stapled 91:15
star 130:16
start 51:1,
63:5, 70:20,
70:24, 134:6,
150:14, 222:3,
243:15, 246:12,
253:13, 257:20,
257:25, 314:13
started 8:6,
8:11, 70:22,
120:24, 236:25

Starting 150:6,
192:4, 192:8,
193:10
starts 135:22,
186:19
State 12:9,
13:6, 15:7,
17:12, 18:7,
19:10, 19:18,
19:25, 20:5,
20:7, 20:20,
21:19, 21:24,
22:9, 22:14,
23:5, 24:11,
37:7, 39:24,
106:6, 109:9,
109:10, 110:1,
110:3, 150:16,
175:5, 179:3,
219:13
stated 20:21,
22:14, 43:25,
58:24, 135:17,
256:9, 266:19,
269:6, 282:22
statement 10:6,
65:18, 76:10,
77:14, 124:15,
136:21, 139:10,
193:24, 228:6,
279:7, 299:2,
321:4, 321:7
statements
87:1, 123:21,
124:22, 129:17,
193:6, 193:22,
201:6, 201:7,
233:5
States 1:1,
1:23, 33:19,
227:19, 236:10,
236:13, 236:17,
264:3, 322:7
station 230:23
status 37:19,
110:21, 312:9,
312:23, 312:25
statute 5:3
stay 37:10
stays 159:24

steal 302:10
stenography
3:46
step 178:2,
218:23, 235:15,
313:25
step-by-step
225:2
Stephanie 11:6,
11:9, 12:10,
33:19, 62:2,
196:10, 201:16,
202:18, 203:1,
214:23, 262:15,
262:16, 263:8,
284:24, 293:16,
293:19, 293:21,
297:24, 304:15,
304:19, 306:10
steps 20:3,
21:9, 24:20,
41:20, 42:12,
42:24, 43:15,
43:18, 43:20,
52:18, 55:8,
55:9, 58:21,
267:1, 281:14,
281:24
Steven 2:3,
4:13
stick 49:2
stickers 302:9
Stites 37:1,
50:1, 50:7,
53:12, 53:21,
54:6, 54:8,
56:14, 56:15,
56:23, 57:2,
57:4, 115:12,
115:14, 250:15,
264:25, 267:19,
304:11
stood 61:5,
61:7, 254:4
stop 56:20,
192:12, 234:16
stopped 136:24
stopping 11:13
storage 153:20,
170:23, 170:24,

171:1, 221:2
stored 169:9
storm 117:10
straight 195:3
strains 123:5
strategy 244:7
straw 314:8
Street 3:40
stretch 83:12,
83:13
Strike 13:19,
16:10, 30:25,
33:1, 40:21,
292:9
struck 42:3
structure
229:16
stuck 8:24,
100:21, 314:7
stuff 20:24,
162:24, 247:19,
251:9, 274:2
stumbles 125:7
style 23:7,
32:20
styled 48:7
sua 320:1
subjected 102:8
submissions
316:2, 321:18
submit 7:15,
301:22
submitted
89:19, 135:6,
318:16
subpart 42:15
subpoena 24:14,
44:24, 195:20,
204:21, 207:19,
208:3
subpoenaed
54:21, 204:16,
207:16, 208:6
subpoenas
26:19, 27:2
subsection
130:20
subsections
146:11, 146:14
Subsequent

31:7, 36:3,
36:7, 43:2
Subsequently
29:17, 31:11,
49:12, 53:17,
94:22, 157:8,
278:13
subsidiaries
103:11, 103:22
subsidiary
105:3
substantial
144:19, 144:21
substantially
315:7
substitute
94:25
subsumed 138:14
successful
20:18, 25:4,
25:5, 35:15,
38:25, 245:8
successfully
273:11
successor 278:4
succinct 178:8
sudden 123:14,
170:20, 171:14
Suffice 82:10,
82:22, 273:7
suggest 124:14,
229:24
suggested
244:9, 287:14,
295:8
suggesting
125:14, 176:12,
252:22, 306:23
suggestion
112:12
Suit 29:6,
29:13, 84:8,
84:9, 84:15,
90:7, 181:10,
203:10, 249:24,
251:3, 312:12
Suite 1:30,
1:38, 2:6,
2:16, 2:29,
2:38, 2:45, 3:5

suits 64:11,
312:12
summarize
163:12, 254:1,
265:21, 282:9,
282:15
summarizing
92:2, 257:5
summary 163:20,
164:5, 164:11
Summation
156:16, 156:18,
156:19, 156:20,
170:9, 170:24,
197:7, 197:12,
197:17, 198:3,
198:10, 200:13,
200:14, 201:12,
213:17, 213:23,
214:3, 223:14,
224:24, 225:1,
225:3, 226:1,
226:5, 226:14,
226:22, 228:11,
230:6, 230:7,
230:9, 230:11,
230:17, 230:18,
230:19, 230:22,
231:13, 245:17
summer 30:19,
33:7, 39:20
superiors 107:8
supervision
103:23, 104:5,
104:7, 104:10,
104:11, 104:13,
104:18, 104:21,
106:9, 106:14,
106:18, 107:5
supervisions
105:19
supplement
129:23, 288:16
supplemental
96:14, 96:20,
96:24, 277:4,
277:6, 277:7
supplied 174:6
support 139:18
supporting

186:5
suppose 317:9
supposed 56:5,
123:1, 123:4,
147:11, 165:16,
269:18, 274:23,
275:6, 298:17,
298:22, 299:2,
299:9, 299:10,
299:13, 299:15,
300:11, 300:13,
300:21, 301:1,
301:10, 306:16
supposedly 45:3
surmise 70:5
surprise 24:17
surprised
118:1, 252:21,
282:22
surrounding
70:6, 72:2
suspect 142:7,
231:1, 308:18
suspected 240:9
suspenders
190:8
Sustained 73:6,
163:24
swilliams@mcdol
ewilliams.com
2:9
switch 23:1
switched
158:13, 166:1
sword 117:4,
122:16, 122:20,
123:15
sworn 127:7,
127:10, 127:25
sworn. 11:18,
102:23, 145:16,
178:23, 219:9,
235:23
synonymous
230:7
system 13:5,
157:15, 167:3,
169:8, 170:2,
197:8, 197:24,
218:2, 222:23,

223:1, 224:23,
224:25, 228:11,
229:17, 242:13,
242:23, 242:25,
243:4, 243:8,
244:17, 245:18,
246:12, 257:9,
286:20
Systems 15:5,
45:17, 64:13,
112:23, 117:13,
117:15, 117:23,
150:25, 167:17,
173:17, 176:23


< T >
T-- 205:15
T-a-u-t-f-e-s-t
179:5
T-netix. 199:3
T-netix/securus
57:16, 65:15,
73:2, 143:6,
237:16
T-netixsecurus
131:14, 138:19
T-rex-- 205:15
tab 10:5,
29:21, 191:25,
258:20
table 160:2
tables 175:14
tabs 146:15
taken. 11:1
talked 36:9,
42:22, 45:16,
64:1, 64:4,
67:3, 69:16,
106:24, 131:17,
156:14, 165:4,
165:24, 165:25,
166:2, 171:25,
172:3, 177:6,
183:6, 185:2,
188:6, 190:13,
191:11, 195:23,
198:1, 222:5,
222:19, 243:10,
243:11, 245:14,

260:6, 260:9,
264:1, 264:22,
277:13, 278:15,
285:23, 296:24,
298:15, 309:2,
315:14
talks 45:12,
188:11, 205:13,
261:6
task 165:15,
165:18, 166:13,
200:15, 293:4
taught 150:2
TB 173:8
team 197:3,
232:1, 232:4,
232:10, 232:17,
232:19, 240:2,
291:7, 291:11,
291:13, 291:21,
292:17, 293:8
technical
14:19, 15:3,
17:1, 45:14,
45:19, 45:25,
73:24, 74:23,
75:7, 75:16,
76:9, 186:6,
186:16, 186:20,
187:3, 187:12,
187:16, 188:16,
188:21, 189:5
Technologies
1:17, 4:23,
64:12, 103:10
Tel 124:19
Tel-link 106:2,
109:17, 109:20,
179:23, 220:7,
220:9
telecommunicati
ons 13:3
teleconference
281:3
telephone 13:4,
20:12, 23:10,
33:1, 33:23,
59:16, 266:4,
266:19, 278:16
tells 67:21,

87:11
Telmate 32:21,
47:10
ten 57:24, 58:5
tend 292:20
tends 248:11
terabyte
153:20, 153:23,
153:25, 155:16,
156:9, 157:5,
170:25
term 47:23,
80:10, 185:21,
185:23, 186:4,
186:19, 186:20,
263:24, 263:25,
264:5, 305:19
termed 133:25
terms 21:19,
30:24, 37:13,
48:9, 48:11,
48:15, 121:9,
132:21, 134:1,
137:13, 181:9,
183:21, 191:1,
191:3, 191:5,
191:6, 204:18,
205:21, 224:20,
240:19, 248:22,
287:4, 315:4,
315:21
test 96:11,
212:23
testified
80:18, 148:6,
148:8, 194:24,
196:19, 208:11,
260:5, 297:19,
307:22, 308:9,
309:3
testify 54:20,
59:19, 82:7,
117:21, 140:7,
215:19
testifying 9:7,
122:2
Texas 1:2, 1:9,
3:41, 13:9,
19:16, 20:20,
23:9, 23:22,

25:2, 25:8,
26:4, 32:16,
32:22, 43:7,
106:17, 137:10,
137:12, 150:20,
180:6, 180:16,
181:22, 283:5,
322:15
text 175:15,
245:15, 245:22
text. 276:13
that-- 230:24
them. 90:19
themselves
47:22, 100:9,
175:13, 175:16,
195:20, 234:5
theory 115:12,
127:20, 139:4
thereafter
100:17, 140:1,
217:9, 282:16
thereof 74:22,
150:16
thereof. 187:13
thereto 97:16,
130:25
they've 268:14
thinking
239:21, 319:1,
319:19
thinks 125:2
third 91:15,
121:4, 150:6,
150:8, 193:12,
251:23, 272:9,
283:22, 297:6,
313:15, 315:6
third-party
204:21, 256:23
though 47:23,
63:4, 63:14,
69:21, 121:5,
122:15, 123:4,
127:6, 137:18,
149:8, 149:18,
161:23, 169:18,
194:7, 204:9,
237:10, 270:6,
273:7, 274:21,

275:16, 313:6
thoughts 279:24
thousand 243:20
thousands
245:24, 245:25,
246:1
Three 13:10,
153:3, 164:23,
164:24, 165:1,
185:22, 223:23,
241:9, 250:10,
254:6, 297:3,
305:18, 312:12,
315:20
threshold
207:14
threw 243:11
throat 207:25
throughout
295:14
throw 5:21,
61:17
Thursday
250:16, 253:1
TIFF 175:15,
245:15, 245:20
Tiffs 246:3,
246:7
tight 148:24,
172:17
til 178:16
time-sensitive
250:20
timeline 54:22,
55:14, 195:3,
216:20
timing 30:10,
33:5, 53:7,
91:3
title 46:22
TN 91:6, 91:15,
95:7, 95:20,
97:6, 199:3,
199:4, 199:5
today 6:19,
31:25, 53:17,
54:14, 69:15,
69:24, 70:18,
71:1, 82:9,
94:8, 98:16,

118:23, 147:2,
147:3, 153:2,
172:19, 172:22,
173:15, 175:5,
175:19, 177:20,
180:25, 182:12,
199:1, 203:12,
219:2, 219:20,
228:9, 305:10
today. 137:16
together 55:14,
55:22, 152:4,
152:21, 182:14,
182:20, 182:25,
183:12, 185:9,
188:1, 191:5,
194:6, 237:24,
244:7, 244:16,
257:16, 264:20,
267:11, 270:17,
309:10
TOLIVER 1:22
Tom 24:22
tomorrow
256:18, 266:25
tomorrow. 90:8
Tony 32:3,
32:9, 65:20,
235:22, 236:4,
239:21, 248:6,
250:13, 250:17,
257:6, 257:15,
263:6, 264:23,
265:21, 272:23,
277:4, 279:22,
309:2
Tony. 256:21
took 20:3,
21:9, 24:20,
27:13, 41:20,
42:12, 58:4,
100:20, 100:22,
100:23, 101:20,
125:6, 129:12,
174:21, 180:2,
190:15, 191:10,
201:7, 213:19,
217:7, 217:8,
222:16, 223:12,
228:9, 236:15,

237:22, 270:2,
284:11
Tool 150:8,
213:24, 230:19,
230:20
top 48:8,
49:22, 153:5,
166:23, 187:7,
187:11, 198:14,
255:10
tortious 37:5,
37:6, 312:12,
312:15
total 231:14
totality 124:14
Totally 199:9
touch 242:19,
274:13, 297:14
touched 158:10
town 253:2,
253:7, 253:8,
253:10, 255:24,
256:1
track 21:18,
166:17
tracked 278:15
tracking 250:1
traffic 8:25
trained 150:13,
150:15, 150:18,
236:15
training
148:20, 149:20,
149:22, 149:25,
150:2, 162:23
transcribed
136:5
TRANSCRIPT
1:21, 3:47,
18:21, 22:15,
25:17, 76:20,
81:11, 83:5,
96:19, 96:22,
98:11, 108:23,
133:16, 134:23,
135:13, 135:21,
136:23, 191:24,
194:9, 208:24,
309:23, 322:3,
322:5

transfer 37:15,
163:4
transferred
17:10, 49:25,
158:7, 168:20
transpire
117:11
transpired
134:24
treat 121:23
treated 15:9,
15:19
trees 89:4
trial 20:17,
74:25, 75:8,
75:19, 76:9,
187:13, 187:18,
187:25, 188:4,
191:3
tried 22:22,
130:12, 242:11,
312:13
tripped 125:9
trouble 269:8
True 48:1,
70:24, 96:22,
97:1, 107:7,
115:10, 123:9,
123:10, 123:11,
124:7, 124:8,
129:17, 141:21,
142:7, 167:12,
169:20, 174:15,
206:11, 210:5,
211:5, 212:18,
212:19, 212:20,
212:22, 231:5,
257:3, 258:22,
279:7, 290:2,
294:1, 302:24
truly 268:22
trust 211:15
truth 51:13,
52:6, 70:16,
140:3, 142:12,
272:22
truthful 123:24
try 24:23,
25:2, 49:2,
117:7, 195:17,

204:15, 240:25,
280:18, 296:3,
314:13
trying 32:14,
81:10, 81:24,
146:1, 147:18,
162:25, 170:12,
233:23, 237:19,
239:21, 248:18,
250:7, 250:8,
256:23, 270:8,
272:11, 273:10,
317:3
turn 5:14,
48:19, 49:5,
61:8, 63:21,
85:8, 89:23,
177:24, 185:10,
189:9, 191:10,
191:24, 192:4,
198:12, 199:18,
201:15, 203:8,
227:5, 239:10,
250:3, 251:16,
256:4, 258:20,
260:23
turnaround
27:25
turned 124:7,
134:14, 138:2
Turner 20:3,
24:22
turning 194:9
two-week 316:5
two. 241:8,
302:4
TX 2:7, 2:17,
2:30, 2:39,
2:46, 3:6
type 15:2,
19:24, 41:9,
59:8, 132:8,
222:13, 230:23
types 14:6,
15:18, 73:24,
179:11, 182:8,
190:22, 219:24
typical 14:6
Typically 48:1,
78:12, 155:24,

251:13, 252:17,
252:19, 264:2,
292:1
typo 192:14

< U >
ultimate 5:13,
13:16, 142:14,
142:20
Ultimately 6:4,
8:12, 22:13,
30:13, 30:17,
36:20, 38:3,
60:23, 68:15,
194:19, 259:5,
260:17, 270:17,
275:25, 292:4
Um-hum 280:1
unable 25:8,
199:10
unaware 24:18
uncommon 264:15
uncontested
54:23
underlying
12:21, 12:25,
13:2, 13:8,
14:1, 14:13,
14:21, 17:4,
18:15, 22:16,
30:24, 60:8,
75:24, 85:13,
88:14, 92:20
underneath
159:12
understand
13:14, 34:4,
35:24, 40:12,
41:17, 46:11,
46:19, 48:1,
48:3, 52:2,
69:23, 72:17,
86:8, 98:15,
98:19, 119:20,
147:20, 158:15,
164:19, 166:12,
168:24, 169:21,
180:25, 207:6,
210:3, 231:12,

240:7, 240:15,
252:13, 263:20,
278:5, 291:2,
306:1, 306:3,
306:4, 316:20,
320:1
understand.
72:21, 72:24
understanding
68:15, 68:17,
90:16, 158:13,
158:22, 162:2,
162:3, 167:6,
168:3, 169:6,
175:19, 181:7,
189:6, 202:10,
203:4, 203:21,
206:19, 221:4,
224:16, 259:6,
264:10, 269:9,
278:2
understands
203:4
understood
32:15, 35:6,
72:25, 73:3,
73:5, 194:12,
195:6, 206:18,
213:19, 244:24,
251:10, 254:22,
264:12, 269:23,
280:15, 280:16,
285:18, 290:13,
309:20, 311:2
undertake 151:6
undertaking
122:6, 240:3
unenforceabilit
y 251:2
unfortunate
16:6, 19:5
unfortunately
138:10, 138:13,
168:10
Union 131:2
unique 151:14
unit 183:1
United 1:1,
1:23, 322:7
University

150:20
unless 26:18,
81:3, 226:4,
268:20, 315:5
unmarried
278:12
unmistakably
132:14
unpublished
45:19
unrelated
114:16
unsigned 92:22
unsuccessful
25:14, 38:1,
311:14
until 5:24,
20:19, 25:14,
27:23, 46:18,
57:24, 70:20,
70:24, 104:14,
113:16, 119:16,
147:5, 154:13,
155:14, 169:6,
173:24, 178:16,
217:10, 234:17,
234:20, 236:16,
267:16, 299:24,
313:3, 315:16,
318:15
untrue 101:4
up-to-date
234:10
upcoming 20:16,
49:13
update 254:2,
254:4
uploaded 257:10
upset 206:18
upshot 206:22,
209:14
urge 116:6
us. 277:12
user 159:1,
161:12, 176:3
uses 157:17
using 170:14,
264:5
UTD 150:20
utilize 163:1

< V >
vacuum 315:2
Vague 40:11,
41:17
valid 48:16
validity 29:20,
85:4, 184:18,
184:25, 256:10
Value-added
1:11, 12:21,
15:4, 15:7,
17:2, 22:22,
24:14, 32:2,
35:5, 35:10,
42:19, 43:4,
45:15, 45:18,
46:7, 55:23,
62:12, 96:15,
98:2, 180:23,
221:9, 271:18
various 13:4,
15:5, 16:1,
20:3, 22:12,
45:25, 73:22,
103:10, 167:22,
183:10, 244:22,
250:22
vast 244:1,
245:18
vehicle 209:6,
209:7
vein 279:5,
312:13
vendor 114:2
vendors 74:24,
75:7, 242:17
veracity 101:5
verdict 116:6,
142:10, 142:13,
142:19
verge 311:14
verified 213:20
verifying
213:22
version 130:17,
140:5, 170:14,
279:1, 315:9
VERSUS 1:9,

1:15, 64:21,
66:4, 106:1,
106:6, 106:12,
106:16, 109:9,
109:17, 109:20,
110:4, 110:12,
111:10, 121:21,
130:4, 131:1
via 20:12,
250:20
vice 103:11,
103:12, 113:3
view 187:23,
204:9, 205:11,
205:14, 208:8,
208:15, 209:7,
209:14, 213:24,
297:17, 297:22,
298:1
viewing 241:2
vigorously
203:25
violate 6:22,
142:3
violated 6:13,
77:9, 116:23
violating
119:2, 161:3,
206:24
violation
19:10, 57:17,
132:3, 319:6
violations 19:7
virtue 126:20
vis-a-vis
131:14, 251:8
visited 58:17,
280:22
voice 253:4
voicemails
250:18
voir 149:2
volume 153:20,
170:22, 171:19,
244:10, 244:25,
245:6
voluminous
164:10
voluntarily
20:21, 24:2,

24:8, 28:9,
35:11, 35:19,
72:3, 296:3,
296:8
volunteer
261:24, 261:25

< W >
Waffenschmidt
121:21
Wait 9:20,
147:8, 169:3
waiting 205:8
walk 225:2,
309:16
wallet 243:16
walls 120:5
Walraven 3:2,
4:23
wanted 8:16,
93:6, 108:11,
113:6, 142:25,
175:9, 175:22,
176:13, 184:6,
184:7, 184:8,
184:9, 184:10,
184:11, 184:12,
185:1, 195:7,
195:13, 204:8,
208:6, 208:9,
240:5, 243:14,
243:16, 265:22,
272:23, 280:17,
281:6
wanting 204:18
wants 134:7,
219:2, 248:12,
316:4
Ware 216:24,
217:1
Washington
1:31, 1:39
watch 244:20
water 12:7
ways 204:10,
204:22
we. 208:5
week 113:6,
113:10, 113:13,

113:14, 113:16,
143:22, 295:21,
312:24
weeks 164:23,
164:24, 165:1,
316:2
welcome 149:7
well-known
138:6
well. 85:18,
200:24, 212:15,
227:21
Western 110:12,
111:8
What'd 24:19,
42:11
whatever
131:22, 153:24,
154:22, 163:16,
169:25, 173:8,
173:9, 194:21,
205:15, 211:16,
213:25, 214:17,
223:10, 225:19,
234:15, 242:23,
280:11, 281:14,
281:24, 290:5,
304:15, 315:12,
316:3
whatsoever
109:14, 131:7,
131:10
wheel 240:22,
241:11
whenever 59:6,
83:19, 104:1,
181:15, 234:17,
234:18, 236:1
where'd 167:2
whereby 82:25
whitcraft
121:10, 127:18,
128:14, 130:4
White 13:21,
13:22, 48:24,
49:2, 78:4,
84:4, 191:24,
192:1, 212:5,
303:15, 303:16
whoever 123:16

whole 7:11,
21:9, 62:22,
63:4, 154:14,
233:25, 241:6
whom 174:15
whomever 224:23
will 7:2, 8:12,
10:18, 11:17,
21:23, 40:4,
67:14, 72:2,
72:4, 76:16,
90:5, 102:21,
114:7, 114:8,
114:10, 137:15,
138:10, 138:11,
140:4, 143:25,
145:10, 178:9,
196:8, 199:12,
203:8, 235:22,
241:18, 252:16,
256:12, 256:17,
256:19, 271:19,
288:19, 291:7
willful 132:3,
134:14, 135:9,
320:3
willfully
319:15
WILLIAM 2:26
williams 2:3,
2:4, 2:14,
4:13, 280:23,
280:24
willing 271:15,
281:9
WILSON 3:39,
322:2, 322:12,
322:13
Wisconsin 1:29,
1:37
wish 40:24,
137:7, 265:13,
271:7
withdraw 20:5,
60:24, 91:16,
91:22, 91:23,
92:10, 92:19,
93:4, 93:9,
93:14, 94:13,
95:22, 96:1,

96:6, 96:7,
96:23, 97:10,
97:11, 98:2,
100:24
withdrawal 92:6
withdrawing
92:2, 92:17,
94:16, 97:25
withdrawn 61:4,
97:16
within 99:1,
120:5, 138:14,
143:22, 153:17,
163:5, 196:15,
285:23, 289:11,
304:18
Without 73:20,
117:21, 123:22,
145:3, 173:21,
174:10, 176:5,
176:8, 251:16,
316:12
witnesses 6:20,
45:25, 55:16,
138:10, 140:14,
182:14, 182:20,
182:22, 192:22,
314:3
word 127:1,
128:17, 132:12,
211:14, 284:25
words 48:11,
72:5, 72:6,
126:6, 126:7,
155:15, 206:17,
270:3, 297:10
work 15:5,
15:13, 20:4,
70:17, 95:7,
148:15, 150:6,
166:20, 173:23,
179:11, 183:12,
185:24, 186:12,
204:14, 219:20,
219:25, 220:4,
220:7, 220:16,
220:25, 231:8,
237:7, 240:14,
252:12, 269:7,
271:10, 272:14,

292:1, 292:14,
304:25
worked 15:15,
150:11, 183:12,
197:10, 210:10,
218:2, 220:19,
220:22, 224:23,
229:3, 234:17,
236:21, 237:21,
240:2, 242:1,
258:13, 291:12
worker 242:2
working 83:11,
85:18, 136:6,
139:19, 158:23,
165:11, 182:25,
186:14, 188:1,
190:3, 192:20,
194:6, 200:24,
202:4, 212:15,
213:15, 214:10,
220:12, 220:15,
222:23, 223:8,
223:21, 223:23,
224:4, 224:6,
226:11, 227:1,
227:21, 228:4,
230:23, 231:24,
234:16, 237:13,
241:8, 242:5,
246:17, 247:11,
294:20, 313:2,
315:1
works 231:3,
313:20
world 46:13
worried 170:16
worry 24:13,
265:19
worth 268:23
write 282:4,
284:4, 287:9,
294:21, 305:3,
305:4, 305:25,
317:19
writes 202:19,
203:10, 214:16
writing 7:21,
34:12, 61:23,
230:14, 287:10,

287:24
written 132:6,
150:1, 150:3,
188:19, 210:16,
296:20
wrote 43:12,
84:22, 136:20,
227:24, 228:1,
305:12


< Y >
y'all 10:22,
83:12, 142:17,
243:4, 257:16,
315:14
year 30:20,
61:14, 165:11,
217:11, 294:12,
312:19
years 15:24,
151:25, 217:10,
236:11, 299:25,
300:3
yesterday 9:8,
201:20, 266:20
you-all 56:11,
321:19
yourself 89:18,
147:23, 201:4,
205:20, 206:14,
236:4, 294:24

1

2                       C E R T I F I C A T I O N

3        I, PAMELA J. WILSON, CSR, certify that the foregoing is a

4    transcript from the record of the proceedings in the

5    foregoing entitled matter.

6        I further certify that the transcript fees format comply

7    with those prescribed by the Court and the Judicial

8    Conference of the United States.

9          This the 26th day of February, 2013.

10

11                              s/Pamela J. Wilson
12                              PAMELA J. WILSON, RMR, CRR
                                Official Court Reporter
13                              The Northern District of Texas
                                    Dallas Division
14

15

16

17

18

19

20

21

22

23

24

25

ORIGINAL

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

MAR – 3 2006

CLERK, U.S. DISTRICT COURT
By _____
Deputy

T-NETIX, INC.,

        Plaintiff/Counter-Defendant,

    v.

VALUE-ADDED
COMMUNICATIONS, INC.,

        Defendant/Counter-Plaintiff,

    v.

SECURUS TECHNOLOGIES, INC.,

        Counter-Defendant.

Case No. 3:05-cv-0654-D

**AGREED PROTECTIVE ORDER**

To expedite the flow of discovery material, to facilitate the prompt resolution of disputes over confidentiality of discovery materials, to adequately protect information the parties are entitled to keep confidential, to ensure that only materials the parties are entitled to keep confidential are subject to such treatment, and to ensure that the parties are permitted reasonably necessary uses of such materials in preparation for and in the conduct of trial, pursuant to Fed. R. Civ. P. 26(c), it is hereby **ORDERED THAT**:

**INFORMATION SUBJECT TO THIS ORDER**

1.    For purposes of this Order, **"CONFIDENTIAL INFORMATION"** shall mean all information or material which is produced for or disclosed to a receiving party; which a producing party, including any party to this action and any nonparty producing information or material voluntarily or pursuant to a subpoena or a court order, considers to constitute or to contain trade secrets or other confidential research, development, or commercial information, whether embodied in physical objects, documents, or the factual knowledge of persons; and

DL1-5966964v2

VAC
EXHIBIT 1
C.A. No. 3-05-654-D

**VAC App. 408**

which has been so designated by the producing party. Any **CONFIDENTIAL INFORMATION** obtained by any party from any person pursuant to discovery in this litigation may be used only for purposes of preparation and litigation of this matter.

2.    Any document or tangible thing containing or including any **CONFIDENTIAL INFORMATION** may be designated as such by the producing party by marking it "CONFIDENTIAL" (or "CONFIDENTIAL INFORMATION") prior to or at the time copies are furnished to the receiving party. Information meeting the criteria in Paragraph 16 for **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** may likewise be so marked.

3.    At the request of any party, the original and all copies of any deposition transcript, in whole or in part, shall be marked "CONFIDENTIAL" (or "CONFIDENTIAL INFORMATION") or "COUNSEL EYES ONLY CONFIDENTIAL INFORMATION" by the reporter. Any portions so designated shall thereafter be separated and treated in accordance with the terms of this Order.

4.    All **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** not reduced to documentary, tangible or physical form or which cannot be conveniently designated as set forth in Paragraph 2, shall be designated by the producing party by informing the receiving party of the designation in writing.

5.    Any documents (including physical objects) made available for initial inspection by counsel for the receiving party prior to producing copies of selected items shall initially be considered, as a whole, to constitute **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** and shall be subject to this Order. Thereafter, the producing party shall have a reasonable time to review and designate the appropriate documents as **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** prior to furnishing copies to the receiving party.

**VAC App. 409**

6.    The following information is not **CONFIDENTIAL INFORMATION**:

    (a)    any information which at the time of disclosure to a receiving party is in the public domain;

    (b)    any information which after disclosure to a receiving party becomes part of the public domain as a result of publication not involving a violation of this Order; and

    (c)    any information which a receiving party can show was received by it, whether before or after the disclosure, from a source who obtained the information lawfully and under no obligation of confidentiality to the producing party.

### NO WAIVER OF PRIVILEGE

7.    Inspection or production of documents (including physical objects) shall not constitute a waiver of the attorney-client privilege or work product immunity or any other applicable privilege or immunity from discovery if, as soon as reasonably possible after the producing party becomes aware of any inadvertent or unintentional disclosure, the producing party designates any such documents as within the attorney-client privilege or work product immunity or any other applicable privilege or immunity and requests return of such documents to the producing party.  Upon request by the producing party, the receiving party shall immediately return all copies of such inadvertently produced document(s).  Nothing herein shall prevent the receiving party from challenging the propriety of the attorney-client privilege or work product immunity or other applicable privilege or immunity designation by submitting a written challenge to the Court.

VAC App. 410

## DISCOVERY RULES REMAIN UNCHANGED

8.      Nothing herein shall alter or change in any way the discovery provisions of the Federal Rules of Civil Procedure.  Identification of any individual pursuant to this Protective Order does not make that individual available for deposition or any other form of discovery outside of the restrictions and procedures of the Federal Rules of Civil Procedure, United States District Court for the Northern District of Texas, and the Court's Deadlines for Docket Control Order and Discovery Order.

## PERSONS AUTHORIZED TO RECEIVE CONFIDENTIAL INFORMATION

### Counsel

9.      Counsel for a receiving party shall have access to the producing party's **CONFIDENTIAL INFORMATION** and **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION**.  The term "counsel" shall mean only outside attorneys retained by the parties to work on this litigation, including supporting personnel employed by the outside counsel, such as technical advisers, paralegals, legal translators, legal secretary, legal clerk and shorthand reporter, or an independent legal translator retained to translate in connection with this action, or an independent shorthand reporter retained to record and transcribe testimony in connection with this action.

### Technical Advisers

10.     **CONFIDENTIAL INFORMATION** and **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** of a producing party, and such copies as are reasonably necessary for maintaining, defending or evaluating this litigation, may be furnished and disclosed to technical advisers.  The term "technical adviser" shall mean any outside person (who is not an employee of a party) and their engineering, technical, accounting, or financial support personnel, including, but not limited to, a proposed expert witness or consultant with whom counsel may

**VAC App. 411**

deem it necessary to consult concerning technical, financial, or other aspects of this case for the preparation or trial thereof.

11.     Should counsel for a receiving party find it necessary for maintaining, defending or evaluating this litigation to disclose a producing party's **CONFIDENTIAL INFORMATION or COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** to any of the persons or services described in Paragraph 10, counsel for the receiving party shall first obtain from such person or service a written Confidentiality Agreement, in the form attached hereto as Attachment A. Such written agreement shall be retained by counsel for the receiving party, but must be disclosed to the producing party within seven (7) days after execution (with the exception of any written agreements signed by consulting-only experts which must be retained by counsel for the receiving party until after final appeal).

### Employees of Parties

12.     Subject to the requirements set forth in this Order, **CONFIDENTIAL INFORMATION** of a producing party, (but not **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION**), and such copies as are reasonably necessary for maintaining, defending or evaluating this litigation, may be furnished and disclosed by counsel for a receiving party, to individuals who are employees of such receiving party with responsibility for maintaining, defending or evaluating this litigation (and supporting personnel).

13.     Should counsel for a receiving party find it necessary for maintaining, defending or evaluating this litigation to disclose a producing party's **CONFIDENTIAL INFORMATION** to an individual identified in Paragraph 12, counsel for the receiving party shall first obtain from such individual a Confidentiality Agreement, in the form attached hereto as Attachment A, stating that he or she has read and understands this Order and agrees to be

VAC App. 412

bound by its terms. Such written agreement shall be retained by counsel for the receiving party and must be disclosed to the producing party within seven (7) days after execution.

### Data Processing Vendors and Graphics/Trial Consultants

14.     Subject to the requirements set forth in this Order, **CONFIDENTIAL INFORMATION** and **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** of a producing party, and such copies as are reasonably necessary for maintaining, defending or evaluating this litigation, may be furnished and disclosed to data processing vendors; graphics or design services retained by counsel for purposes of preparing demonstrative or other exhibits for deposition, trial, or other court proceedings in this action; or non-technical jury or trial consulting services, including mock jurors. The term "data processing vendor" means any person (and supporting personnel) who is a member or staff of an outside data entry or data processing entity employed or retained by a receiving party or its counsel and who is assisting in the development or use of data retrieval systems in connection with this action.

15.     Should counsel for a receiving party find it necessary for maintaining, defending or evaluating this litigation to disclose a producing party's **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** to any of the persons or services described in Paragraph 14, counsel for the receiving party shall first obtain from such person or service a written Confidentiality Agreement, in the form attached hereto as Attachment A. Such written agreement shall be retained by counsel for the receiving party, but need not be disclosed to the producing party until the conclusion of the case.

### INFORMATION DESIGNATED COUNSEL EYES ONLY CONFIDENTIAL INFORMATION

16.     **CONFIDENTIAL INFORMATION** may be additionally designated **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** (by labeling it **COUNSEL ONLY** or **HIGHLY CONFIDENTIAL** or similar designation clearly transmitted in writing to

**VAC App. 413**

Case 3:05-cv-00654-D   Document 44   Filed 03/03/06   Page 7 of 16   PageID 574

the other parties). The **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** designation is reserved for information that constitutes proprietary financial or technical or commercially sensitive competitive information that the producing party maintains as highly confidential in its business, including but not limited to, information obtained from a nonparty pursuant to a current Nondisclosure Agreement ("NDA"), information relating to future products not yet commercially released, strategic plans, codes, technical documents that would reveal trade secrets or other confidential research, development or commercial information, and settlement agreements or settlement communications, the disclosure of which is likely to cause harm to the competitive position of the producing party or a third party's business or personal interests.    Documents designated **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** and contents thereof shall be available only to counsel for the parties, the technical advisers who are assisting them, data processing vendors and graphics and trial consultants.

### CHALLENGES TO CONFIDENTIALITY DESIGNATIONS

17.   The parties will use reasonable care when designating documents or information as **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION.**  Nothing in this Order shall prevent a receiving party from contending that any or all documents or information designated as **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** have been improperly designated.  A receiving party may at any time request that the producing party cancel or modify the confidentiality designation with respect to any document or information contained therein.

18.   A party shall not be obligated to challenge the propriety of a **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** designation at the time made, and a failure to do so shall not preclude a subsequent challenge

VAC App. 414

thereto. Such a challenge shall be written, shall be served on counsel for the producing party, and shall particularly identify the documents or information that the receiving party contends should be differently designated. The parties shall use their best efforts to resolve promptly and informally such disputes. If agreement cannot be reached, the receiving party shall request that the Court cancel or modify a **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** designation.

## LIMITATIONS ON THE USE OF CONFIDENTIAL INFORMATION AND COUNSEL ONLY CONFIDENTIAL INFORMATION

19. **CONFIDENTIAL INFORMATION** and **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** shall be held in confidence by each person to whom it is disclosed, shall be used only for purposes of this litigation, shall not be used for any business or other purpose, and shall not be disclosed to any person who is not entitled to receive such information as expressly provided herein. All produced **CONFIDENTIAL INFORMATION** and **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** shall be carefully maintained so as to preclude access by persons who are not entitled to receive such information. However, nothing in this Order shall prevent any outside court reporter, videographer, mediator and their employees, or the Court, any employee of the Court or any juror from reviewing any evidence in this case for the purpose of this litigation. Further, nothing in this Order shall impact one way or another on the admissibility of any document or other evidence at any hearing or at trial. Court reporters and videographers not employed by the Court must execute a written Confidentiality Agreement, in the form attached hereto as Attachment A.

20. Except as may be otherwise ordered by the Court, any person may be examined as a witness at depositions and trial and may testify concerning all **CONFIDENTIAL INFORMATION** and **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** of

VAC App. 415

which such person has prior knowledge.  Without in any way limiting the generality of the foregoing:

(a)  A present director, officer, and/or employee of a producing party may be examined and may testify concerning all **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** which has been produced by that party;

(b)  A former director, officer, agent and/or employee of a producing party may be interviewed, examined and may testify concerning all **CONFIDENTIAL INFORMATION** and **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** of a producing party which he or she had prior knowledge during the course of his or her employment, including any **CONFIDENTIAL INFORMATION** and **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** that refers to matters of which the witness has personal knowledge, which has been produced by that party and which pertains to the period or periods of his or her employment; and

(c)  Non-parties may be examined or testify concerning any document containing **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** of a producing party which appears on its face or from other documents or testimony to have been received from or communicated to the nonparty as a result of any contact or relationship with the producing party, or a representative of such producing party. Any person other than the witness, his or her attorney(s), and any person qualified to receive **CONFIDENTIAL INFORMATION**

**VAC App. 416**

or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** under this Order shall be excluded from the portion of the examination concerning such information, unless the producing party consents to persons other than qualified recipients being present at the examination. If the witness is represented by an attorney who is not qualified under this Order to receive such information, then prior to the examination, the attorney shall be requested to provide a Confidentiality Agreement, in the form of Attachment A hereto, that he or she will comply with the terms of this Order and maintain the confidentiality of **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** disclosed during the course of the examination. In the event that such attorney declines to sign such a Confidentiality Agreement, prior to the examination, the parties, by their attorneys, shall jointly seek a protective Order from the Court prohibiting such attorney from disclosing such **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION.**

(d)     In addition to the restrictions on the uses of all types of **CONFIDENTIAL INFORMATION** set forth in this Order, the following shall apply to the use of documents a party has designated **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** at a deposition:

(i)     A witness who previously had access to a document designated **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION,** but who is not under a present non-disclosure agreement with the

VAC App. 417

producing party that covers that document, may be shown the document if a copy of this protective order is attached to any subpoena or notice or request served on the witness for the deposition and the witness is advised on the record of the existence of the protective order and that the protective order requires the parties to keep confidential any questions, testimony or documents that are designated as **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION.**

(ii)   The witnesses may not copy, take notes on or retain copies of any **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** used or reviewed at the deposition.  The witness may not take out of the deposition room any exhibit that is marked **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION.**  The producing party of any **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** used at the deposition may also require that the transcript and exhibits not be copied by the witness or his counsel, that no notes may be made of the transcript or the exhibits, and that the transcript and exhibits may only be reviewed by the witness in the offices of one of the counsel representing a party in this case (or another firm acting for one of the counsel representing a party in his case and under the

VAC App. 418

supervision of one of the counsel who is bound by the terms of the order).

21.    All transcripts of depositions, exhibits, answers to interrogatories, pleadings, briefs, and other documents submitted to the Court which have been designated as **CONFIDENTIAL INFORMATION or COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** or which contain information so designated, shall be filed in sealed envelopes or other appropriate sealed containers on which shall be endorsed the title of this matter, an indication of the nature of the contents of such sealed envelope or other container, the words **"CONFIDENTIAL [OR COUNSEL EYES ONLY] INFORMATION - UNDER PROTECTIVE ORDER"** and a statement substantially in the following form:

> This envelope contains confidential information filed in this case by [name of party] and is not to be opened nor the contents thereof to be displayed or revealed except by order of the Court presiding over this matter.

22.    Nothing in this Order shall prohibit the transmission or communication of **CONFIDENTIAL INFORMATION or COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** between or among qualified recipients

(a)    by hand-delivery;

(b)    in sealed envelopes or containers via the mails or an established freight, delivery or messenger service; or

(c)    by telephone, telegraph, facsimile or other electronic transmission system; where, under the circumstances, there is no reasonable likelihood that the transmission will be intercepted or misused by any person who is not a qualified recipient.

23.    **CONFIDENTIAL INFORMATION or COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** shall not be copied or otherwise reproduced by a

VAC App. 419

receiving party, except for transmission to qualified recipients, without the written permission of the producing party, or, in the alternative, by further order of the Court. Nothing herein shall, however, restrict a qualified recipient from making working copies, abstracts, digests and analyses of **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** for use in connection with this litigation and such working copies, abstracts, digests and analyses shall be deemed to be the same level of **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** under the terms of this Order as the original documents upon which such work product was based. Further, nothing herein shall restrict a qualified recipient from converting or translating **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** into machine readable form for incorporation into a data retrieval system used in connection with this action, provided that access to **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION**, in whatever form stored or reproduced, shall be limited to qualified recipients.

## NONPARTY USE OF THIS PROTECTIVE ORDER

24.    A nonparty producing information or material voluntarily or pursuant to a subpoena or a court order may designate such material or information in the same manner and shall receive the same level of protection under this Protective Order as any party to this lawsuit.

25.    A nonparty's use of this Protective Order to protect its **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** does not entitle that nonparty access to **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** produced by any party in this case.

VAC App. 420

## MISCELLANEOUS PROVISIONS

26.    Within sixty (60) days after the entry of a final non-appealable judgment or order, or the complete settlement of all claims asserted against all parties in this action, each party shall, at its option, either return to the producing party or destroy all physical objects and documents which embody **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** which were received from the producing party, and shall destroy in whatever form stored or reproduced, all other physical objects and documents, including but not limited to, correspondence, memoranda, notes, databases and any other work product materials, which contain or refer to **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION**; provided, that all **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION**, not embodied in physical objects and documents, shall remain subject to this Order. Notwithstanding the foregoing, counsel shall be entitled to maintain copies of all pleadings, motions and trial briefs (including all supporting and opposing papers and exhibits thereto), written discovery requests and responses (and exhibits thereto), deposition transcripts (and exhibits thereto) trial transcripts, and exhibits offered or introduced into evidence at trial.

27.    This Order is entered without prejudice to the right of any party to apply to the Court at any time for additional protection, or to relax or rescind the restrictions of this Order, when convenience or necessity requires. The Court shall take appropriate measures to protect **CONFIDENTIAL INFORMATION** and **COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** at trial and any hearing in this case.

28.    The United States District Court for the Northern District of Texas, Dallas Division, is responsible for the interpretation and enforcement of this Protective Order. All disputes concerning **CONFIDENTIAL INFORMATION** or **COUNSEL EYES ONLY**

VAC App. 421

**CONFIDENTIAL INFORMATION** produced under the protection of this Protective Order

shall be resolved by the United States District Court for the Northern District of Texas, Dallas

Division.

29.

**SO AGREED AND STIPULATED:**

By: _Robert W. Turner_ By permission   By: _[signature]_
        JAH

Robert W. Turner                        Aubrey "Nick" Pittman
Attorney-In-Charge                      Attorney-In-Charge
JONES DAY                               The Pittman Law Firm, P.C.
2727 N. Harwood                         100 Crescent Court, Suite 700
Dallas, Texas 75201                     Dallas, Texas 75201
Telephone: 214 220-3939                 Telephone: 214-459-3454
Facsimile: 214 969-5100                 Facsimile: 214-853-5912

ATTORNEYS FOR DEFENDANT/              ATTORNEYS FOR PLAINTIFF,
COUNTER-PLAINTIFF,                   T-NETIX, INC. AND COUNTER-
VALUE-ADDED                          DEFENDANT SECURUS
COMMUNICATIONS, INC.                 TECHNOLOGIES, INC.

IT IS SO ORDERED, with the consent of the parties, this 3rd day of March, 2006.

_[signature]_
Honorable Sidney Fitzwater
United States District Court

AF
-3-06

Unless this order includes a clause that explicitly states that a
particular local civil rule is modified as applied to this case,
nothing in this order shall be construed to modify the provi-
sions, operation, or effect of any local civil rule of this court.

VAC App. 422

## CONFIDENTIALITY AGREEMENT

I, _____, state:

1.      I reside at _____;

2.      My present employer is _____;

3.      My present occupation or job description is _____;

4.      I agree to keep confidential all information provided to me in the matter of *T-NETIX, Inc. v. Value-Added Communications, Inc., et al.* and to be subject to the authority of the United States District Court for the Northern District of Texas, Dallas Division in the event of any violation of this agreement or dispute related to this agreement.

5.      I have been informed of and read the Stipulated Protective Order dated_____, 2006, and I will not divulge any confidential information to persons other than those specifically authorized by said Order.

6.      I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____200__.

_____

DLI-5966964v2

VAC App. 423

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                        DALLAS DIVISION

 3  T-NETIX, INC,                    )   CIVIL ACTION NUMBER
                                     )
 4            Plaintiff,             )
                                     )
 5  VERSUS                           )   3:05-CV-00654
                                     )
 6  VALUE-ADDED COMMUNICATIONS, INC.,)
                                     )
 7            Defendant.             )   April 16, 2008

 8

 9                      VOLUME 1 of 1
                 TRANSCRIPT OF MOTIONS HEARING
10         BEFORE THE HONORABLE WILLIAM F. SANDERSON
               UNITED STATES MAGISTRATE JUDGE
11

12  For the Plaintiff:      MICHAEL BOWERS
                            JEFFREY S. LOWENSTEIN
13                          Bell Nunnally & Martin
                            3232 McKinney Avenue, Suite 1400
14                          Dallas, Texas  75204
                            214/740-1410
15
                            AUBREY NICK PITTMAN
16                          Pittman Law Firm
                            100 Crescent Court, Suite 700
17                          Dallas, Texas  75204
                            214/459-3454
18
                            ERIC TAUTFEST
19                          Gruber Hurst Johansen & Hail,  LLP
                            1445 Ross Avenue, Suite 2500
20                          Dallas, Texas  75202
                            214/855-6873
21
    For the Defendant:      ROBERT W. TURNER
22                          STEPHANIE NEWKIRK CLOUSTON
                            CHRISTOPHER GROVES
23                          SEAN WHYTE
                            Jones Day
24                          2727 N. Harwood Street
                            Dallas, Texas  75266
25                          214/969-2984
```

COPY

1  Proceedings reported by mechanical stenography, transcript
produced by computer.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  P R O C E E D I N G S:

 2              THE COURT:  We have on the docket here this

 3   morning the case of T-Netix, Incorporated versus Value-Added

 4   Communications.  This is number 3-05-CV-654-D.

 5              A couple of matters.  First of all, we have the

 6   Plaintiff's Emergency Motion to Modify Agreed Protective Order

 7   that is document number 117, filed on the docket on October

 8   9th, 2007.  And then we also have VAC's Motion to Enforce the

 9   Protective Order that was filed as docket number 155 on

10   December 28, 2007.

11              First of all, just for the record, let me have

12   counsel for T-Netix identify themselves for the record.

13              MR. BOWERS:  Your Honor, Mike Bowers with the

14   law firm of Bell Nunnally and Martin.

15              THE COURT:  All right.

16              MR. PITTMAN:  Your Honor, Aubry Pittman with the

17   law firm of the Pittman Law Firm.

18              THE COURT:  All right.  And for the defendant,

19   Value-Added.

20              MR. TURNER:  Yes, Your Honor.  Robert Turner for

21   Jones Day, and this is Stefanie Clouston from Jones Day.  And

22   we have Chris Groves back here and Sean Whyte.

23              THE COURT:  All right.

24              MR. LOWENSTEIN:  Also, Jeffrey Lowenstein with

25   the law firm of Bell Nunnally and Martin for T-Netix.
```

1           THE COURT:  All right.  Fine.

2           Well, I think I'm going to take up the VAC's

3  motion first.  It seems to me that may involve more testimony

4  and evidentiary issues, so I think we'll take that one up

5  first.

6           Let me just say as ground rules, of course, both

7  sides have filed extensive pleadings relative to these motions

8  with attachments.  Certainly I have enough paperwork to work

9  with.  So I would appreciate that in the event that there are

10  documents to be presented or examined, that you simply refer to

11  the page -- appendix page in your pleadings so that obviously

12  if a witness needs to take a look at them as exhibit, then

13  certainly that's fine.  But I don't think there's any need or

14  occasion to make the record any larger than it currently is

15  since most of these exhibits may already be a part of the

16  appendix.

17           Of course, if there is a new document that needs

18  to be marked and admitted, that's a different thing, but I just

19  want to avoid, to the extent possible, redundancy of the

20  exhibits here.

21           So let me -- Mr. Turner, do you wish to say

22  anything before we hear from any witnesses on your motion?

23           MR. TURNER:  Yes, Your Honor.  Ms. Clouston has

24  an opening statement.

25           THE COURT:  All right.  Ms. Clouston, be glad to

1  hear from you.

2                    MS. CLOUSTON:   Thank you, Judge Sanderson.

3                    As just kind of first an overview of what we are

4  doing today and the unfortunate circumstances that bring us

5  here today, we have an agreed protective order that was entered

6  by this court on March 6 of 2006, Your Honor.  And we are

7  moving for the enforcement of the agreed protective order that

8  was agreed to by the parties in this case, agreed to by the

9  counsel involved in this case, the Bell Nunnally and Martin

10  firm and the Pittman Law Firm, counsel for T-Netix and Securus,

11  as well as Jones Day on behalf of Value-Added Communications.

12                    Your Honor, Value-Added Communications, T-Netix,

13  Securus are all direct competitors in the prison

14  telecommunications space.

15                    The case that is very clear, Thearead

16  (phonetic), protective orders, such as the one that's been

17  entered by this court, should be enforced and really not only

18  for the protection of the litigants in that case, but for the

19  entire discovery process of these courts, that it's very

20  important that the litigants can rely upon the protective

21  order, rely upon the assurances that the protective order will

22  be adhered to in that it will not be improperly used or

23  disclosed and without -- especially in our particular

24  circumstances, without any notice to Value-Added Communications

25  or Jones Day, VAC's counsel, so that we could try to minimize

1   the harm or prohibit the improper disclosures that were made.

2          There are really two known forums where improper

3   disclosures were made in uses of documents and confidential

4   information that were marked as Confidential and, in most

5   cases, Attorneys Eyes Only, Restricted Confidential, under our

6   agreed protective order.

7          And, Your Honor, we have prepared a chart that

8   has some of the -- to date the known violations by T-Netix,

9   Securus, and their counsel.  And I believe Mr. Whyte was going

10  to bring up a copy.

11         The two forums that are discussed in our motion

12  to enforce their agreed protective order, as well as in the

13  motion to modify the protective order and our motion to stay,

14  are in another case that is pending in now the 68th Judicial

15  District Court before Judge Hoffman in state court here,

16  involving alleged breaches by both parties of a patent license

17  agreement.  That case was filed in 2003 before this case was

18  filed.

19         In addition, there have been disclosures made in

20  the Eastern District of Texas lawsuit, of which VAC is not a

21  party and Jones Day is not involved in that lawsuit as counsel

22  of record, and that T-Netix and its sister company, Evercom,

23  are involved in, along with various other competitors and at

24  least two customers of our client, Value-Added

25  Communications.

```
 1              The violations that first pertain to our state
 2  court case.  The first violations that occurred were in the end
 3  of September of 2007, Your Honor.  At that point we had heard
 4  numerous motions for reconsideration by T-Netix to interject
 5  the royalties issues back into that state court case.  Those
 6  motions have been denied.  Motions to compel, documents
 7  pertaining to line count reports, and also certain financial
 8  documents of Value-Added Communications were also denied by our
 9  former judge, Judge Carlos Cortez of the 44th District Court.
10              At that point all this discovery was deemed
11  irrelevant by the state court judge.  At about the same time we
12  voluntarily produced documents in this lawsuit pertaining to
13  their damage claims that they have made in this patent
14  infringement case, and that included reports that their
15  expert -- their damages expert was relying on pertaining to
16  line count reports, VAC's customer information, and financial
17  information.
18              The counsel involved in this case also
19  represents T-Netix in our state district court case.  They
20  took, Your Honor, the documents that were produced in this
21  case, designated as Counsel Eyes Only information, and filed
22  five different pleadings before then Judge Cortez in the 44th
23  District Court in support of various arguments they were making
24  for reconsideration of the royalty orders, reconsideration of
25  the denying of those documents, and motions to amend pleadings
```

1  to add new claims in.

2          At that point, also, their experts related to

3  those claims had also been stricken because the claims were not

4  relevant in the case.

5          As soon as we discovered that these various

6  motions had been filed, we immediately raised it with opposing

7  counsel and made various pleas for them to please take this

8  information out of the state court record, in addition to not

9  presenting this at a hearing that we had scheduled on October

10  2nd of 2007 -- I'm sorry, October 3rd, 2007.

11          At nine a.m. we had a hearing on a motion to

12  realign the parties that T-Netix had filed at that point.  It

13  was ultimately denied by the next judge, but they had included

14  among the record either as attachments to the motion.  The

15  attachments were filed under seal in the state court case.  The

16  documents and the information were referred to in the motions

17  that were not filed under seal, and they were provided to the

18  state court judge.

19          Again, we sent numerous letters from both myself

20  and Mr. Turner asking that they please remove this information

21  from the file, to cooperate with us to make sure it was

22  expunged from the state court record, and not present this

23  information before the state court judge.

24          Unfortunately, they proceeded with the, at that

25  point, the motion to realign.  Argued from the evidence that

1  had only been produced in this case.  We raised this with Judge

2  Cortez, saying that they were using information and had

3  attached information, some of it under seal, and provided

4  copies of documents that had not, in fact, ever been produced

5  in the state court case, had been denied access to in the state

6  court case because the claims had been deemed irrelevant, and

7  upheld the dismissal with prejudice of those claims in our

8  favor.

9              And as a result of all of that, as well as some

10  other motions, Judge Cortez recused himself voluntarily from

11  our case.

12              In addition, despite that we had raised this

13  with T-Netix's counsel, asked them repeatedly to please take

14  this information out of the file, they filed a motion to

15  declassify federally-produced documents before our state court

16  judge.  Asked him to do that without notifying him that, in

17  fact, these documents had never been produced in the state

18  court case.

19              All of this, Your Honor, we think doesn't have

20  to be submitted in the form of a question/answer format because

21  they're all public filings, pleadings, admissions simply by

22  T-Netix counsel and hearing transcripts of representations made

23  to the state court judge, to counsel for VAC, as well as

24  representations made to this court concerning what happened

25  with the state court proceeding.

1           Unfortunately the problem that we've had,

2   talking about the state court for a moment, is that they

3   have -- we have repeatedly requested that information not be

4   used, that it be taken out of the state court file, that they

5   cooperate with us, enforcing the agreed protective order.

6           And they have represented to state court judges,

7   to VAC, and to this court, Your Honor, that they didn't do

8   anything wrong; that they were entitled or justified in their

9   actions in that the state court judge could and should consider

10  this information.

11          Even after Your Honor's hearing in December of

12  2007 regarding motion to stay and the motion to modify the

13  agreed protective order filed by T-Netix after the

14  declassifications were filed in the state court case, we again

15  requested before another hearing before our new judge, Judge

16  Hoffman, in the 68th Judicial District that the documents

17  please be removed.  Please remove them from the file.  Please

18  do not argue them.  Do not risk having another judge consider

19  these pleadings.

20          They went forward with the hearing with the

21  pleadings still in the file, and it wasn't until after the

22  motions to realign the parties to amend the pleadings that had

23  referenced these were denied, at the end of the hearing they

24  asked for all the documents be taken out of the file.

25          Judge Hoffman did not review those documents,

1 however, because they were in a box still at the 44th District

2 Court and were never included among the transfer of those

3 documents.

4         We did not know if that was the case at the time

5 and raised that repeatedly with Judge Hoffman as well as

6 counsel for T-Netix.  But, nonetheless, it wasn't until after

7 all those motions were denied that had included in prior

8 versions on those pleadings that they finally removed those on

9 December, I think it was the 19th or 20th, Your Honor, but

10 those documents were finally removed from the state court.

11         At the same time there were problems occurring

12 in the Eastern District of Texas case.  In fact, we have just

13 recently, after repeated requests by us, received some

14 documents from the Gruber Hurst law firm as well as a single

15 document from the Bell Nunnally law firm.  And the Bell

16 Nunnally document is Appendix 494 to T-Netix's response to

17 VAC's Motion to Enforce the Agreed Protective Order.

18         And what the Appendix 494 e-mail shows is that

19 on October 3rd, the very day that our state court judge

20 voluntarily recused himself as a result of the state court

21 violations of our agreed protective order in this case,

22 Mr. Tautfest of the Gruber firm, along with some of his other

23 colleagues at the  Gruber firm, requested from Bell Nunnally to

24 be provided the expert reports, exhibits, and other discovery

25 that had been exchanged in our Northern District case.

1          On that day Mr. Lowenstein of the Bell Nunnally

2  firm informs Mr. Tautfest, with a copy to Mr. Pittman and

3  various other partners and associates at Bell Nunnally firm and

4  the Gruber firm, that they could not provide those documents,

5  and they could not be used in the Eastern District of Texas

6  case without a violation of the protective order in, quote,

7  "our case," close quote.  And Mr. Lowenstein attaches a copy of

8  the agreed protective order from this case, Your Honor.

9          Further, Mr. Lowenstein informs the Gruber Hurst

10  firm that, pursuant to the terms of the protective order, "You

11  will need to seek leave from Judge Fitzwater before producing

12  that information," close quote.

13          At this point in time, Your Honor, on

14  October 3rd, 2007 -- this was in the afternoon at 5:04 p.m. --

15  it was of the utmost in all of the persons' involved in our

16  case, in the state case, mind of what the agreed protective

17  order held, what was a violation of the agreed protective

18  order, that VAC did not consent to use of its designated

19  confidential information produced in this case for use in other

20  cases.

21          With all of that foremost in the counsel on this

22  case's mind, they produced the documents to Gruber Hurst firm

23  anyway, knowing that Gruber Hurst wanted those documents to

24  produce in the Eastern District of Texas case.  They also put

25  on notice at that point in time to the Gruber Hurst firm what

1  the terms of the agreed protective order are in this case in

2  that the documents could not be produced or used in the Eastern

3  District of Texas lawsuit, of which VAC is not a party, without

4  a violation of the agreed protective order entered in this

5  case.

6              At that point the documents were apparently

7  provided on or about October 3rd to the Gruber Hurst firm.  And

8  we know that only because on October 5th, 2007, some of the

9  expert reports, one of which was designated on each and every

10  page, Restricted Confidential, Outside Counsel's Eyes Only

11  Information, was, in fact, produced to the other litigants

12  involved in the Eastern District of Texas case.

13              We were never provided notice that the documents

14  were, in fact, produced in that case, nor were we provided

15  notice that Gruber Hurst had Value-Added Communications's

16  confidential information and documents.  And it was only as a

17  result of us, by happenstance, having another counsel

18  representing a competitor of our client told us that the

19  document had been produced that was confidential to VAC in that

20  case.

21              We worked immediately, informing counsel

22  involved in this case, informing the Gruber Hurst firm, trying

23  to minimize the harm, trying to figure out what they, in fact,

24  had provided, what the Gruber firm had in its files, if the

25  documents had been provided to anyone else, when they had been

1  provided.

2              We really have received very little, if any, in

3  fact, cooperation from counsel in this case about when those

4  documents were provided to them, what was actually provided,

5  and if they were provided to anyone else so that we could try

6  to fix this, really, with the extreme prejudice to our client

7  of competitors involved in the other cases.

8              And at the point that the documents were

9  produced, it's our understanding that a formal agreed

10 protective order had not even been entered in that case.  They

11 were under Judge Ward's kind of blanket rule that until a

12 protective order is entered, everything is designated

13 Restricted Confidential.  That there was not a formalized

14 agreed protective order entered by those parties, and it was

15 not a result of the cooperation of the firms representing

16 T-Netix and Securus and their sister company, Evercom, in the

17 other case, cooperation in telling us that the documents had

18 been produced.  It was us finding out from others.

19             It appears to us from some more recent documents

20 that were just produced -- we were able to review them

21 yesterday from the Gruber Hurst firm -- that -- and we have a

22 copy, Your Honor, of a few documents.  They were Bates numbered

23 GHJH for the Gruber Hurst firm.  -- that the allegation that

24 T-Netix and T-Netix's counsel have made in this case that they

25 were, in fact, counsel involved in our case and were entitled

1   to those VAC confidential documents without any notice to us

2   and without executing the agreed protective order is certainly

3   questionable.

4                    They say in e-mails internally between the

5   Gruber firm -- and, Sean, do we have a copy for Judge Sanderson

6   of the most recent documents?

7                    These first, it's some internal documents

8   between Mr. Tautfest of the Gruber Hurst firm and his partners,

9   Michael Gruber, Michael Lane, and I believe she is an

10  associate, maybe a partner also, Lisa Miller of the Gruber

11  Hurst firm, some correspondence between the Gruber Hurst

12  attorneys that are acknowledging that they had actually

13  represented to me, Your Honor, that they didn't have any VAC

14  confidential documents.

15                   That was the first position that was taken at

16  all.  Never said that they were counsel involved in our case or

17  that they were entitled to receive confidential expert reports

18  and other discovery or exhibits in our case.

19                   And also represented to other counsel involved

20  for competitors of the parties involved in these cases that

21  whatever the Gruber Hurst firm was permitted by the counsel

22  involved in this case to get, they would reproduce to the

23  counsel involved in that case.

24                   Again, a period of having acknowledgment that

25  they were not, in fact, ever counsel in this case, nor did they

16

1  ever make that representation to anyone on our side until after

2  October 27th the documents were already produced, and we had

3  posed a lot of questions to the counsel involved in this case

4  for T-Netix, as well as the counsel involved in the Eastern

5  District case of T-Netix that, in fact, they were counsel and

6  entitled to this information.

7           It also appears that on the October 3rd date

8  when, either that day or one of the two days after that point,

9  the Gruber Hurst firm obtained the documents, one of which was

10 actually produced in the other case on October 5th, that they

11 didn't know the terms of our agreed protective order.  They

12 were sent that protective order on that day, and they were

13 informed by counsel on this case that any use of production of

14 confidential expert reports or exhibits or discovery from our

15 case, use in the Eastern District case would, in fact, be a

16 violation of the agreed protective order.

17           ~~Nonetheless, it was, in fact, produced~~ -- yes,

18 Your Honor.

19           THE COURT:  These exhibits here, the Bates

20 numbers GHJH 1366, you provided obviously a copy.  Opposing

21 counsel is aware that these are -- these are new exhibits, do I

22 understand?

23           MS. CLOUSTON:  Yes, Your Honor.  These documents

24 were just produced by the Gruber Hurst law firm to us very late

25 on Monday night.

1              THE COURT:  I wanted to make sure that they're

2  not already a part of the appendices.  Okay.

3              MS. CLOUSTON:  They are not, Your Honor.

4  There's one document -- one of the documents that was of record

5  already in the case that was the correspondence between the

6  Gruber Hurst firm and some of the parties representing the

7  other defendants involved in the Eastern District of Texas case

8  who are competitors of VAC's was actually attached to the

9  appendix filed by T-Netix in response to our motion to enforce

10  their agreed protective order.

11             And that document was Bates numbered -- in

12  reproduction it was Bates numbered GHJH 001354 and 1355.  It

13  was also attached to the appendix as -- Sean, T-Netix response

14  appendix.  This is the document that is between Mr. Tautfest

15  and the other folks involved in the Eastern district of Texas

16  lawsuit.

17             MR. TAUTFEST:  Your Honor, I need to make an

18  objection.  My name is Eric Tautfest.  I'm with Gruber Hurst

19  Johansen & Hail.  I also represented T-Netix.

20             The documents that were just handed to you are

21  attorney/client privileged documents.  These documents should

22  not have been produced yesterday.  That was a mistake by my

23  firm, and I would like to ask that it be given back.

24             I don't think there's anything harmful in there,

25  but just as a matter that we want to make sure there's no

18

```
 1  waiver.  Ask that these documents --
 2              THE COURT:  Okay.  Well, which document and what
 3  communication are you saying is attorney/client privileged
 4  material?
 5              MR. TAUTFEST:  Let's see.  The documents labeled
 6  GHJH 001380 through 001376 through --
 7              THE COURT:  Okay.  Hold on.  1380, you are
 8  saying, through 1382, is that what we're talking about?
 9              MR. TAUTFEST:  That's one of them Your Honor.
10  There are five in total.
11              The next one is 1376 and 1377.
12              Next is 1360 through 1362.
13              THE COURT:  All right.
14              MR. TAUTFEST:   The next is 1363 through
15  1365.
16              Finally, 1366.
17              THE COURT:  So everything given to me at this
18  point in time you are saying was improperly or inappropriately
19  provided, that you are now asserting attorney-client privilege
20  on behalf of your client and the Gruber law firm as to each and
21  every one of these documents?
22              MR. TAUTFEST:  That is correct, Your Honor.  I
23  think what happened was these documents were inadvertently
24  mixed in with the documents we intended to produce yesterday --
25  I'm sorry, Monday to Jones Day.
```

1          THE COURT:  Well, I can't imagine a sloppier job

2  being done, considering all that has occurred, the motions for

3  protective order to quash.  And now you're coming in and

4  telling me, We screwed it up, and all of these documents here,

5  which apparently VAC thinks are fairly material now, you are

6  saying, Well, King's X.  We screwed up.  These are

7  attorney/client privileged material.

8          That's basically the gist of it.  Every one of

9  these documents is attorney-client privilege.

10          MR. TAUTFEST:  Respectfully, Your Honor, I would

11  submit that I take major exception to many of the things that

12  have been represented to you today by Ms. Clouston with regard

13  to what our firm, Gruber Hurst Johansen Hail, did in the

14  Eastern District of Texas patent case.

15          THE COURT:  Well, I certainly am going to hear

16  from you and anyone else in your firm.  But how many people

17  from your firm are here today?

18          MR. TAUTFEST:  Myself and Mr. Lang.

19          THE COURT:  And all of this work that you put in

20  and now you're telling me everything in these documents I

21  should not consider because they're attorney/client privileged.

22  Is that what you're telling me?

23          MR. TAUTFEST:  These documents are

24  attorney-client privilege, Your Honor.

25          THE COURT:  All right.  Well, I think we'll take

1  a break.  I want to look at these to see if, in fact, they are

2  appropriately attorney-client privileged materials.

3        Now, what else are you going to tell me as these

4  presentations are being made about what Gruber has done

5  incorrectly up to this point in time?

6        MR. TAUTFEST:   Well, Your Honor, specifically

7  what happened was we have two patents in another lawsuit in the

8  Eastern District of Texas that overlap with patents that are

9  being asserted in this case, specifically the '702 patent and

10  '323 patent.

11        So the defendants in the Eastern District of

12  Texas case, of course, know about the Northern District's

13  lawsuit that asserts the same patents and have requested from

14  us that we produce discovery, expert reports, and other

15  information regarding those two patents '702 and '323, that

16  were produced in the Northern District case, that we produce

17  those in the Eastern District case.

18        So, of course, we requested those documents from

19  Bell Nunnally.  They gave them to us, our firm, because we also

20  are assisting and are counsel in the Northern District case

21  because we have overlapping patent issues.  So we have to

22  coordinate together, we have to work together to make sure that

23  we don't take inconsistent positions, those kinds of things.

24        I have attended depositions in the Northern

25  District case.  We haven't made an appearance, but we still are

1  working --

2            THE COURT:   Are those subject to a protective

3  order that no one was supposed to be there except counsel and

4  representatives?

5            MR. TAUTFEST:   I believe some of those

6  depositions were designated confidential.  I attended those

7  depositions along with the assistant general counsel of T-Netix

8  and Ms. Clouston, and we took those depositions, and no

9  objection was made.

10           I want to make it very clear, Your Honor.  The

11  only thing that we produced in our case.that should not have

12  been produced --

13           THE COURT:   Well, no.  You are going to have an

14  opportunity to respond.  I am taking a recess so that I can

15  look at what you have now lately raised is attorney-client

16  privileged material after it was submitted to me by opposing

17  counsel.

18           So it looks like we've got several pages here,

19  so we'll take about a 15 minute recess.

20           (A break was held.)

21           THE COURT:   All right.  During the break I have

22  reviewed the Bates numbered pages of e-mails that were

23  submitted by VAC's counsel in her argument.  I have reviewed

24  these.  I can not understand how it is possible for

25  Mr. Tautfest to argue that an e-mail from Jones Day to

1   Mr. Gruber is protected by attorney-client privilege.

2              Of course, these several pages, there is some

3   redundancy comment which probably is not relevant one way or

4   the other, but he was asked in his e-mail from Mr. Gruber on

5   10-27 to speak with Stephanie, which I assume is VAC's counsel

6   here, to speak with her.  A reply that he was "schmoozing with

7   Judge Ward at the Eastern District bar conference, but I will

8   call Stephanie during a break, no problem."  I can't understand

9   how that falls within attorney-client privilege.

10             Basically, Mr. Tautfest, I think whoever went

11   through these to begin with correctly provided these.  There is

12   no attorney-client privilege as to these documents.  That sort

13   of has broken up the line of questioning -- not questioning,

14   but presentation, but I certainly will consider each one of

15   these documents.

16             MS. CLOUSTON:  Thank you, Your Honor.

17             One of the documents that we have submitted and

18   Your Honor is considering is Bates numbered GHJH 001367.  And

19   the response to -- which is e-mail from Mr. Tautfest at the

20   Gruber firm to the Bell Nunnally firm attorneys, with copies to

21   other Gruber attorneys, as well, asking or giving a proposal of

22   the response letter that they plan to send to me, Your Honor,

23   regarding the production of VAC's confidential information in

24   the Eastern District case.

25             In the original proposal of what would have been

1   sent, Your Honor, to me, the Gruber firm does not state, nor

2   anywhere do they try to assert that they are counsel in our

3   case, that they were entitled to receive the confidential

4   information.

5          We see from the correspondence internally

6   between the Gruber firm attorneys that, in fact, they were

7   saying they didn't think they had anything confidential.  They

8   weren't saying they were entitled to it.  That was exactly the

9   representations made to me in communications, telephone

10  communications I had with lawyers from the Gruber firm.

11         It is in the response e-mail and the revisions

12  made by the attorneys in this case to the proposed letter from

13  the Gruber firm to me where they add the language that they are

14  counsel in this case, that they are entitled to receive

15  confidential communications and confidential documents

16  belonging to VAC and reports in this case, and that they have

17  entered the agreed protective order.

18         And they state along those lines -- the Bell

19  Nunnally firm also adds the note to me that says something

20  along the lines of, as you know, Gruber firm is participating

21  in this case, is counsel in this case, and has executed the

22  agreed protective order.

23         None of that was in the original communications

24  between myself and Mr. Turner and the Gruber firm in the

25  depositions or in the immediate telephone conferences that

1  regarded this unfortunate circumstance were documents were

2  produced in the Eastern District case.  It is not until that

3  information is added in by the attorneys in this case that they

4  make for the very first time some allegation or response to us

5  that they're counsel in the case and they're entitled to this

6  information.

7           Mr. Tautfest made a representation a moment ago

8  about attending some depositions in our case.  Attached to the

9  appendix to their response, Your Honor, so I cite to the proper

10 appendix pages, are the excerpts showing who, in fact, appeared

11 on behalf of T-Netix and Securus at the depositions in our

12 case.  And those are exhibits to T-Netix's response to our

13 Motion to Enforce the Agreed Protective Order.  It is Exhibit

14 F, appendix number 470 to 474; appendix T or Exhibit T,

15 appendix pages 475 to 479; Exhibit U, appendix 480 to 482;

16 appendix number 483 to 487; and, last, Exhibit W, appendix 488

17 to 492, all in T-Netix's response to our Motion to Enforce the

18 Agreed Protective Order.

19           THE COURT:  Well, is that going to also say who

20 all was present at the depositions?  Not only the persons that

21 were counsel representing, but also all persons that were

22 present at those?

23           MS. CLOUSTON:  That is correct, Your Honor.  And

24 what -- first of all, every one of these depositions are

25 representatives of their client.  None of VAC's confidential

1   information was, of course, ever used in any of those

2   depositions.

3         I met Mr. Tautfest for the first time at the

4   deposition of Minerva Walker, which was the first deposition

5   taken in this case.  Actually, originally I thought maybe he

6   was with Bell Nunnally because there were a lot of attorneys

7   there.  First break I met Mr. Tautfest.  He told me that this

8   was a witness that may be relevant to a patent in their case,

9   the Eastern District of Texas case.  Same representation made

10  to Mr. Turner the following day.

11        All of these depositions were their witnesses.

12  I noted that none of our information would be used during these

13  depositions.  He asked if he could -- and what he did is sit in

14  on portions of those depositions.  He never appears, and he is

15  just listed as also attended those depositions, along with,

16  Your Honor, in-house representatives, in-house counsel for

17  T-Netix, Securus in this case, in-house corporate

18  representative for T-Netix and Securus in this case.

19        Of course, we never waived the ability to show

20  Attorneys Eyes Only confidential information to their in-house

21  counsel or to their in-house representatives or to the Gruber

22  firm by them just merely attending a deposition of their

23  clients.

24        THE COURT:  All right.

25        MS. CLOUSTON:  And last, I guess, Your Honor,

1  just to talk about for a moment -- thank you, Mr. Turner -- one

2  additional document, and it is attached as appendix 555 in

3  T-Netix's response to our Motion to Enforce the Agreed

4  Protective Order.  It is also -- was also produced two months

5  ago by Gruber Hurst as GHJH 1354 to 1355.

6            In that set of correspondence, it is a set of

7  correspondence between Mr. Tautfest and lawyers representing

8  other defendants in the Eastern District of Texas case

9  regarding getting the documents that were produced back in that

10  case.

11            What Mr. Tautfest tells the attorneys in that

12  case is that, quote -- this is to ICS's counsel.  "We will

13  request a redacted copy of the mistakenly produced documents

14  from counsel in that case and will produce what we are

15  provided."

16            It appears to us, Your Honor -- and I'm sorry.

17  Thank you.

18            The date of that e-mail from Mr. Tautfest to the

19  counsel involved in the other case is October 24, 2007,

20  approximately 20 days after the documents had been produced in

21  that case, and about a week after we found out about it.

22            It is after this, after these representations

23  are made to counsel, but in that case representations made to

24  us that never say that they were entitled to keep the

25  information, that the counsel involved in this case makes the

1  revisions to the letter sent to us.  And they make the

2  representation to us and, ultimately, to this court that they

3  are counsel in our case.  They are entitled to anything and

4  everything belonging to VAC that has been produced in this

5  case, and that they have refused to date to give it back.

6           We have asked repeatedly questions in the

7  correspondence attached to our motions, and some of it's also

8  attached in their response, as well as the subpoenas, that we

9  had a partial agreement on on Friday for the information.  And

10  we're asking about facts, What do you have?  When did you get

11  it?  Who did you give it to?  And, Was it provided to anyone

12  else that we don't know about?

13          We were just recently provided with the executed

14  Exhibit A to our protective order for its counsel involved in

15  this case to not have to execute it for the day.  That Exhibit

16  A was signed on October 30th, after all of this had already

17  happened, Your Honor, and after they represented to us that

18  they were entitled to keep the documents.

19          We think in the motion and the attachments, Your

20  Honor, attached to our motion, we have met the burden of

21  enforcing the protective order and for searches (phonetic) and

22  contempt that we have filed.  And, unfortunately, we did not

23  want to file and tried very hard to get cooperation so that

24  this did not have to happen.

25          But, unfortunately, we're in the circumstance

1  now, and we believe we have continuing and ongoing risk and

2  violations involved in our case.  And the burden, Your Honor,

3  that we must show -- I misplaced it -- is first that there was,

4  in fact, a court order entered in this case.  I think that's

5  undisputed.  Your Honor, it was entered on March 3rd, 2006.  It

6  was negotiated and entered into between these parties and

7  between this counsel in this case and that the agreed

8  protective order required specific conduct by T-Netix and by

9  T-Netix's counsel involved in this case.

10            I think, Your Honor, that's also undisputed.

11  The agreed protective order clearly requires that information

12  that's been designated by either party in this case as

13  confidential information for counsel's eyes only, confidential

14  information cannot be used in any other litigation.  They have

15  violated that provision of the protective order by their

16  actions in the Eastern District of Texas lawsuit as well as the

17  state court lawsuit.

18            In addition, the agreed protective order clearly

19  prohibits providing to anyone other than counsel hired for this

20  case documents that have been designated as Counsel's Eyes Only

21  Confidential Information, but they've also violated that

22  provision of the protective order by first providing the

23  documents to the Gruber firm, who we think from the record were

24  not counsel in this case when they were provided the

25  information, and then the further production of that

1  information to the other defendants involved in -- competitors

2  of VAC's involved in the Eastern District of Texas lawsuit.

3          At the point that those documents were provided

4  to the Gruber firm by the counsel in this case, we had

5  unfortunately already lost our judge in the state court case.

6  We had gone through hearings, numerous motions in the state

7  court case.  This was in the foremost of our minds.  And then

8  it was provided to the Gruber firm, knowing that the Gruber

9  firm intended to produce it and use it in the Eastern District

10  of Texas case.  That, in fact, did happen when it was

11  produced.

12          The Gruber firm did cooperate with us, Your

13  Honor, and we have acknowledged that in our appreciation for

14  the Gruber firm assisting us in getting the documents back from

15  the counsel involved in that case.  We have asked if there are

16  any other documents provided to other parties or people who

17  were not entitled to receive the information, and we believe

18  Gruber was not entitled to receive the information.

19          And we have not received that other than the

20  e-mails that were produced that Your Honor has, which were all

21  internal or between counsel involved in this case.  And the

22  documents that they did produce to us the other night included

23  our damages expert reports from this case.  That, of course,

24  includes the most sensitive of financial and pricing and

25  customer information belonging to that.  It includes the

1  technical expert reports provided in this case that go through

2  all of VAC's products and how they work, schematics, course

3  code that's been produced in this case, the most sensitive of

4  technical information.

5           All of those reports were designated Counsel

6  Eyes Only Confidential Information, and they were undisputedly

7  produced to the Gruber firm because they just gave us their

8  copy of it or they provided us a copy of what they had Bates

9  numbered the other night.

10          Your Honor, in addition they were provided the

11  invalidity reports on the patents at issue in this case.  They

12  produced those to us, their copies.  Those documents, those

13  reports, one of which from their expert, was designated as

14  Counsel's Eyes Only Information was the report that was

15  produced to all the other parties involved in the Eastern

16  District case.

17          We think that there's numerous violations along

18  those steps involved in the Eastern District of Texas

19  lawsuit.

20          The last of our burden -- and I think the

21  violations of the protective order include paragraph 16, which

22  prohibits distributing information to unauthorized persons;

23  paragraph 19 prohibits the use of designated confidential

24  information in any other lawsuit or for any other purpose not

25  permitted under the protective order.  That purpose includes

1   only this litigation.

2                Paragraph 23, that includes copying VAC's

3   confidential information without permission by either VAC or

4   this court, Your Honor.  That was also violated.

5                And paragraphs 17 and 18 include that the

6   failure to go through the proper channels if they wanted to

7   designate any information to provide, number one, notice to us,

8   to ask for the decisions to be changed, to then file with the

9   court and request for that to occur before they were ever

10  provided in the state court case and before they were provided

11  in the Eastern District case.

12               They knew the procedure.  That's shown, Your

13  Honor, in the most recent e-mails.  They knew the proper

14  procedure when they provided this information to the Gruber

15  firm.  Instead, provided the information, anyway, that led to

16  the unfortunate circumstances of (inaudible) in the state court

17  indication and the Eastern District case.

18               Last, the remedies that we have sought in this

19  proceeding include our attorney's fees for the efforts that we

20  have had to go through in the state court case, in this case,

21  Your Honor, in the Eastern District case, to try to remedy the

22  harms and try to mitigate the damage and truly determine where

23  our client's documents are at this point.

24               We actually started this round of proceedings in

25  this court, Your Honor, after the state court circumstance that

1  happened.   T-Netix had filed in state court a motion to

2  declassify our confidential documents produced only in this

3  case.   In state court after that, after the recusal, they

4  actually started these proceedings in this court by filing the

5  motion to modify our agreed protective order to permit their

6  use of all of VAC's confidential information produced in this

7  case in any other litigation.

8              In addition, they filed a motion to declassify

9  the documents belonging to VAC, including line count reports,

10 customer information, financial information, and some

11 schematics and source code technical information so they could

12 use it in other litigation and declassify them completely so

13 they could use them apparently for any purpose, including

14 giving it to their client.

15             All this was done after the fact, after the

16 violations had already occurred, Your Honor, so we've asked for

17 our attorney's fees.

18             We've also asked for injunctive relief.   And I

19 guess going back to the attorney's fees.   There's a Fifth

20 Circuit case of Russo versus Three Eagles Aviation, which

21 clearly entitles the party that has had to seek to enforce a

22 protective order and violations of the court order to receive

23 its attorney's fees for the efforts it's had to undergo as a

24 result.

25             In addition, we've asked for the injunctive

1   relief of, number one, prohibiting counsel involved in this

2   case and counsel involved in the Eastern District case from

3   misusing this information, trying to use it in the other

4   proceedings without going through the proper channels, to

5   actually disclose to us so that we know if there have been any

6   other providing of this information to other people.

7                    There are, at least from what I've been able to

8   look at on Pacer, three other patent infringement lawsuits that

9   involve one of their clients -- one or more of their clients

10  that has been pending in the district -- federal district

11  courts during the time that we have produced documents that are

12  confidential in this case.

13                   We're at a real disadvantage that we should not

14  be in the position and my clients be in the position that we

15  are required to try to go out and figure out what has been done

16  with our client's information.

17                   THE COURT:  Where are those cases pending?

18                   MS. CLOUSTON:  Your Honor, we've got the Eastern

19  District of Texas lawsuit before Judge Ward.  We also have --

20  and I think Heather is getting it.  It's been tabbed.  From the

21  rulings that I was able to find yesterday, there's one that

22  involves Mr. Pittman, and the Bell Nunnally firm had been

23  counsel in the case.  And the case has now been, I believe,

24  closed, but it was open during the pendancy of the time that we

25  produced documents in this case.  That case was pending in the

34

1  Southern District of Texas in Houston.  The style of the case

2  was Tip Systems versus --

3              THE COURT:  Well, I'm more interested in where

4  they are located.

5              MS. CLOUSTON:  Yes, Your Honor.

6              THE COURT:  I don't see that this court has any

7  authority to enjoin a party or a law firm in the Southern

8  District of Texas from using documents that they may have

9  obtained.  I think you've probably got to go there, it seems to

10  me.  I haven't looked into that in any depth.

11              Assuming arguendo that documents were

12  inappropriately and improperly given to a law firm in Southern

13  District of Texas, I think that you perhaps can go down there.

14  And if that is an established fact that the documents were

15  improperly given to a law firm in Southern District, and I

16  think you can seek relief in that court.

17              If there are no assurances that those documents

18  have been retrieved.  Of course, I am assuming arguendo that

19  this protective order that Judge Fitzwater entered has been

20  violated by counsel for T-Netix.

21              MS. CLOUSTON:  Yes, Your Honor.  And what we are

22  asking for really is on the enforcement of the agreed

23  protective order in this lawsuit for the counsel involved in

24  this lawsuit.  And now the Gruber firm, as of October 31, has

25  signed Exhibit A, being down to the documents that he had

1 already obtained and refused to give back, to identify for the

2 court and for us if there is anyone else.

3       We asked for that in our subpoena, and they

4 claimed it's privileged.

5       THE COURT:  That's easy enough to handle, but I

6 didn't quite understand your injunctive relief as it was

7 directed to law firms in districts other than the Northern

8 District.

9       MS. CLOUSTON:  Sorry about that, Your Honor.

10 Thank you.

11       The other last relief is the disqualification of

12 counsel involved in this lawsuit.  And, Your Honor, we do not

13 seek this with really very sad time for us to have to come to

14 the court and ask for this.  The problems that we've had are,

15 there have been knowing violations.  Apparently no remorse and

16 no cooperation.

17       And we stand in a position where we are -- we

18 can provide no assurances to our client that the agreed

19 protective order will be abided by.  They have repeatedly

20 represented to this court, to the state court, and to us that

21 their violations are not, in fact, violations of the protective

22 order, and they were entitled or felt entitled in their

23 actions.

24       And there are -- the indications that we cited

25 in our brief, including the Biopore Medical Technicians case

VAC App. 458

1  out of the District of Kansas that talks about that extreme

2  remedy would be available when there's a continuing violation,

3  continuing harm, and the kind of repeated and unfortunate

4  violations that we've had in this case.

5           Your Honor, we believe that the evidence

6  attached to our motion clearly establishes these facts and this

7  evidence and information.  But we will be happy if Your Honor

8  wants to present it in or cross examine any of the witnesses

9  that they may call from the Gruber firm or counsel involved in

10 this case.

11          THE COURT:  All right.

12          MS. CLOUSTON:  Thank you, Your Honor.

13          THE COURT:  Thank you.

14          Who would like to speak on behalf of T-Netix?

15          MR. PITTMAN:  Your Honor, we actually have three

16 law firms involved.

17          THE COURT:  That will be fine.  I think that is

18 appropriate.

19          Mr. Pittman, I'll hear from you first.

20          MR. PITTMAN:  Okay.  Your Honor, just by way of

21 a little back drop, and I'm just going to spend a little time

22 on some factual matters, and Mr. Bowers is going to spend the

23 bulk of the time on the actual evidence and any examination

24 that's necessary.

25          As the court is aware, there was a protective

1   order entered in this case.  There was also a protective order

2   entered in the state court case.  Those are almost identical in

3   terms of what they protect.  And the basic information that

4   both parties sought to protect was the confidential trade

5   secret information.

6          The parties executed those in good faith, and

7   they worked -- the state court case started in 2003 with McKool

8   Smith, and so now we're 2008.  This case started in 2005.  So

9   from all that time period, Your Honor, the parties have worked

10   to try and abide by the protective orders in both cases.  We've

11   had dozens of deposition negotiation both cases.  We've had

12   over close to 100 orders entered in the state court case.

13   We've had hundreds of pleadings.  Almost enough pleadings to

14   fill this room in the state court case.

15          So the parties have worked hard to abide by the

16   terms of the agreement.  The reason why we brought the Motion

17   to Modify because the terms have become unworkable.  And some

18   of those things, Your Honor -- and it goes to some of the

19   things that Ms. Clouston has referred to that's happening in

20   this case.  Some of the consideration the parties in the

21   federal action and the state action are both the same.  The

22   primary witnesses in the state action and the federal action

23   are the same.

24          THE COURT:  Let me just interrupt.  Why does the

25   protective order say it relates -- what can be produced in this

1    case?  I don't understand why it was the understanding that the

2    protected information could be used in either case, why it says

3    in this case the protective order, it can only be used in this

4    case.

5              MR. BOWERS:  And both protective orders say the

6    same thing.  The state court case also says it can only be used

7    in that action.  The one in this action says it can only be

8    used in this action.

9              And we addressed that the last time in terms of

10   the understanding that the parties had may be totally

11   erroneous, but the understanding the parties have.

12             So the issues are similar.  It involves a

13   license agreement, and the state court cases, the affirmative

14   action in our case.  In the federal case, same license

15   agreement they've asserted as a defense to their claim.  Again,

16   same expert witnesses, the same documents that are being used,

17   a lot of the same documents, not all of them.  A lot of the

18   same documents are being used in the federal case are used in

19   the state court case and vice versa.

20             They are produced in the state court case, but

21   they are some of the same documents.  You look at the patent

22   license agreement that they're using as a defense.  It's the

23   same license agreement entered into in 1996 being used in both

24   cases.

25             So a lot of the same things.

1           Now, what this boils down to is, there is --

2  there's one item that is being referred to as being used in the

3  state court case.   There are some misrepresentations here, and

4  we'll get into those in the evidentiary part of it, but there

5  are a lot of misrepresentations on the document that

6  Ms. Clouston has given you.

7           Basically, we're talking about line count

8  information.   Again, the line count information has been used

9  in the state court case; it's been used in the federal court

10 case.   The same kinds of line count information was used in the

11 state court case by VAC at least 11 times.   The same

12 information that they're saying we shouldn't have used in the

13 state court case, they're using the same information in the

14 state court case.

15          So it's clearly irrelevant to some issue, but

16 Ms. Clouston said the issues have been disposed of.   We tried

17 the case.   They are plaintiffs in that case, in the state court

18 case.   We tried that case, and the jury did not come back with

19 a verdict, so we got to retry that same case.

20          Since that time, Judge Hoffman has reopened

21 discovery, so the issues that she's claiming no longer exist

22 still exist.   That's why we still have our Motion to Modify so

23 that the line count information that they're saying is

24 protected, that they've used 11 times in the state court case,

25 we're asking this court to allow us to use that instead of

1   allowing them to shield it.  That was the purpose behind our

2   motion to modify.

3               So we're talking about one piece of information,

4   and despite all on the chart that she gave you, all the knowing

5   violations, it's one piece.  It's line count information only.

6   It's --

7               THE COURT:  That was not produced in state court

8   in any fashion prior to the time that you sought the

9   modification up here; is that my understanding?

10              MR. PITTMAN:  A portion of it was; a portion was

11  not.  The period runs from 2003 to 2008.  A portion of the --

12  the biggest portion of it was produced in the state court case,

13  used by them 11 times and used by us in the state court case.

14  So we're dealing with it.

15              A few months that was produced just in the

16  federal court case.  That's why we wanted to modify because

17  it's unworkable --

18              THE COURT:  My question is, Was anything

19  produced in the state court that was not previously produced,

20  it came in in this case, that was presented in state court

21  before you filed your motion to modify.

22              MR. PITTMAN:  It was referenced in pleading,

23  yes, Your Honor.

24              THE COURT:  I think that is what the whole

25  problem of this case is.

1              MR. PITTMAN:  Absolutely.  And those were the

2  documents, and Ms. Clouston made a further misrepresentation.

3  Again, we'll get into evidentiary part of it.

4              But nothing has been used.  We have not

5  represented to the court, since Your Honor had a ruling on it.

6              THE COURT:  Why did the first state court judge

7  recuse himself?

8              MR. PITTMAN:  Have no idea.

9              THE COURT:  If he thought he was not supposed to

10  see these data.

11              MR. PITTMAN:  We have no idea, Your Honor.  It

12  would be speculation on both parties.

13              THE COURT:  All right.

14              MR. PITTMAN:  So, Your Honor, again I just

15  wanted to go into the back drop why all the cases are so

16  interwoven.  That's why we brought our motion.  But, again, I

17  thought it was some factual background that the court could

18  take into consideration when we get into the evidentiary

19  portion that Mr. Bowers is about to get into.

20              THE COURT:  Well I think it's a fairly simple

21  issue.  Was there a protective motion order in this case that

22  everyone had agreed to?  Was there anything that was produced

23  by the fact here which they claimed was privileged that was

24  produced in state court or to any other entity before any

25  modification was sought?

1            If there was, I don't see, irrespective of the

2     interrelatedness of these cases, unless the protective order

3     clearly said that anything produced in this case under

4     protective order can be produced in any other litigation that

5     relates to the same course of conduct or the same patents at

6     issue or whatever.

7            MR. BOWERS:   Your Honor, I come humbly before

8     the court to answer your question.   There was a protective

9     order that had very specific protocol for use of documents

10    produced in this litigation if it felt it was needed to be

11    utilized in the state court litigation.   As we've stated in our

12    response to the motion that was filed, there was a technical

13    violation of that protocol by the parties.

14            Your Honor, and I understand what you're saying.

15    I would admit to you the protocol were not followed, but the

16    degree of the relief that is being sought by VAC in this case

17    far and away exceeds the true nature of the use or the alleged

18    use of that information.   And I think it's irrelevant, and it's

19    been very important for the court to at least understand that

20    the punitive, egregious nature that was presented by VAC's able

21    counsel is simply not what occurred in the purported usage of

22    the documents.

23            And I think that we need to go back and look at

24    that alleged use of that documents.   We're talking about the

25    line count summaries that Mr. Pittman was referring to Your

1    Honor.

2              THE COURT: Well, I will say this. This is the

3    first time I have read or heard any concession on the behalf of

4    counsel representing the plaintiff in this case that anything

5    was done wrong. First time. Everything that I have read so

6    far has justified violating the terms of the protective order.

7              MR. BOWERS: I believe our papers came out, Your

8    Honor, and absolutely stated that the protocol of the

9    protective order was not followed. And I believe that before

10   Your Honor that the case law that is applicable to this type of

11   a circumstance would ask the court to consider the

12   circumstances behind that and whether or not the true spirit of

13   the protective order was adhered to.

14             In this case, Your Honor, in that instance

15   counsel absolutely adhered to the true spirit of what the

16   protective order was, which was to protect the confidential

17   nature of the information in question.

18             And to break this down, there was the state

19   court allegations that Ms. Clouston addressed and the Eastern

20   District. So look at the state court allegations, Your Honor.

21   Every single document was filed under seal, and no judge or

22   person saw that information. Not at any point. There's no

23   evidence, nor can any evidence be presented that there was any

24   information or any actual document reviewed by anybody at any

25   time.

1          There is one motion that had a chart of line

2    count summaries that was published in the actual pleading

3    itself, Your Honor.  If we had looked at that section in our

4    response, and that simply shows a number of lines in use, which

5    is relevant in the state proceeding because of the triggering

6    event that would result in the calculation of damages.

7          That information, Your Honor, was ellipted from

8    a document, but it does not enclose the information that

9    Ms. Clouston referred to.  Pricing, customer, location, any of

10   that type of information was never ever publicly disclosed in

11   the state court action, and the documents were sealed.

12         Judge Cortez in the hearing on October 3rd,

13   which he subsequently recused himself, never at any point in

14   the proceeding, as it's replete in the record or absolutely

15   conspicuous in its absence, did Judge Cortez ever say, Well,

16   I'll grant this; now I'm recusing myself.

17         It simply didn't happen because it was always

18   sealed.

19         And the conduct of Bell Nunnally and the Pittman

20   firm and T-Netix was to immediately go with Judge Cortez, along

21   with Ms. Clouston, to retrieve all of those documents and

22   pleadings with the sealed documents in question, place them in

23   a box, seal the box, and then lock that box away.  That

24   occurred on October 3rd.

25         They talked about the return.  They were sealed

1  and locked from that point forward.  And bear in mind, Your

2  Honor, we're talking about five total pleadings and nine

3  documents, all of which were sealed.  And those documents were

4  boxed away and put away.  Nobody ever saw those in the state

5  court proceeding or otherwise.

6        Granted, Your Honor, if we wanted to put those

7  in a sealed file and file those, there are protocol in the

8  order that says what should have been done.  It was not

9  followed.

10        But it does not rise to the level of

11  contemptuous or sanctionable conduct, Your Honor.  The Dual

12  Deck case, the Navajo Nation case, all say that you must go

13  back and look at whether or not the spirit of the order was

14  followed.

15        Those are Ninth Circuit and Federal Claims Court

16  decisions, but they're instructive because of the factual

17  scenarios certainly endured that is identical almost to the T

18  of what occurred in this case.  It was use of documents

19  designated as confidential in a prior proceeding that were used

20  like in a second proceeding.  However, they were filed under

21  seal and did not result in any sanctionable conduct.

22        Southern railway, which is another opinion out

23  of the Fifth Circuit, suggests that --

24        THE COURT:  Can you give me a little bit more of

25  a cite than that?  Southern Railway was in the Fifth Circuit

1   for many, many years until the circuits were split to the

2   Eleventh.

3            MR. BOWERS:  It was a Fifth Circuit out of

4   Georgia, Your Honor.

5            THE COURT:  I anticipated it was of some age.

6            MR. BOWERS:  It was 1969.

7            THE COURT:  But I would like a cite other than

8   just Southern Railway was a party.

9            MR. BOWERS:  Yes, Your Honor.  It is 403 F2d

10  109.  Now, Southern Railway -- and I don't want to mislead the

11  court or make an argument that the court thinks that I'm trying

12  to say that it says.

13           What Southern Railway posits is that once the

14  conduct of the parties has been addressed, there is no reason

15  to still impose contempt order because contempt is intended to

16  be coercive and not punitive.  Granted, I understand that there

17  can be a component added in there, as Russo states, which was

18  cited by Ms. Clouston to allow for the fees.

19           But in this case, Your Honor, you must

20  understand that from the time of December 17, everything that

21  Ms. Clouston and all on their side complain of had been cured

22  or rectified.  And I understand most of what she's complaining

23  about with respect to the Eastern District is highly

24  speculative.

25           Mr. Tautfest says Bell Nunnally did everything

1  to claw back every bit of that information.  Absolute

2  representations were made and affirmations from counsel in the

3  Eastern District, for example.  It stated that all of the

4  information that they had received had been returned.

5          And bear in mind, Your Honor -- I apologize for

6  skipping, but in the Eastern District, we're talking about one

7  document, the McAlexander employment report.  That single

8  document was inadvertently produced by Gruber Hurst in the

9  Eastern District case.

10          Significant and important, the McAlexander

11  rebuttal report does not attach a single confidential document.

12  It makes references, granted, but it does not disclose the

13  document.  And that document was inadvertently produced, was

14  retrieved from all parties in the Eastern District, written

15  affirmations were all provided to Ms. Clouston and her firm in

16  October of 2007, by the latter part of 2007.  And all of those

17  documents were returned.

18          Gruber Hurst first found out about the

19  inadvertent production on October 17.  All of this information

20  had been retrieved and the affirmations provided to

21  Ms. Clouston were for the end of October.  And the other

22  documents that were produced were T-Netix documents.  More than

23  40,000 pages, 43,000 pages of documents.  They were our

24  client's documents that were produced, and I don't believe that

25  Ms. Clouston has an argument about this in this case.

1          But the gross overstatement of what actually

2   occurred, Your Honor, I think is absolutely critical for you to

3   understand that we are not a bunch of mavericks that were

4   taking documents and willy nilly flipping them about in the

5   state court proceeding, nor in the Eastern District.

6          And Mr. Tautfest went to Herculean efforts,

7   acknowledging that it was an inadvertent production of that

8   particular document, and went and -- as we detailed extensively

9   in our moving papers, and as Mr. Tautfest is here to testify to

10  Your Honor, went through all the steps to retrieve those, even

11  replacing the electronic method, the CD, for filing and has

12  been taking all that information out and returning it and

13  assuring Ms. Clouston that's all we received. Ms. Clouston, we

14  received 43,000 documents from T-Netix. We received the expert

15  reports in this case. The only one of which was inadvertently

16  produced was the McAlexander rebuttal report, and the others

17  were discovery responses, none of which were ever produced.

18         In the state court proceeding, Your Honor, we

19  talked about the five pleadings with the nine documents that

20  were attached with no open publishing of the actual

21  confidential documents and nothing more than the line summaries

22  just saying how many lines were in use for a given day,

23  information that Ms. Clouston's firm and herself had

24  represented in court were nothing more than minor disclosures

25  of aggregate information.

1      It's important to note that also the information

2 that they complained of that we allegedly disclosed, which we

3 vehemently deny we disclosed, was the name of their customers,

4 their locations, the prisons, for example, where this

5 information could have been censored. All of that information

6 in large part is available publicly on their website, as we

7 have noted in our papers.

8      But the point in fact here, Your Honor, and I'm

9 not trying to shy away from the fact that there was -- the

10 protocol was not followed for doing this. The harm that befell

11 or did not -- that befell VAC in this case is certainly

12 diminimous, Your Honor. And absolute acknowledgment of that

13 and movement to take care of that was practiced by both the

14 Pittman firm, Bell Nunnally, and, for that matter, the Gruber

15 Hurst firm.

16      Your Honor, the Eastern District -- Gruber Hurst

17 is counsel for T-Netix. Mr. Hurst has -- excuse me.

18 Mr. Tautfest, I believe, has provided the redacted version of

19 the fee agreement. And in the re line on the fee agreement, we

20 did not receive that.

21      In the re line -- may I approach, Your Honor?

22      THE COURT: You may.

23      MR. BOWERS: There is no Bates label on this.

24 It's April 9th document.

25      THE COURT: All right.

1            MR. BOWERS:   The re line on this regarding

2  amended engagement letter, it references in the re line United

3  States Patent 5319702, and United States patent 6560323, all of

4  which is many other patents in this proceeding are in contest.

5  Those two patents that I just referenced, Your Honor, are

6  patents that are in dispute in the state court litigation.

7            Excuse me.   In the federal court litigation.   I

8  apologize.

9            And it goes on through the other body of the fee

10  agreement that specifically references the engagement of the

11  Gruber Hurst firm as counsel for T-Netix which encompasses this

12  proceeding.   And, therefore, Your Honor, it is absolutely a

13  fact that Gruber Hurst was and is counsel for T-Netix and was

14  and is a permissive recipient of documents under the agreed

15  protective order.

16            And I think that that establishes that.   And the

17  decision, Your Honor, in terms of whether we need to argue the

18  debate that -- the documents and information that Ms. Clouston

19  has sought from Gruber Hurst in this case is whether or not

20  there are fees charged and other types of things that are

21  indicative of an attorney/client relationship in her opinion.

22            The Simpson opinion, Your Honor -- Simpson

23  versus James out of the Fifth Circuit, if I can find it fairly

24  quickly, Your Honor.   States that the determination of whether

25  or not a law firm represents a client is an objective standard,

1  and it does not rely upon the actual need of a written

2  agreement, which we actually do have in this case, nor does it

3  rely upon the payment of attorney's fees, whether or not

4  they're paid.  It's an objective standard to be judged

5  objectively.

6          I think the objective facts are here when you

7  combine that with the fact that we have an actual fee agreement

8  covering this.  We also have Mr. Tautfest and Gruber Hurst

9  appearing in depositions.  And the facts are, Your Honor,

10  they've consulted with all the counsel in this case.

11          As Mr. Tautfest has represented to Your Honor

12  earlier that there are an absolute collaboration of work.  And

13  I'm being very careful of where I want to go to because I think

14  we still have an attorney/client and a work product privilege.

15  But I think that enough evidence has been presented that we do

16  have an attorney/client relationship that existed between and

17  still does exist between T-Netix and the Gruber Hurst firm such

18  that they are permissive recipients under the agreed protective

19  order.

20          And I apologize for summary moment, but I will

21  get you the cite for the Simpson versus James opinion.

22          Simpson versus James is 903 F2d at 372 out of

23  the Fifth Circuit.

24          And just as one final piece of evidence

25  regarding this, Your Honor.  It's not a part of our transcript,

1 | but once we learned that this was being an evidentiary hearing,

2 | we do have the declaration of Melissa (inaudible), who was

3 | assistant general counsel for T-Netix, establishing the

4 | attorney/client relationship.

5 |         May I approach?

6 |         THE COURT:  All right.  It will be received.

7 |         MR. BOWERS:  And, Your Honor, I don't know how

8 | you choose to -- wish to proceed at this point, but I do agree

9 | that I think that a lot of this is by argument to Your Honor in

10 | terms of what I was addressing earlier.  We certainly don't

11 | feel that contempt is warranted under the facts and

12 | circumstances as we just presented to Your Honor regarding what

13 | was actually allegedly disclosed, which we certainly understand

14 | that there were sealed pleadings filed, that actually no

15 | disclosure of that information in the state court proceeding,

16 | nor was there any of the -- although Ms. Clouston didn't

17 | address it, I think, at length, there were no oral

18 | representations of confidential information, of proprietary

19 | information in state court proceedings by any counsel for

20 | T-Netix in this case.

21 |         Again, the only information that was referred to

22 | in the ellipted transcript proceedings in the moving papers of

23 | fact were simply references that the information shows that

24 | line counts exceed a certain number.  And there's absolutely

25 | nothing proprietary or confidential about the actual line

53

1  numbers.

2          Again, that is the same information that

3  Ms. Clouston had referred to as minor disclosures of

4  aggregate information.

5          Addressing the arguments that Ms. Clouston

6  raised regarding the imposition of sanctions in this case, the

7  Topallian case out of the Fifth Circuit which is 3 F3d 931,

8  1993, sets forth the four prong analysis that is to be employed

9  in determining whether or not sanctions are appropriate.  And

10 the first thing is to look at the conduct that you're seeking

11 to punish.

12          The second prong is look at the costs or the

13 expenses that were incurred by the aggrieved party.

14          The third prong is to look at the mitigable

15 nature or the reasonableness of the costs or expenses that were

16 incurred.

17          And then, fourthly, take into consideration what

18 lesser sanction could be imposed to achieve the same purpose.

19          The first bit of relief that they looked for,

20 which obviously I think can be characterized as nothing other

21 than a sanction, is the disqualification of the Pittman firm

22 and Bell Nunnally and Martin from this proceeding.  And, Your

23 Honor, that is just simply a draconian remedy that is or

24 sanction that is simply not warranted by the conduct here.

25          No case is recited that even proximate a factual

1   scenario in this case, even accepting all other allegations as

2   true, which we deny, that would warrant disqualification of

3   Bell Nunnally or the Pittman firm in this case.

4          The cases that have been discussed are Dyll

5   versus Adams, D-y-l-l, I believe.  It's Westlaw 222918 Northern

6   District of Texas, 1997.  And in that case we had a lawyer who

7   was accused of paying to obtain favorable testimony from a

8   witness, and a severe ethical breach.

9          However, the witness in that case didn't accept

10  the money and didn't provide the allegedly favorable testimony.

11  But in that case Judge Fitzwater found it unnecessary to

12  disqualify the counsel in that case.

13         A second opinion which did result in the

14  disqualification of counsel is the Cavanaugh decision, which is

15  137 FRD 646 Northern District of Texas in 1991.  And in that

16  case an assistant attorney general was ultimately disqualified

17  by I believe Judge Sanders in that opinion for just constant

18  and repeated violations and outright flagrant and ultimately

19  admitted misrepresentations to the court.

20         What you had in that case, which goes back to

21  the discussions that you must look at with regard to the

22  imposition of this sanction, is repeated, chronic, and grossly

23  unethical behavior on the part of the firm or attorneys sought

24  to be disqualified.

25         We simply don't have that here, again, Your

1  Honor.

2          I believe that the violations that are alleged

3  by Ms. Clouston -- I understand that the motions that they

4  complain of occurred between September 27 and October 3rd.

5          That's it, Your Honor.  T-Netix humbly and

6  apologetically represents to this court and to counsel its

7  apologies for not following the technical procedural

8  requirements of the agreed protective order, but the level of

9  their relief that they're asking for simply is not warranted by

10 the facts, Your Honor.

11         We're good lawyers.  We're good people.  We have

12 not -- none of the lawyers up here before have been sanctioned.

13 Nobody has ever been accused of this conduct.  It is

14 regrettable that these things were filed, but they were filed

15 within the spirit and purpose of the protective order.

16         Certainly in the state court proceeding and in

17 the federal court proceeding when the document was

18 inadvertently produced, enormous efforts were taken to retrieve

19 those documents, and it was accomplished.  And that information

20 was provided to Ms. Clouston and her client.

21         And for that reason, Your Honor, we simply ask

22 this court not to impose the sanctions and certainly the

23 disqualification slot in this case.

24         THE COURT:  All right.

25         All right.  Mr. Pittman, I'll hear from you, if

1  you wish to add anything that has not already been addressed.

2            MR. PITTMAN:  No, Your Honor.

3            THE COURT:  All right.  Does the Gruber firm

4  wish to say anything?

5            MR. TAUTFEST:  We have nothing to add, Your

6  Honor.

7            THE COURT:  All right.  Is there any testimony

8  that either side in this controversy needs to or wishes to

9  present to me?

10           MS. CLOUSTON:  Your Honor, we spoke to the, I

11  guess, first the engagement letter that we have just been

12  provided, Your Honor has been provided.  First, it is from the

13  counsel in Securus Technologies, dated -- to Gruber Hurst,

14  dated August 9, 2007.

15           That is, of course, several years -- two years

16  after this suit was filed.

17           In paragraph, Your Honor, I guess it's on the

18  second page, right after the bold cap, third paragraph down.

19  The engagement letter states that, "This letter will confirm

20  our agreement, the amended agreement, that the firm will

21  represent Securus Technologies, Inc., and its affiliates and

22  subsidiaries, including T-Netix and Evercom against," and it

23  lists, Your Honor, a federation of nine different parties, none

24  of which are Value-Added Communications, Your Honor, or any

25  entity related to Value-Added Communications with the exception

1  of some entities that have entered into contractual

2  relationships with Value-Added Communications.

3          If we need to hear testimony about the

4  engagement letter, the documents that have been presented to

5  Your Honor, we think it is clear that the representations made

6  to us and the court are very different from now what we have

7  seen in evidence and now that the engagement letter, that they

8  were never, in fact, counsel in this case unless they have most

9  recently become counsel and that when the Gruber firm was

10  provided the information on October 3, 2007.

11          The counsel in this case, as well as the counsel

12  from the other case, the Gruber firm attorneys, knew and

13  discussed the fact that documents designated as confidential,

14  confidential information in this case, can not be provided to

15  anyone -- any other counsel, nor can it be used in any other

16  case.

17          Unfortunately, given that we've got now and

18  received that document as well as the correspondence produced

19  to us the other night, it is not an inadvertent violation at

20  this point.  They raised it.  They discussed it.  At that point

21  we already had lost our state court judge, and they gave the

22  documents and the information to the Gruber firm, anyway, and

23  the documents were used and produced in that case.

24          The counsel has represented that this is a

25  technical violation.  This shouldn't rise to the level of

1   concern, that the documents themselves were not shown to the

2   state court judge.

3              Well, first and in the cases of -- these are two

4   Northern District of Texas cases -- Positive Software Solutions

5   versus New Century Mortgage Corporation, 337 F Sub 2nd 862,

6   Northern District case from 2004, as well as the Savory, Inc.

7   versus Lynn Liatrabble (phonetic) Corporation case.   It's 2003

8   U.S. District Lexis 12124, Northern District case 2003.

9              Both of these cases out of this court state

10  that, number one, the court's protective orders prohibit the

11  use of the confidential document for any purpose outside of

12  litigation, but it also prohibits the revelation of the

13  documents' contents as well as their existence.   Both cases

14  state that if orders prohibiting disclosure of confidential

15  information are to have any meaning, they must prohibit

16  disclosure in any form and cite various cases, including Fifth

17  Circuit case, for that proposition and said that the protective

18  order does not exist in a vacuum, and it shouldn't be read in

19  the context of that litigation.

20             First, the documents were, in fact, filed in the

21  state court case.   We have acknowledged that the particular

22  line count reports that are the more recent ones from '06

23  and '07 that were produced in this case, never produced in the

24  state court case, in fact denied repeatedly access to that

25  information, and those claims have been denied to be

1   reinterjected in that case by three different judges in the

2   state court.  Most recently, about a week and a half ago by our

3   new state court judge.

4          Despite that, they filed these documents in an

5   attempt to have the court reconsider interjecting that

6   information.  During the hearing with Judge Cortez, and this is

7   on appendix -- our appendix to the motion to enforce, pages

8   1543 out of the hearing transcript before Judge Cortez, the

9   court -- on up to where the second, the court says, in

10  addressing Mr. Pittman and the Bell Nunnally firm was also

11  there and representing T-Netix.  The court says, "You've told

12  me that there's information that they, VAC, have withheld from

13  me for whatever reason, whether it be the federal agreed

14  protective order or something else that exceeds the 13,500 line

15  limit that Judge Kelton deemed to be the cap if that -- you

16  don't think that taints the judge."

17          Mr. Pittman responds, "I would certainly hope

18  not, Your Honor, because I've told you the same thing the 15th

19  of August."

20          "The Court:  I understand attorney argument.  I

21  understand attorney argument.  Attorney argument is something.

22  Believe me, I hear it all the time.  But if the evidence that

23  you now --"

24          And Mr. Pittman interrupts him and says, "No,

25  there was a prior piece of evidence that was not produced in

1   the federal case."

2          And the court says, "Mr. Pittman, I'm not

3   talking about that.  I'm talking about documents that were

4   produced in federal court that apparently there's a federal

5   agreed protective order not to show those documents outside of

6   that trial.  You're telling me -- you have just told me, and

7   Ms. Drake --" who is the court reporter " -- has got the

8   transcript.  We'll find out, I guess, later.  But it sounds to

9   me that you've told me that there's additional information that

10  supports that that I am not supposed to know about."

11         And he goes on to say that, "If this information

12  is, in fact, protected," and he's going to look at it, has this

13  caused him an early Christmas present, and he would have to and

14  be required to recuse himself in the case.

15         In addition, on page 1551, Judge Cortez goes on

16  to say, "Let me just say one thing for the record.  I have not

17  looked at any -- the only thing that I have read for this

18  morning's hearing was file jacket number 14 and file jacket

19  number 15."

20         We obtained the list of what was included in

21  those file jackets, and three of these motions that included

22  and attached the evidence were included in those two file

23  jackets.

24         We do not know, because he never said that he

25  actually looked at the documents, but certainly throughout the

1  argument made before Judge Cortez, counsel in this case

2  represents to that court that he can and should review that

3  evidence, that he can consider it and that he can declassify

4  the evidence.

5          At the end of that hearing Judge Cortez notes --

6  and at that point, Your Honor, he had already heard about I

7  think it was 11 or 12 hearings in our case and worked very,

8  very hard as the new judge on our case. Was very actively

9  involved and entered a lot of orders.

10          And he said, "I feel very disappointed that this

11 has come up the way it has because we've done too much work and

12 worked too hard for this to be screwed up like this, if it has

13 been screwed up. And right now I'm not sure if I'm even going

14 to be able to hear this case."

15          He, in fact, the very next day recused himself.

16          The counsel in this case made the representation

17 that this was a small technical violation, that the spirit of

18 this court's agreed protective order was adhered to. We

19 repeatedly begged and pleaded and sent letters from both

20 Mr. Turner and myself asking them to please not do this, what

21 they did at the hearing, to take the evidence out of the

22 record, to not use it at the hearing, to not try to present

23 these arguments to Judge Cortez. They ignored our pleas, used

24 it, and Judge Cortez recused himself.

25          Following that, they submitted these same

1   requests to our new Judge Hoffman to review and consider these

2   pleadings, as well as the interim administrative judge.

3               THE COURT:  Well, I thought they had been

4   withdrawn at this point.

5               MS. CLOUSTON:  They have never been --

6               THE COURT:  They are still in the state court?

7               MS. CLOUSTON:  No, Your Honor.  As of December

8   17th, 2007, those documents were officially withdrawn out of

9   the record.  Completely withdrawn.

10              THE COURT:  All right.

11              MS. CLOUSTON:  They were not officially

12  withdrawn by T-Netix until following Your Honor's hearing and

13  following the hearing before the new judge on those motions.

14  What we ended up with, and we kept writing to our new Judge

15  Hoffman, trying to inform him of the problem, to not review

16  these motions, to not consider the evidence attached, and

17  asking him to please withdraw these motions so that he would

18  not, in fact, look at motions he wasn't supposed to.

19              We did not know if every copy had, in fact, been

20  in the box of the documents that were withdrawn after Your

21  Honor's hearing.  We did get them back following Your Honor's

22  hearing about a week later.  I think that happened on December

23  17th.  And they have accurately attached that evidence in their

24  response, but it was not until all of those motions had been

25  denied by the new state court judge that all of that was

63

1   officially by them requested and withdrawn out of the file.

2            THE COURT:  Well, I'll tell you what is on my

3   mind right now that I would like you to address.  And that is

4   the injury that has been suffered and the sanctions that are

5   being sought because what I am hearing, I think, is that these

6   documents have been clawed back.  They are no longer going to

7   be available to anyone who formerly may have seen them

8   improperly.

9            So I think that I would really like to hear a

10  response to that because that's what T-Netix's counsel has

11  said, that this is much too draconian that you are asking the

12  court to do at this point in time, which includes disqualifying

13  counsel that have been in this case I guess since 2005.

14           MS. CLOUSTON:  They entered, Your Honor, an

15  appearance on -- at the end of January of 2006.  Prior to that

16  point in time, the McKool Smith firm had represented T-Netix.

17  But they have been in the case, Your Honor, for approximately

18  two years at this point.

19           MR. BOWERS:  Your Honor, I apologize, but may I

20  address one thing regarding the documents?  Because I believe

21  what was stated left an impression that's just simply not

22  accurate regarding the documents.

23           Judge Cortez entered an order removing those

24  documents completely from the file, placing them in a sealed

25  box with the mark, Do Not Review -- Not To Be Viewed By Anyone

1 | Unless Approved By Judge Cortez.  And those were locked away.

2 |           Ms. Clouston's letter to Judge Hoffman on

3 | November 13, 2007, which I will read from and make available to

4 | Your Honor, states that, "The T-Netix pleadings are among those

5 | that were segregated from the public file and placed under lock

6 | and key with the court clerk in accordance with Judge Cortez's

7 | October 3rd, 2007, oral ruling on plaintiff's emergency motion

8 | to expunge the court order for motion or withdrawal pleadings.

9 | Our understanding is that the pleadings remain segregated and

10 | under lock and key."

11 |           Judge Hoffman never saw those documents.

12 | There's no evidence that he ever did, and there's no evidence

13 | that Judge Cortez ever did.

14 |           Once it came out in the proceedings on the

15 | hearing on October 3rd in which Mr. Pittman stated, "The

16 | documents she -- Ms. Clouston -- is referring to have not been

17 | disclosed to my client, have not been disclosed to any improper

18 | party, including the court in this case."  This is an page 7 of

19 | our response in the ellipted hearing.

20 |           I have a highlighted copy of Ms. Clouston's

21 | November 13th, 2007, order.  It's in the appendix.  I

22 | apologize.  It's in our appendix at pages 1939 through 1940.  I

23 | apologize, their appendix.  VAC's appendix.  I certainly

24 | apologize.

25 |           Is this ours?

1          The actual photograph of the box with

2 instructions is at our appendix for T-Netix at page 353.   And

3 also, Your Honor, on appendix 349 through 351, our appendix,

4 there's a December 18, 2007, letter from Chris Groves of Jones

5 Day, acknowledged by Ms. Clouston and by Mr. Pittman, regarding

6 the actual return of all of the documents that were sealed.

7 And only documents that are in dispute here today with all of

8 those being returned to the Jones Day law firm or December

9 18th, 2007.

10          So the threat of the exposure of these documents

11 is, I think Your Honor was asking the inquiry, they have been

12 retrieved and placed back in their hands.

13          THE COURT:  All right.

14          MS. CLOUSTON:  First, Your Honor, I guess to

15 respond.  On that they cited to the letter that I had written

16 to our new judge, Judge Hoffman, on November 13th, 2007,

17 warning Judge Hoffman about the motions that were coming before

18 him, including separate pleadings, three, in fact, were among

19 those that had caused the problem with Judge Cortez and to

20 please not review them.

21          What they did not cite is Mr. Pittman's letter

22 on November 14th to Judge Hoffman, and it is at appendix to our

23 Motion for Enforcement of the Protective Order at 1941 and

24 1942.

25          What Mr. Pittman represents to our new judge,

1    Judge Hoffman, is that, to begin with, the exhibits and

2    information referenced in VAC's November 13th letter were

3    improperly designated as confidential by VAC.  The information

4    is public information, and VAC has no legal basis for claiming

5    confidentiality.  These are the documents produced in this case

6    under this protective order.

7                    In fact, the information is also clearly

8    relevant to the issues in the current proceeding and should

9    have been produced by VAC in this proceeding as part of its

10   obligation to supplement discovery, not noting that prior judge

11   had already denied their motion to compel those documents.

12                   Next, because of VAC's improper designation,

13   T-Netix was required to challenge and is currently in the

14   process of challenging VAC's improper designation through

15   T-Netix's emergency motion.

16                   The counsel goes on to say that they will

17   provide -- they were improperly labeled by VAC with federal

18   confidentiality designations.

19                   THE COURT:  Well, I can read the letter.  You've

20   given me the appendix cite.

21                   MS. CLOUSTON:  The problem we have, Your Honor,

22   is in the cases that it required a higher sanction than the

23   awarding of attorney's fees for our efforts and efforts of the

24   counsel to have to actually enforce an agreed protective order.

25   Is this a single inadvertent violation?  Have the counsel shown

1 that they will, in fact, abide by their protective order?  Did

2 as soon as they discovered the information and the disclosure

3 remedy it?  Protect the information?  Represent that they're

4 going abide by it?

5             And, Your Honor, they unfortunately did not do

6 this in this case.  They continued to assert that they could,

7 in fact, use this information in the state court litigation.

8 The documents have now been removed as of December 17th, 2007,

9 out of the state court file, and there has been no ongoing

10 problem with the documents in that state court proceeding.

11             They have now served new discovery requests in

12 the state court case for those documents in that case.  So we

13 will have to deal with those issues, but there is no current

14 ongoing violation in the state court proceeding.

15             In the Eastern District of Texas lawsuit, the

16 questions on the ongoing violation is whether or not the Gruber

17 Hurst firm is, in fact, entitled to have and keep VAC's

18 documents, expert reports, discovery responses, et cetera, that

19 contain and cite to information that was designated under our

20 protective order Restricted Confidential, whether they were

21 entitled to keep it, whether -- or whether they were required

22 to return it.

23             They have today refused to return the

24 information to us, and we believe, either based upon the

25 information most recently produced in the last couple of days

1  and then today, Your Honor, that the representations that

2  they were counsel when they received this information, that

3  they were entitled to receive it and they're entitled to keep

4  it --

5              THE COURT:  Well, do I understand that as far as

6  anything that is made -- that is disclosed to any parties or

7  persons in the Eastern District of Texas case, that all of that

8  has now been withdrawn by the Gruber firm in the East Tex

9  litigation?

10             MS. CLOUSTON:  In the documents that we know of

11  that have been produced in that case, they have represented,

12  and as far as we know that representation is accurate that from

13  the other litigants who are competitors of VAC's, those

14  documents have been clawed back by the Gruber firm.

15             THE COURT:  That was my understanding.  I mean,

16  I don't know where we go from there.  If I can not accept the

17  representation of an officer of the court that this is an

18  accurate statement that all these things have been clawed back,

19  I, as a judge, am in really a mess.

20             So I generally -- unless there's something that

21  impeaches that representation, seems to me that we can say

22  safely that any documents that the Gruber firm may have

23  previously obtained have now been retrieved from any third

24  party or from the public record.

25             Now, the next question is, have those documents

1  now been returned to the counsel whose names appear of record

2  as T-Netix's counsel here in the Northern District of Texas?

3  And I guess you can answer that since you're a partner in the

4  Gruber firm.

5          MR. TAUTFEST:   That's correct, Your Honor.  Your

6  Honor, we have -- we do not have the confidential documents.

7  What we have are discovery responses and accident reports.  But

8  we still have those because we are working with Mr. Pittman and

9  the Bell Nunnally firm on the overlapping issues, and we help

10  prepare the witnesses.  We are giving advice in that case.  And

11  we've been asked to do that by our mutual client.

12          So we do still have those documents, Your

13  Honor.

14          THE COURT:   Well, I think the short answer is

15  that needs to go back right now.  If you and your firm want to

16  formally enter an appearance as the third counsel representing

17  T-Netix in this case, then so be it.  But I think there are all

18  kinds of confusions here when you are representing T-Netix or

19  Securus in an Eastern District case.

20          So let's get that back right now.

21          MR. BOWERS:   Your Honor, I thought I heard your

22  question regarding have all the documents that were -- that the

23  McAlexander rebuttal report that was retrieved back by the

24  Gruber Hurst firm.

25          THE COURT:   And I understood that to be the

1  case.

2              MR. BOWERS:   Just to point your attention to

3  footnote 41 of our --

4              THE COURT:   I don't need to know that.   I've

5  been told affirmatively what's happened.

6              MR. BOWERS:   Thank you, Your Honor.

7              THE COURT:   But I do want those documents

8  returned to counsel whose appearance has already been entered

9  in the case.

10              Now, if you wish to enter an appearance formally

11  and file a motion and entry of appearance in this case -- that

12  is, the case here in the Northern District of Texas -- then I

13  think once you have been enrolled and your firm has been

14  enrolled as cocounsel of record in the Northern District of

15  Texas, you are then thereafter entitled to access under the

16  terms of confidentiality order.

17              MR. BOWERS:   Yes, Your Honor, and we will return

18  those documents today.

19              THE COURT:   Okay.   Very good.

20              Anything else that we want to hear on this

21  motion?

22              MS. CLOUSTON:   Your Honor, I think Mr. Turner

23  raised the issue, and this is what the Northern District of

24  Texas cases that we have cited to Your Honor pertain to, that

25  it is about the use of the confidential information cited in

1  those expert reports and documents that we designated in the

2  Eastern District case as well that we need to have some

3  assurances that these -- our client is not a party to that

4  case.

5          We have no way to, you know, monitor it.  That,

6  in fact, the documents and information that's not being used in

7  that lawsuit and that, in fact, the questions that we asked

8  previously in our letters that we know that the information has

9  not been given to anyone else, and it's not being used, in

10  fact, in that case by the experts or by the couple involved in

11  that case, Your Honor.

12          THE COURT:  Well, as I understood it, it's all

13  been clawed back.  If it's been clawed back, then I assume that

14  the rebuttal expert report is no longer available to anyone in

15  the Eastern District of Texas litigation.

16          Now, if it comes to light that it is being

17  misused in that case, I think it needs to be brought to the

18  attention of Judge Ward and whoever the assigned magistrate

19  judge who is handling discovery in that case.

20          I think that I'm not going to go further in that

21  issue after I have received the assurances that everything has

22  been clawed back and that any documents that are presently in

23  the Gruber firm's possession are going to be returned to you

24  here sometime today or tomorrow.

25          MS. CLOUSTON:  Thank you, Your Honor.

1          THE COURT:  Okay.  The motion to modify agreed

2   protective order, I don't know.  I think probably I can decide

3   that issue on the pleadings, but I'm willing to have argument.

4   But, of course, the reason that I've scheduled all this morning

5   and, if necessary, into this afternoon on these two motions is

6   I wanted to be in a position to, if either side wished to

7   present any evidence other than you have presented some, but

8   any testimony, that that would be -- we would accomplish that

9   here today.

10          But I am willing to hear the plaintiff's

11   emergency motion here if there need be argument made on the

12   emergency motion to modify the agreed protective order or I can

13   make a decision on that with -- by my review of that which has

14   already been filed relative to that motion.

15          MR. PITTMAN:  Yes, Your Honor.  We think that

16   the only thing we would add that's not in that document is that

17   a new trial has been set.  That earlier document refers to the

18   previous trial setting.  So there's been a change, and trial is

19   now in August.  But other than that, Your Honor, we would --

20          THE COURT:  That's the state court case.

21          MR. PITTMAN:  Yes, Your Honor.

22          THE COURT:  We've been sort of monitoring that.

23   Just see what happened.  Sounds like a misfire.  And so y'all

24   are going to crank it up again in August.

25          MR. PITTMAN:  Yes, Your Honor.  But other than

1   that, we rely on the pleadings.

2           THE COURT:  Is that all right?

3           MS. CLOUSTON:  Yes, Your Honor.  I believe we

4   can rely upon the pleadings.

5           THE COURT:  Well, I've made one of the rulings

6   that I intend to write some length of memorandum on this.

7           Now, you do understand that in terms of things

8   other than the attorney's fees, which I think we'll reserve to

9   a later date if I determine that attorney's fees are in order.

10  Ultimately, any additional sanctions for violation of Judge

11  Fitzwater's order, if I recommend that those things have

12  occurred, are going to be reserved to Judge Fitzwater.

13          I will only be making a recommendation on the

14  disposition of that aspect of it.

15          And then, again, just so that everyone is clear

16  for records keeping or just housekeeping purposes, were I to

17  recommended that sanctions in the order of attorney's fees be

18  awarded, and Judge Fitzwater accepts that, then I will schedule

19  another hearing for receipt of testimony on that or perhaps you

20  all can resolve that by agreement.

21          So thank you all for coming in this morning.  I

22  will endeavor to get this out.  I will be out of pocket here

23  for a while, and it may be early May before I can file my

24  recommendation, but I will endeavor to get that accomplished as

25  soon as possible.

VAC App. 496

1          Thank you all very much.   We'll be in recess.

2          (End of proceedings)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T I O N

2        I, JANET E. WRIGHT, RPR/CSR, certify that the foregoing

3   is a transcript from the record of the proceedings in the

4   foregoing entitled matter.

5        I further certify that the transcript fees and format

6   comply with those prescribed by the Court and the Judicial

7   Conference of the United States.

8        This is the 9th day of May, 2008.

9

10

11
                              JANET E. WRIGHT, CSR, RPR
12                            Certified Shorthand Reporter
                              My CSR Expires on 12-31-09
13                            6611 Hillcrest Avenue
                              #257
14                            Dallas, Texas  75205
                              214/542-9735
15

16

17

18

19

20

21

22

23

24

25
```

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

T-NETIX, INC. )
)
v. )
)
VALUE-ADDED COMMUNICATIONS )   3-05-CV-654-D
INC. )
)
v. )
)
SECURUS TECHNOLOGIES, INC. )

REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to the District Court's order of reference filed on January 2, 2008, on April 16,

2008, came on to be heard Defendant Value-Added Communications, Inc.'s Motion to Enforce The

Agreed Protective Order, for Civil Contempt, Sanctions and Injunctive Relief filed on December 28,

2007, and having considered the relevant pleadings, appendices and exhibits and the statements of

counsel for the parties and the statements of Eric Tautfest an attorney with the law firm of Gruber,

Hurst, Johansen & Hail LLP, the magistrate judge finds and recommends as follows:

On March 3, 2006, the District Court entered its Agreed Protective Order (Doc. 44) signed

by Aubrey "Nick" Pittman on behalf of T-Netix, Inc. (T-Netix) and by Robert W. Turner on behalf

of Value-Added Communications, Inc. (VAC). Included in the terms of the order were the

following paragraphs:

> 16. CONFIDENTIAL INFORMATION may be additionally designated
> COUNSEL EYES ONLY CONFIDENTIAL INFORMATION (by labeling it
> COUNSEL ONLY or HIGHLY CONFIDENTIAL, or similar designation clearly
> transmitted in writing to the other parties). The COUNSEL EYES ONLY
> CONFIDENTIAL INFORMATION designation is reserved for information that
> constitutes proprietary financial or technical or commercially sensitive competitive
> information that the producing party maintains as highly confidential in its business,
> including but not limited to, information obtained from a nonparty pursuant to a



current Nondisclosure Agreement ("NDA"), information relating to future products not yet commercially released, strategic plans, codes, technical documents that would reveal trade secrets or other confidential research, development or commercial information, and settlement agreements or settlement communications, the disclosure of which is likely to cause harm to the competitive position of the producing party or a third party's business or personal interests. Documents designated COUNSEL EYES ONLY CONFIDENTIAL INFORMATION and contents thereof shall be available only to counsel for the parties, the technical advisers who are assisting them, data processing vendors and graphics and trial consultants.

17. The parties will use reasonable care when designating documents or information as CONFIDENTIAL INFORMATION or COUNSEL EYES ONLY CONFIDENTIAL INFORMATION. Nothing in this Order shall prevent a receiving party from contending that any or all documents or information designated as CONFIDENTIAL INFORMATION or COUNSEL EYES ONLY CONFIDENTIAL INFORMATION have been improperly designated. A receiving party may at any time request that the producing party cancel or modify the confidentiality designation with respect to any document or information contained therein.

18. A party shall not be obligated to challenge the propriety of a CONFIDENTIAL · INFORMATION or COUNSEL EYES ONLY CONFIDENTIAL INFORMATION designation at the time made, and a failure to do so shall not preclude a subsequent challenge thereto. Such a challenge shall be written, shall be served on counsel for the producing party, and shall particularly identify the documents or information that the receiving party contends should be differently designated. The parties shall use their best efforts to resolve promptly and informally such disputes. If agreement cannot be reached, the receiving party shall request that the Court cancel or modify a CONFIDENTIAL INFORMATION or COUNSEL EYES ONLY CONFIDENTIAL INFORMATION designation.

19. CONFIDENTIAL INFORMATION and COUNSEL EYES ONLY CONFIDENTIAL INFORMATION shall be held in confidence by each person to whom it is disclosed, shall be used only for purposes of this litigation, shall not be used for any business or other purpose, and shall not be disclosed to any person who is not entitled to receive such information as expressly provided herein. All produced CONFIDENTIAL INFORMATION and COUNSEL EYES ONLY CONFIDENTIAL INFORMATION shall be carefully maintained so as to preclude access by persons who are not entitled to receive such information. However, nothing in this Order shall prevent any outside court reporter, videographer, mediator and their employees, or the Court, any employee of the Court or any juror from reviewing any evidence in this case for the purpose of this litigation. Further, nothing in this Order shall impact one way or another on the admissibility of any document or other evidence at any hearing or at trial. Court reporters and

2

videographers not employed by the Court must execute a written Confidentiality Agreement, in the form attached hereto as Attachment A.

23. **CONFIDENTIAL INFORMATION or COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** shall not be copied or otherwise reproduced by a receiving party, except for transmission to qualified recipients, without the written permission of the producing party, or, in the alternative, by further order of the Court. Nothing herein shall however, restrict a qualified recipient from making working copies, abstracts, digests and analyses of **CONFIDENTIAL INFORMATION or COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** for use in connection with this litigation and such working copies abstracts, digests and analyses shall be deemed to be the same level of **CONFIDENTIAL INFORMATION or COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** under the terms of this Order as the original documents upon which such work product was based. Further, nothing herein shall restrict a qualified recipient from converting or translating **CONFIDENTIAL INFORMATION or COUNSEL EYES ONLY CONFIDENTIAL INFORMATION** into machine readable form for incorporation into a data retrieval system used in connect with this action, provided that access to **CONFIDENTIAL INFORMATION or COUNSEL EYES ONLY CONFIDENTIAL INFORMATION**, in whatever form stored or reproduced, shall be limited to qualified recipients.

In addition, the order provided mechanisms pursuant to which either party could contest its opponent's confidentiality designations and to obtain a modification of the order's provisions. *Id.* at ¶ 18.

VAC and T-Netix are parties in a state court action pending in Dallas County and docketed in Cause No. 03-11399-B. After VAC filed its Motion to Dismiss T-Netix's Royalty-Related Claims in the state court case, T-Netix's counsel in the federal case filed a response in the state court on September 27, 2007, which used information produced in *this action* under the agreed protective order. *See* VAC's Appendix at 1164-1291. Prior to filing and disclosing materials produced in *this action* under the agreed protective order, T-Netix's counsel in the federal case did not notify VAC's counsel of their intention to submit such documents in the state court proceedings nor did they seek

3

an agreed or court-ordered modification of the protective order.[1]  On the same date T-Netix filed

additional pleadings in the state court citing material produced by VAC under the agreed protective

order in support of the arguments asserted.  Appendix at 1292-1307.

On October 1, 2007, T-Netix filed an amended reply to VAC's response to T-Netix's motion

to realign the parties in No. 03-11399-B.  *Id.* at 1344-1357.  As with the line count summary set out

in its response to the motion to dismiss, *supra,* the amended reply, which was not filed under seal,

reiterated the October 2006 - July 2007 line count reports.

On October 2, 2007, VAC's counsel wrote T-Netix's attorneys advising that enumerated

pleadings filed in the state court case contained and disclosed information which was produced by

VAC subject to the terms of the agreed protective order in *this action* and requesting that T-Netix

immediately withdraw from the state court record any pleadings and documents which disclosed

confidential information.  Appendix at 1509-1510.

On October 3, 2007, T-Netix filed a motion in No. 03-11399-B to declassify the line count

reports for the period from October 2006 through July 2007.  Appendix at 1560-1566.  The motion

argued that the documents produced by VAC pursuant to the agreed protective order filed *in this*

*action* were neither confidential nor proprietary and alternatively that VAC had waived any privilege

which otherwise may have obtained.  Conspicuous by its absence is any statement in the motion

which placed the state court judge on notice of the existence of the agreed protective order in *this*

*action* and that the documents which T-Netix sought to have declassified had been produced by

---

[1]Line Count Report information for October 2006 through July 2007 presented to the
state court came from materials produced by VAC under this court's agreed protective order and
which were designated "Counsel Eyes Only - Confidential Information."  The Line Count
Reports themselves were also included in the pleadings filed on September 27, 2007, and filed
under seal, but were reiterated in the response, Appendix at 1174, which was not filed under seal.

VAC App. 502

VAC pursuant to an agreed protective order entered by this court.

On the same date the then presiding judge in the parties' state court action held a hearing on T-Netix's motion to realign the parties. Appendix 1511-1557. Ms. Stephanie Newkirk Clouston appeared on behalf of VAC and Aubrey "Nick" Pittman appeared on behalf of T-Netix. In the course of the hearing Ms. Clouston referred to an emergency motion which VAC had filed based upon materials which VAC had produced under the agreed protective order in *this action* and which T-Netix had filed or used in its pleadings filed in the state court action. In response to Ms. Clouston's statements Mr. Pittman argued that the royalty agreement between the parties entitled T-Netix to the documents, that the protective order in *this action* permitted either party to use "limited access" documents in their state court action as well, and that the state court could declassify any documents which VAC produced under the agreed protective order in *this action*. The state judge wondered aloud whether he might have been tainted by the contested pleadings and the statements made at the hearing. *Id.* at 1543. The hearing concluded without a ruling by the judge so that a jury trial in another case could proceed. On the same day the judge signed an order recusing himself. *Id.* at 1558. As noted at the hearing, steps were taking to insure that there would be no access to the documents and to any pleadings which referred to documents produced by VAC pursuant to the agreed protective order in *this action*. *Id.* at 1551. Counsel for VAC and T-Netix have agreed that prior to this court's hearing on April 16, 2008, all of these materials were removed from the state court records and returned to T-Netix's counsel.

On a date prior to October 5, 2007, Bell Nunnally, one of T-Netix's counsel of record in this case, provided attorneys with the Gruber, Hurst, Johansen & Hail law firm with copies of documents which had been produced by VAC under the agreed protective order in *this action* which had been

5

designated "Confidential Information - Outside Counsel Eyes Only" which included at the least a

rebuttal invalidity expert report by Joe McAlexander. VAC's counsel learned of this dissemination

and on October 23, 2007, Thomas Jackson e-mailed Michael Gruber to find out what had taken

place. *See* GHJH 001364-65, received in evidence at the magistrate judge's hearing. Ultimately

Eric Tautfest confirmed that the subject expert report had been inadvertently disseminated to parties

in a patent case filed in the Eastern District of Texas in which T-Netix was a party and in which the

Gruber law firm was its counsel of record.

The evidence before the court and the statements made by counsel at the April 16, 2008,

hearing establish that the Gruber law firm successfully clawed back all copies of the McAlexander

report from parties in the Eastern District of Texas case. Further, Eric Tautfest agreed - pursuant

to

the undersigned magistrate judge's oral directive at the hearing - that copies of any documents

which had been produced by VAC in this case under the agreed protective order and which the

Gruber law firm had received from T-Netix's counsel of record in this case would be destroyed or

returned by the Gruber law firm unless or until the Gruber law firm entered its formal appearance

as counsel of record for T-Netix in *this action*.

The magistrate judge finds that T-Netix and its attorneys' arguments that the conduct in

which they engaged in filing pleadings and documents in the state court action which were in

contravention to the terms of the District Court's agreed protective order in *this action* to be a mere

"technical violation" and not inconsistent with the "spirit" of the agreed protective order to be

disingenuous and wholly unpersuasive.

In the first place it was Mr. Pittman in cooperation with Robert W. Turner, representing

6

VAC App. 504

VAC, that drafted the very terms of the order which the District Court signed. Together they chose to define "counsel" as "mean[ing] only outside attorneys retained by the parties to work on this litigation..." *See* Agreed Protective Order (Doc. 44) at ¶ 9. Further, ¶ 19, *supra*, imposes express restrictions on the uses to which confidential information can be put which do not include - as noted by Judge Carlos R. Cortez - using such information in pleadings filed in the pending state court action between these adversaries. As noted above, the agreed protective order in *this action* also provided a means to contest an improper confidentiality designation. ¶¶ 17 and 18. The facts and circumstances before the court with respect to the proceedings in No. 03-11399-B in September and early October 2007 show that T-Netix's attorneys did not seek a modification of VAC's designations of documents from this court prior to filing copies in the state court. In fact, it appears that VAC's attorneys learned that its confidentially designated documents were being included in state court filings only upon their receipt of copies of the same. Finally, as evidenced by the record on October 3rd, and after receipt of Mr. Turner's letter of October 2nd, Mr. Pittman proceeded to argue that the protective order in *this action* did not prohibit the state court from reviewing such designated materials.

I further find that the statements and arguments that members of the Gruber law firm were retained outside attorneys to work on this litigation, and thus were persons authorized to receive confidential information to be incredible and wholly unworthy of belief. While there is no doubt that the firm was retained to represent T-Netix and/or Securus in litigation involving specifically identified third-parties, neither the amended engagement letter dated April 9, 2007, nor the internal e-mails within the law firm imply or suggest that the firm understood that it was representing T-Netix in this case at the time it received documents which VAC had produced. To the contrary, it

7

appears that the law firm's lawyers were unaware of the protective order in *this action* when copies of the McAlexander expert report were disseminated. The declaration of Melissa Drennan executed on April 11, 2008, is nothing but back fill in an effort to exonerate T-Netix's counsel of record in *this action* from a violation of the express terms of the agreed protective order.[2]

In summary the magistrate judge finds that T-Netix and its counsel of record, The Pittman Law Firm, P.C. and Bell Nunnally & Martin LLP, knowingly and deliberately violated the terms of the agreed protective order filed in this action on March 3, 2006.

Having concluded that T-Netix and its attorneys in *this action* knowingly and intentionally violated the terms of the District Court's Agreed Protective Order, the magistrate judge now addresses the sanctions and remedies which should be imposed. It is axiomatic that litigants and their counsel of record must obey court orders unless the orders are modified or vacated by the issuing courts or by higher courts with appellate jurisdiction. Failures to abide by duly issued orders undermine the disposition of cases under the rule of law.

Protective orders are frequently used to balance the interests of a party in obtaining relevant information from a party opponent or a non-party while at the same time protecting the interests of a responder in assuring that its proprietary and confidential information is only disclosed to a limited category of persons and not available to the public at large. In the instance of intellectual property (IP) litigation, such as that in which T-Netix and VAC are engaged, cases could hardly proceed at all absent the entry of protective orders, given the highly sensitive nature of the subject matter of the suits and the fact that more often than not the opposing litigants are business competitors as well.

It is against the backdrop of T-Netix's actions and that of its counsel in this case and the

---

[2]*See* exhibits received at the hearing on April 16, 2008.

8

necessity that protective orders be honored that the magistrate judge addresses the relief to which VAC is entitled.

At the outset I do not find that any injunctive relief is necessary at this time. As noted above, the pleadings and papers improperly filed in No. 03-11399-B were segregated from access on October 3, 2007, and were ultimately returned to T-Netix's counsel without ever having been seen by anyone in that case. Similarly, copies of the McAlexander report were retrieved by the Gruber firm and they and all other documents were returned to T-Netix's attorneys in this case or otherwise destroyed. However, such is not to say that the present state of affairs was obtained without a price.

As set out above, the Agreed Protective Order in *this action* was drafted by the attorneys. No effort was taken to obtain a modification of its terms until after T-Netix's counsel filed the designated documents in the State court action without prior notice to VAC's counsel, after Mr. Pittman argued in the state court that the judge was free to order VAC to produce the records pursuant to the licensing agreement and urged the state judge to modify the District Court's protective order in *this action*, and after the state court judge recused himself in the state action. In each instance when VAC, informally through counsel, e.g. Appendix at 1509-10, or pursuant to a formal motion, e.g. VAC's emergency motion, *Id.* at 1534, and until April 16, 2008, when T-Netix's counsel conceded that they and T-Netix had been guilty of a technical violation of the Agreed Protective Order, T-Netix vigorously opposed VAC's position resulting in time and expense incurred by VAC in filing its motion, appendices and reply as well as additional time expended by the court in reviewing the voluminous appendices filed relating to the present motion.

The case law is not entirely clear with respect to the source of a court's authority to sanction this misconduct of litigants and attorneys who violate an order. In *Natural Gas Pipeline Co. v.*

9

*Energy Gathering, Inc.* the Fifth Circuit citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47, 111 S.Ct. 2123 (1991), observed that:

> "The inherent power to sanction bad faith conduct must extend to reach individuals and conduct not directly addressed by other mechanisms ... Although it is unclear whether the inherent power to sanction discovery abuses extends to abuses committed by non-parties, there is no doubt that this power may be applied to attorneys in the case. 2 F.3d 1397, 1411 (5th Cir. 1993).

In other instances the Fifth Circuit has affirmed a district court's civil contempt order imposed against a litigant and its attorney. In *Lyn-Lea Travel Corp. v. American Airlines, Inc.*, 238 F.3d 282, 290-91 (5th Cir. 2002), the court noted that one of the purposes of a civil contempt order was to compensate a party for losses sustained as a result of the contemnor's actions. The court went on to cite *FDIC v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995), for the three requirements for a finding of civil contempt, i.e. (1) that a court order was in effect; (2) that the order required certain conduct by the respondent; and (3) that the respondent failed to comply with the court's order. For the reasons and findings set out above VAC has made the requisite showing for an order holding T-Netix and its counsel of record, Aubrey "Nick" Pittman and Bell Nunnally & Martin, LLP in civil contempt of court.

VAC also seeks an order disqualifying T-Netix's present counsel of record in this case. It is extremely disheartening to the undersigned that in their zeal to represent the interests of a client T-Netix's attorneys, who otherwise enjoy outstanding professional representations, have allowed their obligation to a client to take precedence - in this instance - over their higher obligation as officers of the court to see that its orders are obeyed. However, I do not think this single instance, reprehensible as it may be, is subject to repetition or is of such magnitude as to warrant an order disqualifying them from further representation of T-Netix, Inc., in the present action.

10

VAC App. 508

## RECOMMENDATION:

For the foregoing reasons it is recommended that the District Court find that T-Netix, Inc. and its counsel of record knowingly and deliberately violated the terms of the court's Agreed Protective Order filed in this action on March 3, 2006, and

That the court further find that Value-Added Communications, Inc., is entitled to recover its reasonable expenses and attorneys' fees incurred in obtaining relief under the inherent authority of the court to sanction bad faith conduct on the part of T-Netix, Inc. and its counsel of record in this action or alternatively upon the District Court's determination that T-Netix, Inc. and its counsel of record in this case are guilty of civil contempt of court for knowingly and willfully failing to comply with the terms of the court's Agreed Protective Order, and

That the District Court determine the reasonable expenses and attorneys' fees incurred by Value-Added Communications, Inc. and order T-Netix, Inc., Aubrey "Nick" Pittman and Bell Nunnally & Martin, LLP, jointly and severally, to pay such expenses to Value-Added Communications, Inc. or in the alternative that the fees and expenses issue be remanded to the magistrate judge for determination.

A copy of this recommendation shall be transmitted to counsel for the parties.

SIGNED this 21st day of April, 2008.

WM. F. SANDERSON, JR.
UNITED STATES MAGISTRATE JUDGE

## NOTICE

In the event that you wish to object to this recommendation, you are hereby notified that you must file your written objections within ten (10) days after being served with a copy of this

11

VAC App. 509

recommendation. Pursuant to <u>Douglass v. United Servs. Auto Ass'n</u>, 79 F.3d 1415 (5th Cir. 1996) (en banc), a party's failure to file written objections to these proposed findings of fact and conclusions of law within such ten-day period may bar a <u>de novo</u> determination by the district judge of any finding of fact or conclusion of law and shall bar such party, except upon grounds of plain error, from attacking on appeal the unobjected to proposed findings of fact and conclusions of law accepted by the district court.

12

VAC App. 510

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| T-NETIX, INC. | ) | |
| | ) | |
|     Plaintiff/Counter-Defendant | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VALUE-ADDED COMMUNICATIONS, | ) | |
| INC. | ) | Case No. 3-05-654-D |
| | ) | |
|     Defendant/Counter-Plaintiff | ) | |
| v. | ) | |
| | ) | |
| SECURUS TECHNOLOGIES, INC. | ) | |
| | ) | |
|     Counter-Defendant | ) | |

## DECLARATION OF STEPHANIE D. CLOUSTON

Before me, the undersigned authority, personally appeared Stephanie D. Clouston being

by me first duly sworn on her oath stated as follows:

    1.    I am over the age of 18 and am competent to testify to the matters contained

herein, which are made from my personal knowledge.

    2.    I am an attorney licensed to practice in the state and federal district courts in

Texas. Currently I am a partner with Alston & Bird LLP. Previously, when I was a partner with

Jones Day, I was counsel of record for Defendant/Counter-Plaintiff Value-Added

Communications, Inc. ("VAC") in this litigation. I also represented VAC during the pendency of

the Dallas County, Texas state court litigation between VAC and T-Netix, Inc., Cause No.

03-11399-B ("State Court Litigation").

1

VAC
EXHIBIT 4
C.A. No. 3-05-654-D

3.     T-Netix, Inc. and its parent Securus Technologies, Inc. are referred to herein as "T-Netix/Securus."

4.     In this patent infringement litigation between competitors, the parties and their counsel anticipated the exchange of highly confidential, proprietary and technical documents and information.  Therefore, prior to the exchange of any such information and documents, the parties and their counsel entered into an Agreed Protective Order ("Protective Order") pursuant to which certain documents and information could be designated and treated as "Attorneys Eyes Only" ("AEO designation").

5.     T-Netix/Securus submitted to the court in the State Court Litigation documents bearing the AEO designation from this litigation.  Judge Cortez, who was the District Court Judge presiding over the State Court Litigation, determined that he had to recuse himself as a result of a hearing in which counsel for T-Netix/Securus presented and argued from AEO-designated documents only produced in this litigation.  T-Netix/Securus used the delay to argue for reconsideration of many dispositive, expert, and discovery motions that Judge Cortez had already ruled in favor of VAC.  As a result of the recusal of Judge Cortez, the State Court Litigation was delayed, and VAC incurred unnecessary costs and expenses.

6.     During the course of discovery in this case, T-Netix/Securus submitted the Rebuttal Report of its expert, Joseph McAlexander ("McAlexander Rebuttal Report").  I recall that the McAlexander Rebuttal Report was over 100 pages long and quoted extensively and verbatim from confidential and proprietary VAC documents and deposition transcripts of VAC witnesses, that included the AEO designation.  I therefore sent a letter on behalf of VAC designating the McAlexander Rebuttal Report as AEO under the Protective Order.

2

7.     I was present during the April 2008 hearing before Magistrate Judge William F. Sanderson regarding the violations by T-Netix/Securus and their counsel of the Protective Order and the motion by T-Netix/Securus requesting that certain documents be declassified from their confidential designation.  Present at that hearing, among others, was Eric Tautfest, a former partner of the Gruber Hurst Johansen & Hail firm ("Gruber Hurst").  Judge Sanderson found that the Bell Nunnally & Martin and Pittman Law firms, both counsel of record for T-Netix/Securus in this litigation, had violated the Protective Order by providing documents which were covered by the Protective Order, including the McAlexander Rebuttal Report, to Gruber Hurst.  Gruber Hurst was counsel for T-Netix/Securus in other patent infringement cases between T-Netix/Securus and inmate telephone competitors pending in other federal courts.

8.     The relief I sought on behalf of VAC at the April 2008 hearing before Judge Sanderson included both a request for attorneys' fees and injunctive relief enforcing the Protective Order as well as an order disqualifying counsel for T-Netix/Securus from further participation in this litigation.

9.     During the April 2008 hearing, Mr. Tautfest of Gruber Hurst represented to the Court and VAC's counsel that the documents had been clawed back from third parties and the public record, and Judge Sanderson determined that neither injunctive relief nor disqualification of any of T-Netix/Securus's counsel were appropriate remedies.  However, having found that the Protective Order was violated, Judge Sanderson decided that sanctions in the form of attorneys' fees would be appropriate.  Judge Sanderson recommended to this Court that monetary sanctions be awarded in favor of VAC against Bell Nunnally, The Pittman firm, and T-Netix/Securus for their violations of the Protective Order.

3

10.     In August 2008, VAC entered into a settlement agreement by which this case was settled and dismissed and agreed to withdraw the then-pending sanctions motion that Judge Sanderson had recommended be granted insofar as VAC sought its attorneys' fees and expenses. The representations made by Mr. Tautfest at the April 2008 hearing that Gruber Hurst would and (subsequently did) return and/or delete all versions of the confidential documents that were the subject of the April 2008 hearing were relied on by Judge Sanderson in determining which sanctions should be imposed and also were relied on by VAC in deciding to withdraw the pending sanctions motion. Since Gruber Hurst was continuing to represent T-Netix/Securus in patent infringement litigation against other inmate telephone competitors, the assurances that Gruber Hurst no longer possessed VAC's confidential and proprietary AEO designated documents from this litigation, and the accompanying elimination of the risk of a subsequent "inadvertent" production of the documents, were important.

11.     On or about August 24, 2010, Anthony Magee, a partner of Gruber Hurst, called me and asked for my help in requesting VAC's permission to provide Gruber Hurst with certain documents, which would have included the McAlexander Rebuttal Report, for production in litigation pending between T-Netix/Securus and Combined Public Communications, Inc. (the "Combined Litigation") and between T-Netix/Securus and Pinnacle Public Services LLC (the "Pinnacle Litigation"). Mr. Magee memorialized his request in an email to me dated August 25, 2010. In that email Mr. Magee states, in part, "I have not seen these [invalidity] contentions because of the prohibitions contained in the protective order, but I understand that they were designated as confidential under the protective order in place in that litigation." Although by that that time Jones Day and I no longer represented VAC, I passed Mr. Magee's request on to VAC.

4

It is my understanding that VAC never agreed that Gruber Hurst could obtain copies of or produce the confidential information in the Combined Litigation and Pinnacle Litigation.

12. Much later, as described below, I learned that prior to the time Mr. Magee reached out to me in late August 2010 in an attempt to obtain VAC's consent to obtain and potentially produce VAC's AEO designated, the McAlexander Rebuttal Report had already been produced by Gruber Hurst to Combined's then counsel (Stites & Harbison) in the Combined Litigation and Gruber Hurst was attempting to claw that report back.

13. In November 2010, a couple of months after Mr. Magee contacted me in August 2010, my then law firm, Jones Day, became successor counsel for Combined Public Communications, Inc. ("CPC") in the Combined Litigation. In the process of Jones Day becoming successor counsel for CPC, Stites & Harbison transferred to Jones Day the discovery materials which had been produced to date by T-Netix/Securus. My recollection is that there were over 400,000 pages of materials.

14. Just prior to the time Jones Day began representing CPC, the parties in the Combined Litigation had participated in an unsuccessful mediation session before the Federal Magistrate Judge for the Western District of Kentucky. Another mediation session was subsequently scheduled before the Federal Magistrate Judge in which Jones Day participated for CPC. After that mediation session also proved unsuccessful, amended pleadings and motions to dismiss were filed by the parties in the Combined Litigation. Thus, Jones Day was engaged in motions practice for about 8 months following the time it appeared as counsel for CPC in the Combined Litigation.

15. Subsequently, in or about July 2011, in preparation for upcoming discovery

5

depositions, I asked one of my associates at Jones Day to review discovery-related

correspondence that were in the files transferred in or about November 2010 to Jones Day by

CPC's former counsel Stites & Harbison. During that review, the Jones Day associate brought to

to my attention two documents she found while reviewing the discovery correspondence: (1) an

August 27, 2010 letter from Mr. Magee to Stites & Harbison referencing Gruber Hurst's

"inadvertent" production of privileged documents and (2) the privilege log enclosed with Mr.

Magee's letter. I immediately recognized that among the materials identified in the privilege log

was the McAlexander Rebuttal Report, one of the AEO designated documents subject to the

Protective Order in this litigation. This was the first time that I had seen either Mr. Magee's

letter or the attached privilege log.

16.    I first realized in July 2011 that Gruber Hurst had already obtained and produced

VAC's confidential information, including the McAlexander Rebuttal Report, and had attempted

to claw the McAlexander Rebuttal Report back from opposing counsel before Mr. Magee

approached me in August 2010. Before that time, I was unaware that Gruber Hurst may have,

contrary to representations made to VAC and Judge Sanderson, impermissibly retained and/or

T-Netix/Securus had impermissibly been provided with and retained copies of the McAlexander

Rebuttal Report after the April 2008 contempt hearing.

17.    Around this same time, I left Jones Day and joined Alston & Bird LLP. In

October 2011, Jones Day notified VAC of the apparent misuse by T-Netix/Securus and/or its

outside counsel, Gruber Hurst of VAC's confidential information in further violation of the

Protective Order.

6

Dated: December 14, 2012.

FURTHER AFFIANT SAYETH NOT.

Stephanie D. Clouston

STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §


SUBSCRIBED AND SWORN to before me on the 14th day of December, 2012, to certify which, witness my hand and official seal.

ALLISON KIMBERLY WOKAL
MY COMMISSION EXPIRES
October 14, 2015

NOTARY PUBLIC

7

 

**GRUBER | HURST | JOHANSEN | HAIL**

ERIC S. TAUTFEST
Direct: 214.855.6873
etautfest@ghjhlaw.com

Gruber Hurst Johansen & Hail LLP
Attorneys | Counselors
1445 Ross Avenue | Suite 2500
Dallas Texas 75202
214.855.6800 main
214.855.6808 fax

April 16, 2008

*Via Hand Delivery*
Jeff Lowenstein Esq.
Bell Nunnally & Martin, L.L.P.
3232 McKinney Ave., Suite 1400
Dallas, Texas 75204-2429

Re:  *T-Netix, Inc., and Evercom Systems, Inc. v. Global Tel\*Link Corporation, et al;*
    *Civil Action No. 2-06cv-426-TJW*

Dear Jeff:

Pursuant to Judge Sanderson's order today from the bench, enclosed please find all documents in our possession that were received from your office regarding the VAC case.

1) Expert Report of Melvin R. Mercer regarding invalidity claims;
2) Rebuttal Expert Report of Joseph C. McAlexander regarding validity of claims;
3) Supplemental Expert Report of Melvin R. Mercer regarding invalidity claims;
4) Expert Report of Joseph C. McAlexander regarding infringement;
5) ~~Rebuttal Expert Report of Melvin R. Mercer regarding non-infringement;~~
6) Preliminary Expert Report of Bruce L. Blacker regarding damages;
7) Expert Report of Sanford E. Warren, Jr. regarding attorneys fees;
8) T-Netix's Initial Disclosures;
9) T-Netix's Answers to Defendant VAC's First Set of Interrogatories to Plaintiff;
10) T-Netix's Answers to Defendant VAC's First Set of Requests for Documents and Things to Plaintiff;
11) T-Netix's Response to Defendant VAC's Second Set of Interrogatories to Plaintiff;
12) T-Netix's Response to Defendant VAC's Second Set of Requests for Production of Documents and Things to Plaintiff;
13) Securus' Response to Defendant VAC's First Set of Requests for Production of Documents and Things to Counter-Defendant;
14) T-Netix's Response to VAC's Third Set of Requests for Production of Documents and Things;
15) T-Netix's Supplemental Rule 26(a)(1) Initial Disclosures;
16) VAC's Initial Disclosure Statement;
17) VAC's Responses to Plaintiff's First Request for Production of Documents;

EXHIBIT B-1            Exhibit A to Tautfest Declaration            APP. 25

Jeff Lowenstein Esq.   
April 16, 2008
Page 2

18)   VAC's Responses to Plaintiff T-Netix's First Set of Interrogatories;
19)   VAC's Answers and Objections to T-Netix's Second Set of Interrogatories;
20)   VAC's Supplemental Rule 26(a) Disclosures; and
21)   VAC's Second Supplemental Rule 26(a) Disclosures.

Please be advised that we have deleted the above documents from our database and have destroyed all working copies as well.

Sincerely,

Eric S. Tautfest

EST/dmp
Enclosures

**BELL NUNNALLY & MARTIN LLP**

ATTORNEYS & COUNSELORS

3232 MCKINNEY AVENUE
SUITE 1400
DALLAS, TX 75204-2429

TELEPHONE 214.740.1400
FACSIMILE 214.740.1499
BELLNUNNALLY.COM

WRITER'S DIRECT NUMBER:

(214) 740-1410

WRITER'S EMAIL ADDRESS:

jeffl@bellnunnally.com

April 17, 2008

**Via Facsimile**
Stephanie Clouston
Jones Day
2727 North Harwood Street
Dallas, Texas 75201-1515

> Re: Civil Action No. 3:05-CV-0654-D; *T-Netix, Inc. v. Value-Added Communications, Inc. v. Securus Technologies, Inc.*; United States District Court, Northern District of Texas, Dallas Division.

Dear Ms. Clouston:

Following yesterday's hearing in front of Judge Sanderson, we received from Gruber Hurst Johanson & Hail ("GHJH") all documents previously provided to GHJH subject to the protective order in the above-referenced matter. GHJH has also confirmed that GHJH has deleted the above documents from its database and has destroyed all working copies of the documents. Please let me know if you would like me to send the documents to you or maintain them at our office.

Sincerely,

Jeffrey S. Lowenstein

JSL/reb



VAC EXHIBIT 6
C.A. No. 3-05-654-D

APP. 001

**VAC App. 520**

# JONES DAY

2727 NORTH HARWOOD STREET • DALLAS, TEXAS 75201-1515
TELEPHONE: 214-220-3939 • FACSIMILE: 214-969-5100

Direct Number:  (214) 969-2919
sdclouston@jonesday.com

JP002252
242576-605001

April 18, 2008

## BY FAX

Jeffrey S. Lowenstein, Esq.
Bell Nunnally & Martin, LLP
1400 One McKinney Plaza
3232 McKinney Avenue
Dallas, TX  75204-2429

Re:   *T-NETIX, Inc. v. Value-Added Communications, Inc., Case No. 3:05-CV-0654-D,*
      *United States District Court, Northern District of Texas, Dallas Division*

Dear Jeff:

We have received your letter of April 17, 2008, notifying us that Gruber Hurst Johanson
& Hail has returned to you all copies of documents that contain any information designated by
VAC as "confidential" under the Agreed Protective Order.  Please send all of these documents to
my office at your earliest convenience.

Sincerely,

*Stephanie D. Clouston*
*By permission*
*SMW*

Stephanie D. Clouston, Esq.

cc:   Eric S. Tautfest, Esq.
      Michael J. Lang, Esq.
      Aubrey D. Pittman, Esq.
      Christopher Groves, Esq.
      Robert W. Turner, Esq.
      Sean M. Whyte, Esq.



DH-0183a21v1

ATLANTA • BEIJING • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • FRANKFURT • HONG KONG • HOUSTON
IRVINE • LONDON • LOS ANGELES • MADRID • MILAN • MOSCOW • MUNICH • NEW DELHI • NEW YORK • PARIS • PITTSBURGH
SAN DIEGO • SAN FRANCISCO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

## BELL NUNNALLY & MARTIN LLP

ATTORNEYS & COUNSELORS

3232 MCKINNEY AVENUE
SUITE 1400
DALLAS, TX 75204-2429

TELEPHONE 214.740.1400
FACSIMILE 214.740.1499
BELLNUNNALLY.COM

WRITER'S DIRECT NUMBER:
(214) 740-1407

WRITER'S EMAIL ADDRESS:
nrshs@bellnunnally.com

April 18, 2008

**Via Hand Delivery**
Stephanie Clouston
Jones Day
2727 North Harwood Street
Dallas, Texas 75201-1515

> Re:   Civil   Action   No.   3:05-CV-0654-D;   *T-Netix,   Inc.   v.   Value-Added*
> *Communications, Inc. v. Securus Technologies, Inc.;* United States District
> Court, Northern District of Texas, Dallas Division.

Dear Stephanie:

Per your request earlier today, I am enclosing with this letter all of those documents
returned to Bell Nunnally & Martin LLP by Gruber Hurst Johansen & Hail related to the above-
referenced case, along with a letter from Eric Tautfest confirming the enclosed documents were
all documents Gruber Hurst Johansen & Hail received regarding the VAC case. Should you
have any questions, please do not hesitate to contact me.

Sincerely,

Neal J. Suit

NJS/reb
Enclosures
cc:   Nick Pittman
      Jeff Lowenstein
      Eric Tautfest (via e-mail)
      420577_1.DOC/56497.5



VAC
EXHIBIT 8
C.A. No. 3-05-654-D

APP. 003

**GRUBER I HURST I JOHANSEN I HAIL**

Eric S. Tautfest
Direct: 214.855.6873
etautfest@ghjhlaw.com

Gruber Hurst Johansen & Hail I LP
Attorneys I Counselors
1445 Ross Avenue I Suite 2500
Dallas Texas 75202
214.855.6800 main
214.855.6808 fax

April 16, 2008

*Via Hand Delivery*
Jeff Lowenstein Esq.
Bell Nunnally & Martin, L.L.P.
3232 McKinney Ave., Suite 1400
Dallas, Texas 75204-2429

Re:   *T-Netix, Inc., and Evercom Systems, Inc. v. Global Tel\*Link Corporation, et al;*
      *Civil Action No. 2-06cv-426-TJW*

Dear Jeff:

Pursuant to Judge Sanderson's order today from the bench, enclosed please find all documents in our possession that were received from your office regarding the VAC case.

1) Expert Report of Melvin R. Mercer regarding invalidity claims;
2) Rebuttal Expert Report of Joseph C. McAlexander regarding validity of claims;
3) Supplemental Expert Report of Melvin R. Mercer regarding invalidity claims;
4) Expert Report of Joseph C. McAlexander regarding infringement;
5) Rebuttal Expert Report of Melvin R. Mercer regarding non-infringement;
6) Preliminary Expert Report of Bruce L. Blacker regarding damages;
7) Expert Report of Sanford E. Warren, Jr. regarding attorneys fees;
8) T-Netix's Initial Disclosures;
9) T-Netix's Answers to Defendant VAC's First Set of Interrogatories to Plaintiff;
10) T-Netix's Answers to Defendant VAC's First Set of Requests for Documents and Things to Plaintiff;
11) T-Netix's Response to Defendant VAC's Second Set of Interrogatories to Plaintiff;
12) T-Netix's Response to Defendant VAC's Second Set of Requests for Production of Documents and Things to Plaintiff;
13) Securus' Response to Defendant VAC's First Set of Requests for Production of Documents and Things to Counter-Defendant;
14) T-Netix's Response to VAC's Third Set of Requests for Production of Documents and Things;
15) T-Netix's Supplemental Rule 26(a)(1) Initial Disclosures;
16) VAC's Initial Disclosure Statement;
17) VAC's Responses to Plaintiff's First Request for Production of Documents;

APP. 004

Jeff Lowenstein Esq.
April 16, 2008
Page 2

18)   VAC's Responses to Plaintiff T-Netix's First Set of Interrogatories;
19)   VAC's Answers and Objections to T-Netix's Second Set of Interrogatories;
20)   VAC's Supplemental Rule 26(a) Disclosures; and
21)   VAC's Second Supplemental Rule 26(a) Disclosures.

Please be advised that we have deleted the above documents from our database and have destroyed all working copies as well.

Sincerely,

Eric S. Tautfest

EST/dmp
Enclosures

APP. 005

**Ryan, Christina**

| | |
|---|---|
| **From:** | Anthony Magee [amagee@ghjnlaw.com] |
| **Sent:** | Wednesday, August 25, 2010 6:18 PM |
| **To:** | Ryan, Christina |
| **Cc:** | Shara Schafer |
| **Subject:** | RE: T-Netix v. Combined |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Red |

Christina:

As I stated over the telephone yesterday, as a result of your recent inquiry, we have discovered that a batch of privileged documents appear to have been inadvertently included on the hard drive that we sent you earlier this month. We are developing a preliminary privilege log identifying these documents, which I anticipate being able to send to you tomorrow. Once you received the log, please take immediate steps to delete the identified documents from your database. Also, please return the hard drive to me once you are done with it. I appreciate your cooperation.



Lastly, we have obtained some consents to produce confidential license agreements to you. I am having those documents processed for production and am hopeful of being able to send them to you tomorrow. We are still working diligently with some of the licensees to obtain their consents and will keep you informed of our progress.

Best regards.

Tony Magee
214-855-6819

**From:** Ryan, Christina [mailto:cryan@stites.com]
**Sent:** Tuesday, August 24, 2010 4:16 PM
**To:** Anthony Magee
**Subject:** RE: T-Netix v. Combined

Tony,
It was good speaking with you this morning. I spoke with one of our e-discovery paralegals and we can simply delete the privileged documents from the production on our system. This appears to be the most efficient way to address the issue as we have already uploaded the majority of the production. Please provide a privilege log with

8/31/2010



the relevant document numbers as soon as possible.

Best regards,

Christina

**Christina I. Ryan,** *Associate*
Direct: (502) 587-2087, Fax: (502) 779-6038
Email: cryan@stites.com

## STITES & HARBISON PLLC
ATTORNEYS

About Stites & Harbison | Bio | V-Card

400 W. Market St., Suite 1800 | Louisville, KY 40202

NOTICE: This message is intended only for the addressee and may contain information that is privileged, confidential and/or attorney work product. If you are not the intended recipient, do not read, copy, retain or disseminate this message or any attachment. If you have received this message in error, please call the sender immediately at (502) 587-3400 and delete all copies of the message and any attachment. Neither the transmission of this message or any attachment, nor any error in transmission or misdelivery shall constitute waiver of any applicable legal privilege.



8/31/2010

VAC App. 526

"Anthony Magee"

<amagee@ghjhlaw.c

om>

To

"Stephanie D Clouston"

<sdclouston@jonesday.com>

08/25/2010 11:02

cc

AM          "Shara Schafer"

<sschafer@ghjhlaw.com>

Subject

T-Netix Inc. v Combined Public

Communications & T-Netix v.

Pinnacle Public Services

3



VAC
EXHIBIT 10
C.A. No 3-05-654-D

Stephanie:

Thank you for taking the time to talk to me last night. I have attached a copy of the letter that my colleague sent to VAC's CEO earlier this month.

Please would you follow up with VAC and let me know as soon as you can what its position is with regard to our clients producing in the two cases identified above marked as "Confidential - Attorneys Eyes Only" the agreements identified in the letter. Also, please let me know whether VAC is agreeable to our client disclosing to these defendants VAC's invalidity contentions that were served in its litigation with our clients. I have not seen these contentions because of the prohibitions contained in the protective order, but I understand that they were designated as confidential under the protective order in place in that litigation.

I appreciate your assistance. Please call me if you have any questions.

Anthony J. Magee
Partner

Gruber|Hurst|Johansen|Hail
Fountain Place
1445 Ross Avenue, Suite 2500
Dallas, Texas 75202
Email: amagee@ghjhlaw.com
( 214.855.6819 (direct)
( 214.855.6808 (fax)

Gruber Hurst Johansen & Hail is a Limited Liability Partnership formed under the laws of the State of Texas. This message (and any attached
files) is intended only for the use of the addressee(s). This electronic transmission (and the documents accompanying it) may contain trade secrets, copyrighted materials, and confidential information belonging to the sender that is protected by the Electronic Communications Privacy Act, 18 U.S.C.
Sections 2510 and 2521 and may be legally privileged. If you are not the intended recipient, any dissemination, copying or distribution of this message or files attached with it is strictly prohibited. If you have received this communication in error, please notify Gruber Hurst Johansen & Hail immediately by telephone (214-855-6800) and destroy the original message.

(See attached file: Value Added Notice Ltr with Attachments.pdf)

==========

4

**GRUBER ┊ HURST ┊ JOHANSEN ┊ HAIL**

ANTHONY J. MAGEE
Direct Dial: 214.855.6819
Email: amagee@ghjhlaw.com

Gruber Hurst Johansen & Hail LLP
Attorneys ┊ Counselors
1445 Ross Avenue ┊ Suite 2500
Dallas, Texas 75202
214.855.6800 main
214.855.6808 fax

August 27, 2010

VIA CERTIFIED MAIL AND ELECTRONIC MAIL
Joel T. Beres, Esq.
Christina L. Ryan, Esq.
Stites & Harbison, PLLC
400 West Market Street, Suite 1800
Louisville, KY 40202-3352

Re:   *T-Netix, Inc. v. Combined Public Communications, Inc.*, Cause No:
      3:09CV-743-S, in the United States District Court for the Western District
      of Kentucky, Louisville Division

Dear Counsel:

Following my recent discussions with Christina Ryan regarding our inadvertent production of privileged documents in this litigation, I have enclosed a preliminary privilege log identifying the documents or pages of documents that we wish to snapback and require you to remove from your database. Please note that item 1 on the log is not being snapped back on the basis of attorney-client privilege or attorney work product. Rather, this is a document relating to invalidity contentions that is protected from disclosure by a protective order in prior litigation involving our client, but was inadvertently included in our document production. As indicated in previous discussions, we are willing to produce this document to you pursuant to a court order or with the consent of the party whose confidential information is referred to in the document, namely, Value Added Communication, Inc. ("VAC"). We are in discussions with VAC and will let you know its position as soon as we can.

Please confirm promptly that you have deleted all copies of the documents identified in the enclosed privilege log. If you would like us to provide replacement copies of any of the documents with respect to which only some pages have been snapped back, please let me know.

As I mentioned in prior correspondence, we have received consents from some of the patent licensees to produce to you copies of the confidential patent license agreements referred to in our client's discovery responses. I have enclosed a disk containing copies of those agreements, which have been designated as "Confidential – Attorneys Eyes Only." As we obtain additional consents, we will send you copies of the additional documents.



VAC
EXHIBIT 11
C.A. No. 3-05-654-D

**VAC App. 529**

**GRUBER | HURST | JOHANSEN | HAIL**

Joel T. Beres, Esq. and
Christina I. Ryan, Esq.
August 27, 2010
Page 2

Regarding the Omniphone subpoena duces tecum, Omniphone is working to produce the documents we have requested, but is not yet in a position to produce them. Therefore, the deposition that we noticed for August 31 will have to be deferred.

Please provide me with a prompt response to my August 25 email identifying, as you requested, the financial documents that we require from your client well before the Court-ordered settlement conference.

Very truly yours,

Anthony J. Magee

Enc.

Cc:     Thomas P. O'Brien (via electronic mail/ without disc)
        Joel Bill Campbell (via electronic mail/ without disc)

56300_1.DOC

EXHIBIT A-1                 Exhibit A to Magee Declaration                 APP. 11

**VAC App. 530**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| T-NETIX, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3-09cv-743-S |
| | § | |
| COMBINED PUBLIC | § | |
| COMMUNICATIONS, INC. | § | |
| | § | |
| Defendant. | § | Jury Trial Requested |
| | § | |

### PLAINTIFF'S PRELIMINARY PRIVILEGE LOG

Pursuant to FED. R. CIV. P. 26, Plaintiff T-Netix, Inc. hereby submits its Preliminary Privilege Log attached as Exhibit "A" hereto.

Dated: August 27, 2010          Respectfully submitted,

G. Michael Gruber
Texas State Bar No. 08555400
**Anthony J. Magee**
Texas State Bar No. 00786081
**Michael J. Lang**
Texas State Bar No. 24036944

**GRUBER HURST JOHANSEN HAIL, LLP**
1445 Ross Ave., Suite 2500
Dallas, Texas 75202
Telephone:    214.855.6800
Facsimile:    214.855.6808

*– and –*

EXHIBIT A-1                    Exhibit A to Magee Declaration                    APP. 12

**VAC App. 531**

Thomas P. O'Brien, III
tobrien@fbtlaw.com
Cory J. Skolnick
cskolnick@fbtlaw.com

FROST BROWN TODD LLC
400 West Market Street, 32nd Floor
Louisville, KY 40202-3363
Telephone: (502) 568-5400
Facsimile: (502) 582-1087

**ATTORNEYS FOR PLAINTIFF T-NETIX, INC.**

EXHIBIT A-1            Exhibit A to Magee Declaration            APP. 13

**VAC App. 532**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record are being served with a copy of this document via electronic mail and Certified Mail, Return Receipt Requested, in accordance with the Federal Rules of Civil Procedure, on this 27th day of August, 2010.

Joel T. Beres
jberes@stites.com
Christina I. Ryan
cryan@stites.com
Lindsey Yeakel Capps
lcapps@stites.com
STITES & HARBISON, PLLC
400 West Market Street, Suite 1800
Louisville, KY 40202-3352
Telephone: (502) 587-3400
Facsimile: (502) 587-6391

Joe Bill Campbell
Campbell Law Office
Suite 105, 1011 Lehman Avenue
Bowling Green, Kentucky 42103
Telephone: (270) 782-8228
Facsimile: (270) 782 8229
campbelljoebill@bellsouth.net

Anthony J. Magee

EXHIBIT "A"

| Privilege Log No. | Bates Numbers | Date | Privileged Document Type | Author(s) | Addressee(s) | Privilege Claim |
|---|---|---|---|---|---|---|
| 1. | ST200646-200760 | 07/02/07 | Rebuttal Expert Report | Joseph McAlexander | | Confidential document covered by Protective Order |
| 2. | ST227524-227533 | December 2003 | PowerPoint – Litigation Strategies | Jennifer Gaines, Gen. Counsel | Evercom Board of Directors | Attorney Client and Work Product |
| 3. | ST227732-227741 | December 2003 | PowerPoint – Litigation Strategies | Jennifer Gaines, Gen. Counsel | Evercom Board of Directors | Attorney Client and Work Product |
| 4. | ST 229991-229998 | December 2003 | PowerPoint– Litigation Strategies | Jennifer Gaines, Gen. Counsel | Evercom Board of Directors | Attorney Client and Work Product |
| 5. | ST301219-235 | 12/15/02 | Email re ProjectSNAP with draft PowerPoint seeking legal advice | Tim Murphy | Dick Falcone, Sandra Skogen (Legal Counsel), John Viola, Bob Mudd | Attorney Client Communication |
| 6. | ST301242-247 | 12/16/02 | Email re ProjectSNAP | Tim Murphy | Dick Falcone, Sandra Skogen, John Viola, Bob Mudd | Attorney Client Communication |
| 7. | ST307141-143 | 10/26/07 | Report regarding litigation | M. Polozola, representative of T-Netix & Evercom | Gruber Hurst Johansen & Hail LLP | Attorney Client and Work Product |
| 8. | ST373526-529 | Undated | Settlement Due Diligence Request List (previous Global litigation) | McKool Smith | | Attorney Client and Work Product |

| | | | | | |
|---|---|---|---|---|---|
| 9. | ST373982 | 05/06/03 | Email regarding GOTU patent | David Hayes of Fenwick & West | Theodore Stevenson, III, Douglas Cawley, Rick Cree, Wayne Johnson, Michael Blum | Attorney Client and Work Product |
| 10. | ST373997 | 12/06/02 | Letter enclosing documents and advice regarding patent prosecution. | Thomas L. Ewing of Fenwick & West | Rick Cree of T-Netix, Inc. | Attorney Client and Work Product |
| 11. | ST374008-374010 | 11/15/02 | Letter regarding status of application | Thomas L. Ewing of Fenwick & West | Rick Cree of T-Netix, Inc. | Attorney Client and Work Product |
| 12. | ST374023-374024 | 07/18/02 | Letter enclosing documents and advice regarding patent rights. | Thomas L. Ewing of Fenwick & West | Rick Cree of T-Netix, Inc. | Attorney Client and Work Product |
| 13. | ST374054-374055 | 06/26/02 | Email re patent application | Michael Blum of Fenwick & West | Rick Cree, David Hayes, Doug Cawley | Attorney Client Communication |
| 14. | ST374070-374071 | 03/05/02 | Letter regarding status of applications | Thomas L. Ewing of Fenwick & West | Rick Cree of T-Netix, Inc. | Attorney Client and Work Product |
| 15. | ST374168-374169 | 03/13/01 | Letter enclosing documents and advice regarding patent prosecution. | Michael R. Blum of Fenwick & West | Rick Cree of T-Netix, Inc. | Attorney Client and Work Product |

PLAINTIFF'S PRELIMINARY PRIVILEGE LOG
56296_1.DOC

EXHIBIT A-1          Exhibit A to Magee Declaration          APP. 16

**VAC App. 535**



**BELLNUNNALLY**
ATTORNEYS & COUNSELORS

JEFFREY S. LEVINGSTEIN
TEL: 214.740.1410
FAX: 214.740.5710
JEFFL@BELLNUNNALLY.COM

October 3, 2012

**VIA FACSIMILE & EMAIL**

Stephanie D. Clouston, Esq.
Alston + Bird, LLP
2828 North Harwood Street, 18th Floor
Dallas, Texas 75201-2139



Re:   Cause No. 3-05-654-D; *T-NETIX, Inc. v. Value-Added Communications, Inc. v. Securus Technologies, Inc.;* In the United States District Court, Northern District of Texas (the "Northern District of Texas Litigation")

Ms. Clouston,

Bell Nunnally & Martin, LLP represents T-NETIX, Inc. ("T-NETIX"), Securus Technologies, Inc. ("Securus"), Richard A. Smith ("Smith"), and Dennis J. Reinhold ("Reinhold") (collectively, the "Securus Parties"). We along with Gruber Hurst Johansen Hail Shank LLP ("Gruber") recently learned, through documents filed with the Court in the Northern District of Texas and communications with current counsel for Value-Added Communications, Inc. ("VAC") that counsel for VAC believes you are in possession of a document, specifically the McAlexander Rebuttal Report, that is subject to the March 3, 2006 Protective Order entered in the Northern District of Texas Litigation (the "Protective Order"). Because Combined's prior counsel committed to destroy all copies of the McAlexander Rebuttal Report and because you, as VAC's former counsel, and Combined's current counsel, are prohibited from retaining the document, demand is hereby made that you *immediately* destroy all copies of the McAlexander Rebuttal Report.

We understand that prior counsel for Combined Public Communications, Inc. ("Combined") received a copy of the McAlexander Rebuttal Report as part of a grouping of inadvertently produced privileged documents as part of a document production in the litigation pending between Combined and T-NETIX in cause no. 3:09-cv-00743-CRS-DW, in the United States District Court for the Western District of Kentucky (Bowling Green Division) (the "Combined Litigation") in approximately August 2010. Shortly after the inadvertent production of the document, counsel for T-NETIX in the Combined Litigation clawed back the McAlexander Rebuttal Report. In fact, Stites & Harbison, PLLC, then counsel for Combined, agreed to destroy all digital copies of a grouping of privileged documents, which included the McAlexander Rebuttal Report, and to return the hard drive containing the original set of produced documents. Joel Beres, a partner at Stites & Harbison, who was the attorney-in-charge



APP. 008

 **BELLNUNNALLY**
ATTORNEYS & COUNSELORS

STEPHANIE CLOUSION
OCTOBER 3, 2012
PAGE 2

for Combined in the Combined Litigation in August 2010 has confirmed that the inadvertently produced documents were deleted from counsel's electronic database. The original hard drive containing the production was returned to Gruber by Stites & Harbison on October 4, 2010, several weeks before you made your appearance as counsel of record for Combined in the Combined Litigation.

As stated above, we are surprised to learn from current counsel for VAC that you possess a copy of the McAlexander Rebuttal Report. VAC's counsel has alleged it is concerned that Combined, a competitor of VAC, would have access to the allegedly confidential information contained in the McAlexander Rebuttal Report. As you are aware of, and subject to, the Protective Order, and as a result of your continuing obligations to VAC, as its prior counsel in the Northern District of Texas Litigation, there is no justification for your failure to immediately purge the McAlexander Rebuttal Report from your files. If VAC's counsel is incorrect and you are no longer in possession of the McAlexander Rebuttal Report, please so confirm. Additionally, please conduct an additional review of the production and file in the Combined Litigation and confirm that the report, including all hard copies, electronic copies, and any related metadata, has in fact been completely purged.

In the event you are currently in possession of the McAlexander Rebuttal Report, and to assist us in ensuring full compliance with the Protective Order, within ten (10) days from the date of this letter please: (1) provide written confirmation to us that all hard copies of the McAlexander Rebuttal Report have been destroyed, (2) provide written confirmation to us that that all electronic copies of the McAlexander Rebuttal Report, including all related metadata, have been deleted from your electronic files, (3) provide written confirmation to us that the McAlexander Rebuttal Report has not been disclosed to Combined or any other person or party, and (4) provide an explanation, in writing, regarding how and when you obtained the copy of the McAlexander Rebuttal Report in your possession. If you have disclosed the McAlexander Rebuttal Report to anyone outside the Protective Order, please provide contact information for that person so we can follow-up with those third parties to ensure they have destroyed any copies of the report provided by you or Combined's former counsel.

If you fail to promptly and completely respond to this letter, Securus will consider its legal remedies related to this matter. We appreciate your prompt attention to this matter.

Sincerely,

Jeffrey S. Lowenstein                    Anthony J. Magee

JSL/acs
1069088_1.DOCX/56975

# ALSTON&BIRD LLP

2828 N. Harwood Street
Suite 1800
Dallas, TX 75201-2139

214-922-3400
Fax: 214-922-3853
www.alston.com

Stephanie D. Clouston      Direct Dial: 214-922-3403      Email: stephanie.clouston@alston.com

October 19, 2012

## VIA FACSIMILE AND CERTIFIED MAIL,
## RETURN RECEIPT REQUESTED

Jeffrey S. Lowenstein, Esq.          Anthony J. Magee, Esq.
Bell Nunnally & Martin LLP        Gruber Hurst Johansen Hail Shank LLP
3232 McKinney Avenue           1445 Ross Avenue
Suite 1400                        Suite 2500
Dallas, Texas 75204            Dallas, Texas 75202
Facsimile – 214-740-5710        Facsimile – 214-855-6808

> Re:     Cause No. 3-05-654-D; *T-NETIX, Inc. v. Value-Added
> *Communications, Inc. v. Securus Technologies, Inc.*; In the
> United States District Court, Northern District of Texas
> ("Northern District of Texas Litigation")

Dear Mr. Lowenstein and Mr. Magee:

As you know, I was prior counsel for Value-Added Communications, Inc. in the Northern District of Texas Litigation and currently represent Combined Public Communications, Inc. ("CPC") in a trio of lawsuits originated by the Securus Parties, all of which are pending in the Western District of Kentucky: (1) *Evercom Systems, Inc. v. Combined Public Communications, Inc. v. Securus Technologies, Inc.*, No. 1:09-cv-90 (Bowling Green Division); (2) *T-NETIX, Inc. v. Combined Public Communications, Inc. v. Securus Technologies, Inc., Evercom Systems, Inc., and Lattice Incorporated*, No. 3:09-cv-743 (Louisville Division); and (3) *Securus Technologies, Inc. v. Combined Public Communications, Inc.*, No. 3:12-cv-191 (Louisville Division).

I am in receipt of your joint letter dated October 3, 2012 related to the Securus Parties' and Gruber's production of materials in violation of the March 3, 2006 Protective Order entered in the Northern District of Texas Litigation ("Protective Order"). Your letter specifically refers to the Securus Parties' and Gruber's production in federal litigation of the McAlexander Rebuttal Report, which is subject to the Protective Order and was central to a prior contempt proceeding before now retired Magistrate Judge Sanderson. According to your letter, the McAlexander Rebuttal Report was produced in "cause no. 3:09-cv-00743-CRS-DW, in the United States District Court for the Western District of Kentucky (Bowling Green Division)." We are unaware of a case with that style pending in Bowling Green.

Atlanta • Brussels • Charlotte • Dallas • Los Angeles • New York • Research Triangle • Silicon Valley • Ventura County • Washington, D.C.



**VAC App. 538**

Jeffrey S. Lowenstein, Esq.
Anthony J. Magee, Esq.
October 19, 2012
Page 2


As stated above, we are aware of a case pending in Bowling Green against CPC
(Cause No. 1:09-cv-90) and two other cases pending in Louisville against CPC (Cause
Nos. 3:09-cv-743 and 3:12-cv-191). Since your letter is unclear as to which case you are
actually referring, I will address your request as to all three.

With regard to the Cause No. 1:09-cv-90 (Bowling Green), I do not believe that a
copy of the McAlexander Rebuttal Report has ever been a part of discovery in this case
and I never received a copy of the McAlexander Rebuttal Report produced in the
Bowling Green case.

With regard to the Cause No. 3:09-cv-743 (Louisville), I did discover a copy of
the McAlexander Rebuttal Report included in the discovery materials that I inherited
when I took over representation of CPC. I recognized the document as subject to the
Protective Order. As a result, the document was segregated and purged from our
electronic database and all copies were destroyed. In addition, I do not have any hard
copies of the McAlexander Rebuttal Report in my possession. Further, I never
disseminated the document to anyone at CPC or produced it to CPC or to anyone else.

With regard to the Cause No. 3:12-cv-191 (Louisville), I never received any copy
of the McAlexander Rebuttal Report in this case.

To the extent that Securus has produced additional copies of the McAlexander
Rebuttal Report or any other materials subject to the Protective Order in any of the
lawsuits originated by the Securus Parties against CPC, please identify those materials
and I will likewise comply with my professional obligations.

Finally, I am shocked that you would find it appropriate to threaten "legal
remedies related to this matter" if I "fail to promptly and completely respond to this
letter." As I understand it, this is your first correspondence to me related to this issue.
Furthermore, you are asking me for information about a document that neither Gruber nor
the Securus Parties should have ever had in its possession, but which you nonetheless
produced in other litigation in which I am involved. Prior to receipt of your threatening
letter, I had already taken affirmative steps to remedy your improper production. I have
always sought to fulfill my ethical obligations and will continue to do so now.

Sincerely,

Stephanie D. Clouston

cc:    Donna Mangold, Esq.
       Cooter, Mangold, Deckelbaum & Karas, L.L.P.
       5301 Wisconsin Avenue N.W.
       Suite 500 Washington, DC 20015
       Fax: 202-364-3664

**GRUBER | HURST | JOHANSEN | HAIL | SHANK**

Anthony J. Magee
Direct Dial: 214-855-6819
amagee@ghjhlaw.com

Attorneys | Counselors
A Limited Liability Partnership
1445 Ross Avenue | Suite 2500
Dallas Texas 75202-2711
214.855.6800 main
214.855.6808 fax .

November 9, 2012

**VIA ELECTRONIC MAIL AND U.S. MAIL**

Dale A. Cooter, Esq.
Cooter, Mangold, Deckelbaum & Karas, LLP
5301 Wisconsin Avenue, NW
Suite 500
Washington, DC 20015

Re:    T-Netix, Inc. v. Value-Added Communications, Inc., Case No. 3-05-654-D,
        U.S. District Court, Northern District of Texas

Dear Mr. Cooter:

        I am following up to reiterate in writing the proposal I made during our telephone conference earlier this week. In an effort to alleviate your client's continuing concern about the risk of possible further disclosure of the McAlexander Rebuttal Expert Report (the "Report"), my firm would agree to allow an independent outside expert to inspect our firm's computer servers, at our firm's cost, in order to ensure that any and all electronic copies of the Report are permanently erased from our firm's computer servers. We propose that the inspection be performed by one of the partners of the Dallas metroplex-based data forensics consultancy firm of G-C Partners, LLC, either David Cowen or Raphael Gorgal. I have attached copies of the resumes of Mr. Cowen and Mr. Gorgal. Please let me know promptly if you have any objection to this proposed course of action.

        I appreciate your cooperation.

                        Very truly yours,

                        Anthony J. Magee

Enc.

Cc:    (via electronic mail)
        Kenneth P. Kula
        Steven N. Williams
        Jeffrey S. Lowenstein



VAC's
EXHIBIT 14
C.A. No. 3-05-654-D

# David Cowen, CISSP

## Experience

**G-C PARTNERS, PARTNER**

**FIOS, SR. CONSULANT**

**S3 PARTNERS, SR. SECURITY SPECIALIST**

**VIGILAR INC., SR. SECURITY SPECIALIST, DALLAS TX**

**ENSTAR LLC, SECURITY SERVICES MANAGER, Dallas TX**

**SOUTH TEXAS INTERNET, Partner, Brownsville, TX**

**TRIDENT DATA SYSTEMS, Network Security Engineer, San Antonio, TX & Colorado Springs, CO**

## Computer Security
- Co author Hacking Exposed: Computer Forensics
- Co author Anti Hacker Toolkit, 3rd edition
- Expert in Unix security, Windows Security, web security and network security penetration studies
- Extensive security experience in the following systems: Windows NT (3.51 and 4.0), Windows 2000, Windows 95/98, Novell (3.1&4.11) Unix (Irix, SunOs, OpenBSD, FreeBSD, Linux, HP/UX, AIX, Solaris, Osf1, Sco, sco mvs+, etc...), MPE/XL, VAX/VMS, Primos, Picos, various older os's
- Experience setting up all major firewalls, VPN and router products including: multiple platforms of Cyberguard, Raptor, Firewall-1, TIS Toolkit, ipfwadmin, gauntlet, Cisco, Bay(Nortel), 3com, and Ascend, ipfilter, Altiga
- Extensive experience with all aspects of TCP/IP.
- Experience in installing and configuring secure VoIP
- Experience in Computer Forensics, Product Experience with: EnCase Professional, TCT, and other forensic tools
- Expert Witness

## Telecommunications Security
- Expert in Telecommunications Security
- Extensive security experience with the following PBX systems including; AT&T Definity G (All models), Samsung Prostar DCS, Meridian, Rolm-CBX, intertel, comdial, executech various older models
- Also security experience with large switching systems including: AT&T 1aESS, 5ESS, Northern Telecom DMS series, GTE GTD5, Ericsson Axe 10
- Extensive experience with microwave wireless networking and security, including: DSSS vs FH, multiple licensing schemes, and Point to Point and Multipoint configurations
- Experience with microwave wireless systems: breezecom, waveaccess, wavespan and proxim models
- Design and management of a multi point-to-point international microwave network for ies.net

## Programming
- Experience with pascal, perl, sh (various shells within), c, c++, java , tcl/tk, visual c, visual basic, and relational query languages: SQL, Quel
- Experience with relational database systems: Oracle, MS SQL, Access

## Education
University of Texas at Dallas - B.S. Computer Science

## Certifications and Training

CISSP Certified Information Systems Security Professional

CCSE Checkpoint Certified Security Engineer

TSSA TekSweep Security Administrator

HTCIA Spring Training Conference

PROXIM – Rangelan2

Wavespan & Waveaccess

Black Hat Security Conference – Las Vegas, NV, July 2000

CCNA – Training

## Speaking Engagements

-US Air Force Information Protection Conference - Paterson AFB, Denver, CO
-USAA National Conference - USAA Headquarters, San Antonio, TX -Presentation of the Distributed Password Management Protocol
-InfraGard - FBI field office, Dallas, TX -Demonstrated Live Network Penetration to various federal & state law enforcement agencies and security executives representing US critical infrastructure companies
-ITEC Computer Showcase – Convention Center, Dallas, TX – Demonstrated a Network Penetration, Target Acquisition & User Profiling
- ITEC Computer Showcase – Convention Center, Dallas, TX - June – Panelist member for a network security discussion with various vendors.
- Enstar Security Symposium, San Antonio – Presenter – Demonstrated Live Network Penetration.
- Region One Technology Conference, South Padre Island – Presenter – Discussed Network Security In the Academic Environment
- HTCIA Dallas Chapter – Speaker – Discussed methodology used in previous computer forensic cases
- HTCIA Southwest Conference 2001  Presented course on IDS to Law Enforcement and Private Sector computer investigators
- HTCIA Southwest Conference 2002  Presented course on Unix forensics to Law Enforcement and Private Sector computer investigators
- Assest Recovery & Due Diligence Conference 2003 - Speaker
- Texas State Bar - Panelist Email Discovery conference
- HTCIA Southwest Confrence 2004 - Presented course on Encase scripting language Enscript

## RAFAEL GORGAL

Mr. Gorgal is a Partner, with the firm of G-C Partners LLC, an information security consultancy, and the three term past President of the Southwest Chapter, High Technology Crime Investigations Association.

Mr. Gorgal has extensive experience in analyzing digital evidence and has conducted numerous forensic investigations, developed methodologies for use by incident response teams, and managed teams of forensic consultants. He has also developed computer forensic curriculums currently being taught to both private sector and law enforcement investigators.

He has consulted extensively in the area of information systems security, specifically dealing with network vulnerability assessments, computer forensics, high technology crime investigation, and cyber terrorism. Mr. Gorgal's work experience includes consultant to the Office of the Secretary of Defense regarding development and implementation of information systems security protection programs and initiatives concerning open-source intelligence. He helped pioneer several innovative private sector open-source intelligence initiatives currently utilized by the national security and emergency response communities. Mr. Gorgal has taught Information Security at Southern Methodist University and the University of California at Los Angeles, as part of their e-Commerce curriculum and the National Technological University, in their Advanced Engineering curriculum.

He is a frequent speaker at security community seminars and industry conferences. He has written numerous articles on information warfare and security management, which have appeared in web and print publications. He is also a contributing author to the best selling book, "Hacking Exposed – Computer Forensics, Secrets and Solutions", published by McGraw Hill in 2004.

As a recognized expert in data security, Mr. Gorgal has spoken extensively at industry conferences, including:

- InfowarCon
- Escalation of the Terrorist Threat, Issues in Nuclear, Chemical/Biological and Cyber Terrorism
- High Technology Crime Investigations Association, Annual Conference
- Computer Associates, Regional Security Symposiums
- Certified Fraud Examiners, Annual Conference
- The Dawn of a New Millennia, High Technology Crime at the Turn of the Century

## Anthony Magee

| | |
|---|---|
| **From:** | Kenneth Kula <kkula@mcdolewilliams.com> |
| **Sent:** | Friday, November 16, 2012 11:18 AM |
| **To:** | Shara Schafer |
| **Cc:** | Anthony Magee; Donna Mangold (dmangold@cootermangold.com); Dale A. Cooter (dcooter@cootermangold.com) |
| **Subject:** | RE: T-Netix/Value-Added Communications |

Anthony,

I am writing to supplement my response below. We are asking that neither you, your firm, nor anyone at its direction purge the McAlexander Rebuttal Report that is at issue in this matter from your firm's computer system. Such a deletion, removal, or purge may affect the history of the document, including when and from where it came and to whom it went, as well as the metadata associated with the document. We ask this with the understanding that your firm will not further disseminate the document either within the firm, to your client, or to any third party. It is our belief that the safer course of conduct is to keep the document and all the information associated with it essentially in "lock down" on your firm's computer system until after this matter is resolved.

Please acknowledge receipt of this e-mail.

Thanks.

Ken.

**From:** Kenneth Kula
**Sent:** Thursday, November 15, 2012 1:49 PM
**To:** 'Shara Schafer'
**Cc:** amagee@ghjhlaw.com
**Subject:** RE: T-Netix/Value-Added Communications

Anthony,

I am writing in response to your November 9 correspondence to Dale Cooter. Contrary to your suggestion, it is not my client's place to object to your firm allowing "an independent outside expert to inspect [your] firm's computer servers, at [your] firm's cost, in order to ensure that any and all electronic copies of the Report are permanently erased from [your] firm's computer servers." Those measures, however, do not obviate the fact that all of the copies of the Report were not previously destroyed or returned as Ordered by the Court, nor do such measures have any effect on the pending matters before the Court.

Thank you.

Ken.

**From:** Shara Schafer [mailto:sschafer@ghjhlaw.com]
**Sent:** Friday, November 09, 2012 3:20 PM
**To:** dcooter@cootermangold.com; Anthony Magee
**Cc:** Kenneth Kula; Steve Williams; jeffl@bellnunnally.com; Shara Schafer
**Subject:** T-Netix/Value-Added Communications

Dear Counsel,



1

Please see the attached correspondence in connection with the above matter. Same will be forwarded to you via regular mail.

If you have any questions please contact Anthony Magee.

Thank you,
Shara C. Schafer
Legal Secretary to Anthony J. Magee,
Jonathan R. Childers and Robert E. Weitzel

**GRUBER | HURST | JOHANSEN | HAIL | SHANK**
1445 Ross Avenue | Suite 2500
Dallas, Texas 75202-2711
214.855.6874 Voice
214.855.6808 Fax
Email: sschafer@ghjhlaw.com

Gruber Hurst Johansen Hail Shank is a Limited Liability Partnership formed under the laws of the State of Texas. This message (and any attached files) is intended only for the use of the addressee(s). This electronic transmission (and the documents accompanying it) may contain trade secrets, copyrighted materials, and confidential information belonging to the sender that is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510 and 2521 and may be legally privileged. If you are not the intended recipient, any dissemination, copying or distribution of this message or files attached with it is strictly prohibited. If you have received this communication in error, please notify Gruber Hurst Johansen Hail Shank LLP immediately by telephone (214-855-8800) and destroy the original message.

EXHIBIT A-3                    Exhibit C to Magee Declaration                    APP. 36

**VAC App. 545**

*TO BE FILED UNDER SEAL*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| T-NETIX, INC. | § | |
| | § | |
|     **Plaintiff/Counter-Defendant,** | § | |
| | § | |
| v. | § | |
| | § | |
| VALUE-ADDED COMMUNICATIONS, | § | Case No. 3:05-CV-0654-D |
| INC. | § | |
|     **Defendant/Counter-Plaintiff** | § | |
| v. | § | |
| SECURUS TECHNOLOGIES, INC. | § | |
| | § | |
|     **Counter-Defendant** | § | |
| | § | |

---

## DECLARATION OF ANTHONY J. MAGEE

---

    I, Anthony J. Magee, make the following declaration pursuant to 28 U.S.C. § 1746:

    1. "My name is Anthony Magee. I am over twenty-one years of age. I have never been convicted of a felony. I am a resident of Dallas County, Texas. I am fully competent to make this declaration. I am a currently in the law firm of Gruber Hurst Johansen Hail Shank LLP, formerly known as Gruber Hurst Johansen & Hail, LLP ("Gruber Hurst"). Except where otherwise stated, I have personal knowledge of the facts stated herein, which are all true and correct to the best of my knowledge and belief.

    2. I joined Gruber Hurst on September 2, 2008. My responsibilities at Gruber Hurst have included managing the firm's intellectual property litigation, which has

VAC
EXHIBIT 16
C.A. No. 3-05-654-D

EXHIBIT A

APP. 2

included managing several patent infringement suits on behalf of T-Netix, Inc. and Securus Technologies, Inc. ("Securus").

3.   I am aware that before I joined the firm, Gruber Hurst represented T-Netix, Inc. in patent litigation brought by T-Netix, Inc. against Global Tel*Link in *T-Netix, Inc. et al v. Global Tel-Link Corporation*, No. 2:06-CV-00425-TJW, in the U.S. District Court for the Eastern District of Texas, Marshall District (the "Global Litigation"). The Global Litigation had been settled and disposed of before I joined Gruber Hurst and I did not work on the Global Litigation and was not aware of the details of the litigation. Eric Tautfest had left Gruber Hurst before I joined the firm.

4.   After I joined Gruber Hurst, Securus filed the patent infringement actions referred to in paragraph 20 of VAC's Brief in support of Application to Show Cause filed under seal in this action ("VAC"s Brief") as the Combined Litigation and the Pinnacle Litigation. My responsibilities included managing the day-to-activities on these two actions.

5.   In August 2010, Gruber Hurst made simultaneous document productions in the Combined Litigation and the Pinnacle Litigation and produced, in large measure, the same documents in each case. I learned that the patents-in-suit in the Combined Litigation and the Pinnacle Litigation overlapped with the patents-in-suit in the Global Litigation and determined that we should produce in the Combined Litigation and the Pinnacle Litigation the documents that had been previously produced in the Global Litigation. I was not directed to do this by either Richard A. Smith, CEO of Securus, or Dennis Reinhold, General Counsel of Securus.

**DECLARATION OF ANTHONY J. MAGEE – Page 2**
#83003v1

EXHIBIT A                                                                      APP. 3

**VAC App. 547**

6.  By August 2010, Lisa Miller, one of the firm's paralegals who had previously worked on the Global Litigation, had long since left the firm. I was being assisted in the Combined Litigation and Pinnacle Litigation by our paralegal, Josh Ellis, who had joined the firm in July 2010. At this time in August 2010, I was not aware of any of the facts and events set forth in paragraphs 1-20 of VAC's Brief, and had not seen the Protective Order referred to in paragraph 4 of VAC's Brief or the transcript of the April 16, 2008 hearing referred to in paragraph 13 of VAC's Brief.

7.  In preparation for the document productions in the Combined Litigation and the Pinnacle Litigation, I instructed Josh Ellis to try to locate the documents that had been previously produced in the Global Litigation. He was unable to locate them in our office or on our computer system. I instructed him to contact our outside document vendor, Equivalent Data, who I understood had assisted in the preparation of document productions in the Global Litigation, to ascertain whether they had retained copies of the documents. Equivalent Data discovered that it had retained an archive of documents that had been produced in the Global Litigation, which it restored at my instruction. When the restoration was complete, however, Equivalent Data discovered that the archive did not contain the vast majority of the documents I was looking for.

8.  On August 4, 2010, Equivalent Data conducted a GoToMeeting with Josh Ellis, which would enable them to connect to Josh's computer and search our Summation databases and server for the Volume IDs of the documents that we were looking for. During that meeting, instead of finding just the Volume IDs, Equivalent Data was actually able to locate the images of the documents that had previously been produced in the Global Litigation. This included the ST000001-400731 Bates range of documents.

DECLARATION OF ANTHONY J. MAGEE – Page 3
#83003v1

9.  At my instruction, Josh Ellis arranged for the document images and load files to be downloaded to hard drives, which were then produced to opposing counsel in the Combined Litigation and the Pinnacle Litigation on August 6, 2010. Unknown to any of us at that time, the ST000001-400731 Bates range of documents included the McAlexander Rebuttal Report.

10.  Shortly after August 6, 2010, then counsel for CPC, Christina Ryan, of Stites and Harbison, PLLC, informed me that her paralegal was loading the documents that we had produced and suspected, from some of the coding that was included with the documents, that we may have inadvertently produced some privileged documents. I investigated the matter and concluded that she was right. She and I agreed that I would send her a privilege log identifying any documents that we needed to claw-back and that she would have them deleted from her firm's computer system.

11.  In the course of investigating and identifying the privileged documents that had been inadvertently produced, I learned that the McAlexander Rebuttal Report had also been produced. I discovered that this document had been identified as privileged on a privilege log prepared in the Global Litigation, but as it appeared to be an expert report, I did not understand why it was privileged. I discussed the matter with Michael Lang, an associate with Gruber Hurst who had worked on the Global Litigation, who informed me that the McAlexander Rebuttal Report was not privileged but that it was subject to the Protective Order in this case and should be clawed back from Combined and Pinnacle.

12.  I prepared a privilege log, which included McAlexander Rebuttal Report, and sent it to counsel for Combined and Pinnacle enclosed with a letter dated August 27, 2010. A copy of my letter is attached as Exhibit "A." I instructed counsel to destroy the

documents identified on the privilege log and to return the hard drives to me. Counsel for Pinnacle confirmed by email that they had done this and returned the hard drive to us. A copy of the email from Pinnacle's counsel is attached as Exhibit "B." I cannot find written confirmation from Combined's counsel, Stites & Harbison, that they destroyed the clawed-back documents, but they did return the hard drive, as requested. Moreover, based on my communications with Christina Ryan, I have no doubt that Combined's counsel did comply with my claw-back request in 2010. Furthermore, I have spoken with Combined's former counsel, Joel Beres, who was lead attorney for Combined in August 2010, who has confirmed that his firm did, indeed, comply with my claw-back request.

13.  For the reasons stated in this declaration, I believe that Gruber Hurst's retention of an electronic copy of the McAlexander Rebuttal Report and its subsequent production in the Global Litigation were inadvertent. In addition, I believe that the McAlexander Rebuttal Report was effectively clawed back from counsel for Combined and Pinnacle in the Combined Litigation and the Pinnacle Litigation and that no copies of the document should have remained in their possession. Furthermore, the documents that were produced in the Combined Litigation and the Pinnacle Litigation were produced subject to protective orders entered in those actions which prohibited counsel for Pinnacle and Combined from disclosing confidential documents, including the McAlexander Rebuttal Report, to their respective clients.

14.  In about November 2010, Combined disengaged with its then counsel, Stites & Harbison, and replaced them with Stephanie Clouston, then of the Jones Day law firm, who, I understand, previously represented VAC in this action.

15.   VAC has suggested in its filings that Combined's current counsel, Ms. Clouston, has a copy of the McAlexander Rebuttal Report and that VAC is concerned that Combined is using the information contained in the report to VAC's competitive disadvantage. If Ms. Clouston gave a copy of the McAlexander Rebuttal Report to Combined, she did in violation of both the protective order entered in the Combined Litigation and the protective order entered in this case. As former counsel for VAC in this action, Ms. Clouston would have been well aware of the terms of the protective order in this case and the significance of the McAlexander Rebuttal Report. I did not give a copy of the McAlexander Rebuttal Report to Ms. Clouston. If Ms. Clouston got that document from Combined's former counsel, then she must have obtained it as a result of their failure to comply with my claw-back demand and their express agreement to destroy the document.

16.   On September 7, 2012, I requested and voluntarily attended a meeting with counsel for VAC together with Jeff Lowenstein of Bell Nunnally. My purpose in initiating and attending the meeting was to explain to VAC's counsel the circumstances surrounding Gruber Hurst's production of the McAlexander Rebuttal Report in the Combined Litigation and the Pinnacle Litigation, that it was inadvertent, and Gruber Hurst's "claw-back" of the documents, and to cooperate with VAC to ensure that any concern it had that the McAlexander Rebuttal Report was being misused or causing damage to VAC was allayed. I asked counsel for VAC whether they wanted me to take steps in the Combined Litigation to compel Ms. Clouston's compliance with the Protective Order in this case and the protective order entered in the Combined Litigation.

DECLARATION OF ANTHONY J. MAGEE – Page 6
#83003v1

EXHIBIT A                                                                              APP. 7

Counsel for VAC assured me that they did not want me to do that, stating that they would "handle" Ms. Clouston.

17.  During that September 7 meeting, counsel for VAC explicitly accepted my explanation that the production of the McAlexander Rebuttal Report in August 2010 in the Combined Litigation and the Pinnacle Litigation had been inadvertent. Furthermore, counsel for the Securus Parties and I volunteered our assistance in the future to: (1) again confirm that any information that was inadvertently produced in August 2010 was clawed back in 2010, and (2) facilitate the return and/or destruction of any copies of the McAlexander Rebuttal Report that were not returned or destroyed in 2010. Other than that, VAC's did not ask me to take any additional steps to avert any possible damage to VAC arising from the inadvertent production of the McAlexander Rebuttal Report. In fact, VAC's counsel was unable to confirm that the McAlexander Rebuttal Report was actually in Combined's possession.

18.  Gruber Hurst remains willing to cooperate with VAC to ensure compliance with the Protective Order. Moreover, based on my discussion with VAC's counsel and the facts stated above, it does not appear that the inadvertent production of the McAlexander Rebuttal Report in August 2010 has caused VAC to suffer any damage.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct."

Executed this _28th_ day of September, 2012.

_Anthony Magee_
Anthony J. Magee

---

DECLARATION OF ANTHONY J. MAGEE – Page 7
#83003v1

EXHIBIT A                                                    APP. 8

**VAC App. 552**



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| **T-NETIX, INC.** | ) |
| | ) |
| *Plaintiff/Counter-Defendant* | ) |
| | ) |
| v. | ) |
| | ) |
| **VALUE-ADDED COMMUNICATIONS,** | ) |
| **INC.** | )     **Case No. 3-05-654-D** |
| | ) |
| *Defendant/Counter-Plaintiff* | ) |
| v. | ) |
| | ) |
| **SECURUS TECHNOLOGIES, INC.** | ) |
| | ) |
| *Counter-Defendant* | ) |
| _____ | ) |

## DECLARATION OF DONNA S. MANGOLD

I, Donna S. Mangold, declare and state under the laws of perjury of the District of Columbia, as follows:

1.  I am over the age of 18 and am competent to testify to the matters contained herein based upon my personal knowledge. This Declaration is submitted in support of *Value-Added Communications, Inc's Objections to the United States Magistrate's March 28, 2013 Findings, Conclusions and Recommendations.*

2.  I am an attorney licensed to practice in the District of Columbia and the State of Maryland. I am a partner with the law firm of Cooter, Mangold, Deckelbaum & Karas, LLP., counsel for Defendant/Counter-Plaintiff Value-Added Communications, Inc. ("VAC") and admitted pro hac vice in this action.

3.  VAC App. 001 - 031 is a true and correct copy of the March 28, 2013 Findings,

Conclusions, and Recommendations.

4. VAC App. 032 - 407 is a true and correct copy of the February 25, 2013 Transcript of the Show Cause Hearing.

5. VAC App. 408 - 423 is a true and correct copy of the March 3, 2006 Agreed Protective Order.

6. VAC App. 424 - 498 is a true and correct copy of the April 16, 2008 Transcript, from the Motions Hearing before the Honorable William Sanderson.

7. VAC App. 499 - 510 is a true and correct copy of the April 21, 2008 Report and Recommendation of the United States Magistrate Judge.

8. VAC App. 511 - 517 is a true and correct copy of the December 14, 2012 Stephanie Clouston Declaration.

9. VAC App. 518 - 519 is a true and correct copy of the April 16, 2008 Letter from Eric Tautfest to Jeff Lowenstein.

10. VAC App. 520 is a true and correct copy of the April 17, 2008 Letter from Jeffrey Lowenstein to Stephanie Clouston.

11. VAC App. 521 is a true and correct copy of the April 18, 2008 Letter from Stephanie Clouston to Jeffrey Lowenstein.

12. VAC App. 522 - 524 is a true and correct copy of the April 18, 2008 Letter from Neil Suite to Stephanie Clouston attaching 4/16/08 letter from Tautfest to Lowenstein.

13. VAC App. 525 - 526 is a true and correct copy of the August 25, 2010 Email from Anthony Magee to Christina Ryan.

14. VAC App. 527 - 528 is a true and correct copy of the August 25, 2010 Email from Anthony Magee to Stephanie Clouston.

**VAC App. 555**

15.   VAC App. 529 - 535 is a true and correct copy of the August 27, 2010 Letter from Anthony Magee to Joel Beres.

16.   VAC App. 536 - 537 is a true and correct copy of the October 3, 2012 Letter from Jeffrey Lowenstein to Stephanie Clouston.

17.   VAC App. 538 - 539 is a true and correct copy of the October 19, 2012 Letter from Stephanie Clouston to Jeffrey Lowenstein and Anthony Magee.

18.   VAC App. 540 - 543 is a true and correct copy of the November 9, 2012 Letter from Anthony Magee to Dale Cooter.

19.   VAC App. 544 - 545 is a true and correct copy of the November 16, 2012 Email from Kenneth Kula to Anthony Magee.

20.   VAC App. 546 - 552 is a true and correct copy of the September 28, 2012 Declaration of Anthony J. Magee.

21.   VAC App. 553 is a true and correct copy of the Demonstrative exhibit (prepared by David Cowen) describing copying of drive.


I swear under the penalties of perjury that the facts set forth above are true and correct and made from my personal knowledge.

Executed under the penalties of perjury of the District of Columbia on the 11th day of April, 2013.

_____
Donna S. Mangold

**VAC App. 556**